Dennis F. Dunne
Evan R. Fleck
MILBANK LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219

Gregory Bray
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile: (213) 629-5063

*Proposed Counsel for Debtors and*
*Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x
                                                               :
In re:                                                         :    Chapter 11
                                                               :
AVANCA HOLDINGS S.A., *et al.*,[1]                             :    Case No. 20-11133 (MG)
                                                               :
                              Debtors.                         :    (Joint Administration Requested)
                                                               :
---------------------------------------------------------------x

**DEBTORS' MOTION FOR AN ORDER PURSUANT TO SECTIONS 363(B), 507,**
**AND 105(A) OF THE BANKRUPTCY CODE (I) AUTHORIZING, BUT NOT**
**DIRECTING, THE DEBTORS TO (A) PAY PREPETITION WAGES,**
**COMPENSATION AND EMPLOYEE BENEFITS AND (B) CONTINUE PAYMENT**
**OF WAGES, COMPENSATION, EMPLOYEE BENEFITS AND RELATED**
**ADMINISTRATIVE OBLIGATIONS IN THE ORDINARY COURSE OF**
**BUSINESS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE**

---

[1]    The Debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaraguense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

**BANKS AND FINANCIAL INSTITUTIONS TO PROCESS AND PAY ALL
CHECKS PRESENTED FOR PAYMENT AND TO HONOR
ALL FUNDS TRANSFER REQUESTS MADE BY THE DEBTORS**

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

Avianca Holdings S.A. and its affiliated debtors in the above-captioned chapter 11 cases,
as debtors and debtors-in-possession (collectively, the "Debtors"), respectfully represent as
follows in support of this motion (the "Motion"):[2]

**RELIEF REQUESTED**

1.      By this Motion, the Debtors seek entry of interim and final orders, substantially in
the forms annexed hereto as **Exhibit A** and **Exhibit B** (respectively, the "Interim Order" and "Final
Order"), pursuant to sections 105(a), 363(b), and 507 of title 11 of the United States Code, 11
U.S.C. §§ 101, et seq (as amended, the "Bankruptcy Code") and Rules 6003 and 6004 of the
Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), (i) authorizing, but
not directing, the Debtors to (a) pay certain prepetition wages, compensation, and employee
benefits; and (b) continue payment of wages and compensation and honoring employee benefit
programs in the ordinary course of business and to pay related costs and expenses; and (ii)
authorizing and directing applicable banks and other financial institutions to process and pay all
checks presented for payment and to honor all funds transfer requests made by the Debtors relating
to the foregoing.

2.      The Debtors are in the unfortunate position of having to file these Chapter 11 Cases
in the middle of the COVID-19 global pandemic. As explained in the First Day Declaration,
COVID-19 has caused a complete cessation in the Debtors' passenger transport business (though

---

[2]     Capitalized terms used but not defined herein shall have the meanings ascribed to them in the First Day
Declaration (as defined below).

the Debtors' cargo transport business and certain ancillary operations remain in full operation).

Like many other airlines amidst these difficult times, a large percentage of the Debtors' employees

(more than 40%) are currently on voluntary unpaid leave or have had their labor agreements

suspended (collectively, the "Furloughed Employees"), though certain of the Furloughed

Employees may receive continued employee benefits and a modest stipend.

3.      The Debtors believe that this situation is temporary. Although there remains

considerable uncertainty as to when various national and local governments will lift travel

restrictions, the Debtors hope to be in a position to return as many of their Furloughed Employees

to work as possible. Based on information currently available, the Debtors hope that some of their

Furloughed Employees will be able to return to work in early weeks and months of the Chapter 11

Cases, subject to governmental authorities lifting travel restrictions.  In the short term, the Debtors

have retained certain employees (the "Retained Employees") to maintain the Debtors' limited

business operations during this global crisis.  Many of the employees that have been retained have

agreed to month-to-month voluntary wage reductions. These reductions do not constitute

modifications of their employment agreements.

4.      Because the Debtors are hopeful that they will be in a position to return the

Furloughed Employees to work once they full re-operationalize, the relief sought by this Motion

is with respect to both the Furloughed and Retained Employees (collectively, the "Employees").

The Debtors reserve the right to seek additional and/or supplemental relief for Furloughed

Employees.  The Debtors believe that the skills and experience of their Employees, as well as their

relationships with customers and vendors and institutional knowledge, are essential to the Debtors'

ability to effectively operate their business. In order to maintain morale and ensure that the

Furloughed Employees return to work for the Debtors after the furlough period and that Retained

Employees continue in their jobs, and the Debtors request authority to pay and honor certain prepetition claims and obligations to all of their Employees, including the wages due under their employment agreements.

5.      Absent the relief requested by this Motion, the Debtors' Employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable them to meet their own personal financial obligations.  Moreover, based on the role played by employee issues in other airline bankruptcies, the Debtors believe that, without the requested relief, the stability of their business operations will be undermined, perhaps irreparably, by the possibility that otherwise loyal Employees will seek other employment alternatives.  For many months prior to the Petition Date, given the financial condition and pressures faced by the Debtors, the Debtors' Employees have been working in an environment of uncertainty about their future.  The commencement of these Chapter 11 Cases only heightens employee anxiety, and the requested relief is critical to stabilizing these concerns.  The Employees' skills and knowledge of the Debtors' operations are essential to the continued operation of the Debtors' business.  Without the Employees' continued services, an effective reorganization of the Debtors will not be possible.

6.      In light of the foregoing, the Debtors request the authority to pay various amounts as described herein (including on account of wages, benefits, sick time, vacation time and other paid time off, and severance) payable to, or otherwise earned in the ordinary course of business by, the Debtors' Employees and Retired Employees (each, as defined herein).  With respect to certain benefits representing prepetition accruals, the Debtors reserve the right to allow Employees to use such benefits only in the ordinary course of business and not to cash out any such prepetition benefits upon termination of employment or otherwise.  The Debtors further reserve the right to

limit the amount paid to Employees on account of such benefits.  The relief requested in this Motion is without prejudice to the Debtors' right to seek to discontinue or modify any compensation and/or benefit programs during these chapter 11 cases (the "Chapter 11 Cases").

## JURISDICTION

7.      This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157 and 1334.

8.      This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

9.      Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The bases for the relief requested herein are sections 105(a), 363(b), and 507 of the Bankruptcy Code and Bankruptcy Rules 6003 and 6004.

## STATUS OF THE CASE

11.     On the date hereof (the "Petition Date"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

12.     Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

13.     No creditors' committee has yet been appointed in these cases.  No trustee or examiner has been appointed.

14.     The Debtors have filed a motion requesting joint administration of the Chapter 11 Cases pursuant to Bankruptcy Rule 1015(b).

## BACKGROUND

15.     Avianca is the second-largest airline group in Latin America and the most important carrier in the Republic of Colombia and in the Republic of El Salvador.  It is the largest airline in the Republic of Colombia (the third largest Latin American economy), a code-share partner of United Airlines, and a member of the Star Alliance which, with 26 members, is the world's largest

global airline alliance.  Established in 1919, Avianca has a 100-year legacy as a leading provider of air travel and cargo services in the Latin American market and around the globe.  Avianca is well respected throughout Latin America and maintains significant customer brand equity and market share in the regions it services.

16.   The Debtors operate an extensive network of routes from their primary hubs in Bogotá and San Salvador (in addition to other focus markets) and offer passenger services on more than 5,350 weekly flights to more than 76 destinations in 27 countries.  With approximately 18,900 employees and approximately $3.9 billion in annual revenues, the Debtors play a key role in the Latin American airline market.

17.   Despite an effective debt reprofiling executed in the second half of 2019, a significant improvement in Avianca's liquidity position in early 2020, and the successful 2019 launch of the "Avianca 2021" transformation plan , the Debtors have been compelled to file these Chapter 11 Cases for one principal reason: the COVID-19 pandemic, which has affected the world's population and economies in ways that have never been experienced.  The reduction in travel as a result of the virus, and the measures undertaken to combat the virus, including restrictions commercial flights and on travel, have had and will continue to have an adverse impact on the Debtors.  As a result of the ongoing pandemic and its consequences, the Debtors are facing significantly reduced revenues from ticket sales and ancillary revenues, government prohibitions globally on international flights, substantial ongoing contractual obligations to their lessors, lenders and other creditors, and a near complete standstill of the global economy—all with significant continued impact and limited visibility as to the potential market recovery.

18.   On March 20, 2020, the Republic of Colombia, consistent with what numerous other governments around the world have done, announced that it would close its airspace to

address the spread of COVID-19. As a result of the restrictions imposed by the Colombian government, as well as similar measures in various other of the Debtors' primary markets, on March 24, 2020 the Debtors announced that they were suspending all scheduled passenger flights from March 25, 2020 until at least the end of April 2020; this situation has now been extended and is ongoing, and no date has been established for restart of flights.

19.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the commencement of these Chapter 11 Cases is set forth in the *Declaration of Adrian Neuhauser in Support of Chapter 11 Petitions and First Day Motions* (the "First Day Declaration"), which is being filed contemporaneously herewith and is incorporated by reference herein.

