**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------x

In re:                                                                                  **FOR PUBLICATION**

Chapter 11

AVANCA HOLDINGS S.A., *et al.*,[1]                              Case No. 20-11133 (MG)

                                                      Debtors.            (Jointly Administered)

------------------------------------------------------------------x

### MEMORANDUM OPINION GRANTING IN PART AND DENYING IN PART DEBTORS' MOTION TO REJECT THE USAV AGREEMENTS

*A P P E A R A N C E S :*

MILBANK LLP
*Counsel to Debtors and Debtors-In-Possession*
55 Hudson Yards
New York, NY 10001
By:    Dennis F. Dunne, Esq.
         Evan R. Fleck, Esq.
         -and-
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
By:    Gregory Bray, Esq.
         -and-
1850 K Street NO
Suite 1100
Washington, D.C. 20006

---

[1]    The Debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaraguense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A).  The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

By:     Andrew M. Leblanc, Esq.
        Aaron L. Reneger, Esq.

MORRISON & FOERSTER LLP
*Counsel to the Official Committee of Unsecured Creditors*
250 West 55th Street
New York, NY 10019
By:     Brett H. Miller, Esq.
        Todd M. Goren, Esq.
        Erica J. Richards, Esq.
        Benjamin W. Butterfield, Esq.

KASOWITZ BENSON TORRES LLP
*Counsel to USAVflow Limited*
1633 Broadway
New York, NY 10019
By:     Sheron Korpus, Esq.
        David S. Rosner, Esq.
        David J. Mark, Esq.

WHITE & CASE LLP
*Counsel to the USAV Secured Lender Group*
1221 Avenue of the Americas
New York, NY 10020
By:     Glenn M. Kurtz, Esq.
        Scott Greissman, Esq.
        Joshua D. Weedman, Esq.
        Mark Franke, Esq.
        Brandon D. Batzel, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

## I.     INTRODUCTION[2]

Pending before the Court is the motion of Avianca Holdings S.A. and its affiliated

debtors (the "Debtors" or "Avianca") seeking entry of an order pursuant to section 365 of the

Bankruptcy Code authorizing the rejection of the eight (8) contracts collectively referred to as

the USAV Agreements *nunc pro tunc* to June 23, 2020, the motion filing date.  ("Motion," ECF

Doc. # 306.)  The USAV Agreements were entered into on or about December 12, 2017 to

---

[2]      Capitalized terms in the Introduction are defined below.

effectuate a transaction among the Debtors, USAVflow Limited ("USAV"), an offshore special purpose vehicle, certain credit card processors, and other counterparties (collectively, the "2017 Transaction") in connection with USAV's purchase of certain existing contract rights—including the proceeds generated from certain credit card receivables—and accrued receivables from the Debtors for $150 million plus the potential for additional amounts.  (Lender Objection ¶ 1.)  The USAV Lender Group financed the $150 million purchase price in exchange for primary and guarantee claims against USAV and certain Debtors.  (*Id.*)

The central question before the Court is whether some or all of the USAV Agreements are executory and can be rejected under section 365 of the Bankruptcy Code.  The Debtors argue that the Debtors and USAV have material unperformed obligations under two of the eight agreements, the RSPA and Undertaking Agreement, and ask the Court to deem the remaining agreements inseparable from the RSPA and Undertaking Agreement for purposes of rejection. (Motion ¶ 29; Reply ¶ 36.)  USAV and the USAV Lender Group (together, the "USAV Parties") argue that the RSPA and Undertaking Agreement are not executory contracts because USAV has no material unperformed obligations under either agreement.  According to the USAV Parties, the Debtors, by rejecting the RSPA, are seeking to unwind the 2017 Transaction to get back the contract rights they sold in violation of the Supreme Court's holding *Mission Prod. Holdings v. Tempnology, LLC*, 139 S. Ct. 1652 (2019) [hereinafter "*Tempnology*"].  (Lender Sur-Reply ¶ 16 (citing *Tempnology*, 139. S. Ct. at 1662, 1663); USAV Objection ¶¶ 31–32).)

For the reasons discussed below, the Debtors' Motion is **GRANTED IN PART** and **DENIED IN PART**: The Court concludes that the RSPA and Undertaking Agreement are executory contracts that the Debtors may reject pursuant to section 365 of the Bankruptcy Code.

The remaining USAV Agreements are not executory contracts that can be rejected by the Debtors.

## II.   BACKGROUND

Established in 1919, Avianca is a leading provider of air travel and cargo services in Latin America and around the globe.  (Motion ¶ 7.)  Avianca is the second-largest airline group in Latin America and the most important carrier in the Republic of Colombia and the Republic of El Salvador.  (*Id.*)  Avianca is a code-share partner of United Airlines and a member of the Star Alliance—the world's largest global airline alliance.  (*Id.*)  Before the COVID-19 pandemic, the Debtors offered passenger services on more than 5,350 weekly flights to more than 76 destinations in 27 countries.  (*Id.* ¶ 8.)  With approximately 18,900 employees and approximately $3.9 billion in annual revenues, the Debtors play a key role in the Latin American airline market. (*Id.*)  On March 20, 2020, the Republic of Colombia closed its airspace to address the spread of COVID-19.  (*Id.* ¶ 9.)  Due to the restrictions imposed by the Colombian government, on March 24, 2020, the Debtors announced that they were suspending all scheduled passenger flights from March 25, 2020.  (*Id.*)  On May 10, 2020 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  (*Id.* ¶ 10.)  Each Debtor is continuing to operate its business and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  (*Id.*)

### A.  The Rejection Motion

On June 23, 2020, the Debtors filed the Motion to reject the USAV Agreements.[3]  In support of the Motion, the Debtors submit the declaration of their CFO, Adrian Neuhauser

---

[3]     On June 23, 2020, the Debtors also filed an adversary proceeding against USAV seeking to recharacterize the 2017 Transaction as a disguised secured financing and seeking a declaration that USAV has no security interest in certain postpetition credit card receivables and related collateral pursuant to section 552 of the Bankruptcy Code. (*See* "Complaint," Adv. Proc. No. 20-1189, ECF Doc. # 1 ¶¶ 2–3.)  The Debtors state that it will not be necessary

("Neuhauser Declaration," ECF Doc. # 306-1), and the declaration Aaron L. Reneger, which attaches copies of the USAV Agreements. ("Reneger Decl.," ECF Doc. # 306-2.) On July 22, 2020, objections were filed by USAV (the "USAV Objection," ECF Doc. # 616) and the USAV Lender Group (the "Lender Objection," ECF Doc. # 617). Foreign law opinions and declarations were submitted in support of the USAV Objection (ECF Doc. # 616-1) and the Lender Objection (ECF Doc. # 618). The Lender Group also submits the declaration of Joshua D. Weedman in support of their Objection. ("Weedman Decl.," ECF Doc. # 619.)

On July 27, 2020, the Court held a status conference with counsel to the Debtors, USAV, the Lender Group, and the Official Committee of Unsecured Creditors (the "Committee") to discuss the schedule of reply briefs and the necessity of an evidentiary hearing. (*See* ECF Doc. # 628.) The Court also raised several inquiries for the parties to address in supplemental briefs.

On August 7, 2020, the Debtors filed their reply brief ("Reply," ECF Doc. # 683) and the Committee filed a reply in support of Debtors' Motion ("UCC Reply," ECF Doc. # 681). In support of the Reply, the Debtors submit the second declaration of Adrian Neuhauser ("Second Neuhauser Decl.," ECF Doc. # 683-1) and the second declaration of Aaron L. Renenger ("Second Renenger Decl.," ECF Doc. # 683-2). The Debtors also submit the declaration of Jamie Alberto Arrubla-Paucar analyzing, under Colombian law, the effects of a failure to comply with the RSPA by Avianca and the contractual remedies available to USAV. ("Arrubla Decl.," ECF Doc. # 684.)

On August 18, 2020, the Debtors and the Committee each filed a supplemental response to the Court's questions posed at the July 27, 2020 status conference. ("Debtors' Supplemental Response," ECF Doc. # 715; "UCC Supplemental Response," ECF Doc. # 714.) On that same

---

for the Court to reach the issues raised in the Complaint to the extent that the Court grants the relief requested in the Motion. (*See* Motion ¶ 1 n.2.)

day, the Lender Group filed their response to the Court's questions posed at the July 27, 2020 status conference ("Supplemental Lender Response," ECF Doc. # 716) and a sur-reply to the Lender Objection ("Lender Sur-Reply," ECF Doc. # 718).  In support of the Supplemental Lender Response and Lender Sur-Reply, the Lenders submit the declaration of Vicente Lines ("Lines Decl.," ECF Doc. # 719); the second declaration of Jorge Suescun Melo ("Second Melo Decl.," ECF Doc. # 720); and the second declaration of Joshua D. Weedman ("Second Weedman Decl.," ECF Doc. # 721).  USAV filed a combined response to the Debtors' Reply and questions posed at the July 27, 2020 status conference.  ("Supplemental USAV Response," ECF Doc. # 717.)

The parties also agreed that all of the declarations and exhibits offered in support of and in opposition to the Motions were admissible in evidence (ECF Doc. ## 749, 750), and the parties waived the right to cross-examine any of the declarants (ECF Doc. # 740).  The Court entered an Order admitting the declarations and exhibits in evidence.  (ECF Doc. # 751.)