## BACKGROUND RELEVANT TO MOTION

20.    The Debtors employ in the aggregate approximately 18,900 Employees, all of whom receive wages, compensation, and/or other employment-related benefits from the Debtors.[3] In addition, approximately 375 of the Debtors' retired pilots and pilot's widows who had a minimum of 20 years of service with the Debtors (the "Retired Employees") currently receive employment-related benefits from the Debtors.  To minimize the personal hardship the Employees and Retired Employees will suffer—especially in light of the turmoil caused by the COVID-19 crisis—if the Debtors' employment-related obligations are not paid when due, and to maintain the Employees' morale at this critical time, the Debtors, by this Motion, seek authority (but not direction) to (i) pay certain prepetition claims for, among other items, wages, salaries, incentives,

---

[3]    Of this total headcount, more than 18,000 employees are employed directly by Debtor entities; the remaining 288, all pilots, are employed by three "employer companies," which are not themselves Debtor entities but take direction from and receive all of their funding from Debtor entities.  With respect to such "employer companies," the authority sought in this Motion is to authorize the relevant Debtor entities to fund and/or take all actions necessary to ensure that payroll payments are made and benefits maintained by the corresponding "employer company."

commissions and other compensation, vacation and other paid leave, withholding and payroll taxes, obligations under employee benefit plans and certain other benefits that the Debtors pay in the ordinary course of business (all obligations to the Employees and Retired Employees described herein, collectively, the "Employee Obligations"); and (ii) continue to pay and honor Employee Obligations as they arise in the ordinary course of the Debtors' business. The Debtors expect that approximately $15.3 million of Employee Obligations will come due in the first 30 days of these Chapter 11 Cases.

## A.    Unpaid Compensation

### i.    *Employees*

21.    The Debtors' Employees serve in a variety of roles, including pilots, mechanics, customer service agents, reservation agents, management and clerical, and others. Approximately 58% of Employees are located in Colombia, 15% in El Salvador, 6% in Costa Rica, 5% in Ecuador, and 16% elsewhere, including approximately 324 Employees in the United States of which 8 are in New York. The remaining Employees in the United States are in New Jersey, Massachusetts, Florida, Texas, California, Illinois, and Washington, D.C.

22.    In the ordinary course of business, prior to the shutdown caused by the COVID-19 pandemic, the Debtors made payroll payments, in most cases by direct deposit bank transfer to Employee accounts, at intervals and on dates and/or days that vary by jurisdiction, as set forth below:

| REGION | COUNTRY | FREQUENCY OF PAYMENT | PAYMENT DAY |
|---|---|---|---|
| **North America** | United States | Every two weeks | Friday |
| | Puerto Rico | Every two weeks | Friday |
| | Canada | Every fifteen days | 15 and 30 |
| **Central America** | Costa Rica (Hourly) | Every fifteen days | 15 and 30 |
| | Costa Rica (Salaried) | Monthly | 25 |
| | Mexico | Every fifteen days | 14 and 29 |

| | | | |
|---|---|---|---|
| | Panama | Every fifteen days | 15 and 30 |
| | Dominican Republic | Every fifteen days | 15 and 30 |
| | Aruba | Monthly | 24 |
| | Curaçao | Monthly | 24 |
| | El Salvador | Monthly | 25 |
| | Guatemala | Monthly | 21 |
| | Honduras | Monthly | 21 |
| | Nicaragua | Monthly | 15 |
| **Europe** | Germany | Monthly | 24 |
| | Spain | Monthly | 24 |
| | United Kingdom | Monthly | 24 |
| **South America** | Argentina | Monthly | 21 |
| | Bolivia | Monthly | 26 |
| | Brazil | Monthly | 3 |
| | Chile | Monthly | 21 |
| | Colombia | Monthly | 21 |
| | Ecuador | Monthly | 30 |
| | Paraguay | Monthly | 25 |
| | Perú | Monthly | 25 |
| | Uruguay | Monthly | 5 |

23.     The Debtors' average gross monthly payroll, prior to COVID-19, was approximately $46.6 million, which amount includes approximately $6.7 million in monthly payroll tax obligations. The Debtors estimate that approximately $29.8 million in prepetition wages, salaries and other non-incentive compensation (collectively, the "Unpaid Compensation") may remain unpaid by relevant Debtors and "employer companies" as of the Petition Date because (a) the Debtors' chapter 11 petitions were filed during one or more of the Debtors' regular salary payroll periods; (b) some direct deposit transfers (or, in rare instances, payroll checks) made or issued to Employees prior to the Petition Date may not have cleared the banking system (or been presented for payment) as of the Petition Date; and/or (c) Employees have not yet been paid all their salaries and wages for services previously performed on behalf of the Debtors.

24.     The Debtors seek authority to pay the Unpaid Compensation in the ordinary course of business.  Paying the Unpaid Compensation is justified by the Employees' critical importance

to the Debtors' business operations and the need to avoid any negative effect on Employee morale should such payment not be made.

25.     The Debtors believe that all of the Employees would have a priority claim of less than $13,650, pursuant to section 507(a)(4) of the Bankruptcy Code, with respect to all of their earned but unpaid prepetition compensation.  Accordingly, such amounts would ultimately have to be paid to the Employees in full prior to the payment of general unsecured claims under any plan of reorganization.

### ii.    *Independent Contractors*

26.     The Debtors also have a contract with a personnel vendor in Colombia pursuant to which the Debtors have hired individuals to serve, among other roles, as copilots in training and coordinators, analysts, and project assistants for special projects within the company (the "Independent Contractors").  The Debtors pay the personnel vendor with whom they contract and this vendor, in turn, pays the Independent Contractors.  If such personnel vendor and, by extension, the Independent Contractors are not paid prepetition amounts, they will suffer—especially in light of the turmoil caused by the COVID-19 crisis—undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable them to meet their own financial obligations.  Further, if the Independent Contractors are not paid, they will likely no longer continue to be available to the Debtors, which could put the Debtors at serious risk given the vital role such Independent Contractors play in the Debtors' daily operations.

27.     Accordingly, by this Motion, the Debtors also request authority (but not direction) to pay any outstanding prepetition amounts owed to the Independent Contractors, which the Debtors estimate to be approximately $1.0 million, and continue performance under the contracts with the personnel vendor.  Nothing herein, however, shall be deemed to be a request to assume such contracts.

### iii.     *Director Compensation*

28.     The Debtors maintain several boards of directors, which include a total of approximately eleven non-Employee individuals (each, a "Director"). Directors are also entitled to fees for serving of the Debtors' boards as well as expense reimbursements for reasonable out-of-pocket expenses in connection with travel related to their Director duties (the "Director Compensation").

29.     The Debtors do not believe they presently owe any prepetition amounts on account of the Director Compensation. As such, the Debtors seek, pursuant to the Final Order only, authority to pay any prepetition amounts, solely out of an abundance of caution, and to continue to pay the Director Compensation on a postpetition basis in the ordinary course of business and consistent with past practices.

## B.     **Non-Insider Incentive Plans**

30.     In the ordinary course of business, certain of the Debtors maintain incentive plans for different categories of non-insider Employees (collectively, the "Incentive Plans").   The Debtors seek the authority to continue the Incentive Plans at their reasonable discretion and consistent with their prepetition practices in order to retain valuable Employees and preserve employee morale as the Debtors seek to implement a successful reorganization.

31.     Generally, the Debtors utilize goal-driven compensation incentive programs for their Employees that utilize financial and operating metrics.  The Debtors also have employee incentives for the achievement of monthly "on time performance" goals.  The Debtors believe that the Incentive Plans contribute to the Debtors' success by rewarding the accomplishment of pre-defined financial and operating goals with variable compensation.  Although the Incentive Plans are designed to reward outstanding operations, financial performance and customer service, safety is the Debtors' priority.  Therefore, the Incentive Plans also take into account whether there are

11

any accidents.   The details of each Incentive Plan vary based on their aims and intended participants.

32.    The Incentive Plans include annual incentive plans, long-term incentive plans (including stock incentive plans), sales commission arrangements, and other incentive programs. The Incentive Plans provide for bonuses that are paid at different intervals and on different dates depending on jurisdiction and the relevant Debtor, and can range from 10% to 50% of an Employee's annual fixed salary. Typically, 50% to 100% of the bonus amount is based on corporate performance, and, where not determined based entirely on corporate performance, the remaining percentage is based on the achievement of individual goals, as determined for managers in each department.  Importantly, many of the Debtors' direct competitors offer comparable types of incentive compensation plans.  Such incentive plans are also common in numerous non-airline industries with which the Debtors compete for talented employees.  Continuation of the Incentive Plans is critical to the Debtors' ability to remain a competitive employer and to avoid a potential loss of Employees.

33.    With respect to Incentive Plan periods prior to the Petition Date, the Debtors estimate the gross obligations payable in connection with the Incentive Plans (the "Incentive Plan Obligations") to be approximately $3.8 million.  As it relates to postpetition Incentive Plan periods, given the massive financial and operational dislocations caused by the COVID-19 crisis, it is very difficult for the Debtors to estimate accurately such Incentive Plan Obligations.  The Debtors seek to continue the Incentive Plans in the ordinary course of the Debtors' business (to the extent any amounts are due thereunder), and to pay all prepetition amounts due and owing under the Incentive Plans.