On August 25, 2020, the Court entered an order with questions that counsel for the parties were asked to address during the hearing on the Motion.  (ECF Doc. # 757.)  On August 26, 2020, the Court held a hearing using Zoom for Government and heard arguments from the Debtors, the Committee, the USAV Lender Group, and USAV.

### B.  Overview of the 2017 Transaction

In 2017, Avianca retained an investment banker to assist in securing new debt financing—the 2017 Transaction was the result of these efforts.  (*See* Complaint ¶ 12.)  On December 12, 2017, the Debtors and USAV entered into the Contract Rights and Receivables Sale, Purchase and Servicing Agreement (the "RSPA").[4]  (*Id.* ¶ 13.)  The RSPA is governed by

---

[4]        The RSPA is annexed as Exhibit 1 to the Reneger Decl.

the laws of Colombia. (*Id.* (citing RSPA § 9.09).) The RSPA memorializes the purported sale of the Debtors' accrued credit card receivables (the "Receivables") and the Debtors' rights to future credit card receivables under card processing agreements (the "Contract Rights") with (i) American Express Travel Related Services Company, Inc. and American Express Payment Services Limited ("AMEX") (the "AMEX Agreement") and (ii) BAC International Bank Inc. and its subsidiaries ("Credomatic") (the "Credomatic Agreement" and, together with the AMEX Agreement, the "Credit Card Processing Agreements") related to the purchase in the United States of airline tickets and related services with American Express, Visa, and MasterCard credit cards. (*Id.* ¶ 14 (citing RSPA § 2.01; Recitals).)

In exchange for the purported "sale" of the Contract Rights and Receivables, Avianca received $150 million plus the potential for additional amounts equal to future credit card receivables generated in any payment period less a reserve amount generally equal to the amount required for USAV's monthly amortization payments (the "Additional Purchase Price") under the USAV Loan Agreement (defined below). (*Id.* (citing RSPA § 3.01(a)).)

Contemporaneously with the execution of the RSPA, USAV entered into a loan agreement (the "USAV Loan Agreement")[5] with the USAV Lender Group, certain Debtors as guarantors, and Citibank, N.A. as administrative agent and collateral agent (in such capacities, "Citibank"). (*Id.* ¶ 15.) The USAV Loan Agreement is governed by New York law. (*Id.* ¶ 15 n.4 (citing USAV Loan Agreement § 8.9.1).) Under the USAV Loan Agreement, the USAV Lender Group advanced to USAV $150 million—the same amount USAV used to pay Avianca under the RSPA. (*Id.* ¶ 16 (citing Cash Management Agreement § 2.1.1).) To repay the loan, USAV retains a portion of the collections on credit card receivables—funneled through a New

---

[5]    The USAV Loan Agreement is annexed as Exhibit 9 to the Reneger Decl.

York-based bank account (the "New York Pass-Through Account")—sufficient to make the

required amortization payments under the USAV Loan Agreement.  (*Id.*)  Any surplus above

what is required to be repaid or reserved under the USAV Loan Agreement is remitted to the

Debtors as the Additional Purchase Price.  (*Id.* (citing RSPA § 2.01 and Cash Management

Agreement § 2.02).)

The figure below provides an overview of the "future flow" transaction structure

contemplated by the 2017 Transaction.



("Figure 1," Complaint ¶ 17.)

### C.  Events Prior to the Petition Date

From January 2020 through March 2020, the Debtors generated between $25.2 million

and $48.8 million in credit card receivables each month, with 92% to 95% flowing back to the

Debtors as Additional Purchase Price payments.  (Reply ¶ 9 (citing Second Neuhauser Decl. ¶

3).)  On March 31, 2020, Citibank, as Administrative Agent, sent a notice to the Debtors by

email, with the subject line, "USAVFlow—Notice of Reservation of Rights" (the "March Notice"). (*Id.* ¶ 10.) The March Notice declared that a Trigger Event had occurred as a result of the Debtors' inability to fly and that as a result the Debtors were in "breach" of the RSPA (the "Flight Impairment Trigger Event"). (*Id.*) The March Notice did not invoke any remedies, but simply reserved Citibank's rights to pursue available remedies under the RSPA. (*Id.* (citing Weedman Decl., Ex. A–B.) Thereafter, between April 1, 2020 and April 9, 2020, the Debtors received Additional Purchase Price payments in the aggregate amount of $255,951.22. (*Id.* ¶ 11 (citing Second Neuhauser Decl. ¶ 5).)

### D. Retention Event Notice

On May 11, 2020, the day after the Petition Date, Citibank delivered to the Debtors a notice that a "Retention Event" under the RSPA had occurred as a result of the drop in the Collections Coverage Ratio (the "Retention Event Notice"). (*Id.* ¶ 13 (citing Motion ¶ 22).) On May 15, 2020, Debtors' counsel delivered a letter to Citibank's counsel via email stating that the Retention Event Notice implicated the Debtors' property and was likely in violation of the automatic stay (the "Automatic Stay Notice"). (*Id.* ¶ 14 (citing Second Renenger Decl., Ex. 1).) On May 18, 2020, Citibank, at the instruction of the Lender Group, transferred approximately $13.5 million from the New York Pass-Through Account, the Debt Service Reserve Account, and the Collection Account[6] to the accounts of the Lender Group. (*Id.* ¶ 15 (citing Second Neuhauser Decl. ¶ 7; Second Renenger Decl., Ex. 2).) The Debtors state that, on information and belief, from May 18, 2020 to the present, Citibank has been sweeping all funds received from AMEX and Credomatic (the "Credit Card Processors")—over $5 million—to the accounts of the Lender Group. (*Id.* ¶ 16 (citing Second Neuhauser Decl. ¶ 8).)

---

[6]    The New York Pass-Through Account, Debt Service Reserve Account, and the Collection Account are under the control of Citibank, N.A., London Branch. (*See* RSPA at 4, 6, 10.)

### E.  Overview of the USAV Agreements

The eight USAV Agreements that are the subject of the Motion, include the following:

i.  The **RSPA**, entered into on December 12, 2017 between Aerovías del Continente Americano S.A. Avianca, as Seller and Servicer, and USAV, as purchaser.  (Renenger Decl. ¶ 2; *id.*, Ex. 1.)  The governing law under the RSPA is Colombian law.  (*See* RSPA § 9.09.)  The RSPA is more fully discussed below.

ii.  The **Undertaking Agreement**, entered into on December 12, 2017 between Aerovías del Continente Americano S.A. Avianca, as Seller and Servicer, and USAV, as purchaser.  (Renenger Decl. ¶ 3; *id.*, Ex. 2.)  The governing law under the Undertaking Agreement is Colombian law.  (*See* Undertaking Agreement § 4.09.)  The Undertaking Agreement is more fully discussed below.

iii.  The RSPA Assignment of Rights Agreement (the "**Assignment Agreement**"), entered into on December 12, 2017 between Aerovías del Continente Americano S.A. Avianca and USAV.  (Renenger Decl. ¶ 4; *id.*, Ex. 3.)  The governing law under the Assignment Agreement is Costa Rican law.  (Assignment Agreement § 5.)  The form of Assignment Agreement is annexed to the RSPA as Exhibit E.

iv.  The **Cash Management Agreement**, entered into on December 12, 2017 among Aerovías del Continente Americano S.A. Avianca, as Seller and Servicer, USAV as purchaser, and Citibank, as Administrative Agent and Collateral Agent.  (Renenger Decl. ¶ 5; *id.*, Ex. 4.)  The governing law under the Cash Management Agreement is New York law.  (Cash Management Agreement § 3.08(a).)

v.  The Credomatic Notice of Transfer (the "**Credomatic Notice**"), dated December 12, 2017 executed by Aerovías del Continente Americano S.A. Avianca, Avianca, Inc., Taca International Airlines, S.A. and USAV and accepted and agreed by Citibank as Collateral Agent.  (Renenger Decl. ¶ 6; *id.*, Ex. 5.)  The governing law under the Credomatic Notice is New York law.  (Credomatic Notice § 7(a).)

vi.  The **Credomatic Consent and Agreement**, dated December 12, 2017 executed by Credomatic.  (Renenger Decl. ¶ 7; *id.*, Ex. 6.)  The contract does not have a governing law provision.  The form Credomatic Consent and Agreement is annexed to the RSPA as Exhibit B.

vii.  The **AMEX Notice and Consent**, dated December 12, 2017 and executed by Aerovías del Continente Americano S.A. Avianca and other of the Debtors, USAV, American Express Travel Related Services Company, Inc., American Express Payment Services Limited, and Citibank as Collateral Agent.  (Renenger Decl. ¶ 8; *id.*, Ex. 7.)  The governing law under the AMEX Notice and Consent is New York law.  (AMEX Notice and Consent § 6.)  The form of AMEX Notice and Consent is annexed to the RSPA as Exhibit A.

viii.    The **Expenses Agreement**, entered into on December 12, 2017 between USAV and
Aerovías del Continente Americano S.A. Avianca.  (Renenger Decl. ¶ 9; *id.*, Ex. 8.)  The
governing law under the Expenses Agreement is the law of the Cayman Islands.
(Expenses Agreement § 6.)