C.      **Non-Insider Retention Plan**

34.      The Debtors also maintain a retention plan with respect to approximately 34 of its non-insider Employees (the "Retention Plan").  The total award amounts for Employees under the Retention Plan range from 30% to 50% of the covered Employees' salaries, with cash payments made quarterly to applicable Employees who remain in good standing.  Participants whose employment is terminated voluntarily or for cause before payment of any amounts (i.e., before the end of a quarter) are not eligible to receive any further retention awards under the Retention Plan. The Debtors estimate the approximately $1.25 million in prepetition obligations remain outstanding under the Retention Plan.  The Debtors seek the authority to continue the Retention Plan at their reasonable discretion and consistent with their prepetition practices in order to retain valuable Employees and preserve employee morale as the Debtors seek to implement a successful reorganization.

D.      **Vacation and Sick Days**

35.      All Employees are eligible for paid vacation.  In some cases, eligibility for paid vacation requires completion of a probationary or a minimum period of active service in the employment of the Debtors, as specified by the applicable collective bargaining agreements, individual agreements, or company policy.  Accrual of vacation days is based on years of service and Employees accrue a specified number of vacation days or fraction of days for each month of active service.  Employees in the United States may carry over a maximum of 20 unused vacation days (160 hours) from one year to the next, subject to certain limitations.  In certain circumstances, depending on the country in which they are located, non-U.S. Employees may also carry over unused vacation days.

36.      Employees located in Colombia and Ecuador may cash out vacation time, depending on the cash-out policy in effect at the relevant Debtor at the time of cash-out (with such

cash-out policies being restricted from time to time). Employees in the United States may only cash out vacation time if it is required by applicable state law. In many cases, unused accrued vacation payments will be made to Employees upon separation from the Debtors to the extent required by the applicable collective bargaining agreement and/or applicable state or foreign law. Employees in El Salvador may only receive compensation on account of unused vacation days accrued in their last year of employment upon separation from the Debtors, while Employees in the United States will only receive compensation on account of unused accrued vacation time upon separation from the Debtors if it is required by applicable state law.

37.     Taking into account (i) the vacation time earned but unused as of the Petition Date, and (ii) the amounts that would be earned relating to postpetition services, the Debtors estimate that, going forward, they may owe approximately $13.5 million to Employees on account of vacation time (the "Vacation Obligations").

38.     In addition, under the applicable collective bargaining agreements or company policies, Employees are entitled to paid sick leave (the "Sick Leave Obligations"). In most instances, the payment of Sick Leave Obligations is required by the applicable laws of the jurisdictions in which Employees are located. Sick leave benefits are earned at various rates based on hours worked per month and may be carried forward from year to year, subject to the local labor laws and economic protections afforded employees in the various jurisdictions in which the Debtors operate. In the United States, the Debtors provide a maximum of six (6) days' sick leave for full-time Employees, with Employees becoming eligible to receive these sick leave days after a 90-day probation period.[4] Employees are not paid for accrued sick leave when they separate from the company. Non-U.S. Employees do not have a specific number of allotted sick leave days.

---

[4]     Full-time Employees in San Francisco are entitled to receive a total of nine (9) paid sick leave days.

Instead, sick leave days are granted depending on medical certifications stating that the relevant employee is required to be absent for a specified period of time, as dictated by the Employee's condition.

39.     In addition to vacation and sick leave, Employees are paid for holidays; non-U.S. Employees are paid in accordance with the applicable collective bargaining agreement and local labor laws in each applicable country, while U.S. Employees are paid for thirteen (13) holidays per year (collectively, the "Holiday Obligations," and, together with the Vacation Obligations and Sick Leave Obligations, the "Leave Obligations").  Employees are only paid for unused holidays when they separate from the company if applicable U.S. state law requires such payment (*e.g.*, California and Illinois).

40.     The Debtors request that, to the extent applicable, they be authorized to honor the Leave Obligations accrued in respect of prepetition periods.  However, the Debtors reserve the right to allow Employees to use accrued Leave Obligations only in the ordinary course of business and to prohibit Employees from cashing out any prepetition accrued Leave Obligation benefits. The Debtors further reserve the right to limit the amount paid to Employees on account of the Leave Obligations.  The Debtors also request that, in the event an Employee uses, or is paid cash on account of, his or her Leave Obligations from and after the Petition Date, such vacation days, sick days, or holidays shall first be applied against vacation days, sick days, and holidays accruing postpetition and thereafter to vacation days, sick days, and holidays accruing prepetition.

E.     **Workers' Compensation Programs and Benefits**

41.     The Debtors provide workers' compensation benefits to all Employees, both in the United States and internationally ("Workers' Compensation Obligations").  These benefits are currently administered by the respective insurers (the "Workers' Compensation Plans") covering the countries in which Employees are located.  Failure to maintain these benefits could result in

the institution of administrative or legal proceedings and material fines against the Debtors and their officers and directors.  As of the Petition Date, there were approximately twenty-three (23) workers' compensation claims pending against the Debtors.

42.     The Debtors seek authority to continue paying all undisputed amounts on account of the Workers' Compensation Obligations that arose prior to the Petition Date, including, without limitation, any payments for workers' compensation claims, fees owed for administrative costs, and other amounts required in connection with the Debtors' workers' compensation programs, as such amounts become due in the ordinary course of the Debtors' business. The Debtors will continue contesting in good faith, as appropriate in the Debtors' business judgment, the disputed amounts on account of the Workers' Compensation Obligations.

## F.     Employee Health and Medical Benefits

43.     The Debtors have various plans and policies pursuant to which Employees are provided with medical, dental, vision, disability, life insurance, retirement savings and other benefits (collectively, the "Employee Benefits" and amounts owed on account thereof, the "Employee Benefit Obligations").   The Debtors seek the authority, but not the direction, to (i) satisfy Employee Benefit Obligations relating to prepetition periods; and (ii) continue providing Employee Benefits going forward.

44.     The table below summarizes the approximate monthly/annual cost of each of the Employee Benefit Obligations as well as the Debtors' estimate of the unpaid prepetition obligations associated with each.

| Employee Benefit | Approx. Monthly/Annual Cost | Approx. Amount Outstanding Prepetition |
|---|---|---|
| Social Security Health | $1.3 million/month | $1.8 million |
| Colombia Health | $4 million/year | $402,249 |

| Non-Colombia Health | $5.3 million/year | $733,318 |
|---|---|---|
| Additional Health | $2.2 million/year | $67,460 |
| Retired Employee | $45,333/month | $58,697 |
| Life Insurance | TBD | $0 |
| Disability Insurance | TBD | $0 |
| Retirement Saving | $1.4 million/month | $0 |
| Foreign Pension | $38.7 million/year | $3.3 million |
| Social Security Pension | $21.7 million/year | $442,945 |
| Compensation Fund | $655,000/month | $994,407 |
| **Total:** | | $7.8 million |

## **Health Care Coverage**

45.     The Debtors provide primary health care coverage for their Employees, including coverage for medical and (for certain Employees) dental expenses. The Employee Benefits may be divided into three tiers, as follows:

### *Tier I – Social Security Health*

46.     Outside of the United States, the Debtors are required to contribute a percentage of each Employee's salary to fund the Employee's basic health coverage in accordance with local law.  In Colombia, for example, the Debtors contribute 8.5% of an Employee's salary (if the salary is more than 10 times the minimum monthly legal wage), while the Employee is responsible for making a 4% contribution. This 12.5% contribution allows Employees to affiliate themselves with one of a number of health promotion agencies, known as Entidades Promotoras de Salud ("EPSs"), of their choice, and to thereby access basic health coverage.  This affiliation is mandated by applicable Colombian law.

47. The sum of the contributions made by the Debtors for EPS affiliations amounts, on an aggregate basis, to a monthly expense of approximately $1.3 million.

### *Tier II – Other Benefits: Medical Agreements with Prepaid Medical Services and Health Insurers*

48. The Debtors have established various health care plans designed to provide the best coverage to their Employees and supplement the basic coverage provided by the EPSs, while at the same time minimizing the high cost of providing healthcare. The Debtors offer a variety of medical programs to their Employees.

49. *Colombia Health Benefits Providers.* In Colombia, Employees can affiliate themselves with health benefits plans through various insurers for themselves and their families:

| **Eligible Employees** | **Type of Benefits** | **Prepaid Health Care Provider** |
|---|---|---|
| Colombia | Medical | Suramericana |
| | | Colsanitas |
| | | Colmedica |
| | | Coomeva |
| | | Emermedica |
| | | Medisanitas |
| | | EMI |
| | | Allianz |

50. Several of the benefits providers listed above (each, a "Colombia Health Benefits Provider") are preferred provider organizations under which enhanced benefits are available when using a doctor, dentist, or other healthcare provider who is within the network of preferred providers. The Debtors are required to pay a monthly premium in exchange for the benefits provided to Employees who subscribe to the Colombia Health Benefits Provider.