Collectively, USAV Agreements effectuate the 2017 Transaction and establish the

mechanics of the "future flow" transaction structure set forth in Figure 1 above.

1.    The RSPA

The RSPA functions as the master agreement pursuant to which the other USAV

Agreements were entered to effectuate the 2017 Transaction.  As previously stated, the RSPA

was entered into between Aerovías del Continente Americano S.A. Avianca, as Seller and

Servicer, and USAV, as Purchaser.

*a.    Purchase, Sale and Transfer (Article II)*

The RSPA provides that on the "Effective Date," December 12, 2017, "the Seller sells to

the Purchaser, and the Purchaser buys from the Seller, finally, definitively, and irrevocably, the

existing (as of the date hereof) Contract Rights arising under and the Receivables accrued under

the AMEX Contract and the Credomatic Contract."  (*See* RSPA § 2.01(a)(i).)  "Contract Rights"

are defined in the RSPA as the contract rights of Avianca under the Card Processing

Agreements[7] "to (i) receive any kind of payments, indemnities or economic compensation

derived therefrom on account of Specified Sales, including the right, among other things, to

receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i)

against the respective Card Processors thereunder."  (*See id.* § 1.01.)  "Receivables" are defined

in the RSPA as "any and all Collections accrued under the Card Processing Agreements that are

due on account of Specified Sales from . . . AMEX or Credomatic to the Seller immediately prior

---

[7]    The RSPA defines Card Processing Agreements to mean the Credomatic Contract, the AMEX Contract,
and each Additional Card Purchasing Agreement.  (Renenger Decl. at 12.)

to giving effect to this Agreement on the Effective Date (and due to the Purchaser immediately upon giving effect to this Agreement on the Effective Date)." (*See id.* § 1.01.)

The RSPA provides a general definition of the term "Specified Sales" and refers to the AMEX Notice and Consent and the Credomatic Notice and Consent to determine what "Specified Sales" means with respect to each Card Processing Agreement. (*See* Reneger Decl. at 22.)

The AMEX Notice and Consent defines Specified Sales to mean "the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by an American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement." (*Id.* at 321.) Exhibit A to the AMEX Notice and Consent includes just one (1) merchant number: "7992700286." (*Id.* at 322.)

The Credomatic Notice and Consent defines Specified Sales to mean "the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by Avianca S.A. where payment in the case of any such sale is made by a Master Card® Card or Visa® Card, however branded, or any one or more of said Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement." (*Id.* at 280–281.) Exhibit A to the Credomatic Notice and Consent includes just one (1) merchant code: "Credomatic FL (VI/MC): 5610-014001084970". (*Id.* at 283.)

12

The RSPA also provides that upon termination of either of their Credit Card Processing Agreements, Debtors are required to enter into replacement credit card processing agreements on substantially similar terms within 10 calendar days.  (*See* RSPA § 2.03(b).)  Upon entry into the replacement processing agreements, the Debtors are obligated to sell to USAV for no additional consideration the Debtors' payment rights under the new agreements.  (*See id.* § 2.01(a)(ii).) The Debtors are also required to enter into ancillary agreements with the credit card processors intended to perfect USAV's interest in the new agreements and resulting proceeds.  (*See id.* §§ 2.01(b)(ii), (c)(ii); 2.03(b)(i)–(vii).)

### b.  *Consideration (Article III)*

The purchase price under the RSPA was $150 million plus the Additional Purchase Price, which is defined as amounts payable to the Seller under the RSPA subject to the satisfaction of various conditions, including that no Trigger Event be continuing.  (*See id.* §§ 1.01, 3.01(a).)  If a Trigger Event occurs, USAV is entitled to withhold the Additional Purchase Price from Avianca during the continuance of the Trigger Event.  (*See id.* § 3.01(a)(ii).)

### c.  *Trigger Events and Remedies*

The RSPA lists eighteen (18) events that constitute "Trigger Events."  (*See id.* § 6.01(a)– (r).)  As discussed above, the RSPA provides that "no Additional Purchase Price shall be paid during the continuation of . . . a Trigger Event."  (*See id.* § 3.01(a)(ii).)  A Trigger Event occurs, for example, when "the capacity or ability of the Seller to operate domestic and/or international flights is materially impaired for any reason" (*see id.* § 6.01(i)(i)), or upon the occurrence of any Insolvency Event, which the RSPA defines to include the filing of a voluntary petition in bankruptcy (*see id.* § 6.01(h).)  A Trigger Event also occurs if the Debtors fail to perform or observe "any term or obligation under the Undertaking Agreement (except Sections 2.01(c), (d),

13

(e), and (s)(i) and Section 2.02(c) thereof), any RSPA Security Document or any Notice and Consent.  (*See id.* § 6.01(c)(i).)  Avianca must also continue to generate Receivables sufficient to (i) pay to USAV the Monthly Settlement Amount (as defined in the Cash Management Agreement) and (ii) maintain a Collection Coverage Ratio of at least 1.75:1:00 at any date of determination.  (*See id.* §§ 6.01(a), (b).)

If a Trigger Event occurs, USAV is entitled to terminate the RSPA and demand Liquidated Damages, which the RSPA defines as an amount equal to unpaid principal on USAV's loan plus surcharged interest and administrative costs related to unwinding the transaction.  (*See id.* § 6.02.)  If a Trigger Event occurs due to an Insolvency Event, the Liquidated Damages shall become automatically due and payable.  (*See id.* § 6.03.)

## 2.  The Undertaking Agreement

Pursuant to the Undertaking Agreement, certain of the Debtors agreed to carry out certain duties as responsibilities as a Servicer in respect to the Contract Rights and Receivables. (Undertaking Agreement §§ 3.02 and 3.03.)  As Servicer, the Debtors agreed to undertake certain administrative duties that include (i) responding to inquiries of the Card Processors, correcting errors, and settling claims and disputes relating to receivables (*id.* § 3.02(b)); (ii) managing, servicing, and administering the Contract Rights and the Collections (*id.* § 3.02(e)); (iii) using its best efforts to collect all payments called for under the terms and provisions of the Card Processing Agreements as and when the same become due (*id.* § 3.02(h)); and (iv) providing monthly statements regarding Collections to USAV and Citibank (*id.* § 3.02(k)).  Pursuant to the Undertaking Agreement, USAV is required to provide documents, including powers of attorney, necessary for the Debtors to carry out their obligations under the Undertaking Agreement.  (*See id.* § 3.05.)

3.    <u>The Relationship Among the USAV Agreements</u>

The USAV Agreements each have a separate and distinct purpose.  (USAV Objection ¶ 12.)  As discussed above, the RSPA is a sale agreement pursuant to which Avianca sold its rights to future credit card receivables and associated contract rights under the Card Processing Agreements—*i.e.*, the Contract Rights and Receivables.  Pursuant to the Card Processing Agreements, Credomatic and AMEX agreed, among other things, to pay Avianca for sales, including future sales, made by travel agencies in the United States of Avianca's airline tickets and related services purchased in the United States with Visa or MasterCard cards and American Express cards, respectively.  (*Id.*)

Under the Assignment Agreement, Avianca assigned to USAV its interests in its Card Processing Agreement with Credomatic in exchange for the purchase price under the RSPA.  Similarly, Avianca transferred to USAV the Contract Rights and Receivables under the AMEX Card Processing Agreement through the AMEX Notice and Consent.  (*Id.* ¶ 13.)

The Cash Management Agreement governs the disbursement of funds to the parties, including in the case of a "Trigger Event," as defined in section 6.01 of the RSPA.  Upon notice of the parties of major events (including a Retention Event or a Trigger Event) or any unpaid fees, expenses or indemnities incurred by or claimed through or disbursable to USAV or the Administrative Agent, Citibank is required to adjust the schedule of payments to conform with the priority of payments set forth in Article II of the Cash Management Agreement.  (*See* Cash Management Agreement §§ 2.06, 2.07(a), 2.09(c).)

Pursuant to the Expenses Agreement, Avianca agreed to indemnify and settle on USAV's behalf certain costs, including but not limited to, "any and all fees and expenses USAV incurred in connection with its entry into and the performance of its obligations," and "all costs, fees and

expenses incurred by [USAV, Citibank], and any other person contracted to provide services in relation to the Receivables or the Loan Agreement or the transactions contemplated thereby." (*See* Expenses Agreement ¶¶ 3.1, 3.4.)