51. Such premiums for Colombia Health Benefits Provider coverage are funded by Employee contributions withheld from Employee paychecks. Additionally, based on an Employee's performance, such person may be eligible for prepaid health care aid, which is funded

through supplemental payments to the Employee's payroll.  In the ordinary course of business, each Colombia Health Benefits Provider premium may vary as the number of Employees enrolled in the Colombia Health Benefits Provider plans changes and as the Colombia Health Benefits Provider administrators change their prices.

52.    To participate in plans with the Colombia Health Benefits Providers, the Debtors are required to pay an aggregate annual premium of approximately $4 million, but this amount is mostly recovered from the Employees through their paychecks.  All premiums to the Colombia Health Benefits Providers are paid in advance on a monthly basis.  Because the obligations to their Colombia Health Benefits Providers are current, the Debtors estimate that, as of the Petition Date, they owe approximately $402,249 on account of Colombia Health Benefits Provider premiums.

53.    ***Non-Colombia Health Benefits Providers.***  Outside of Colombia, the Debtors have also negotiated various health care plans designed to provide the best coverage to their Employees while at the same time minimizing the high cost of providing healthcare.  Employees can affiliate to the following health benefits plans through various insurers for themselves and their families:

| **Eligible Employees** | **Type of Benefits** | **Benefits Provider** |
| --- | --- | --- |
| U.S. Employees | Medical | Aetna Life Insurance |
| | Dental | |
| | Vision | |
| El Salvador | Medical | Pan American Life Insurance SAL |
| Costa Rica | Medical | Pan American Life Insurance de Costa Rica |
| Mexico | Medical | MetLife Mexico |

| Ecuador | Medical | Mediecuador Humana S.A. |

54.     Several of the benefits providers listed above (each, a "<u>Non-Colombia Health Benefits Provider</u>") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider who is within the network of preferred providers.  The Debtors are required to pay a monthly premium in exchange for the benefits provided to Employees who subscribe to the Non-Colombia Health Benefits Providers.

55.     For such Non-Colombia Employee Health Benefits Provider coverage, the Debtors fund 30% of the premium, and the remaining cost (70%) is withheld from the Employee's paycheck.  In the ordinary course of business, each Non-Colombia Health Benefits Provider premium may vary as the number of Employees enrolled in the Non-Colombia Health Benefits Provider plans changes and as the Non-Colombia Health Benefits Provider administrators change their prices.

56.     To participate in plans with the Non-Colombia Health Benefits Providers, the Debtors are required to pay an aggregate annual premium of approximately $5.4 million.  All premiums to Non-Colombia Health Benefits Providers are paid in advance on a monthly basis. Because the obligations to their Non-Colombia Health Benefits Providers are current, the Debtors estimate that, as of the Petition Date, they owe approximately $733,318 on account of Non-Colombia Health Benefits Provider Premiums.

### *Tier III – Additional Medical Benefits Borne by the Debtors*

57.     Additionally, the Debtors provide other health care coverage for some of their higher-level Employees and some Retired Employees, including coverage for medical and dental expenses.  The Debtors have established various health care plans designed to provide the best coverage for this subset of the Debtors' Employees.

58.    ***Additional Health Benefits Providers***.    The Debtors administer the following health benefits plans through various insurers to the designated eligible Employees and their families:

| <u>Eligible Employees</u> | <u>Type of Benefits</u> | <u>Benefits Provider</u> |
|---|---|---|
| Vice Presidents | Medical | At Employee's choice |
| Colombia (Pilots) | Medical and Supply of Medicine | Sura |

59.    Several of the benefits providers listed above (each, an "<u>Additional Health Benefits Provider</u>") are preferred provider organizations under which improved benefits are available when using a doctor, dentist, or other healthcare provider who is within the network of preferred providers.  Under most contracts between the Debtors and the Additional Health Benefits Providers, the Debtors are required to pay an annual premium in exchange for the benefits provided to Employees who subscribe to the Additional Health Benefits Provider.  Such premiums for Additional Health Benefits Provider coverage are entirely funded by the Debtors.

60.    To participate in plans with the Additional Health Benefits Providers, the Debtors are required to pay an aggregate annual premium of approximately $2.2 million.  All premiums to Additional Health Benefits Providers are paid in advance on a monthly basis.  Because the obligations to their Additional Health Benefits Providers are current, the Debtors estimate that, as of the Petition Date, they owe approximately $67,460 on account of Additional Health Benefits Provider premiums.

61.    ***Retired Employee Medical Benefits***.    The Debtors also maintain medical plans for approximately 297 Retired Employees, which are made available as a mandatory union benefit for pilots that were employed by the Debtors for twenty (20) years or more.  The benefits provided to the Retired Employees cost the Debtors approximately $45,333 on a monthly basis.

## G.    Life and Disability Insurance

62.    The Debtors provide basic life insurance in varying amounts to their Employees. The entire cost of such insurance is borne by the Debtors.  The Debtors pay premiums for this coverage monthly in arrears.  The premiums for such insurance vary, based upon the Debtors' accident rate for the preceding year.  The Debtors estimate that, as of the Petition Date, they owed no amounts to insurance companies for basic life insurance for the prior month.  In Colombia, the Debtors maintain an additional life insurance plan in which Employees may elect to participate. Approximately 3% of the Employees in Colombia have elected this coverage for themselves and/or for their dependents.  The Debtors estimate that, as of the Petition Date, there are no outstanding amounts representing contributions for additional life insurance coverage withheld from Employees' wages prior to the Petition Date pending transfer to the insurance carriers.

63.    The Debtors also maintain long-term and short-term disability insurance plans for certain U.S. Employees.  A portion of the long-term disability benefits is funded by the Debtors, which is included in the premiums for the life insurance policies.  The Debtors estimate that, as of the Petition Date, they do not hold any prepetition amounts withheld in respect of Employee disability insurance contributions.

## H.    Retirement Savings

64.    For U.S. Employees, the Debtors maintain a retirement savings plan (the "Savings Plan") that meets the requirements of Section 401(k) of the Internal Revenue Code of 1986.  The Savings Plan is administered by MassMutual Retirement Services.  Employees may elect to defer up to 100% of their earnings on a pre-tax basis, up to the maximum dollar limit amount set by federal law which can vary per calendar year.  The Debtors match 25% of the first 6% of earning that Employees defer into the Savings Plan. The Debtors seek authority (but not direction) to pay

all amounts collected or otherwise payable by the Debtors towards prepetition contributions to the Savings Plan, as and when due.

65.     In other countries, an additional savings plan applies to the Debtors' directors (*i.e.*, mid-level executives; not members of any board of directors) and Vice Presidents.  The Debtors contribute 25% of these Employees' savings, which ranges from 2% to 10% of any particular Employee's salary.  In the aggregate, the Debtors contribute approximately $6.7 million on a monthly basis to these international savings plans and the Savings Plan in the aggregate.

I.     **United States and Foreign Pension Plans**

66.     ***U.S. Pension Benefits***.  The Debtors' U.S. Employees do not receive pension benefits.

67.     ***Foreign Pension Benefits***.  In Colombia and Costa Rica, as set forth in more detail below, approximately 1,094 of the Debtors' Employees participate in specific defined benefit pension plans, including the following:

| Country | Pension Plan Name | Participants (as of 04/30/20) |
|---|---|---|
| Colombia | Tierra Avianca | 24 |
| Colombia | Tierra Valorem | 64 |
| Colombia | Títulos pensionales Tierra – Avianca | 29 |
| Colombia | Títulos pensionales Tierra – Valorem | 350 |
| Colombia | Vuelo - CAXDAC | 579 |
| Colombia-Tampa | Tierra | 4 |
| Colombia-Tampa | Vuelo - CAXDAC | 73 |
| Costa Rica | Pensiones | 29 |

|  |  |  |
|--|--|--|
|  |  |  |

68.    The Debtors contribute to both defined benefit and defined contribution pension plans, and estimate that approximately $3.3 million is or will be due and owing on account of unpaid prepetition contributions. The approximate annual cost for these defined benefit and defined contribution plans, is $67.3 million. The Debtors seek authority (but not direction) to continue to pay/honor all of their pension obligations as they become due in the ordinary course of their businesses, including amounts in respect of prepetition periods that may be owed.

69.    The Debtors and their pension-eligible Employees also contribute to a social security fund that covers pension liability in the applicable non-U.S. countries in which the Debtors operate.  For example, in Colombia, the Debtors contribute 12% of an Employee's salary while the Employee is responsible for making a 4% contribution.  The approximate annual cost for these social security contributions, including employer contributions and related administrative fees, is $52.1 million.  The Debtors seek authority (but not direction) to continue to pay/honor all of their social security obligations as they become due in the ordinary course of their businesses, including amounts in respect of prepetition periods that may be owed.