The Debtors concede that the following six (6) agreements are not executory by their own terms: Cash Management Agreement, Expense Agreement, Assignment Agreement, Credomatic Notice, Credomatic Consent and Agreement, and AMEX Notice and Consent.  (Motion ¶ 29.) The Debtors state that these agreements exist solely to effectuate the RSPA, which, according to the Debtors, should deem them inseparable from the RSPA and Undertaking Agreement for purposes of rejection.  (*Id.*)

### III.    LEGAL STANDARD

#### A.  Determining Whether a Contract is Executory

Section 365 of the Bankruptcy Code provides that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Notably, the Bankruptcy Code does not define the term "executory contract." The Supreme Court has noted that an executory contract is a contract that neither party has finished performing.  *Tempnology*, 139 S. Ct. at 1657 (citing 11 U.S.C. § 365(a)).)  Most courts have adopted Professor Countryman's definition of an executory contract as "a contract under which the obligation of both the [debtor] and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other."  Vern Countryman, *Executory Contracts in Bankruptcy: Part 1*, 57 MINN. L. REV. 439, 460 (1973).  Under Countryman's "material breach" test, a prepetition contract is executory when both sides are still obligated to render substantial performance.  *Enter. Energy Corp. v. United States (In re Columbia Gas Sys.)*, 50 F.3d 233, 239

16

(3d Cir. 1995); *Mitchell v. Streets (In re Streets & Beard Farm P'ship)*, 882 F.2d 233, 235 (7th Cir. 1989); *In re 375 Park Ave. Assocs.*, 182 B.R. 690, 697 (Bankr. S.D.N.Y. 1995).  Where such performance remains due on only one side, the contract is non-executory, and hence, neither assumable nor rejectable.  *See In re Chateaugay Corp.*, 102 B.R. 335, 345 (Bankr. S.D.N.Y. 1989).  The materiality of the breach is a question of state law.  *In re Columbia Gas Sys., Inc.*, 50 F.3d at 239 n.10.

To determine whether a contract was executory, the court in *Gen. DataComm Indus., Inc. v. Arcara (In re Gen. DataComm Indus., Inc.)*, 407 F.3d 616, 624 (3d Cir. 2005), considered whether there were material obligations that remained unperformed by the counterparty at the time the bankruptcy petition was filed.  The court found that when the parties define a breach of one party's obligation as a terminable breach in the contract, such obligations are material obligations.  *See id.*  As such, the benefit plan at issue was executory because it specified that the failure to perform certain duties entitled the counterparty to terminate the contract, and "by contractual definition, therefore, such obligations were material."  *Id.* at 625; *see also Jay Dee/Mole Joint Venture v. Mayor & City Council of Balt.*, 725 F. Supp. 2d 513, 526 (D. Md. 2010) ("Where the contract itself is clear in making a certain event a material breach of that contract, a court must ordinarily respect that contractual provision.") (internal quotation marks and citations omitted).

### B.  *Tempnology* and the Effect of Rejection

*Tempnology* involved a debtor's attempt in a Chapter 11 case to terminate a trademark license it had previously granted to a licensee by rejecting the underlying licensing agreement.  *Tempnology*, 139 S. Ct. at 1658–59.  The debtor argued that, as a result of rejection, the debtor not only was free to stop performing under the parties' agreement, but also that rejection

terminated the licensee's right to use the licensed trademark going forward. *Id.* The

bankruptcy court agreed, reasoning that the debtor's rejection of a trademark licensing

agreement must extinguish the rights that the agreement had conferred in the trademark

licensee. *Id.* at 1659.

The Bankruptcy Appellate Panel reversed, relying on the Seventh Circuit's decision in

*Sunbeam Prods. v. Chicago Am. Mfg., LLC*, 686 F.3d 372 (7th Cir. 2012). The court

determined that while rejection converts a debtor's unfulfilled obligations to a pre-petition

damages claim, it does not "terminate the contract" or "vaporize[ ]" the counterparty's rights, so

the licensee could continue to use the trademark as previously granted to it by the debtor.

*Tempnology*, 139 S. Ct. at 1659. The First Circuit rejected the Panel's view, reinstating the

bankruptcy court's opinion terminating the license. *Id.* The Supreme Court granted certiorari

to resolve the circuit split. *Id.* at 1660.

In an 8-1 decision, Justice Kagan, writing for the Court, reversed the decision of the First

Circuit, holding that rejection of an executory contract gives rise to a claim for breach of contract

against the debtor, but it does not operate as a termination or rescission of the rejected contract,

so a debtor cannot evade its pre-rejection grant of rights. *Id.* at 1657–58. The Court deemed this

distinction a "rejection-as-breach" approach, as opposed to the "rejection-as-rescission"

approach advocated by the debtor and adopted by the First Circuit. *Id.* at 1663.

The Supreme Court explained that rejection is a breach, and the consequences of such

breach are determined by "non-bankruptcy contract law." *Id.* at 1662. Thus, "a debtor's

rejection of an executory contract in bankruptcy has the same effect as a breach outside of

bankruptcy." *Id.* at 1666. That is, it "does not eliminate rights to the contract already conferred

on the non-breaching party." *Id.* at 1659. "It gives the counterparty a claim for damages, while

leaving intact the rights the counterparty has received under the contract." *Id.* at 1661.

Thus, a debtor does not have a right to repudiate prior performance, but rather can only "repudiat[e] any further performance of its duties." *Id.* at 1658, 1662 (stating that a debtor "cannot unilaterally revoke" what it contracted to provide the counterparty based on the debtor's own breach); *In re Lyondell Chem. Co.*, 416 B.R. 108, 115 (Bankr. S.D.N.Y. 2009); *In re Exec. Tech. Data Sys.*, 79 B.R. 276, 282 (Bankr. E.D. Mich. 1987). "A rejection breaches a contract but does not rescind it. And that means all the rights that would originally survive a contract breach, remain in place." *Tempnology*, 139 S. Ct. at 1657–58, 1666 ("[Rejection] cannot rescind rights that the contract previously granted."); *Rudaw/Empirical Software Prods., Ltd. v. Elgar Electronics Corp. (In re Rudaw/Empirical Software Prods., Ltd.)*, 83 B.R. 241, 245 (Bankr. S.D.N.Y. 1988) (stating that "debtor cannot undo an executed sale of property where title has passed. Such property does not revert as a result of the debtor's rejection of the executory contract."). "When it occurs, the debtor and counterparty do not go back to their pre-contract positions. Instead, the counterparty retains the rights it has received under the agreement. As after a breach, so too after a rejection, those rights survive." *Tempnology*, 139 S. Ct. at 1662.

*Tempnology* applies to all contracts, not just trademark licenses: "we reject an argument for the rescission approach turning on the distinctive features of trademark licenses. Rejection of a contract—any contract—in bankruptcy operates not as a rescission but as a breach." *Id.* at 1661. As the Court explained, Section 365 provides debtors with a "powerful tool: Through rejection, the debtor can escape all of its future contract obligations, without having to pay much of anything in return," given that debtors typically pay claims at "only cents on the dollar." *Id.* at 1658, 1665.

### C. Business Judgment Standard

Courts are inclined to "approve motions to assume, assume and assign, or reject executory contracts or unexpired leases upon a showing that the debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment." *In re MF Glob. Holdings Ltd.*, 466 B.R. 239, 242 (Bankr. S.D.N.Y. 2012); *see also NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523 (1984) (stating that section 365 is traditionally subject to the "business judgment" standard); *In re Gucci*, 193 B.R. 411, 415 (Bankr. S.D.N.Y. 1996) ("A bankruptcy court reviewing a trustee's decision to assume or reject an executory contract should apply its 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.").

In most cases, a court "will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate." *MF Glob. Holdings*, 466 B.R. at 242; *see also In re Balco Equities Ltd., Inc.*, 323 B.R. 85, 98 (Bankr. S.D.N.Y. 2005) ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous.'") (quoting *In re Sundial Asphalt Co.*, 147 B.R. 72, 84 (Bankr. E.D.N.Y. 1992)). "The 'business judgment' test merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's estate." *MF Glob. Holdings*, 466 B.R. at 242; *see also Bregman v. Meehan (In re Meehan)*, 59 B.R. 380, 385 (E.D.N.Y. 1986) ("The primary issue under the business judgment test is whether rejection of the contract would benefit general unsecured creditors."); *In re Helm*, 335 B.R. 528, 538 (Bankr. S.D.N.Y. 2006) ("To meet the business judgment test, the debtor in possession must 'establish that rejection will benefit the estate.'") (quoting *In re Cent. Jersey Airport Servs., LLC*, 282 B.R. 176, 183 (Bankr. D.N.J. 2002)).

# IV.   **DISCUSSION**

The central question before the Court is whether the USAV Agreements are executory and can be rejected under section 365 of the Bankruptcy Code.  The parties agree on the legal standard for determining whether the USAV Agreements are executory: "if *both* parties have substantial unperformed obligations, the contract is executory even though the uncompleted obligation of one of the parties only involves the payment of money."  *In re Teligent, Inc.*, 268 B.R. 723, 732 (Bankr. S.D.N.Y. 2001) (emphasis in original).  (*See* Motion ¶ 27; USAV Objection ¶ 22 n.7; Lender Objection ¶ 47.)

The Debtors argue that the Debtors and USAV have material unperformed obligations under the RSPA and Undertaking Agreement.  (Motion ¶¶ 24–28; Reply ¶¶ 18–29.)  The USAV Parties argue that the RSPA and Undertaking Agreement are not executory contracts because USAV has no material unperformed obligations under either agreement.  (Lender Objection ¶¶ 44–60; USAV Objection ¶¶ 17–26.)  The Debtors concede that the remaining six (6) agreements are not executory by their own terms (Motion ¶ 29), but argue that, under Colombian law, the USAV Agreements should be construed as one transaction for purposes of rejection.  (Reply ¶ 37.)  The USAV Parties agree that the Court should apply Colombian law to this part of the analysis (Supplemental Lender Response ¶¶ 21–24), but argue that Colombian law does not permit multiple agreements to be treated as one integrated contract.  (*Id.* ¶¶ 18–20.)