**J.    Compensation Funds (*Cajas de Compensación*)**

70.    In Colombia, the Debtors are required to contribute to Employee Social Security, Health, Retirement Savings, and Compensation Funds (known as *Caja de Compensación*) (the "Compensation Funds").  The Compensation Funds are private, non-profit entities, of economic redistribution and solidarity nature, created to improve quality of life of Colombian workers' families through management and delivery of subsidies and services, from social security contributions made by employers.  The Compensation Funds offer services in health, education, recreation, culture, tourism, sport, housing, credit and microcredit.  The Debtors' monthly payment for these Compensation Fund benefits and other similar benefits is approximately $655,000.

71.     The Debtors seek authority (but not direction) to continue to pay/honor all of the foregoing benefits as they become due in the ordinary course of their businesses, including amounts in respect of prepetition periods that may be owed.

## K.     Reimbursable Business Expenses

72.     As is customary for businesses comparable to the Debtors' business, the Debtors reimburse their Employees for certain business expenses incurred in the performance of their duties.  Reimbursable business expenses are ordinary course expenses that the Debtors' employees incur in performing their job functions, and include, among others, those incurred in connection with domestic and overseas business travel, medical care outside of the country, issuance of travel documents such as visas and equipment licenses for pilots and cabin crew, fuel charges, automobile maintenance, cellular phone charges, and meals (collectively, including as described below, the "Reimbursable Business Expenses").  Reimbursable Business Expenses also arise through the use of corporate purchasing cards to pay for the Debtors' procurement of items, such as office supplies, which are used in the ordinary course of the operation of the Debtors' business.  The continuation of the ability of the Debtors' employees to use the corporate purchasing cards for procurement is vital to the continued operation of the Debtors' business.  It is essential to the continued operation of the Debtors' business that the Debtors be permitted to continue reimbursing, or making direct payments on behalf of, employees for such expenses.

73.     Periodically, the Debtors will also provide relocation expense reimbursements to certain Employees.  Pursuant to individual agreements, such Employees may be reimbursed for certain defined expenses, including temporary housing, moving expenses, and other costs attendant to relocation.  The Debtors do not believe there are any obligations in this respect outstanding as of the Petition Date; however, to the extent there are, the Debtors seek authority to pay such outstanding obligations in the ordinary course of business.

74.     Travel expenses for pilots and crew are generally prepaid.   Moreover, non-executive Employees traveling on business typically receive prepaid credit cards.   Accordingly, outstanding Reimbursable Business Expenses at any given time are usually nominal.   However, the Debtors anticipate that certain of the checks issued for Reimbursable Business Expenses may not have cleared as of the Petition Date.   The Debtors estimate that the sum of such checks will be *de minimis*.

75.     Employees may use corporate credit cards for the Reimbursable Business Expenses, and generally use American Express outside of Colombia and Davivienda within Colombia (collectively, the "Card Issuers").   The Card Issuers invoice the Debtors directly for all amounts owed.   The Debtors remit payment monthly to the Card Issuers, but the Employees are personally liable for any charges they incur.   Certain of the Debtors' employees also may charge Reimbursable Expenses for business travel to the Debtors' American Express central bill account. Such expenses are the same types of expenses as are incurred on the American Express corporate card program.   The continuation of the Employees' ability to use the central billed accounts for business travel is essential to the continued operation of the Debtors' business.

76.     The Debtors estimate that, as of the Petition Date, an aggregate of approximately $29,000 will be owed on account of Reimbursable Business Expenses, which will become payable within 30 days upon submission of appropriate documentation and approval.

L.     **Employee Payroll Deductions**

77.     Periodically, the Debtors are presented with garnishment or child support orders requiring withholding of an Employee's wages to satisfy such Employee's obligations (the "Garnishment Deductions").   Amounts withheld on account of the Garnishment Deductions are remitted to the appropriate state, federal, or non-U.S. authorities.   The average amount withheld on account of the Garnishment Deductions per month is approximately $25,000.   Payment of these

26

obligations is made from amounts otherwise payable to the Employee and is not an incremental cost obligation of the Debtors' estates.

78.    Debtors operating in the United States are required by law to withhold from Employees' salaries and wages certain amounts related to federal, state, local, and foreign income taxes, social security and Medicare taxes, and other taxes imposed by law, and to remit the same to the appropriate taxing authorities (collectively, with the similar obligations of foreign-based Debtors, the "Payroll Tax Obligations").  Foreign-based Debtors have similar obligations under the laws of the various foreign nations in which they operate.  As of the Petition Date, the Debtors estimate that they owed approximately $6.7 million in prepetition Payroll Tax Obligations.[5]

## M.    Severance Plans

79.    As of the Petition Date, the Debtors offer certain severance programs to Employees. In the United States, Employees' entitlement to severance is based solely on the discretion of the Debtors and is evaluated on a case-by-case basis.  Non-U.S. Employees may be entitled to varying levels of severance (together with the severance obligations to U.S. Employees, the "Severance Obligations") based on existing individual contracts, collective bargain agreements, or local laws.

80.    The Severance Obligations arise in the ordinary course of the Debtors' business and their payment is necessary to sustain the morale of Employees during these Chapter 11 Cases. The Debtors believe that continuation of the existing severance programs is advisable—especially in light of the turmoil caused by the COVID-19 crisis—but reserve the right to make modifications in the event such modifications become necessary or otherwise advisable in the Debtors' business judgment.

---

[5]    The Debtors are still seeking to determine whether there were additional Payroll Tax Obligations outstanding as of the Petition Date.  The Debtors seek permission to pay any undisputed amounts that they subsequently determine may be due and owing to the extent not previously paid.

81.     The amount of the Severance Obligations may vary depending on the type of employment and the reason for termination.  Payments to non-U.S. Employees have traditionally ranged between six (6) and twenty-four (24) months' salary, depending on existing contractual agreements and local laws.  The Debtors cannot reasonably estimate—especially in light of the turmoil caused by the COVID-19 crisis—the amount of Severance Obligations that would become payable during the pendency of these Chapter 11 Cases.  However, by way of example, in the eleven months ending in November 2019, the Debtors paid approximately $15.2 million on account of the Severance Obligations.

82.     The Debtors request authority (but not direction) to continue honoring the Severance Obligations and to continue making severance payments to eligible Employees in the ordinary course of business and at their sole discretion.  To the extent that severance is payable pursuant to an agreement, the Debtors do not seek, by this Motion, to assume such agreement.  The Debtors will not make any severance amounts that are not in compliance with section 503(c)(2) of the Bankruptcy Code.

**N.      Overall Relief Requested**

83.     In summary, to minimize the personal hardship the Debtors' Employees will suffer in connection with the filing of these Chapter 11 Cases—especially in light of the turmoil and uncertainty caused by the COVID-19 crisis—the Debtors request entry of an order (i) authorizing (but not directing) the Debtors to pay, in their sole discretion, prepetition obligations described in this Motion, including, but not limited to, the Unpaid Compensation, Payroll Tax Obligations, Incentive Plan Obligations, Leave Obligations, Workers' Compensation Obligations, Employee Benefit Obligations, Reimbursable Business Expenses, Severance Obligations, Garnishment Deductions and all costs incident to the foregoing (such obligations, collectively, including any obligations to Retired Employees, the "Prepetition Employee Obligations"); (ii) authorizing (but

not directing) the Debtors to continue to honor their practices, programs and policies with respect to the Employees and Retired Employees, as such practices, programs and policies were in effect as of the Petition Date, with authorization (but not direction) to pay the Employee Obligations that become due and owing during the pendency of these Chapter 11 Cases; and (iii) authorizing and directing applicable banks and other financial institutions (collectively, the "Disbursement Banks") to receive, process and pay any and all checks drawn on the Debtors' payroll and general disbursement accounts (collectively, the "Disbursement Accounts"), and automatic payroll transfers to the extent that such checks or transfers relate to any of the foregoing.

## BASIS FOR RELIEF REQUESTED

### A.      Paying Prepetition Employee Obligations Is Warranted

84.      Sections 507(a)(4) and 507(a)(5) of the Bankruptcy Code entitle the majority of the Employee Obligations to priority treatment.  To the extent that an Employee seeks no more than $13,650 on account of her or his prepetition compensation claim, such claim is entitled to priority under section 507(a) and the relief sought herein with respect to compensation and benefit plans only affects the timing of payment to such Employee and does not have any negative impact on recoveries for general unsecured creditors.  The Debtors are required to pay priority claims in full to confirm a chapter 11 plan and, thus, such Employee claims will, in all events, be paid ahead of unsecured claims.  See 11 U.S.C. § 1129(a)(9)(B) (requiring payment of priority claims for (a) wages, salaries, or commissions, including vacation, severance, and sick leave pay earned by an individual and (b) contributions to an employee benefit plan). Thus, the Debtors submit that payment of the Prepetition Employee Obligations at this time enhances value for the benefit of all interested parties. Finding, attracting, and training new qualified talent would be extremely difficult and would most likely require higher salaries, guaranteed bonuses, and more comprehensive compensation packages than are currently provided to Employees.

85.     In addition, local labor laws and legal requirements in various jurisdictions in which the Debtors operate outside of the United States may require the payment of various employee obligations, including pension obligations[6] and severance,[7] even in the event of insolvency. Foreign courts have also been willing to pierce the corporate veil to satisfy pension obligations.[8] Accordingly, non-payment of the vast majority of the Employee Obligations would not only result in disastrous consequences for the Debtors in terms of employee morale, it would also likely violate multiple local labor laws and legal requirements.