According to the Lenders, the Debtors, by rejecting the RSPA, are seeking to unwind the 2017 Transaction to get back the contract rights they sold in violation of Supreme Court's holding in *Tempnology*.  (Lender Sur-Reply ¶ 16 (citing *Tempnology*, 139. S. Ct. at 1662, 1663).)  The Debtors argue that they are not seeking to unwind the 2017 Transaction.  Rather, the Debtors seek to reject—*i.e.*, breach—the RSPA to be relieved of their unperformed obligations

thereunder, namely under RSPA § 2.01 to sell to USAV, for no additional consideration, the

contract rights arising under new card processing agreements.  (*See* Reply ¶¶ 7, 57.)

### A.  The RSPA Is Executory

The USAV Parties argue that neither the Debtors nor USAV have material obligations

remaining under the RSPA.  (*See* Lender Objection ¶¶ 44–60; USAV Objection ¶¶ 18–29.)  The

Debtors and Committee disagree.  As discussed below, the RSPA is an executory contract

subject to rejection under section 365 of the Bankruptcy Code because both the Debtors and

USAV have material unperformed obligations thereunder.

### 1.  The Debtors' Ongoing Obligations Under the RSPA

The Debtors have several material unperformed obligations under the RSPA, including

the obligation to sell their rights to payment under replacement credit card processing

agreements to USAV for no additional consideration.  (*See* RSPA § 2.01(a)(ii).)  Other material

unperformed obligations of the Debtors include to (a) ensure the Collection Coverage Ratio does

not drop below 1.75:1:00 (RSPA § 6.01(b)); (b) observe all obligations under the Undertaking

Agreement (*id.* § 6.01(c)(i)); (c) keep all Card Processing Agreements in effect by adhering to all

obligations under those agreements (*id.* § 6.01(e)–(f)); and (d) maintain the capacity or ability to

operate domestic and/or international flights (*id.* § 6.01(i)(i)) (collectively, the "Trigger Event

Obligations").

The failure to perform any of the Trigger Event Obligations results in a Trigger Event

under the RSPA, whereby USAV is entitled to prematurely terminate the RSPA and demand, as

damages, payment in full of its loan to the Lender Group, plus surcharged interest and

administrative costs—*i.e.*, the Liquidated Damages.  (*See* RSPA § 6.02.)  The Lender Group

argues that the Trigger Event Obligations are not ongoing obligations of the Debtors, but rather

conditions—the non-occurrence of which trigger certain consequences—namely, acceleration of the loan amount in the form of the Liquidated Damages.  (Lender Sur-Reply ¶ 46, 47.)  The Lender Group interprets the Trigger Event Obligations as being the opposite of a breach, they represent the Debtors' obligation to comply with contractual terms, not a failure to comply with a contractual term.  (*Id.* ¶ 47 (citing *In re Peanut Corp Ins. Litig.*, 524 F.3d 458, 474 (4th Cir. 2008) (noting that "[a] condition precedent is either an act of a party that must be performed or a certain event that must happen before a contractual right accrues or contractual duty arises") (citations and quotations omitted)).)  According to the Lender Group, "all" Trigger Events are merely conditions and that failing to perform is "simply not a breach."  (Lender Objection ¶ 57 (citing *In re Hawker Beechcraft, Inc.*, 486 B.R. 264, 276 (Bankr. S.D.N.Y. 2013) (stating that the "[n]on-occurrence of a condition is not a breach by a party unless he is under a duty that the condition occur.")  (citations and quotations omitted).

Regardless of how the Trigger Events are characterized, the RSPA clearly gives USAV the right to "prematurely terminate" the RSPA upon the occurrence of a Trigger Event—whether USAV decides to exercise that right is up to it.  (*See* RSPA § 6.02.)  While the RSPA does not require Avianca to "use best efforts" to ensure that a Trigger Event does not occur, USAV, at the direction of the Lender Group, has the right to unilaterally terminate the RSPA if a Trigger Event occurs.  (*Id.* (providing that, "[u]pon the occurrence of a Trigger Event, the Purchaser may or the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) shall prematurely terminate (*resolver*) this Agreement . . . .").)

When parties to a contract define a breach of one party's obligations as a terminable breach, such obligations are material obligations.  *See In re Gen. DataComm Indus., Inc.*, 407 F.3d at 625 (holding that a contract was executory because it specified that the failure to perform

certain duties entitled the counterparty to terminate the contract, and "by contractual definition, therefore, such obligations were material"). *See also In re Hawker Beechcraft, Inc.*, 486 B.R. at 278 (stating that where the parties "contractually agree that some or all of the terms are sufficiently important to discharge any further obligations imposed on the party aggrieved by a breach, their intent will govern"); *Gencor Indus., Inc. v. CMI Terex Corp. (In re Gencor Indus., Inc.)*, 298 B.R. 902, 911 (Bankr. M.D. Fla. 2003) (holding that an "affirmative duty to [e]nsure that the condition occurs" will be a material obligation); *In re Level Propane Gases, Inc.*, 297 B.R. 503, 508–09 (Bankr. N.D. Ohio 2003) (holding that the requirement to execute releases was material, and not conditional, where it was "specifically what the Debtors bargained for," without the satisfaction of which, "there would be no sound reason" for the parties to have entered the agreement). Accordingly, the Court concludes that the Debtors have material unperformed obligations under the RSPA.

### 2. USAV's Ongoing Obligations Under the RSPA

USAV also has material ongoing obligations under the RSPA, most significantly to distribute funds and make payments to the Debtors of the Additional Purchase Price. (Motion ¶ 27 (citing RSPA § 3.01(a)(ii)).) However, the USAV Parties argue this obligation is no longer ongoing because the prepetition Flight Impairment Trigger Event automatically "cut off" the Debtors' right to an Additional Purchase Price. (Lender Objection ¶¶ 14–15, 48 (citing RSPA § 3.01(a)(ii)).) The Debtors counter that the occurrence of a Trigger Event does not permanently relieve USAV from payment of the Additional Purchase Price. (Reply ¶ 28 (citing RSPA § 3.01(a)(ii) providing "that no Additional Purchase Price shall be paid during the continuance of a . . . Trigger Event").) Thus, the declaration of a Trigger Event only temporarily relieves USAV's obligation to pay the Advance Purchase Price. (Reply ¶ 28.) The Debtors also point to section

24

2.02 of the Cash Management Agreement, which calls for the resumption of payment of the
Additional Purchase Price once the Collateral Agent revokes any Trigger Event Notice.  (*Id.*
(citing Cash Management Agreement § 2.02).)

USAV's conduct confirms its obligation is only temporarily "cut off" upon the
occurrence of a Trigger Event: Citibank continued to send Additional Purchase Price payments
to the Debtors in April 2020 after sending the March Notice declaring a Trigger Event.  (*See*
Second Neuhauser Decl. ¶ 5.)  The Lender Group does not dispute that the Additional Purchase
Price payments are a contingent obligation of USAV.  (*See* Lender Sur-Reply ¶ 33.)  Rather, the
Lenders argue that, because the Flight Impairment Trigger Event remains ongoing and neither
USAV nor the Agents has revoked the Trigger Event, USAV has no unperformed obligation to
make Additional Purchase Price payments.  (*Id.* ¶ 35.)

The fact that an obligation is contingent is irrelevant for the purposes of determining
whether the underlying contract is executory.  (*See* UCC Reply ¶ 13 (citing *In re RoomStore,
Inc.*, 473 B.R. 107, 112–13 (Bankr. E.D. Va. 2012) ("In contrast, debtor's position, which finds
ample support in the case law, is that a contingent obligation, even though not yet triggered on a
debtor's petition date, is nevertheless executory until expiration of the contingency because until
the time has expired during which an event triggering a contingent duty may occur, the
contingent obligation represents a continuing duty to stand ready to perform if the contingency
occurs.") (citations and internal quotations omitted) (collecting authorities).  The fact that
USAV's obligation to pay the Additional Purchase Price was contingent on the Petition Date
(*i.e.*, such payments would become due following the cessation of the Trigger Event in the
future) does not change the legal reality that the obligation is material and unperformed for the
purposes of determining the executory nature of the RSPA.  (*See* RSPA §§ 3.01(a), 6.01(i)(i).)

25

Accordingly, the Court finds that USAV has material ongoing and unperformed obligations under the RSPA, namely the contingent obligation to make Additional Purchase Price payments. Therefore, the Court concludes that the RSPA is an executory contract that the Debtors may reject pursuant to section 365 of the Bankruptcy Code.

### B. The Undertaking Agreement Is Executory

The parties do not seriously dispute that the Debtors have material unperformed obligations under the Undertaking Agreement. However, the extent of USAV's unperformed obligations is contested by the USAV Parties. For the reasons set forth below, the Court finds that the Undertaking Agreement is executory because both the Debtors and USAV have material unperformed obligations thereunder.