86.     The Debtors also seek authority to pay the Payroll Tax Obligations and Garnishment Deductions to the appropriate third-party payees. Governments and judicial authorities mandate that such amounts be deducted from Employees' wages. Indeed, these obligations are not property of the Debtors' estates because the Debtors have withheld such amounts from Employees' wages on another party's behalf. See 11 U.S.C. §§ 541(b)(1), (d). Further, federal, state, and foreign laws require the Debtors to withhold certain amounts from Employees' wages and to pay such amounts to the appropriate taxing authority. 26 U.S.C. §§

---

[6]    The Colombian Constitutional Court has granted constitutional protection to obligations due to employees for salaries, benefits and pensions. *Constitutional Court, Decision C-071 de 2010. M.P. Luis Ernesto Vargas Silva*. More recently see *Constitutional Court, Decision C-145 of 2018. M.P. Diana Fajardo Rivera.* The recognition and payment of these kind of claims is considered a fundamental constitutional right as it relates to articles 11 (Right to Life), 49 (Health), 25 (Work), 48 (Social Security), 53 (Payment of Wages) of the Political Constitution. Colombian Law 1116 of 2006 (Article 10) also provides that pension claims must be paid as an administrative expense claims in an insolvency proceeding. Separately, various courts have permitted the payment of unpaid prepetition pension contributions. See, e.g., In re Windstream Holdings, Case No. 19-22312 (Bankr. S.D.N.Y. Apr. 22 2019) (RDD) [Docket No. 378]; In re GCX Limited, Case No. 19-12031 (Bankr. D. Del. Oct. 15, 2019) (CSS) [Docket No. 104]; In re Jack Cooper Ventures, Case No. 19-62393 (Bankr. N.D. Ga. Sept. 3, 2019) [Docket No. 220]

[7]    Colombian labor law does not consider the initiation of a reorganization or liquidation of an employer as just cause for the termination of a labor contract (Article 62, Colombian Labor Code), and severance payments generally must be paid in full.  *Supreme Court of Justice, Decision 68773, October 16, 2019. M.P. Rigoberto Echeverri Bueno.*

[8]    In *Compañía de Inversiones de la Flota Mercante S.A., Constitutional Court, Decision SU-1023 of 2001. M.P. Jaime Córdoba Triviño*, the Colombian Constitutional court held that a non-obligor company that was deemed to exercise control over the obligor company was liable for the unfunded pension obligations of the obligor company.

6672, 7501(a); see also City of Farrell v. Sharon Steel Corp., 41 F.3d 92, 95-97 (3d Cir. 1994) (finding that state law requiring a corporate debtor to withhold city income tax from its employees' wages created a trust relationship between debtor and the city for payment of withheld income taxes); DuCharmes & Co. v. Mich. (In re DuCharmes & Co.), 852 F.2d 194, 196 (6th Cir. 1988) (noting that individual officers of a company may be held personally liable for failure to pay trust fund taxes).  Because the Payroll Tax Obligations and Garnishment Deductions are not property of the Debtors' estates, the Debtors request authorization to transmit these amounts to the proper parties in the ordinary course of business.

87.     Similarly, federal, state, and applicable foreign laws require the Debtors to maintain the Workers' Compensation Program.  If the Debtors fail to maintain the Workers' Compensation Programs, the Debtors may be prohibited from operating in the applicable jurisdictions.  Payment of all obligations related to the Workers' Compensation Program is therefore crucial to the Debtors' continued operations and the success of these Chapter 11 Cases.

88.     Courts generally acknowledge that it is appropriate to authorize the payment of comparable prepetition obligations in appropriate circumstances. See, e.g., In re Ionosphere Clubs, Inc., 98 B.R. 175 (Bankr. S.D.N.Y. 1989) (recognizing existence of judicial power to authorize debtor in reorganization case to pay prepetition claims where such payment "is essential to the continued operation of the debtor"); see also Armstrong World Indus., Inc. v. James A. Phillips, Inc. (In re James A. Phillips, Inc.), 29 B.R. 391, 398 (S.D.N.Y. 1983) (granting authority to pay prepetition claims of suppliers who were potential lien claimants).  In authorizing payments of certain prepetition obligations, courts have relied on several legal theories, rooted in sections 105(a), 363(b), 507, 1107(a), and 1108 of the Bankruptcy Code.

89.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, debtors-in-possession are fiduciaries "holding the bankruptcy estate[s] and operating the business[es] for the benefit of [their] creditors and (if the value justifies) equity owners." In re CoServ, L.L.C., 273 B.R. 487, 497 (Bankr. N.D. Tex. 2002).  Implicit in the fiduciary duties of any debtor-in-possession is the obligation to "protect and preserve the estate, including an operating business's going-concern value." Id.  Some courts have noted that there are instances in which a debtor can fulfill this fiduciary duty "only . . . by the preplan satisfaction of a prepetition claim." Id.  The CoServ court specifically noted that satisfaction of prepetition claims would be a valid exercise of the debtor's fiduciary duty when the payment "is the only means to effect a substantial enhancement of the estate." Id.

90.     Consistent with a debtor's fiduciary duties, courts have also authorized payment of prepetition obligations under section 363(b) of the Bankruptcy Code where a sound business purpose exists for doing so.  See, e.g., In re Ionosphere Clubs, 98 B.R. at 175 (discussing prior order authorizing payment of prepetition wage claims pursuant to section 363(b) and noting that relief is appropriate where payment is needed to "preserve and protect its business and ultimately reorganize, retain its currently working employees and maintain positive employee morale."); see also Armstrong, 29 B.R. at 397 (relying on section 363 to allow contractor to pay prepetition claims of suppliers who were potential lien claimants because the payments were necessary for general contractors to release funds owed to debtors).  Specifically, the business judgment standard requires that a debtor "articulate some business justification, other than mere appeasement of major creditors." In re Ionosphere Clubs, 98 B.R. at 175.

91.     In addition, courts may authorize payment of prepetition claims in appropriate circumstances based on section 105(a) of the Bankruptcy Code.  Section 105(a) codifies the

bankruptcy court's inherent equitable powers to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title." Under section 105(a), courts may authorize pre-plan payments of prepetition obligations when essential to the continued operation of a debtor's businesses. See In re Ionosphere Clubs, 98 B.R. at 175-76. Specifically, the court may use its power under section 105(a) of the Bankruptcy Code to authorize payment of prepetition obligations pursuant to the "necessity of payment" rule (also referred to as the "doctrine of necessity"). See In re Ionosphere Clubs, 98 B.R. at 176. See also In re C.A.F. Bindery, Inc., 199 B.R. 828, 835 (Bankr. S.D.N.Y. 1996); see also In re Fin. News Network Inc., 134 B.R. 732, 735–36 (Bankr. S.D.N.Y. 1991) (holding that the "doctrine of necessity" stands for the principle that a bankruptcy court may allow pre-plan payments of prepetition obligations where such payments are critical to the debtor's organization").

92.     The Debtors submit that the payment of the Prepetition Employee Obligations represents a sound exercise of the Debtors' business judgment, is necessary to avoid immediate and irreparable harm to the Debtors' estates, and is therefore justified under sections 105(a), 363(b), 507, 1107 and 1108 of the Bankruptcy Code. Paying prepetition wages, employee benefits, and similar obligations will benefit the Debtors' estates and their creditors by allowing the Debtors' business operations to continue without interruption. Indeed, the Debtors believe that without the relief requested herein, Employees may seek alternative employment opportunities, perhaps with the Debtors' competitors. Such a development would deplete the Debtors' workforce, thereby hindering the Debtors' ability to operate their business and, likely, diminishing stakeholder confidence in the Debtors' ability to successfully reorganize.

93.     The loss of valuable Employees and the resulting need to recruit new personnel (and the costs attendant thereto) would be distracting at this crucial time when the Debtors need to

focus on stabilizing their business operations. Accordingly, the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor all wage, benefit, and related obligations, including the Prepetition Employee Obligations. The Debtors simply cannot be put at risk of such avoidable instability to their business and the crisis of confidence among the Employees that would ensue in the event of non-payment of the Prepetition Employee Obligations or the failure to continue honoring all wage, benefit, and related obligations.

94.     In addition, Employees expect and require their wages to arrive on a timely basis. The majority of Employees rely exclusively on their compensation and benefits to satisfy their daily living expenses. Furthermore, if this Court does not authorize the Debtors to honor their obligations under the insurance programs described herein, Employees will not receive health coverage and, thus, may be obligated to pay certain health care claims that the Debtors have not satisfied. Consequently, Employees will be exposed to significant financial hardship if the Debtors are not permitted to honor their obligations to the Employees. Moreover, failure to satisfy such obligations will jeopardize employee morale and loyalty at a time when employee support is critical to the Debtors' business and when the Debtors need Employees to perform their jobs at peak efficiency. Additionally, as set forth above, Employee attrition would cause the Debtors to incur additional expenses to find appropriate and experienced replacements, severely disrupting the Debtors' operations at this critical juncture.