### 1. Debtors' Ongoing Obligations Under the Undertaking Agreement

The Debtors have several ongoing obligations under the Undertaking Agreement. These include carrying out duties and responsibilities as servicer of the Contract Rights and Receivables. As Servicer, the Debtors agreed to undertake certain administrative duties that include (i) responding to inquiries of the Card Processors, correcting errors, and settling claims and disputes relating to receivables (Undertaking Agreement § 3.02(b)); (ii) managing, servicing, and administering the Contract Rights and the Collections (*id.* § 3.02(e)); (iii) using its best efforts to collect all payments called for under the terms and provisions of the Card Processing Agreements (*id.* § 3.02(h)); and (iv) providing monthly statements regarding Collections to USAV and Citibank (*id.* § 3.02(k)). (Motion ¶ 24). The Undertaking Agreement also requires the Debtors to ensure that each of the Card Processing Agreements remains the legal, valid, and binding obligation of each of the parties thereto, to perform and observe all of its material covenants and obligations contained in each of them, and to "renew each Card Processing

Agreement in accordance with the terms thereof and not consent to any termination by any Card Processor to any termination thereof." (Motion ¶ 25 (citing Undertaking Agreement § 2.01(v)).)

The USAV Parties do not contest that the Undertaking Agreement imposes ongoing obligations on the Debtors. (*See, e.g.*, USAV Objection ¶ 15 (stating that Avianca has ongoing obligations to USAV under the Undertaking Agreement "concerning late and delinquent receivables, including to collect USAV-owned receivables so that they can be delivered to USAV").) While the Lender Group appears to argue that the March Notice terminated the Debtors' obligations under the Undertaking Agreement, they immediately concede in a footnote that it failed to comply with the technical requirements to name a new servicer as would have been required under the Undertaking Agreement. (*See* Lender Objection ¶ 56; Undertaking Agreement § 3.12.)

Accordingly, the Court concludes that the Debtors have material unperformed obligations under the Undertaking Agreement.

2. <u>USAV's Ongoing Obligations Under the Undertaking Agreement</u>

Pursuant to section 3.05 of the Undertaking Agreement, USAV is required, upon the Debtors' request, to furnish to the Debtors any documents necessary to enable the Debtors to carry out their duties under the Undertaking Agreement, including furnishing any powers of attorney and other documents. (Lender Objection ¶ 49 (citing Undertaking Agreement § 3.05).) The Lenders argue that such obligation is *de minimis* and contingent, thus, not a material obligation for purposes of determining whether the Undertaking Agreement is executory. (*Id.*)

The Court rejects the Lenders' argument and finds that the obligation to furnish to the Debtors any documents, including powers of attorney, necessary to enable the Debtors to carry out their duties under the Undertaking Agreement is a material unperformed obligation. *Burley*

*v. Am. Gas & Oil Investors (In re Heafitz)*, 85 B.R. 274 (Bankr. S.D.N.Y. 1988) is instructive in

this regard.  There, the court found that an oil and gas limited partnership agreement was

executory because, *inter alia*, the general partner had an ongoing "obligation to make

distributions, to furnish additional financial statements, to prepare quarterly progress reports and

to maintain the books and records of the partnership." *Id.* at 282–84.  Similarly, in *In re

Teligent, Inc.*, 268 B.R. 723 (Bankr. S.D.N.Y. 2001), Judge Bernstein, while ruling that a merger

agreement was executory on narrower facts than those raised by the parties, flagged, *inter alia*,

the following as an unperformed obligation under the merger agreement: "the parties must

execute any and all further documents and instruments necessary and/or appropriate to carry out

the terms and provisions of the Merger Agreement." *Id.* at 729 n.7; *see also RDP Holdings v.

Tech Pharmacy Servs. (In re Provider Meds, L.L.C.)*, 907 F.3d 845, 855 (5th Cir. 2018) (finding

that a licensing agreement was executory where, *inter alia*, the agreement "straightforwardly

obligated the debtors to take certain ongoing actions, such as filing quarterly reports and not

discussing the settled lawsuit").  These cases support the conclusion that USAV's ongoing

obligation to furnish all necessary account records to the Debtors is a material obligation,

especially where—as here—Debtors require those documents to perform their obligations under

the Undertaking Agreement.

Accordingly, the Court finds that USAV has material unperformed obligations under the

Undertaking Agreement.  Therefore, the Court concludes that the Undertaking Agreement is an

executory contract that the Debtors may reject pursuant to section 365 of the Bankruptcy Code.

### C.  Under Colombian Law, The USAV Agreements Cannot be Construed as One Agreement for Purposes of Rejection

Having concluded that the RSPA and Undertaking Agreement are executory contracts

that may be rejected, the Court will now address the Debtors' request to reject the remaining

USAV Agreements.  As previously stated, the Debtors concede that the following six (6)

agreements are not executory by their own terms: (1) Cash Management Agreement, (2) Expense

Agreement, (3) Assignment Agreement, (4) Credomatic Notice, (5) Credomatic Consent and

Agreement, and (6) AMEX Notice and Consent.  (Motion ¶ 29.)  The Debtors state that these

agreements exist solely to effectuate the RSPA and ask the Court to deem these agreements to be

inseparable from the RSPA and Undertaking Agreement for purposes of rejection.  (Motion ¶ 29;

Reply ¶ 36.)  The USAV Parties argue that the USAV Agreements are not a single contract for

purposes of rejection.  (Lender Objection ¶ 34–43; USAV Objection ¶ 27–29.)

The parties agree that Courts look to applicable non-bankruptcy law on this issue and

agree that Colombian law—governing law of the RSPA and Undertaking Agreement—should

apply to the Court's analysis regarding the relatedness of the USAV Agreements.  (*See*

Supplemental Lender Response ¶ 16; Reply ¶ 36.)  The Debtors and the Lender Group submitted

Colombian law declarations addressing, *inter alia*, the extent to which several related agreements

can be treated as a single contract under Colombian law.  (*See* Arrubla Decl., ECF Doc. # 684-1;

Second Melo Decl., ECF Doc. # 720.)  The Court has reviewed the Colombian law declarations

and both declarants were available at the August 26, 2020 hearing to answer questions of the

Court.  For the reasons discussed below, the Court concludes that, under Colombian law, the

USAV Agreements should not be treated as a single contract for purposes of rejection under

section 365 of the Bankruptcy Code.

The Debtors argue that, under Colombian law, the USAV Agreements should be

evaluated together for purposes of rejection under section 365.  (Reply ¶ 37.)  In support of their

position, the Debtors submit the Arrubla Declaration, which states that, under Colombian law,

agreements that are "related between themselves in regard to their overall economic purpose, so

that each of them has repercussion on the others, and may be based on a single cause or shared

economic objective . . . must not be understood in an isolated manner, but instead, they should be

interpreted according to the 'supra-contractual' economic function of the entire operation as a

whole."  (Arrubla Decl. ¶ 14 (citing Supreme Court of Justice, Civil Division, Judgment of

December 19, 2018).)  Further, "[i]n order to establish a link, the emphasis of the interpretation

should not be on the contract, but rather the overall deal as an economic reality and this can be

present even when in different contracts the parties only coincide partially or when they are

regulated by different rules, whenever they seek the same overall economic goal."  (*Id.* (citing

Supreme Court of Justice, Civil Division, Judgement of November 15, 2017).)

The Lender Group submits that, under Colombian law, the USAV Agreements cannot be

evaluated together.  (*See* Lender Group Supplement Response ¶ 19.)  In support, the Lender

Group submits the second declaration of Jorge Suescun Melo, which states that, under

Colombian law, the doctrine of "colligated contracts" (*contratos coligados*) does not permit

multiple agreements to be treated as one integrated contract.  (Lender Sur-Reply ¶ 19 (citing

Second Melo Decl. ¶¶ 9–19).)  Further, "the purpose of the *contratos coligados* doctrine is not to

treat separate contracts as a single contract, but simply as an aid to courts when considering how

to interpret one contract within a suite of linked contracts, or as a framework for understanding

links among a series of contracts towards a common business objective."  (Second Melo Decl. ¶

19.)  The Second Melo Declaration also provides that:

> The *contratos coligados* doctrine has nothing to do with whether, and to my
> knowledge has never been used (and in my view cannot be used) in a
> manner that would result in, the colligated contracts being treated as a single
> contract.  I am aware of no Colombian case law or arbitral awards applying
> Colombian law holding that *contratos coligados* are "inseparable" or
> inextricably linked such that they would be treated by a Colombian court or
> arbitral panel as a single contract.  In fact, the case law says that the opposite
> is true: if parties wished for a suite of contracts to be treated as one contract,

> they must combine all terms and conditions of the proposed transaction into
> a single writing and separate writings will never be considered a single
> contract for purposes of Colombian law.

(*Id.* ¶ 11 (citing Colombian Supreme Court of Justice, Decision, November 15, 2017).)

Having considered the Parties respective Colombian law declarations, the Court

concludes that, under Colombian law, the USAV Agreements cannot be treated as a single

contract for purposes of rejection.[8]  The Court finds that the Arrubla Declaration merely sets

forth a general cannon of contract interpretation with respect to related agreements but does not

discuss or cite to any Colombian case law or arbitral awards holding that related agreements

should be treated as a single contract.  (*See* Arrubla Decl. ¶¶ 14, 15.)  In contrast, the Second

Melo Declaration specifically states that "the case law says that . . . separate writings will never

be considered a single contract for purposes of Colombian law."  (Second Melo Decl. ¶ 11

(citing Colombian Supreme Court of Justice, Decision, November 15, 2017).)  The Second Melo

Declaration further provides that "I am aware of no Colombian case law or arbitral awards

applying Colombian law holding that *contratos coligados* are 'inseparable' or inextricably linked

such that they would be treated by a Colombian court or arbitral panel as a single contract."  (*Id.*

¶ 11.)