95.     The importance of employees to a debtor's operations has been repeatedly recognized by courts in this district, and such courts have granted relief similar to the relief requested herein. See, e.g., In re Windstream Holdings, Inc., Case No. 19-22312 (RDD) (Bankr. S.D.N.Y. Apr. 22, 2019) (authorizing debtors to continue employee compensation and benefit programs and pay certain prepetition obligations related thereto on a postpetition basis); In re

Ditech Holding Corp., Case No. 19-10412 (JLG) (Bankr. S.D.N.Y. Mar. 19, 2019) (same); In re

Aegean Marine Petrol. Network Inc., Case No. 18-13374 (MEW) (Bankr. S.D.N.Y. Dec. 6, 2018)

(same); In re Nine West Holdings, Inc., Case No. 18-10947 (SCC) (Bankr. S.D.N.Y. Apr. 9, 2018)

(same); In re Cenveo Inc., Case No. 18-22178 (RDD) (Bankr. S.D.N.Y. Feb. 2, 2018) (same); In

re 21st Century Oncology Holdings, Inc., Case No. 17-22770 (RDD) (Bankr. S.D.N.Y. June 20,

2017) (same); In re BCBG Max Azria Glob. Holdings, LLC, Case No. 17-10466 (SCC) (Bankr.

S.D.N.Y. Mar. 29, 2017) (same).[9]

96.     Similar relief has also been granted by this court and others in large chapter 11

cases involving airlines.  See, e.g., In Republic Airway Holdings Inc., Case No. 16-10429 (SHL)

(Bankr. S.D.N.Y. Mar. 23, 2016); In re AMR Corp., Case No. 11-15464 (SHL) (Bankr. S.D.N.Y.

Nov. 29, 2011); In re Delta Airlines, Inc., Case No. 05-17923 (CGM) (Sept. 16, 2005); In re

Northwest Airlines Corp., Case No. 05-17930 (ALG) (Bankr. S.D.N.Y. Sept. 15, 2005); In re ATA

Holdings Corp., Case No. 04-19866 (BHL) (Bankr. S.D. Ind. Oct. 29, 2004); In re US Airways

Grp., Inc., Case No. 04-13819  (SSM) (Bankr. E.D. Va. Sep. 14, 2004); In re Hawaiian Airlines,

Inc., Case No. 03-00817 (RJF) (Bankr. D. Hawaii Mar. 21, 2003); In re UAL Corp., Case No. 02-

48191 (ERW) (Bankr. N.D. Ill. Dec. 11, 2002).

97.     The Debtors do not seek to alter their compensation, incentive, vacation, and other

benefit policies at this time.  This Motion is intended only to permit the Debtors, in their discretion,

to make payments consistent with those prepetition policies to the extent that, without the relief

sought herein, such payments would be inconsistent with the Bankruptcy Code.

---

[9]     Because of the voluminous nature of the orders cited herein, such orders have not been attached to this Motion.
       Copies of these orders are available upon request to the Debtors' proposed counsel.

**B.      The Court Should Authorize and Direct Banks and Other
Financial Institutions to Honor and Pay Checks Issued and
<u>Make Other Transfers to Pay Prepetition Employee Obligations</u>**

98.     As a result of the commencement of these Chapter 11 Cases, and in the absence of
an order of the Court providing otherwise, the Debtors' checks, wire transfers and direct deposit
transfers on account of the Prepetition Employee Obligations may be dishonored or rejected by
the Disbursement Banks.  The Debtors request that the Court authorize and direct the Disbursement
Banks to honor and pay all prepetition and postpetition checks issued or to be issued, and fund
transfers requested or to be requested, by the Debtors on account of the Prepetition Employee
Obligations that were not honored or paid as of the Petition Date.  The Debtors also seek authority
to issue new postpetition checks, or initiate new fund transfers, on account of the Prepetition
Employee Obligations to replace any prepetition checks or fund transfer requests that may be
dishonored or rejected.

99.     The Debtors represent that each of these checks or transfers is or will be drawn on
the Disbursement Accounts and can be identified as relating directly to the payment of the
Prepetition Employee Obligations.  Accordingly, the Debtors believe that prepetition checks and
transfers other than those for Prepetition Employee Obligations will not be honored inadvertently.

100.    Authorization to pay amounts on account of the Prepetition Employee Obligations
shall not be deemed to constitute postpetition assumption or adoption of any contract, program or
policy pursuant to section 365 of the Bankruptcy Code.  The Debtors are in the process of
reviewing these matters and reserve all their rights with respect thereto.  Moreover, authorization
to pay all amounts on account of Prepetition Employee Obligations shall not affect the Debtors'
right to contest the amount or validity of any Prepetition Employee Obligations, including without
limitation the Payroll Tax Obligations that may be due to any domestic or foreign taxing authority.

<u>**RESERVATION OF RIGHTS**</u>

101.    Nothing contained herein is intended to be or shall be construed as: (i) an admission as to the validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any appropriate party-in-interest's right to dispute any claim; or (iii) an approval or assumption of any agreement, contract, program, policy, or lease under section 365 of the Bankruptcy Code.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended to be and should not be construed as an admission to the validity of any claim or waiver of the Debtors' rights to dispute such claim subsequently.

## BANKRUPTCY RULE 6003 IS SATISFIED AND
## REQUEST FOR WAIVER OF STAY

102.    The Debtors further submit that because the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtors for the reasons set forth herein and in the First Day Declaration, Bankruptcy Rule 6003 has been satisfied.

103.    Specifically, Bankruptcy Rule 6003 provides:

> Except to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within 21 days after the filing of the petition, issue an order granting the following: . . . (b) a motion to use, sell, lease, or otherwise incur an obligation regarding property of the estate, including a motion to pay all or part of a claim that arose before the filing of the petition, but not a motion under Rule 4001 . . . .

Fed. R. Bankr. P. 6003.

104.    As described above, any delay in paying the Prepetition Employee Obligations will adversely impact the Debtors' relationship with the Employees and will irreparably impair the Employees' morale, dedication, confidence, and cooperation.  Employee support for the Debtors' reorganization efforts is critical.  At this early stage, the Debtors simply cannot risk the substantial damage to their business that would inevitably attend any decline in the Employees' morale (and inevitable subsequent attrition) attributable to the Debtors' failure to pay wages, salaries, benefits

and similar items.  Accordingly, the Debtors submit that the relief requested herein is necessary to avoid immediate and irreparable harm and, therefore, Bankruptcy Rule 6003(b) is satisfied.

105.    The Debtors further seek a waiver of any stay of the effectiveness of the order approving this Motion.  Pursuant to Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 6004(h).  As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going-concern value, and their efforts to pursue a resolution to these Chapter 11 Cases.

106.    Accordingly, the relief requested herein is appropriate under the circumstances and under Bankruptcy Rules 6003 and 6004(h).

## NOTICE

107.    Notice of this Motion has been given to the following parties or, in lieu thereof, to their counsel, if known: (a) the Office of the United States Trustee for the Southern District of New York; (b) the holders of the forty (40) largest unsecured claims against the Debtors (on a consolidated basis); (c) the holders of the five (5) largest secured claims against the Debtors (on a consolidated basis); (d) the Internal Revenue Service; (e) the Securities and Exchange Commission; (f) the Federal Aviation Administration; and (g) any party that has requested service pursuant to Bankruptcy Rule 2002.

108.    In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## NO PRIOR REQUEST

109.    No prior request for the relief sought in this Motion has been made to this or to any other court.

## CONCLUSION

WHEREFORE, the Debtors request that this Court enter an order granting the relief requested herein and granting such other and further relief as is just and proper.

Dated:  New York, New York                    MILBANK LLP
        May 10, 2020

                                              /s/ Evan Fleck
                                              Dennis F. Dunne
                                              Evan R. Fleck
                                              MILBANK LLP
                                              55 Hudson Yards
                                              New York, New York 10001
                                              Telephone:  (212) 530-5000
                                              Facsimile:  (212) 530-5219

                                              - and -

                                              Gregory A. Bray
                                              MILBANK LLP
                                              2029 Century Park East, 33rd Floor
                                              Los Angeles, CA 90067
                                              Telephone:  (424) 386-4000
                                              Facsimile:  (213) 629-5063

                                              *Proposed Counsel for Debtors and*
                                              *Debtors-in-Possession*

# EXHIBIT A

## INTERIM ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x
                              :

In re:                         :     Chapter 11
                              :

AVIANCA HOLDINGS S.A., *et al.*,[1]   :     Case No. 20-11133 (MG)
                              :

             Debtors.        :     (Joint Administration Requested)
                              :

---------------------------------------------------------------x

### INTERIM ORDER PURSUANT TO SECTIONS 363(B), 507, AND 105(A) OF THE BANKRUPTCY CODE (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS AND (B) CONTINUE PAYMENT OF WAGES, COMPENSATION, EMPLOYEE BENEFITS AND RELATED ADMINISTRATIVE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND FINANCIAL INSTITUTIONS TO PROCESS AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL FUNDS TRANSFER REQUESTS MADE BY THE DEBTORS

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and

debtors-in-possession (the "Debtors"), seeking entry of an order pursuant to sections 363(b), 507,

and 105(a) of the Bankruptcy Code (i) authorizing, but not directing, the Debtors to (a) pay certain

prepetition wages, compensation and employee benefits; and (b) continue payment of wages,

---

[1]   The Debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaraguense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

[2]   Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

compensation and certain employee benefit programs in the ordinary course of business; and

(iii) authorizing and directing applicable banks and other financial institutions to process and pay

all checks presented for payment and to honor all funds transfer requests made by the Debtors

relating to the foregoing, all as described more fully in the Motion; and the Court having

jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C.