Therefore, the Court rejects the Debtors' argument that the USAV Agreements should be

considered a single contract for purposes of rejection and concludes that the following

agreements are not executory contracts that the Debtors may reject pursuant to section 365 of the

Bankruptcy Code: (1) Cash Management Agreement, (2) Expense Agreement, (3) Assignment

Agreement, (4) Credomatic Notice, (5) Credomatic Consent and Agreement, and (6) AMEX

---

[8]     Federal Rule of Civil Procedure 44.1 provides, in relevant part, as follows:  n determining foreign law, the
court may consider any relevant material or source, including testimony, whether or not submitted by a party or
admissible under the Federal Rules of Evidence.  The court's determination must be treated as a ruling on a question
of law."  FED. R. CIV. P. 44.1.

Notice and Consent.  But as the Debtors' counsel acknowledged during argument, while the Debtors may not reject these contracts, the counterparties can assert damages claims under applicable non-bankruptcy law for any breach.

### D.  Rejection of the RSPA Does Not Rescind or Unwind the 2017 Transaction

Having concluded that the RSPA and Undertaking Agreements are executory contracts subject to rejection under Bankruptcy Code section 365, the Court must still address the USAV Parties' argument that rejection of the RSPA would violate the Supreme Court's holding in *Tempnology* that rejection does not permit a debtor to "get back" rights that they sold or "unwind" or "rescind" a transaction.  (Lender Sur-Reply ¶ 16 (citing *Tempnology*, 139. S. Ct. at 1662–63); *see also* Lender Group Objection ¶¶ 26, 33 (stating that rejection "would not allow the Debtors to take back from USAV Proceeds of the Contract Rights they sold in 2017 because of the contract mechanics.").)  The USAV Parties argue that even if the RSPA may be rejected, they are entitled to receive all of the proceeds from *future* (post-rejection) credit card receivables without paying any additional consideration because future receivables were among the Contract Rights sold in 2017.  The Debtors and Committee disagree with the assertions made by the Lenders and USAV.  Debtors submit that they seek to breach the RSPA so that they are no longer obligated to perform under the RSPA, namely, under RSPA § 2.01(a)(ii), to sell to USAV, for no additional consideration, the contract rights arising under new card processing agreements that the Debtors may seek to enter.  (*See* Reply ¶¶ 7, 57.)  Indeed, whether the USAV Parties are entitled to receive all of the proceeds from future (post-rejection) credit card receivables without paying any additional consideration is the crux of the dispute.

1. *Tempnology* Holds that Rejection Does Not Terminate a Contract

In *Tempnology*, the Bankruptcy Court granted the debtors' motion to reject a non-exclusive executory license agreement it entered into with Mission Products for, *inter alia*, the use of certain trademarks of the debtors both in the United States and around the world. *See Tempnology*, 139 S. Ct. at 1658. The consequence of debtors' breach meant two things on which the parties agreed. First, the debtors could stop performing under the contract. *Id.* at 1659. Second, Mission could assert (for whatever it might be worth) a pre-petition claim in the bankruptcy proceeding for damages resulting from the debtors' nonperformance. *Id.* However, the debtors thought that a further consequence of rejection was termination of the rights it had granted Mission to use the trademarks. *Id.* The debtors returned to the Bankruptcy Court and moved for a determination of what rights Mission retained following rejection of the license agreement. *Id.*

In an 8-1 decision, Justice Kagan, writing for the Court, held that rejection of an executory contract gives rise to a claim for breach of contract against the debtor, but it does not operate as a termination or recession of the rejected contract. *Id.* at 1657–58. The Court deemed this distinction a "rejection-as-breach" approach, as opposed to the "rejection-as-rescission" approach advocated by the debtor and adopted by the First Circuit. *Id.* at 1663.

Section 365 of the Bankruptcy Code provides that subject to Bankruptcy Court approval, a debtor may "'reject any executory contract'—meaning a contract that neither party has finished performing." *Id.* at 1657 (quoting 11 U.S.C. § 365(a)). The Supreme Court explained that rejection is a breach, and the consequences of breach are determined by "non-bankruptcy contract law." *Id.* at 1662. The majority held, and the concurrence emphasized, that in specific cases, specialized terms in a contract may limit what rights the non-breaching counterparty may

33

have.  *See id.* at 1666 ("[T]he baseline inquiry remains whether the licensee's rights would survive a breach under applicable nonbankruptcy law.  Special terms in a licensing contract or state law could bear on that question in individual cases.") (Sotomayor, J., concurring).  Thus, "a debtor's rejection of an executory contract in bankruptcy has the same effect as a breach outside of bankruptcy.  *Id.*  That is, it "does not eliminate rights to the contract . . . already conferred on the non-breaching party."  *Id.* at 1659.  Rather, "[i]t gives the counterparty a claim for damages, while leaving intact the rights the counterparty has received under the contract."  *Id.* at 1661.  "When [rejection] occurs, the debtor and counterparty do not go back to their pre-contract positions.  Instead, the counterparty retains the rights it has received under the agreement.  As after a breach, so too after rejection, those rights survive."  *Id.* at 1662.

### 2.  The Debtors Sold Contract Rights to Specified Sales Processed by AMEX and Credomatic

Here, the determination of any rejection damages claim is not currently an issue before the Court.  But the parties have forcefully contested what rights USAV, as Purchaser, received under the RSPA that necessarily survive the Debtors' rejection of the RSPA.

Pursuant to the RSPA, Avianca agreed to (i) sell and transfer to the Purchaser, and to be replaced by the Purchaser in the contractual positions under the Card Processing Agreements with respect to, all rights of the Seller in, to and under the Contract Rights; and (ii) sell and transfer to the Purchaser the Receivables.[9]  (Reneger Decl. at 10.)  The RSPA defines Contract Rights to mean "the contract rights of the Seller under the Card Processing Agreements to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on

---

[9]    The RSPA defines Receivables to mean "any and all Collections accrued under the Card Processing Agreements that are due on account of Specified Sales from (a) AMEX or Credomatic to the Seller immediately prior to giving effect to this Agreement on the Effective Date (and due to the Purchaser immediately upon giving effect to this Agreement on the Effective Date)."  (ECF Doc. # 306-2 at 20–21.)

account of Specified Sales, including the right, among other things, to receive all future

Collections derived therefrom; and (ii) enforce the rights referred to in (i) against the respective

Card Processors thereunder." (*Id.* at 13.)  The RSPA provides a general definition of the term

"Specified Sales" [10] and refers to the AMEX Notice and Consent and the Credomatic Notice and

Consent to determine what "Specified Sales" means with respect to each Card Processing

Agreement.  (*Id.* at 22.)

The AMEX Notice and Consent defines Specified Sales to mean "the sales, including

future sales, made by travel agencies in the United States and cleared through ARC of airline

tickets or related services provided by the Receivables Seller where payment in the case of any

such sale is made by an American Express® Card, however branded, or any one or more of such

Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A

hereto, with such changes, if any, as shall have been made from time to time after delivery and

acceptance of a Merchant ID Supplement." (*Id.* at 321.)  Exhibit A to the AMEX Notice and

Consent includes just one (1) merchant number: 7992700286 (the "AMEX Merchant Number").

(*Id.* at 322.)  Accordingly, the Court finds that the Debtors sold to USAV the Debtors' right to

receive payment of any sales identified by the AMEX Merchant Number and/or any replacement

or additional merchant number assigned by AMEX that identify the Specified Sales with respect

---

[10]     The RSPA defines Specified Sales to mean "the sales, including future sales, made by travel agencies in the
United States and cleared through ARC of airline tickets or related services provided by the Seller where payment in
the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however
branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set
forth in any Notice and Consent or any notice given by a Card Processor to the Purchaser and the Collateral Agent
from time to time as provided in the Notice and Consent by and among, inter alia, the Purchaser, the Seller, the
Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement,
'Specified Sales' shall include only 'Specified Sales' as defined in the Notice and Consent relating to such Card
Processing Agreement." (*Id.* at 22.)

to AMEX.  Rejection of the RSPA and Undertaking Agreement does not terminate USAV's right

to receive payment of any sales processed by AMEX under the AMEX Notice and Consent.

The Credomatic Notice and Consent defines Specified Sales to mean "the sales, including

future sales, made by travel agencies in the United States and cleared through ARC of airline

tickets or related services provided by Avianca S.A. where payment in the case of any such sale

is made by a Master Card® Card or Visa® Card, however branded, or any one or more of said

Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A

hereto, with such changes, if any, as shall have been made from time to time after delivery and

acceptance of a Merchant ID Supplement." (*Id.* at 280–281.)  Exhibit A to the Credomatic

Notice and Consent includes just one (1) merchant code: "Credomatic FL (VI/MC): 5610-

014001084970" (the "Credomatic Merchant Code"). (*Id.* at 283.)  Accordingly, the Court finds

that the Debtors also sold to USAV the Debtors' right to receive payment of any sales identified

by the Credomatic Merchant Code and/or any replacement or additional merchant code assigned

by Credomatic that identify the Specific Sales with respect to Credomatic.  Rejection of the

RSPA and Undertaking Agreement does not terminate USAV's right to receive payment of any

sales processed by Credomatic under the Credomatic Notice and Credomatic Consent and

Agreement.