§§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District

Court for the Southern District of New York*, dated February 1, 2012; and it appearing that venue

of these chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408

and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b);

and it appearing that proper and adequate notice of the Motion has been given and that no other or

further notice is necessary; and upon the Motion and the *Declaration of Adrian Neuhauser in

Support of the Debtors' Chapter 11 Petitions and First Day Orders*, dated as of the Petition Date;

and upon the statements of counsel in support of the relief requested in the Motion at the hearing

before the Court; and all of the proceedings had before the Court; and this Court having determined

that the relief requested in the Motion is in the best interests of the Debtors, their estates, their

creditors and other parties-in-interest; and after due deliberation thereon; and good and sufficient

cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED and approved on an interim basis as set forth herein.

2.      The final hearing (the "<u>Final Hearing</u>") on the Motion shall be held on _____,

2020, at__:__ _.m., prevailing Eastern Time. Any objections or responses to entry of the Final

Order shall be filed on or before 4:00 p.m., prevailing Eastern Time, on _____, 2020, and

shall be served on: (a) the Debtors; (b) proposed counsel to the Debtors; (c) counsel to any statutory

committee appointed in these cases; and (d) the Office of the United States Trustee for the Southern District of New York.  In the event no objections to entry of the Final Order are timely received, this Court may enter the Final Order without need for the Final Hearing.

3.      The Debtors are hereby authorized, but not directed, to pay, in their sole discretion, the Prepetition Employee Obligations; provided, however, that prior to the final hearing on the Motion, the Debtors shall not make any payments with respect to any of (i) the Incentive Programs, (ii) the Retention Program, or (iii) Director Compensation.

4.      No payment to any Employee may be made pursuant to this Order to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code.

5.      The Debtors are hereby authorized, but not directed, (i) to pay and/or honor the Employee Obligations that become due and owing during the pendency of these Chapter 11 Cases and (ii) to continue their practices, programs, and policies with respect to the Employees (and, where applicable, Retired Employees) as such practices, programs and policies were in effect as of the Petition Date.

6.      Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Plan in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Plan and pay all prepetition amounts relating thereto in the ordinary course. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Plan.

7.      All applicable Disbursement Banks and other financial institutions are authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor, and pay any and all prepetition and postpetition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors on account of the Prepetition Employee

Obligations that were not honored or paid as of the Petition Date, whether those checks were presented or fund transfers requested prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

8.      Authorization to pay and/or honor all Prepetition Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Prepetition Employee Obligations, including without limitation the Payroll Tax Obligations that may be due to any taxing authority.

9.      The Debtors are authorized, but not directed, to re-employ any and all Furloughed Employees postpetition without further order of this Court.

10.     Nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors of any executory contract or unexpired lease by virtue of reference to any such contract or lease in the Motion.

11.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is anything herein intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

12.     This Interim Order is effective from the date of entry through this Court's disposition of the Motion on a final basis; provided that the Court's ultimate disposition of the Motion on the final basis shall not impair or otherwise affect any action taken pursuant to this Order.

13.     Bankruptcy Rule 6003(b) has been satisfied because the relief requested in the Motion is necessary to avoid immediate and irreparable harm to the Debtors.

14.     Notwithstanding any applicability of Bankruptcy Rule 6004, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

15.     The Debtors are authorized and empowered to take all actions necessary to implement the relief requested in this Order.

16.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**<u>FINAL ORDER</u>**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
----------------------------------------------------------------x
                                                                :
In re:                                                          :   Chapter 11
                                                                :
AVICANCA HOLDINGS S.A., et al.,[1]                              :   Case No. 20-11133 (MG)
                                                                :
                                  Debtors.                      :   (Joint Administration Requested)
                                                                :
----------------------------------------------------------------x
```

### FINAL ORDER PURSUANT TO SECTIONS 363(B), 507, AND 105(A) OF THE BANKRUPTCY CODE (I) AUTHORIZING, BUT NOT DIRECTING, THE DEBTORS TO (A) PAY PREPETITION WAGES, COMPENSATION AND EMPLOYEE BENEFITS AND (B) CONTINUE PAYMENT OF WAGES, COMPENSATION, EMPLOYEE BENEFITS AND RELATED ADMINISTRATIVE OBLIGATIONS IN THE ORDINARY COURSE OF BUSINESS; AND (II) AUTHORIZING AND DIRECTING APPLICABLE BANKS AND FINANCIAL INSTITUTIONS TO PROCESS AND PAY ALL CHECKS PRESENTED FOR PAYMENT AND TO HONOR ALL FUNDS TRANSFER REQUESTS MADE BY THE DEBTORS

Upon consideration of the motion (the "Motion")[2] of the above-captioned debtors and

debtors-in-possession (the "Debtors"), seeking entry of an order pursuant to sections 363(b), 507,

and 105(a) of the Bankruptcy Code (i) authorizing, but not directing, the Debtors to (a) pay certain

prepetition wages, compensation and employee benefits; and (b) continue payment of wages,

---

[1]    The Debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaraguense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A).  The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

[2]    Capitalized terms not defined herein shall have the meaning ascribed to them in the Motion.

compensation and certain employee benefit programs in the ordinary course of business; and (iii) authorizing and directing applicable banks and other financial institutions to process and pay all checks presented for payment and to honor all funds transfer requests made by the Debtors relating to the foregoing, all as described more fully in the Motion; and the Court having jurisdiction to consider the Motion and the relief requested therein in accordance with 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the Southern District of New York*, dated January 31, 2012; and it appearing that venue of these chapter 11 cases and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that this matter is a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that proper and adequate notice of the Motion has been given and that no other or further notice is necessary; and upon the Motion and the *Declaration of Adrian Neuhauser in Support of the Debtors' Chapter 11 Petitions and First Day Orders*, dated as of the Petition Date; and upon the statements of counsel in support of the relief requested in the Motion at the hearing before the Court; and all of the proceedings had before the Court; and this Court having determined that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties-in-interest; and after due deliberation thereon; and good and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED and approved in all respects on a final basis.

2.      The Debtors are hereby authorized, but not directed, to pay, in their sole discretion, the Prepetition Employee Obligations.

3.      The Debtors are hereby authorized, but not directed, (i) to pay and/or honor the Employee Obligations that become due and owing during the pendency of these Chapter 11 Cases

and (ii) to continue their practices, programs, and policies with respect to the Employees (and, where applicable, Retired Employees) as such practices, programs and policies were in effect as of the Petition Date.

4.      No payment to any Employee may be made pursuant to this Order to the extent that it is a transfer in derogation of section 503(c) of the Bankruptcy Code.

5.      Pursuant to section 362(d) of the Bankruptcy Code, Employees are authorized to proceed with their claims under the Workers' Compensation Plan in the appropriate judicial or administrative forum and the Debtors are authorized to continue the Workers' Compensation Plan and pay all prepetition amounts relating thereto in the ordinary course. This modification of the automatic stay pertains solely to claims under the Workers' Compensation Plan.

6.      All applicable Disbursement Banks and other financial institutions are authorized and directed, when requested by the Debtors in the Debtors' sole discretion, to receive, process, honor, and pay any and all prepetition and postpetition checks issued or to be issued, and fund transfers requested or to be requested, by the Debtors on account of the Prepetition Employee Obligations that were not honored or paid as of the Petition Date, whether those checks were presented or fund transfers requested prior to or after the Petition Date, provided that sufficient funds are available in the applicable accounts to make the payments.

7.      Authorization to pay and/or honor all Prepetition Employee Obligations shall not affect the Debtors' right to contest the amount or validity of any Prepetition Employee Obligations, including without limitation the Payroll Tax Obligations that may be due to any taxing authority.

8.      The Debtors are authorized, but not directed, to re-employ any and all Furloughed Employees postpetition without further order of this Court.

9.      Nothing contained in this Order or the Motion shall constitute a rejection or assumption by the Debtors of any executory contract or unexpired lease by virtue of reference to any such contract or lease in the Motion.

10.     Notwithstanding the relief granted herein and any actions taken hereunder, nothing herein shall create, nor is anything herein intended to create, any rights in favor of, or enhance the status of any claim held by, any party.

11.     Notwithstanding any applicability of Bankruptcy Rule 6004, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

12.     The Debtors are authorized and empowered to take all actions necessary to implement the relief requested in this Order.

13.     This Court shall retain jurisdiction with respect to any matters, claims, rights or disputes arising from or related to the implementation of this Order.

Dated: _____, 2020

_____
UNITED STATES BANKRUPTCY JUDGE