The result of rejection here is not a recession of the RSPA or Undertaking Agreement and

rejection does not allow the Debtors to take back the Contract Rights to Specified Sales

processed by AMEX and Credomatic that the Debtors sold in 2017.  Rather, the result of

rejection is to relieve the Debtors of their future performance obligations to USAV, including the

unperformed obligation under section 2.01(a)(ii) of the RSPA to sell to USAV the contract rights

arising under new credit card processing agreements that the Debtors may seek to enter with new

credit card processors. The only link between the profits generated by operating flights and selling airline tickets and the payment rights purportedly acquired by USAV is the fact that the Debtors have not yet terminated their prepetition credit card agreements with AMEX and Credomatic. (Committee Reply ¶ 22.) Accordingly, the Court rejects the USAV parties' argument that rejection of the RSPA and Undertaking Agreement is a rescission of those agreements in violation of the Supreme Court's holding in *Tempnology*.

### E. Rejection Damages

The Debtors' rejection of the RSPA and Undertaking Agreement gives the USAV Parties a claim for damages. *See* 11 U.S.C. § 365(g)(1); *see also Tempnology*, 139 S. Ct. at 1661. The USAV Parties argue that any rejection damages claim in the amount of the Liquidated Damages under the RSPA would be wholly secured pursuant to the terms of the RSPA and its attendant security agreements. The Debtors and Committee submit that USAV's claim for rejection damages would be an unsecured prepetition claim in the amount of the Liquidated Damages under the RSPA. The issue of rejection damages must be resolved through the claims resolution process and is not relevant to the question before the Court of whether the Debtors should be permitted to reject the USAV Agreements. Without resolving the rejection damages issues, the Court will summarize the Parties' competing positions in the footnote below.[11] The parties

---

[11] The Lenders argue that providing USAV with an impaired claim under a plan of reorganization would not provide "payment in full" of the Liquidated Damages amount. (Lender Sur-Reply ¶¶ 6, 20.) The Lenders submit that all obligations of the Debtors under the RSPA and the Undertaking Agreement, including the obligation to "transfer Collection to [USAV] should they be received by [the Debtors] after the date of execution of the RSPA," are "Secured Obligations" under (i) a Pledge over Contract Rights and Future Revenues (the "Colombian Purchaser Security Agreement") between Aerovias, as grantor, and USAV as secured party; and (ii) a Costa Rican Back-Up Security Agreement (the "Costa Rican Purchaser Security Agreement") between Aerovias, as grantor, and USAV as secured party. (Supplemental Lender Response ¶ 10 (citing RSPA §§ 6.02 and 6.03).) Thus, the Lenders argue that USAV would be entitled to priority rights against the Contract Rights and Proceeds under the Colombian and Costa Rican Purchaser Security Agreements. (*Id.* ¶ 12.)

The Lender Group further argues that USAV granted security interests in all of its assets to the Lender Group to secure the obligations under the Loan Agreement, including the Contract Rights, and all of USAV's bank accounts into which the Proceeds are deposited, pursuant to (i) a New York Security Agreement governed by New York law; (ii) an Account Control Agreement governed by New York law; (iii) a Security Agreement governed by

should endeavor to resolve these disputes through plan negotiations and, if necessary, through mediation.

### F. Rejecting the RSPA and Undertaking Agreement is a Sound Exercise of the Debtors' Business Judgement

In most cases, a court "will not second-guess a debtor's business judgment concerning whether the assumption or rejection of an executory contract or unexpired lease would benefit the debtor's estate." *MF Glob. Holdings*, 466 B.R. at 242; *see also In re Balco Equities Ltd., Inc.*, 323 B.R. at 98 ("A court 'should defer to a debtor's decision that rejection of a contract would be advantageous.'") (quoting *In re Sundial Asphalt Co.*, 147 B.R. at 84). "The 'business judgment' test merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit the Debtor's estate." *MF Glob. Holdings*, 466 B.R. at 242.

Here, the Debtors state that rejection of the RSPA and Undertaking Agreement is crucial for their estates because when the Debtors begin flying again, the cash flow generated by the

---

English law; and (iv) a Security Trust Deed governed by English law. (*Id.* ¶ 13.) Thus, the Lender Group concludes that, in the event that the Court grants the rejection Motion, the Lender Group would have a first-priority lien on the Contract Rights and Proceeds "back-to-back" to the valid and enforceable security interests held by USAV under the Colombian and Costa Rican Purchaser Security Agreements. (*Id.*)

The Debtors contend that the result of breach as a result of rejection will be USAV's claim for rejection damages against the Debtors—specifically, an unsecured pre-petition claim in the amount of the Liquidated Damages provision contained within the RSPA. (Reply ¶ 42.) This Liquidated Damages amount is equal to the unpaid principal remaining on USAV's loan, plus surcharged interest on that principal until paid in full, and other miscellaneous costs related to the unwinding of the transaction. (*Id.*) That breach of the RSPA, the Debtors submit, would lead to this result is apparent from the RSPA itself—for under Colombian law, as under U.S. law, the remedy for breach of contract is determined in the first instance by reference to the contract itself. (*See* Arrubla Decl. ¶ 18.) The Debtors submit that, at most, they granted a contingent security interest in the Contract Rights and Receivables to USAV in the Colombian and Costa Rican Purchaser Security Agreements. (Debtors' Supplemental Response ¶ 15.) The Debtors argue, however, that the contingent security interests granted in both of these security agreements were not in effect as of the Petition Date, and to date have not yet sprung into effect. (*Id.*) Although the RSPA permitted USAV to file, and USAV did file, a UCC-1 filing statement, the UCC-1 statement did not perfect a security interest in the Contract Rights but rather perfected the sale thereof. (*Id.* ¶ 18.) The Debtors submit that, even if the Court were to determine that USAV would have a secured rejection damages claim, section 552 of the Bankruptcy Code would cut off any such security interest with respect to post-petition receivables. (*Id.* ¶ 19.) According to the Debtors, because post-petition receivables are generated by the Debtors' post-petition operations and labor, those receivables would no longer be subject to any security interest that the USAV Parties claim to hold. (*Id.*)

credit card receivables collected under the Card Processing Agreements and the proceeds thereof will be a vital component of the Debtors' liquidity.  (Reply ¶ 8.)  And Debtors believe that rejection is in their best interests whether the rejection damages claim is secured or unsecured.  Absent that cash flow, the Debtors will not be able to bear the cost related to producing the services that give rise to such receivables.  (*Id.*)  The Court finds that being relieved of unperformed obligations under the RSPA and Undertaking Agreement will benefit the Debtors' estates by restoring critical cash flow to the Debtors.  Accordingly, the Court concludes that the decision to reject the RSPA and Undertaking Agreement is a sound exercise of the Debtors' business judgment.

### G.    Rejection of the RPSA and Undertaking Agreement Is Effective *Nunc Pro Tunc* to June 23, 2020

The Debtors argue that rejection should be effective as of June 23, 2020, the date that the rejection motion was filed.  The USAV Parties appear to dispute that argument.  The Court agrees that rejection should be *nunc pro tunc* to the date the Motion was filed.  *See BP Energy Co. v. Bethlehem Steel Corp.*, No. 02 CIV. 6419 (NRB), 2002 WL 31548723, at \*3–4 (S.D.N.Y. Nov. 15, 2002) (stating that, in a case involving gas purchase contracts, "nothing in the language of § 365(a) indicates that a bankruptcy court should be prohibited from assigning a retroactive rejection date" and holding "that a bankruptcy court is not precluded as a matter of law from authorizing a rejection date which precedes the filing of objection when the equities demand such remediation"); *see also In re Jamesway Corp.*, 179 B.R. 33, 38 (S.D.N.Y.1995) ("[A] court can, where appropriate, approve rejection retroactively."); *In re CCI Wireless LLC*, 279 B.R. 590, 595 (Bankr. D. Colo. 2002) ("[T]his Court may—and in this instance should—approve the

rejection of a non-residential lease retroactive to the filing date of the motion to reject the lease.")[12]

## V.    CONCLUSION

For the reasons discussed above, the Debtors' Motion is **GRANTED IN PART** and **DENIED IN PART**: The Court concludes that the RSPA and Undertaking Agreement are executory contracts that the Debtors may reject pursuant to section 365 of the Bankruptcy Code. The remaining USAV Agreements are not executory contracts that can be rejected by the Debtors.

**IT IS SO ORDERED.**

Dated:  September 4, 2020
        New York, New York

_Martin Glenn_
MARTIN GLENN
United States Bankruptcy Judge

---

[12] While the Court acknowledges that courts in this Circuit have approved retroactive rejection dates most commonly in the context of unexpired leases of nonresidential real property under section 365(d)(3), the Court rejects the Lenders' argument that such precedent is inapposite to the present Motion. *See BP Energy Co. v. Bethlehem Steel Corp.*, 2002 WL 31548723, at *3 n.7 (stating that while the majority of cases "deal with the rejection of an unexpired lease rather than the rejection of an executory utility contract, we find these cases analogous for the purposes of determining whether a bankruptcy court is authorized to assign a retroactive rejection date")