**Hearing Date & Time: July 26, 2021 at 2:00 p.m. (prevailing Eastern Time)**
**Objection Deadline: July 26, 2021 at 2:00 p.m. (prevailing Eastern Time)**

Dennis F. Dunne, Esq.
Evan R. Fleck, Esq.
Benjamin M. Schak, Esq.
MILBANK LLP
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000

Gregory Bray, Esq.
MILBANK LLP
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000

*Counsel for Debtors and*
*Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-----------------------------------------------------------------x

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AVIANCA HOLDINGS S.A. *et al.*, | : | Case No. 20-11133 (MG) |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |

**NOTICE OF HEARING ON DEBTORS' MOTION FOR ENTRY OF AN ORDER**
**(I) APPROVING TERMS OF, AND DEBTORS' ENTRY INTO AND**
**PERFORMANCE UNDER, THE DIP-TO-EXIT FACILITY COMMITMENT LETTERS**
**AND (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE**
**OF OBLIGATIONS THEREUNDER AS ADMINISTRATIVE EXPENSES**

---

[1]    The debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaragüense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aéreo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A); AV Loyalty Bermuda, Ltd. (N/A); Aviacorp Enterprises, S.A. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

**PLEASE TAKE NOTICE** that a hearing will be held at **2:00 p.m. (prevailing Eastern Time) on July 26, 2021** before the Honorable Martin Glenn, United States Bankruptcy Judge, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, New York 10004 to consider the *Debtors' Motion for an Order (I) Approving Terms of, And Debtors' Entry Into and Performance Under, the DIP-to-Exit Facility Commitment Letters and (II) Authorizing Incurrence, Payment, and Allowance of Obligations Thereunder as Administrative Expenses* (the "Motion").

**PLEASE TAKE FURTHER NOTICE** that the Hearing will be conducted remotely via Zoom for Government.  Parties wishing to appear at the Hearing, whether in a "live" or "listen only" capacity, must make an electronic appearance through the "eCourtAppearances" tab on the Court's website (http://www.nysb.uscourts.gov/content/judge-martin-glenn) no later than **4:00 p.m. (prevailing Eastern Time) the business day before the Hearing** (the "Appearance Deadline").  Following the Appearance Deadline, the Court will circulate by email the Zoom link to the Hearing to those parties who have made an electronic appearance.  Parties wishing to appear at the Hearing must submit an electronic appearance through the Court's website by the Appearance Deadline and not by emailing or otherwise contacting the Court.  Additional information regarding the Court's Zoom and hearing procedures can be found on the Court's website.

**PLEASE TAKER FURTHER NOTICE** that any objections or responses to the relief requested in the Motion shall: (a) be in writing; (b) conform to the Federal Rules of Bankruptcy Procedure, the Local Bankruptcy Rules for the Southern District of New York, all General Orders applicable to chapter 11 cases in the United States Bankruptcy Court for the Southern District of New York, and the Case Management Order; (c) be filed electronically with this Court on the

docket of *In re Avianca Holdings S.A.*, Case 20-11133 (MG) by registered users of this Court's electronic filing system and in accordance with the General Order M-399 (which is available on this Court's website at http://www.nysb.uscourts.gov) by **July 26, 2021, at 2:00 p.m. (prevailing Eastern Time)**; and (d) be served on the following parties: (i) the Chambers of the Honorable Martin Glenn, United States Bankruptcy Court for the Southern District of New York, One Bowling Green, New York, NY 10004 (mg.chambers@nysb.uscourts.gov); (ii) the Debtors, Avenida Calle 26 No. 59-15 Bogotá D.C., Colombia (Attn: Richard Galindo (richard.galindo@avianca.com)); (iii) Milbank LLP, 55 Hudson Yards, New York, New York 10001, (Attn: Evan R. Fleck, Esq., Gregory A. Bray, Esq., and Benjamin M. Schak, Esq. (efleck@milbank.com, gbray@milbank.com, and bschak@milbank.com)), counsel for the Debtors; (iv) Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019 (Attn: Brett H. Miller, Esq. and Todd M. Goren, Esq. (bmiller@willkie.com and tgoren@willkie.com)), counsel to the Official Committee of Unsecured Creditors (the "Committee"); (v) U.S. Department of Justice, Office of the U.S. Trustee, 201 Varick Street, Room 1006, New York, NY 10014 (Attn: Brian Masumoto, Esq. and Greg Zipes, Esq. (brian.masumoto@usdoj.gov and greg.zipes@usdoj.gov)); (vi) the Securities and Exchange Commission, 100 F Street, NE, Washington, D.C. 20549; (vii) the Federal Aviation Administration, 800 Independence Ave., S.W. Washington, DC 20591 (Attn: Office of the Chief Counsel); (viii) Skadden, Arps, Slate, Meagher & Flom LLP, 155 North Wacker Drive, Chicago, IL 60606 (Attn: James Mazza, Esq. and Justin Winerman, Esq. (james.mazza@skadden.com and justin.winerman@skadden.com)), counsel to certain of the proposed Lenders; (ix) Davis Polk & Wardwell LLP, 450 Lexington Ave, New York, NY 10017 (Attn: Damian Schaible, Esq. and Abraham Bane, Esq. (damian.schaible@davispolk.com and abraham.bane@davispolk.com)), counsel to certain of the

proposed Lenders; (x) Paul Hastings LLP, 515 South Flower Street, 25th Floor, Los Angeles, CA 90071 (Attn: Yousuf Dhamee, Esq. (yousufdhamee@paulhastings.com)), counsel to one of the proposed Lenders; and (xi) Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017 (Attn: Sandeep Qusba, Esq. and Nicholas Baker, Esq. (squsba@stblaw.com and nbaker@stblaw.com)), counsel to the DIP Facility Agent.

PLEASE TAKE FURTHER NOTICE that copies of the Motion and other pleadings for subsequent hearings may be obtained free of charge by visiting the KCC website at http://www.kccllc.net/avianca.  You may also obtain copies of any pleadings by visiting at http://www.nysb.uscourts.gov in accordance with the procedures and fees set forth therein.

PLEASE TAKE FURTHER NOTICE that *your rights may be affected*.  You should read the Motion carefully and discuss them with your attorney, if you have one.  If you do not have an attorney, you may wish to consult with one.

PLEASE TAKE FURTHER NOTICE that the Hearing may be continued or adjourned thereafter from time to time without further notice other than an announcement of the adjourned date or dates at the Hearing or at a later hearing.

PLEASE TAKE FURTHER NOTICE that you need not appear at the Hearing if you do not object to the relief requested in the Motion.

PLEASE TAKE FURTHER NOTICE that if you do not want the Court to grant the relief requested in the Motion, or if you want the Court to consider your view on the Motion, then you or your attorney must attend the Hearing.  If you or your attorney do not take these steps, the Court may decide that you do not oppose the relief sought in the Motion and may enter orders granting the relief requested in the Motion with no further notice or opportunity to be heard.

Dated: July 22, 2021
New York, New York

By:    /s/ *Evan R. Fleck*

Dennis F. Dunne, Esq.
Evan R. Fleck, Esq.
Benjamin M. Schak
**MILBANK LLP**
55 Hudson Yards
New York, NY 10001
Telephone: (212) 530-5000
Facsimile: (212) 530-5219
Email:  ddunne@milbank.com
        efleck@milbank.com
        bschak@milbank.com

Gregory Bray, Esq.
**MILBANK LLP**
2029 Century Park East
33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Email: gbray@milbank.com

*Counsel for Debtors and
Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| | x | |
| In re: | : | Chapter 11 |
| | : | |
| AVIANCA HOLDINGS S.A., *et al*., | : | Case No. 20-11133 (MG) |
| | : | |
| Debtors.[1] | : | Jointly Administered |
| | : | |
| | x | |

**DEBTORS' MOTION FOR ENTRY**
**OF AN ORDER (I) APPROVING TERMS OF, AND**
**DEBTORS' ENTRY INTO AND PERFORMANCE UNDER,**
**THE DIP-TO-EXIT FACILITY COMMITMENT LETTERS AND**
**(II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE**
**OF OBLIGATIONS THEREUNDER AS ADMINISTRATIVE EXPENSES**

Avianca Holdings S.A. and its affiliated debtors in the above-captioned chapter 11 cases

(the "Chapter 11 Cases"), as debtors-in-possession (collectively, the "Debtors"), respectfully

represent as follows in support of this motion (the "Motion"):

**RELIEF REQUESTED**

1.      By this Motion, the Debtors request the entry of an order substantially in the form

annexed hereto as **Exhibit A** (the "Commitment Letters Order") (i) authorizing them to accept,

---

[1]     The debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent
applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A);
Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease
Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665);
AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A.
(N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments
Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca
Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A.
(N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-
2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del
Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC
(41-2187926); Nicaragüense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas
S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aéreo y Rampa S.A. (N/A); Servicios Aeroportuarios
Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca
International Airlines S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services,
S.A. de C.V. (N/A); AV Loyalty Bermuda, Ltd. (N/A); Aviacorp Enterprises, S.A. (N/A).  The Debtors' principal
offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

execute and enter into the DIP-to-exit commitment letters attached hereto as **Exhibits B-1** and **B-2** (respectively, the "Tranche A-1 Commitment Letter" and the "Tranche A-2 Commitment Letter" and, together, the "Commitment Letters")[2] and (ii) approving the incurrence and payment of obligations under the Commitment Letters (including the Commitment Premiums, the Fee and Expense Reimbursements and the indemnification obligations set forth therein) as superpriority administrative expenses of the Debtors' estates.

2.      If the Court grants this Motion, the Debtors intend to seek soon, by separate motion, approval of an amendment to the existing DIP Documents to provide for two new tranches of loans or notes (respectively, the "New Tranche A-1 DIP/Exit Loans" and the "New Tranche A-2 DIP/Exit Loans" and, together, the "New Tranche A DIP/Exit Loans").   The New Tranche A DIP/Exit Loans would refinance in full the existing $1.4 billion "Tranche A" DIP obligations, provide the Debtors with approximately $220 million in additional liquidity, and would convert into long-term debt financing upon the Debtors' emergence from chapter 11 upon the satisfaction of certain conditions.   The relief requested in this Motion is a predicate to the Lenders' participation in the New Tranche A DIP/Exit Loans.

## JURISDICTION

3.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. § 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4.      The principal bases for the relief requested herein are sections 105(a), 363, 503(b)(1), and 507(a)(2) of title 11 of the U.S. Code (the "Bankruptcy Code") and Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[2]    Capitalized terms not defined herein have the meanings ascribed to them in the Commitment Letters or the Final DIP Order, as applicable.

## BACKGROUND

### A.  General Background

5.    On May 10, 2020, each of the Debtors except AV Loyalty Bermuda, Ltd. and Aviacorp Enterprises, S.A. filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court commencing their Chapter 11 Cases.  On September 21, 2020, the remaining two Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in this Court commencing their Chapter 11 Cases.

6.    The Debtors continue to manage and operate their businesses and properties as debtors-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  The Debtors' cases are being jointly administered pursuant to Bankruptcy Rule 1015(b).  No trustee or examiner has been appointed in any of the Chapter 11 Cases.  On May 22, 2020, the U.S. Trustee appointed the Committee pursuant to section 1102 of the Bankruptcy Code.  *See Notice of Appointment* [ECF No. 154].

7.    Additional information regarding the Debtors' business, capital structure, and the circumstances leading to the filing of these cases is set forth in the First Day Declaration.

### B.  The DIP Financing

8.    Last fall, this Court entered an order [ECF No. 1031] (the "Final DIP Order") approving a senior tranche of DIP loans and notes ("Tranche A") and a junior tranche of DIP loans and notes ("Tranche B").  The Debtors' entry into this postpetition financing was a major step forward in the Chapter 11 Cases, coming after months of negotiations with existing lenders and bondholders, existing equity holders, other potential sources of new-money financing, the Committee, and other stakeholders, led by the Debtors' management team, Seabury Securities LLC ("Seabury"), and other arrangers.  Since then, the DIP Facility has given the Debtors the

liquidity needed to make meaningful progress in these Chapter 11 Cases. Additional information about the development, marketing, and structure of the DIP Facility is set forth in the *Declaration of John E. Luth* filed contemporaneously herewith and in the *Declaration of John E. Luth* filed on September 21, 2020.[3]

9.      Tranche A, which is now fully drawn, consists of loans and notes, the consideration for which consisted of new money from prepetition noteholders and new lenders, Advent International's sale of LifeMiles equity to the Debtors, and a roll-up of prepetition secured notes. The Debtors have consistently paid interest and fees on Tranche A in kind. As a result, the total amount owing under Tranche A is now approximately $1.38 billion.

10.     Tranche A may be repaid in cash at any time without penalty, but must be paid in full in cash no later than its maturity date or the date on which the Debtors consummate their chapter 11 plan. Whenever Tranche A is repaid, the Debtors will be charged Tranche A Back-end Fees of 1.75% for certain Tranche A loans that were originally made by lenders that provided a backstop and 0.75% for other Tranche A loans.

11.     Tranche B, which is also fully drawn, consists of loans, the consideration for which consisted of new-money investments (in part from lenders under the prepetition credit facility known as the "Stakeholder Facility") and a roll-up of all outstanding loans under that same facility. As with Tranche A, the Debtors have consistently paid interest and fees on Tranche B in kind. As a result, the total amount owing under Tranche B is now approximately $790,000,000 and, together with exit fees of 10%, will equal or exceed $935,000,000 upon emergence from chapter 11 (on or after October 31, 2021).

---

[3]    *Declaration of John E. Luth in Support of (I) Debtors' Motion for Entry of an Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Superpriority Administrative Claims, and (C) Granting Related Relief, and (II) Debtors' Motion for an Order (A) Authorizing Debtors' Entry Into a Securities Purchase Agreement; and (B) Granting Related Relief* [ECF No. 966].

12.     Tranche B may, at the Debtors' option and subject to certain conditions, be converted into equity in the reorganized Debtors upon consummation of a chapter 11 plan.

### THE COMMITMENT LETTERS

13.     As previously reported to the Court, the Debtors commenced a marketing process for exit equity financing on April 14, 2021, led by Seabury.  The purpose of this competitive process was to solicit up to $300 million of additional equity capital to be matched up with the option being negotiated with the Tranche B Lenders.  Seabury and the Debtors solicited proposals from any party or group of parties willing to provide equity capital of sufficient size to pay off the Tranche B obligations and on more attractive terms than the Tranche B conversion option. Indications of interest in the exit equity financing were due to Seabury by June 2, 2021.  See *Notice Regarding Exit Equity Financing Process* [ECF No. 1739].

14.     The Debtors and Seabury initially contacted over 125 potential investors to solicit new investments in the Debtors.  Many of these parties, such as current DIP lenders, were already highly familiar with the Debtors' business, and over 35 parties ultimately signed up for access to a data room with comprehensive information on the Debtors' business plan, cash flow projections and other materials.  Many of these potential investors also participated in focused diligence sessions with Avianca's management and professionals.

15.     Although the principal purpose of this marketing process was to obtain additional *equity* capital (to either supplement or replace the Tranche B conversion option), the Debtors and Seabury also actively discussed *debt* financing structures with dozens of potential investors who participated in the solicitation.

16.     At the same time, the Debtors sought the advice of (and are in the process of formally retaining) Credit Suisse Securities (USA), LLC ("Credit Suisse") as a debt capital

markets advisor for the exit debt financing facilities, along with other banks. The Debtors did so in order to benefit from Credit Suisse's and other banks' expertise and obtain its advisory and structuring services in connection with the exit debt financing. As part of the Debtors' forthcoming motion to approve an amendment to the existing DIP Facility documents to provide for the New Tranche A DIP/Exit Loans, the Debtors intend to seek approval of fees associated with other financial institutions that assisted in obtaining the financing.

17.    As a result of those discussions, the Debtors have now obtained two important financial commitments for replacement DIP financing. The first commitment, from a group of lenders that includes many of the existing Tranche A DIP Lenders, is for $1,050,000,000 in New Tranche A-1 DIP/Exit Loans. The second commitment, from a group of new-money lenders, is for $550,000,000 in New Tranche A-2 DIP/Exit Loans. The two tranches have slightly different commercial terms, but both will be used to replace the existing Tranche A and both will convert, at the Debtors' option (subject to satisfaction of certain conditions precedent), to 7-year exit financing upon emergence. These commitments are embodied in the Commitment Letters, which the Lenders have delivered and the Debtors have accepted and executed, subject to this Court's approval.

18.    This newly committed financing will be a key component of any chapter 11 plan that the Debtors propose. Between the existing Tranche B equity conversion option and these new debt conversion options, the Debtors have now secured commitments for the vast majority of the exit financing that they expect to obtain in preparation for emergence. As shown in the following illustrative chart, the New Tranche A DIP/Exit Loans will combine with the Debtors' existing

Tranche B equity conversion option to constitute a significant majority of the exit financing that the Debtors anticipate having in place at emergence.



Illustrative Exit Financing

■ New Tranche A-1 ($1.050bn)    ■ New Tranche A-2 ($550mm)
■ Tranche B Equity Conversion Option (~$935mm)    ■ Other Equity Financing (~$200mm)

19.    While the New Tranche A DIP/Exit Loans offer a significant long-term benefit to the Debtors, they do not come at unreasonable cost.  To the contrary, the interest expense under the New Tranche A DIP/Exit Loans will actually be *lower* than under the existing Tranche A, and interest will be paid in kind during the Chapter 11 Cases (as is currently the case under Tranche A).  Moreover, the "Commitment Premiums" set forth in each Commitment Letter (███% for Tranche A-1 and ███% for Tranche A-2) are not unreasonable and are squarely in line with fees that the Debtors would expect to pay for alternative sources of long-term exit financing.  The Commitment Letters also require the Debtors to incur certain expense reimbursement and indemnification obligations in favor of the Lenders (together with the Commitment Premiums described above, the

"Commitment Obligations"). These Commitment Obligations are summarized in the following

chart:

| Commitment Obligations[4] | | |
|---|---|---|
| | **Tranche A-1** | **Tranche A-2** |
| **Commitment Premium**<br><br>*See* Tranche A-1 Commitment Letter, page 2; Tranche A-2 Commitment Letter, page 2 | "As consideration for the Lenders' commitments under this Commitment Letter, you agree to pay or cause to be paid to the Lenders, for their own account, a commitment premium in an aggregate amount equal to $▮▮▮ (the "***Commitment Premium***"), which Commitment Premium shall be divided among the Lenders based on their pro rata share of the aggregate commitment amount of the DIP-to-Exit Facility as of the date hereof. The Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon entry of an order by the Bankruptcy Court, in form and substance acceptable to you and the Required Designated DIP Lenders, approving the Commitment Letter, including the Commitment Premium, the indemnification obligations hereunder and other fees and expenses payable hereunder (the "***Commitment Approval Order***"). The Commitment Premium shall be due and payable in full on the earlier of the date on which the commitments under this Commitment Letter terminate for any reason or the Closing Date and, if paid on the Closing Date, may be payable at the option of Avianca in the form of cash in immediately available funds, payment-in-kind as additional principal under the loans or with the proceeds of the loans under the DIP-to-Exit Facility (and the DIP-to-Exit Facility may be net funded on the Closing Date to account | "As consideration for the Lenders' commitments under this Commitment Letter, you agree to pay or cause to be paid to the Lenders, for their own account, a commitment premium in an aggregate amount equal to $▮▮▮ (the "***Commitment Premium***"), which Commitment Premium shall be divided among the Lenders based on their pro rata share of the aggregate commitment amount of the New Tranche A-2 DIP Loans as of the date hereof. The Commitment Premium shall be fully earned, nonrefundable and non-avoidable upon entry of an order by the Bankruptcy Court, in form and substance acceptable to you and the Required A-2 DIP Lenders, approving the Commitment Letter, including the Commitment Premium, Fee and Expense Reimbursement (as defined below,) the indemnification obligations hereunder and other fees and expenses payable hereunder (the "***Commitment Approval Order***"). The Commitment Premium shall be due and payable in full on the earlier of the date on which the commitments under this Commitment Letter terminate for any reason or the Closing Date and, if paid on the Closing Date, may be payable at the option of Avianca in the form of payment-in-kind as additional principal under the loans or with the proceeds of the loans under the DIP-to-Exit Facility (and the DIP-to-Exit Facility may be net funded on the |

---

[4]    This summary is qualified in its entirety by reference to the Commitment Letters. In the event of a conflict, the terms set forth in the Commitment Letters control. Certain other fees and premiums will be payable under each tranche of the proposed New Tranche A DIP/Exit Loans—namely a "Conversion Premium" that will be paid if Debtors exercise the exit conversion option and an "Exit Fee" that will be paid if the Debtors do not. This Motion does not seek approval of those fees.

| **Commitment Obligations[4]** | | |
|---|---|---|
| | for such Commitment Premium).  If the Commitment Premium is payable on any date that is not the Closing Date, it shall be payable in cash in immediately available funds.  You agree that, once paid, the Commitment Premium or any part thereof payable hereunder shall not be refundable or subject to recharacterization, setoff or disgorgement under any circumstances, and shall be paid free and clear of any withholding or deduction for applicable taxes (or shall be grossed up for such taxes).  The Commitment Premium shall be in addition to reimbursement of our out-of-pocket expenses as agreed in this Commitment Letter." | Closing Date to account for such Commitment Premium).  You agree that, upon entry of the Commitment Approval Order, the Commitment Premium or any part thereof payable hereunder shall not be refundable or subject to recharacterization, setoff or disgorgement under any circumstances, and shall be paid free and clear of any withholding or deduction for applicable taxes (or shall be grossed up for such taxes).  The Commitment Premium shall be in addition to the Fee and Expense Reimbursement as agreed in this Commitment Letter." |
| **Fee and Expense Reimbursement** *See* Tranche A-1 Commitment Letter, page 3; Tranche A-2 Commitment Letter, page 3 | "By executing this Commitment Letter, you agree to reimburse the Lenders from time to time on demand for all reasonable and documented out-of-pocket fees and expenses of Davis Polk & Wardwell LLP ("*Davis Polk*"), as counsel to the Lenders, and all reasonable and documented out-of-pocket fees and expenses of any other local or special counsel to the Lenders (limited to one counsel for each jurisdiction or area of specialty for the Lenders as a whole, and it being understood that for purposes of the creation, documentation and perfection of the collateral to secure the Tranche A-1 DIP Loans, the Lenders will not retain separate local counsel, but that local counsel will be retained by the Lenders and the collateral agent for such purpose in connection with the  A-1 Exit Notes) incurred in connection with the DIP-to-Exit Facility (including the A-1 Exit Notes), the preparation of the definitive documentation therefor and the other transactions contemplated hereby (the "*Fee and Expense Reimbursement*").  You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from Davis | By executing this Commitment Letter, you agree to reimburse the Lenders from time to time on demand for all reasonable and documented out-of-pocket fees and expenses of (x) Skadden, Arps, Slate, Meagher & Flom LLP ("*Skadden*"), as New York counsel to the Lenders, (y) Paul Hastings LLP ("*Paul Hastings*"), as counsel to one of the Lenders (provided that Paul Hastings's documented fees and expenses shall not exceed $200,000) and (z) one local counsel in each other relevant jurisdiction for both the Lenders and the collateral agent (and of one or more additional counsel in such other relevant jurisdiction in case one or more conflicts of interest, or potential conflicts of interest, arise), incurred in connection with the DIP-to-Exit Facility, the preparation of the definitive documentation therefor and the other transactions contemplated hereby (the "*Fee and Expense Reimbursement*").  You acknowledge that we may receive a benefit, including without limitation, a discount, credit or other accommodation, from Skadden based on the fees Skadden may receive on account of their relationship with us including, |

| **Commitment Obligations**[4] | | |
|---|---|---|
| | Polk may receive on account of their relationship with us including, without limitation, fees paid pursuant hereto." | without limitation, fees paid pursuant hereto. |
| **Indemnification**<br>*See* Tranche A-1 Commitment Letter, pages 3-4; Tranche A-2 Commitment Letter, pages 3–4 | "You agree to indemnify and hold harmless each Lender and each of their affiliates and their respective officers, directors, employees, agents, accountants, attorneys, advisors and other representatives (each, a "*Representative*") and any Representative of such Representatives (each, an "*Indemnified Party*") from and against (and will reimburse each Indemnified Party as the same are incurred for) any and all claims, damages, liabilities and expenses (such expenses, in the case of counsel, to include the reasonable and documented fees, disbursements and other charges of Davis Polk as counsel to the Lenders and one special or local counsel for each relevant jurisdiction or specialty for the Lenders taken as a whole, and in the case of an actual or perceived conflict of interest, one additional New York counsel and local and special counsel for each group of similarly situated Indemnified Parties) that may be incurred by or asserted or awarded against any Indemnified Party, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) this Commitment Letter, the DIP-to-Exit Facility, the DIP-to-Exit Facility Documents, any related transaction and any use made or proposed to be made with the proceeds thereof, IN ALL CASES, WHETHER OR NOT CAUSED OR ARISING, IN WHOLE OR IN PART, OUT OF THE COMPARATIVE, CONTRIBUTORY OR SOLE NEGLIGENCE OF THE INDEMNIFIED PARTY except to the extent such claim, damage, loss, liability or expense is found in a final, | "You agree to indemnify and hold harmless each Lender and each of their affiliates and their respective officers, directors, employees, agents and advisors (each, a "*Protected Person*") from and against (and will reimburse each Protected Person as the same are incurred for) any and all claims, damages, liabilities and expenses (including, without limitation, the reasonable and documented fees, disbursements and other charges of counsel, including, without limitation, Skadden as counsel to the Lenders) that may be incurred by or asserted or awarded against any Protected Person, in each case arising out of or in connection with or by reason of (including, without limitation, in connection with any investigation, litigation or proceeding or preparation of a defense in connection therewith) (a) this Commitment Letter, the DIP-to-Exit Facility, any related transaction and any use made or proposed to be made with the proceeds thereof, except to the extent such claim, damage, loss, liability or expense is found in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from (i) such Protected Person's bad faith, gross negligence or willful misconduct in performing the services that are the subject of this Commitment Letter, the DIP-to-Exit Facility or any related transaction, or (ii) such Protected Person's material breach of its obligations under this Commitment Letter. In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or a Protected Person or any other person, whether or |

| **Commitment Obligations**[4] | | |
|---|---|---|
| | nonappealable judgment by a court of competent jurisdiction to have resulted from (i) such Indemnified Party's bad faith, gross negligence or willful misconduct or (ii) such Indemnified Party's material breach of its obligations under this Commitment Letter.  In the case of an investigation, litigation or proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by you, your equityholders or creditors or an Indemnified Party or any other person, whether or not an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  You also agree that no Indemnified Party shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to (w) special, (x) indirect, (y) consequential or (z) punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's bad faith, gross negligence or willful misconduct.  Notwithstanding any other provision of this Commitment Letter, no Indemnified Party shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the bad faith, gross negligence or willful misconduct of such Indemnified Party as determined by a final and nonappealable judgment of a court of competent jurisdiction." | not a Protected Person is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.  You also agree that no Protected Person shall have any liability (whether direct or indirect, in contract or tort or otherwise) to you or your subsidiaries or affiliates or to your or their respective equity holders or creditors arising out of, related to or in connection with any aspect of the transactions contemplated hereby, except to the extent of direct, as opposed to (w) special, (x) indirect, (y) consequential or (z) punitive, damages determined in a final, nonappealable judgment by a court of competent jurisdiction to have resulted from such Protected Person's bad faith, gross negligence or willful misconduct.  Notwithstanding any other provision of this Commitment Letter, no Protected Person shall be liable for any damages arising from the use by others of information or other materials obtained through electronic telecommunications or other information transmission systems, other than for direct or actual damages resulting from the bad faith, gross negligence or willful misconduct of such Protected Person as determined by a final and nonappealable judgment of a court of competent jurisdiction." |

20.     The motion to approve the New Tranche A DIP/Exit Loans will likely not be heard until the August 18 omnibus hearing, and the Lenders are aware that the Debtors will continue to be active in the capital markets in connection with other components of the anticipated exit financing.[5]    In this context, and as a key condition to receiving the proposed financing commitments, the Debtors are requesting expedited approval of the proposed Commitment Obligations.    After good-faith, arm's-length negotiations with the Lenders, the Debtors have formed a judgment that the Commitment Obligations are a reasonable price to pay for the long-term financing commitments that the Lenders are offering.

21.     Failure to obtain approval of this Motion (and, in turn, the Lenders' commitments) could be detrimental to the Debtors' ability to obtain the exit financing that will be vital to any feasible chapter 11 plan.    Furthermore, time is of the essence.    The Commitment Letters contain a milestone requiring the Debtors to obtain an order approving the Commitment Obligations no later than five business days after the date when the Commitment Letters were executed, subject to court availability, but in no event later than twenty-one (21) calendar days after the date when the Commitment Letters were executed.    If the Debtors do not meet this milestone, the Lenders would have the right to terminate both of the Commitment Letters.    The Debtors would need to seek alternative financing, which may not be available on similarly advantageous terms.

---

[5]    One of the Commitment Letters generally prohibits the Debtors from soliciting proposals for alternative debt financing prior to the execution of definitive documentation with respect to the New Tranche A DIP/Exit Loans.    *See* Tranche A-2 Commitment Letter at 2.    However, consistent with their fiduciary duties, the Debtors retain the ability to respond to unsolicited proposals for alternative debt financing and to solicit proposals with respect to other components of the anticipated post-emergence capital structure.    *See id.*

## BASIS FOR RELIEF

### A.  The Debtors' Agreement to Accept the Commitment Letters and Incur the Commitment Obligations Represents a Sound Exercise of Business Judgment.

22.    "Section 363 [of the Bankruptcy Code] . . . governs the use of funds by the debtor in possession while it operates its business after the bankruptcy petition is filed." *In re Enron Corp.*, 335 B.R. 22, 27 (S.D.N.Y. 2005).  Section 363(b) of the Bankruptcy Code provides, in relevant part, that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b); *In re Lionel Corp.*, 772 F.2d 1063, 1066 (2d. Cir. 1983).  Section 105(a) of the Bankruptcy Code provides that, "the court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title," including the provisions of section 363(b).  *See* 11 U.S.C. § 105(a); *In re Enron Corp.*, 335 B.R. at 27.

23.    Courts generally will approve a request for relief under section 363 of the Bankruptcy Code where the debtor demonstrates a sound business justification for seeking such relief.  *In re Lionel Corp.*, 722 F.2d at 1071 ("The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application."); *In re Fairfield Sentry Ltd.*, 539 B.R. 658, 668 (Bankr S.D.N.Y. 2015) (SMB) (same); *In re MF Global Inc.*, 467 B.R. 726, 730 (Bankr. S.D.N.Y. 2012) (MG) ("Although not specified by section 363, the Second Circuit requires that transactions under section 363 be based on the sound business judgment of the debtor or trustee.").

24.    To determine if a "good business reason" exists, courts apply the business judgment rule.  *In re Integrated Res., Inc.*, 147 B.R. 650, 656 (S.D.N.Y. 1992).  The business judgment rule is "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interest

of the company." *Id.* Additionally, courts generally will not interfere with corporate decisions as to what is in a debtor's best interest absent a showing of bad faith, self-interest, or gross negligence. *Id.* Generally, "[w]here the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will not entertain objections to the debtor's conduct." *In re MF Global Inc.*, 467 B.R. at 730 (citing *In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986)). Furthermore, "[i]f a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate; the burden of rebutting that presumption falls to parties opposing the transaction." *Id.*

25.    Here, the Commitment Obligations are both reasonable and appropriate, and represent a sound exercise of the Debtors' business judgment as an integral part of their anticipated New Tranche A DIP/Exit Loans. The Commitment Obligations are the product of extensive arm's-length negotiations among the Debtors and the Lenders, with all parties represented by counsel and (in the case for the Debtors) financial advisors. The Debtors and the Lenders completed several rounds of negotiation regarding the Commitment Obligations and, as a result of these negotiations, the Debtors were able to secure commitments for long-term financing on highly favorable terms. The Commitment Obligations reflect market conditions and are fair and reasonable in light of the type of transactions and the size of the proposed financings, and the Debtors believe that the Commitment Premiums are similar to the premiums that alternative financiers would expect the Debtors to pay.

26.    The Fee and Expense Reimbursement is also warranted in light of the substantial diligence undertaken by the Lenders, as well as their good-faith negotiations and incurrence of professional fees leading up to the execution of the Commitment Letter. The expenses to be

reimbursed by the Debtors are reasonable in light of the amount of work undertaken by the Lenders and their advisors, as well as the significant benefits that the Debtors and their estates stand to realize from consummation of the anticipated New Tranche A DIP/Exit Loans.

27.    The indemnification obligations set forth in the Commitment Letters are similarly reasonable.  The Lenders require the assurance of indemnification from the Debtors before they will enter into the anticipated New Tranche A DIP/Exit Loans.  As the Lenders will be providing the commitments necessary to ensure that the Debtors can obtain critically needed postpetition financing, it is appropriate and customary for the indemnified parties to be protected from claims and litigation arising in connection with that financing.  Furthermore, the indemnification obligations are subject to customary carve-outs for losses arising out of the Lenders' bad faith, willful misconduct, or gross negligence.

28.    Without the inducements of the Commitment Obligations, the Lenders would not have committed to provide the New Tranche A DIP/Exit Loans.  The Commitment Obligations are a material condition to the Lenders' commitments.  If the Debtors cannot satisfy the Commitment Obligations, the Debtors will be unable to finalize an agreement with the Lenders concerning the anticipated DIP refinancing, which will in turn jeopardize their prospects for obtaining the exit financing required to propose a feasible chapter 11 plan.  Accordingly, the Commitment Obligations are reasonable and enhance the value of the Debtors' estates.

29.    Bankruptcy courts frequently approve fees and expense reimbursements for the benefit of anticipated DIP lenders.  See, e.g., Order, *In re LATAM Airlines Group, S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y. July 26, 2020) [ECF No. 679] (approving 0.75% break fee and expense reimbursement); Order, *In re Grupo Aeroméxico, S.A.B. de C.V.*, Case No. 20 11563 (SCC) (Bankr. S.D.N.Y. Aug. 21, 2020) [ECF No. 317] (approving 1.2% break fee and expense

reimbursement); Order, *In re Lakeland Tours, LLC*, Case No. 20-11647 (JLG) (Bankr. S.D.N.Y.

Aug. 6, 2020) [ECF No. 95] (approving commitment fee of 3%, backstop fee of 5%, and expense

reimbursement); Order, *In re Nine West Holdings, Inc.*, Case No. 18-10947 (SCC) (Bankr.

S.D.N.Y. Jun. 28, 2018) [ECF No. 450] (approving 7.75% upfront fee and 2.5% exit fee); Order,

*In re BCBG Max Azria Global Holdings, LLC*, Case No. 17-10466 (Bankr. S.D.N.Y. Mar. 28,

2017) [ECF No. 228] (approving 3.5% DIP closing fee, 1.5%. exit fee, and expense

reimbursement).

30.     In sum, the Debtors respectfully submit that their acceptance and execution of the

Commitment Letters and their agreement to incur the Commitment Obligations are a valid exercise

of their business judgment, reasonable and justified under the circumstances, and should be

approved.

**B. The Commitment Obligations Should Be Granted Superpriority Administrative Expense Status Pursuant to Sections 503(b) and 507(a)(2) of the Bankruptcy Code.**

31.     The Commitment Obligations constitute "necessary costs and expenses of

preserving the estate" under section 503(b)(1)(A) of the Bankruptcy Code. Without the ability to

pay the Commitment Premiums, Fee and Expense Reimbursements, and indemnification

obligations, the Debtors would be unable to secure the commitment of the Lenders to participate

in the anticipated New Tranche A DIP/Exit Loans. That result would jeopardize the Debtors'

ability to obtain important exit financing on favorable terms.

32.     Bankruptcy courts in this district and others regularly grant superpriority

administrative expense status to the type of transaction protections sought to be approved herein.

*See, e.g.*, Order, *In re LATAM Airlines Group, S.A.*, Case No. 20-11254 (JLG) (Bankr. S.D.N.Y.

July 26, 2020) [ECF No. 679] (break-up fee for anticipated DIP lender deemed allowed, to the

extent payable under commitment letter, as administrative priority claim); Order, *In re Breitburn*

*Energy Partners LP*, Case No. 16-11390 (SMB) (Bankr. S.D.N.Y. Dec. 1, 2017) [ECF No. 1886] (break-up fee, expense reimbursement, and indemnification under backstop agreement deemed allowed administrative expense claims); Order, *In re Genco Shipping & Trading Ltd.*, Case No. 14-11108 (SHL) (Bankr. S.D.N.Y. Apr. 25, 2014) [ECF No. 47] (break-up fee under RSA deemed administrative expense); Order, *In re KIT Digital, Inc.*, Case No. 13-11298 (REG) (Bankr. S.D.N.Y. Jun. 17, 2013) [ECF No. 238] (break-up fee and expense reimbursement deemed allowed administrative expenses).

33.    Accordingly, the circumstances justify according superpriority administrative expense status to the Commitment Obligations pursuant to sections 503(b) and 507(a)(2) of the Bankruptcy Code.

### REQUEST FOR WAIVER OF STAY

34.    The Debtors request a waiver of the stay of the effectiveness of the Commitment Letters Order under Bankruptcy Rule 6004(h), which provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."

35.    As set forth above, a delay in final Court approval of the Commitment Letters and the Commitment Obligations may seriously inhibit the Debtors' ability to obtain exit financing and, ultimately, to propose a confirmable chapter 11 plan.  Accordingly, the Debtors respectfully submit that the relief requested herein is necessary to avoid immediate and irreparable harm.

### NOTICE

36.    Notice of this Motion will be given to the Standard Parties (as defined in the *Order Implementing Certain Case Management and Notice Procedures* [ECF No. 47]) and any party that

has requested service pursuant to Bankruptcy Rule 2002.  In light of the nature of the relief requested, the Debtors submit that no further notice need be given.

## NO PRIOR REQUEST

37.    No prior request for the relief sought in this Motion has been made to this or any other court.

Dated:    New York, New York
          July 22, 2021

*/s/ Evan R. Fleck*--------------------------------
Dennis F. Dunne
Evan R. Fleck
Benjamin M. Schak
MILBANK LLP
55 Hudson Yards
New York, NY  10001
Telephone:  (212) 530-5000
Facsimile:  (212) 530-5219

- and –

Gregory A. Bray
MILBANK LLP
2029 Century Park East, 33rd Floor
Los Angeles, CA  90067
Telephone:  (424) 386-4000
Facsimile:  (213) 629-5063

*Counsel for Debtors and
Debtors-in-Possession*

**<u>Exhibit A</u>**

Proposed Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------x

| | : | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| AVIANCA HOLDINGS S.A., *et al.*,[1] | : | Case No. 20-11133 (MG) |
| | : | |
| Debtors. | : | (Jointly Administered) |
| | : | |

-------------------------------------------------------------x

### ORDER (I) APPROVING TERMS OF, AND
### DEBTORS' ENTRY INTO AND PERFORMANCE UNDER,
### THE DIP-TO-EXIT FACILITY COMMITMENT LETTERS AND
### (II) AUTHORIZING INCURRENCE, PAYMENT AND ALLOWANCE
### OF OBLIGATIONS THEREUNDER AS ADMINISTRATIVE EXPENSES

Upon the motion (the "Motion")[2] [Docket No. [ ]] of the Debtors, pursuant to

sections 105(a), 363(b), 503(b) and 507(a)(2) of the Bankruptcy Code, for entry of an

order (i) approving the terms of, and the Debtors' entry into and performance under, the

Commitment Letters, (ii) authorizing the incurrence, payment and allowance of the

Commitment Premium (as defined in each Commitment Letter), the Fee and Expense

Reimbursement (as defined in each Commitment Letter) and the indemnification

obligations set forth in each Commitment Letter (collectively, the "Commitment

---

[1]   The Debtors in these chapter 11 cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41- 2187926); Nicaragüense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aéreo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92- 4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A); AV Loyalty Bermuda Ltd. (N/A); Aviacorp Enterprises S.A. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

[2]   Capitalized terms not otherwise defined herein shall be given the meanings ascribed to them in the Motion.

Obligations") as superpriority administrative expense claims, and (iii) granting related relief, all as more fully provided in the Commitment Letters and as set forth in the Motion; and the Court having jurisdiction to decide the Motion and the grant the relief requested therein pursuant to 28 U.S.C. §§ 157 and 1334, and the *Amended Standing Order of Reference M-431*, dated January 31, 2012 (Preska, C.J.); and consideration of the Motion and the requested relief being a core proceeding pursuant to 28 U.S.C. § 157(b); and venue being proper before the Court pursuant to 28 U.S.C. §§ 1408 and 1409; and due and proper notice of the relief sought in the Motion having been provided in accordance with the Case Management Order, such notice having been adequate and appropriate under the circumstances, and it appearing that no other or further notice need be provided; and the Court having held a hearing to consider the relief requested in the Motion (the "Hearing"); and this Court having found that the Commitment Letters have been negotiated in good faith and at arms'-length between the Debtors and the other parties to such agreements; and upon the record of the Hearing on July 26, 2021; and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein; and it appearing that the relief requested in the Motion and granted herein is in the best interests of the Debtors, their estates, creditors, shareholders, and all parties in interest; and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein. Any and all objections with respect to the Motion, to the extent not withdrawn, are hereby overruled in all respects on the merits.

2

2.      The Commitment Letters attached as **Exhibit B-1** and **Exhibit B-2** to the Motion are hereby approved in their entirety. The Commitment Letters are valid, binding and enforceable against the Debtors.

3.      The Debtors' entry into the Commitment Letters constitutes a reasonable exercise of the Debtors' business judgment and is hereby approved. The Debtors are authorized to perform under and implement the terms of each Commitment Letter and all exhibits thereto, and to negotiate, prepare, execute and deliver all documents, and to take any and all actions necessary and appropriate to implement the terms of the Commitment Letters and to perform all obligations thereunder on the terms and conditions set forth therein, without further notice, hearing or order of this Court.

4.      The Commitment Obligations, including the Commitment Premiums and Fee and Expense Reimbursements, are actual and necessary costs and expenses of preserving the Debtors' estates and shall be treated as allowed superpriority administrative expenses in the Chapter 11 Cases, having priority over all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code other than the DIP Superpriority Claims (as defined in the Final DIP Order), which DIP Superpriority Claims shall be *pari passu* in right of payment to the superpriority administrative expenses arising from the Commitment Obligations, and none of the amounts shall be discharged, modified, or otherwise affected by any chapter 11 plan of any of the Debtors, subject to and in accordance with the Commitment Letters.

5.      Upon termination of the Commitment Letters for any reason, the Debtors shall pay the Commitment Premiums, in accordance with the Commitment Letters, within three (3) business days of such termination.

#4818-7533-9758v8

6.       The Debtors are authorized to reimburse the Lenders for their fees and expenses, indemnify the Lenders and their representatives and affiliates, and pay and incur the Commitment Premiums, whether incurred prior to, on, or after the date of this Order, in each case pursuant to the terms and conditions set forth in the Commitment Letters, without further notice, hearing, or order of this Court, as, when, and to the extent they become due and payable under the terms of the Commitment Letters, which Commitment Obligations shall not be subject to any challenge, contest, attack, rejection, recoupment, reduction, defense, counterclaim, offset, subordination, recharacterization, disgorgement, avoidance or other claim, cause of action or other challenge of any nature under the Bankruptcy Code, under applicable non-bankruptcy law or otherwise.  Invoices for such fees and expenses shall not be required to comply with the U.S. Trustee guidelines, may be in summary form (which summary may contain redactions of privileged, confidential or otherwise sensitive information), and shall not be required to contain time details.  The invoices for fees and expenses to be paid pursuant to this paragraph 5 shall be provided to the Debtors, counsel to the Official Committee of Unsecured Creditors, and the Office of the U.S. Trustee (the "Fee Notice Parties").  Within ten calendar days after delivery of such invoices (the "Fee Objection Period"), without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors.  If a written objection is made by any of the Fee Notice Parties within the Fee Objection Period to the reasonableness of the requested fees and expenses, then only the disputed portion of such fees and expenses shall be withheld until the objection is resolved by the applicable parties in good faith or by order of the Court, and the undisputed portion shall be promptly paid by the Debtors.

4

Any objection raised by a Fee Notice Party with respect to the requested fees and expenses may be made only on the basis of "reasonableness" and shall specify in writing the amount of the contested fees and expenses and the detailed basis for such objection.

7.    The terms and provisions of this Order shall be binding in all respects upon all parties in these chapter 11 cases, the Debtors, their estates, and all successors and assigns thereof, including any chapter 7 trustee or chapter 11 trustee appointed in any of these cases or after conversion of any of these cases to cases under chapter 7 of the Bankruptcy Code; provided, that the Lenders shall be under no obligation to extend any financing to any chapter 7 trustee or chapter 11 trustee.

8.    Subject to the terms and conditions of the Commitment Letters, the Debtors and the Lenders may enter into any nonmaterial amendment, modification or supplement of any provision of any Commitment Letter, and the Debtors are authorized to enter into any such amendment, modification, supplement or waiver (and to pay any fees and other expenses, amounts, costs, indemnities and other obligations in connection therewith), without further notice, hearing or order of this Court.

9.    Nothing in this Order, the Commitment Letters or any other documents related to the transactions contemplated thereby shall in any way be construed or interpreted to impose or allow the imposition upon any Lender of any liability for any claims arising from the post-petition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.

10.    Except as explicitly provided for herein, this Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect or incidental beneficiary.

#4818-7533-9758v8

11.     Notice of the Motion as provided therein shall be deemed good and sufficient and the requirements of the Bankruptcy Rules and the Bankruptcy Local Rules are satisfied by such notice.

12.     Notwithstanding the possible applicability of Bankruptcy Rule 6004(h) or any other Bankruptcy Rule or otherwise, the terms and provisions of this Order shall be immediately effective and enforceable upon its entry.

13.     The Debtors are authorized to take all reasonable actions necessary to effectuate the relief granted pursuant to this Order in accordance with this Order and the Motion.

14.     The automatic stay under section 362 of the Bankruptcy Code is hereby modified to the extent necessary to enable the Lenders to perform under each of the Commitment Letters and to exercise any and all of their contractual rights thereunder without seeking further relief from the automatic stay, and neither the Debtors, nor any other party-in-interest, may enforce the automatic stay against any of the Lenders or any Indemnified Person under either Commitment Letter.

15.     The Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation of this Order.

IT IS SO ORDERED.

Dated:

New York, New York

                                        /s/
                                        MARTIN GLENN
                                        United States Bankruptcy Judge

6

## **<u>Exhibit B-1</u>**

**Tranche A-1 Commitment Letter and Term Sheet**

**[Commitment Letter Redacted from Public Filing]**

**EXHIBIT A to Commitment Letter**

**Avianca Holdings S.A.**

**DIP-to-Exit Facility Term Sheet**

This term sheet (the "**DIP-to-Exit Facility Term Sheet**") sets forth the principal terms of a potential refinancing of a portion of the Company's outstanding super-priority debtor-in-possession term loans in the form of loans and/or notes (collectively, the "**New Tranche A DIP Loans**") and conversion of the New Tranche A DIP Loans in the form of notes (the "**A-1 Exit Notes**").

The New Tranche A DIP Loans (as defined below) will be subject to (a) the approval of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), (b) a final order entered by the Bankruptcy Court authorizing the Loan Parties (as defined below) to enter the New Tranche A DIP Loans and to amend the DIP Credit Agreement (as defined below), which order shall be in form and substance reasonably acceptable to Required Designated DIP Lenders (as defined below) and the Majority Tranche B Lenders (as defined in the DIP Credit Agreement) and (c) the "Conditions Precedent to New Tranche A-1 DIP Loans" as set forth below and the conditions described in the Commitment Letter to which this DIP-to-Exit Facility Term Sheet is attached (the "**Commitment Letter**"). The issuance of A-1 Exit Notes and conversion of the New Tranche A DIP Loans into such notes will be subject to (i) emergence by the Loan Parties from their respective cases under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**," and the date of such emergence, the "**Emergence Date**"), in accordance with the chapter 11 plan of reorganization (the "**Plan**"), (ii) an order entered by the Bankruptcy Court authorizing the Loan Parties to issue the A-1 Exit Notes, which order may be part of the order confirming the Plan, which shall be in form and substance reasonably acceptable to Designated DIP Lenders (as defined below) holding no less than 60% of the commitments under the Commitment Letter on the date hereof (the "**Required Designated DIP Lenders**"), and the Majority Tranche B Lenders, which order shall be final, non-appealable and in full force and effect and (iii) the "Conditions Precedent to Conversion Election" as set forth below.

| Summary of Principal Terms of New Tranche A DIP Loans | |
|---|---|
| Borrower: | Avianca Holdings S.A., as Borrower (the "**Company**"). |
| Guarantors: | Each of the Borrower's Subsidiaries that are debtors and parties to the DIP Credit Agreement, each as a debtor and debtor-in-possession in the Chapter 11 Cases (collectively, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"). |
| Amount: | The principal amount of the New Tranche A DIP Loans shall not exceed $1,600,000,000, of which $1,050,000,000 will be new Tranche A-1 loans or notes (the "**New Tranche A-1 DIP Loans**") and $550,000,000 will be new Tranche A-2 loans or notes (the "**New Tranche A-2 DIP Loans**") which New Tranche A DIP Loans shall be used as provided in the Use of Proceeds below. The Designated DIP Lenders shall be allocated the New Tranche A-1 DIP Loans. The New Tranche A-1 DIP Loans may be provided in the form of loans under the DIP Credit Agreement or notes to be issued under a new indenture and may, at the option of any assignee, be converted from loans to notes upon the assignment thereof. To the extent provided in the form of loans, all or a portion of the New Tranche A-1 DIP Loans may be provided by a financial institution acting as a fronting lender and subsequently assigned as a loan to the applicable Designated DIP Lender (the "**Fronting Lender**"). |
| Ranking; Other Material Terms: | The New Tranche A-1 DIP Loans and the New Tranche A-2 DIP Loans shall be made in connection with an Amendment (the "**DIP Amendment**") to that Super-Priority Debtor-In-Possession Term Loan Agreement, dated as of October 13, 2020 (the "**DIP Credit Agreement**")[1], among the Borrower, the Guarantors, the several banks and other financial institutions or entities from time to time party thereto and JPMorgan Chase Bank, N.A., as |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

administrative agent and collateral agent (in such capacities, the "**Administrative Agent**").

The New Tranche A-1 DIP Loans and the New Tranche A-2 DIP Loans shall be *pari passu* and the other material terms of the DIP Credit Agreement and the New Tranche A-1 DIP Loans shall be consistent with the terms of the DIP Credit Agreement as in effect except as set forth in the section "DIP Amendment Provisions" as described below.

The definitive documentation evidencing the New Tranche A-2 DIP Loans shall not include any term or condition that would be more beneficial to the lenders thereof than any analogous provision contained in the definitive documentation evidencing the New Tranche A-1 DIP Loans.

| | |
|---|---|
| Designated DIP Lenders: | Lenders (including any subsidiaries, affiliates, or any funds and/or accounts managed, advised or controlled by any such lenders, and any applicable fronting institution) that executed the Commitment Letter (the "**Designated DIP Lenders**" and together with all lenders under the New Tranche A DIP Loans, the "**New Tranche A DIP Lenders**"). |
| **New Tranche A-1 DIP Loans** | |
| Pricing: | Fixed interest rate of 9.00% per annum.  At the option of the Borrower, interest, fees and premiums shall be payable in cash or in kind.  Interest, fees and premiums that the Borrower elects to pay in kind will be added to the outstanding principal amount of the New Tranche A-1 DIP Loans and shall be treated as principal and bear interest from the date of such in-kind payment. |
| Maturity Date: | The New Tranche A-1 DIP Loans shall mature on March 31, 2022. |
| Closing Date: | The date on which the satisfaction of all Conditions Precedent to New Tranche A-1 DIP Loans described herein have occurred (the "**Closing Date**"). |
| Commitment Premium: | The Commitment Premium (as defined in the Commitment Letter) shall be paid to the Designated DIP Lenders as set forth in the Commitment Letter. |
| Use of Proceeds: | The proceeds of the New Tranche A DIP Loans shall be used to (i) repay in full all Tranche A Loans and all Tranche A Notes outstanding under the DIP Loan Documents (as defined in the DIP Credit Agreement), (ii) all fees, expenses and other amounts (including legal and financial advisor fees) incurred in connection with the New Tranche A DIP Loans, the DIP Amendment, the other agreements related thereto and the transactions contemplated thereby other than fees paid-in-kind or paid as original issue discount and (iii) for working capital and general corporate purposes of the Loan Parties. |
| Prepayment before the Maturity Date/Exit Fee: | Prior to the Maturity Date, any optional or mandatory prepayment of New Tranche A-1 DIP Loans (other than in connection with a Conversion Election) shall be accompanied by (x) a premium equal to 9.00% of the principal amount of the New Tranche A-1 DIP Loans so prepaid plus (y) all accrued interest, payable in cash on the New Tranche A-1 DIP Loans so prepaid. <br><br> If on the earlier of the Maturity Date and the date on which the Borrower or any of its successors exits from its Chapter 11 Case (whether by way of consummation of a plan of reorganization or otherwise), the Borrower has not made a Conversion Election or the Conditions Precedent to Conversion Election are not satisfied, or if the New Tranche A-1 DIP Loans are accelerated in accordance with their terms, the Borrower shall pay the New |

| | |
|---|---|
| | Tranche A DIP Lenders holding New Tranche A-1 DIP Loans, for their ratable benefit, a premium in an amount equal to 9.00% of the New Tranche A-1 DIP Loans then outstanding.[2] |
| DIP Amendment Provisions: | Amendments to the DIP Credit Agreement under the DIP Amendment shall include: |
| | (i)     Amendments necessary to provide for the New Tranche A DIP Loans under the DIP Credit Agreement and effectuate the provisions set forth in this DIP-to-Exit Facility Term Sheet; |
| | (ii)    Amend the Maturity Date to March 31, 2022 for the New Tranche A DIP Loans; |
| | (iii)    Addition of a new Section 2.16 setting forth the mechanics of the Conversion Election; |
| | (iv)    Deletion of Section 7.16(b) (Cumulative Cash Burn); |
| | (v)     Provide for the majority of the Lenders of New Tranche A DIP Loans to have the amendment protections set forth in Section 11.08(a)(vi) and (vii); |
| | (vi)    Addition of newly created UK SPVs as guarantors and the termination and release of certain Pledges of Rights to Waterfall Proceeds and Aircraft Residual Value; |
| | (vii)    Amend the Bankruptcy Milestones to include, without limitation, the following: |
| |        a.   The Bankruptcy Court entering an order confirming a Company Approved Reorganization Plan (as defined in the DIP Credit Agreement and as further described below), which order shall be reasonably acceptable to the Required Designated DIP Lenders, by no later than 60 days after entry of the disclosure statement order; and |
| |        b.   Such Company Approved Reorganization Plan becoming effective by no than later 30 days after the entry of the Confirmation Order. |
| | (viii)   Amend Sections 4.16, 6.05(a) and 7.06 to delete the bold, stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, double-underlined text (indicated textually in the same manner as the following example: **double-underlined text**) as set forth on Annex A hereto. |
| Conditions Precedent to New Tranche A-1 DIP Loans | (i)     The Administrative Agent, the Tranche B Lenders, and the New Tranche A DIP Lenders shall have received copies of the DIP Amendment duly executed by the Majority Tranche B Lenders, the New Tranche A DIP Lenders, the Administrative Agent and each Loan Party and the New Tranche A DIP Loans shall be secured by |

---

[2] Including assignees, i.e. this premium shall be payable to the lenders of the New Tranche A-1 DIP Loans at the time such payment is due.

#94532811v47

the Liens under the order described under clause (viii) below and the Collateral Documents (as defined in the DIP Credit Agreement), and the terms and conditions of the definitive documentation of the DIP-to-Exit Facility shall be consistent with this DIP-to-Exit Facility Term Sheet and otherwise satisfactory to the Required Designated DIP Lenders and, as to matters affecting the rights and obligations of the Administrative Agent and the Fronting Lender, reasonably satisfactory to the Administrative Agent and the Fronting Lender, as applicable;

(ii)    The Administrative Agent shall have received duly executed copies of an indenture made in connection with the New Tranche A DIP Loans that will take the form of notes, and the terms of such notes and the agreements related thereto shall be consistent with this DIP-to-Exit Facility Term Sheet and otherwise satisfactory to the Required Designated DIP Lenders;

(iii)    With respect to the New Tranche A DIP Loans that will take the form of notes, the issuance of such notes shall be contemporaneous with the funding of the New Tranche A DIP Loans, and the New Tranche A DIP Lenders and Administrative Agent shall have received satisfactory evidence of the consummation of such issuance and the receipt of proceeds thereunder;

(iv)    The Administrative Agent shall have received a Loan Request as described in Section 2.02 of the DIP Credit Agreement with respect to the New Tranche A DIP Loans to be made as loans (and the Trustee shall have received a comparable request for any New Tranche A DIP Loans to be made in the form of notes) no later than three (3) Business Days prior to the proposed funding date;

(v)    The Borrower shall have paid all reasonable and documented out-of-pocket fees, charges and disbursements due and payable under the DIP Loan Documents and incurred in connection with the New Tranche A DIP Loans, including all reasonable and documented out-of-pocket fees, charges and disbursements of the Administrative Agent and the Fronting Lender and counsel to the Administrative Agent, counsel to the Fronting Lender and counsel to the Designated DIP Lenders;

(vi)    No Default or Event of Default shall have occurred and be continuing or would immediately result from the DIP Amendment or the transactions contemplated thereby;

(vii)    With respect to the funding of the New Tranche A-1 DIP Loans, the funding of the New Tranche A-2 DIP Loans shall occur concurrently therewith on terms consistent with the terms disclosed to the Designated DIP Lenders prior to the date of the Commitment Letter or otherwise reasonably acceptable to the Required Designated DIP Lenders;

(viii)    The Bankruptcy Court shall have entered an order approving the DIP Amendment, the other agreements related thereto and the transactions contemplated thereby (including without limitation, the fees payable in respect of such transactions), and such order (i) shall be final and non-appealable and shall not be subject to any pending appeal, petition for certiorari, motion for reargument, reconsideration, or

#94532811v47

rehearing, (ii) shall be in form and substance acceptable to the Required Designated DIP Lenders and the Majority Tranche B Lenders and (iii) shall be in form and substance reasonably acceptable to each of the Administrative Agent and the Fronting Lender as it relates to matters affecting the rights and obligations of the Administrative Agent and the Fronting Lender, as applicable;

(ix)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or examiner or receiver with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed or designated with respect to the Loan Parties or their respective business, properties or assets under any of the Chapter 11 Cases;

(x)    The Administrative Agent and the New Tranche A DIP Lenders shall have received the definitive v2.0 Plan, with such v2.0 Plan (including the debt/equity capital structure of the Company and its affiliates and the aircraft fleet ownership/lease structure specified therein) being acceptable to the New Tranche A DIP Lenders (it being understood and agreed that the draft v2.0 Plan delivered to the New Tranche A DIP Lenders prior to executing the Commitment Letter shall be deemed to be acceptable to the New Tranche A DIP Lenders);

(xi)    All representations and warranties contained in the DIP Loan Documents and the indenture made in connection with the New Tranche A DIP Loans shall be true and correct in all material respects on and as of the date of each New Tranche A DIP Loan (both before and after giving effect thereto and, in the case of each New Tranche A DIP Loans the application of proceeds therefrom) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; *provided* that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects as though made on and as of the applicable date, before and after giving effect to such New Tranche A DIP Loan;

(xii)    The New Tranche A DIP Lenders and the Administrative Agent shall have received a certificate of a responsible officer of the Borrower demonstrating in reasonable detail that, as of the Closing Date, reflect that the Borrower is in compliance with all applicable financial covenants under the DIP Loan Documents, including those under the DIP Amendment;

(xiii)    Any and all necessary governmental and material third party consents and approvals necessary in connection with the funding of the New Tranche A DIP Loans and the execution and delivery by the Loan Parties of the DIP Amendment shall have been obtained and shall remain in effect;

(xiv)    All applicable taxes and stamp duties, if any, arising in connection with the execution, delivery and performance of the DIP Amendment, shall have been paid in full; and

(xv)    The Administrative Agent shall have received a confirmation and reaffirmation agreement in respect of the Collateral Agency Agreement and the collateral

#94532811v47

| | documents under the existing DIP facility, in form and substance satisfactory to the Required Designated DIP Lenders, as well as any other collateral documentation reasonably required (if any) to affirm the collateral granted under the existing DIP facility. |
|---|---|
| **Summary of Conversion Election** | |
| Conversion Election: | The Borrower may elect to convert all or part of the New Tranche A-1 DIP Loans to A-1 Exit Notes on the Emergence Date; *provided*, that the Conditions Precedent to Conversion Election have been satisfied or waived by the Required Designated DIP Lenders, including payment of the Conversion Premium.[3] |
| Conversion Premium: | If the Borrower exercises the Conversion Election, a conversion premium in the amount equal to ▮▮▮% of the (x) principal amount of the New Tranche A-1 DIP Loans then outstanding and (y) all accrued interest and shall be paid in the form of additional A-1 Exit Notes to the New Tranche A DIP Lenders holding New Tranche A-1 DIP Loans, for their ratable benefit.[4] |
| Conditions Precedent to Conversion Election: | (i)  The DIP Credit Agreement, DIP Amendment and the indenture made in connection with the New Tranche A DIP Loans (the "**DIP Documentation**") shall be in full force and effect; |
| | (ii)  The negotiation, execution and delivery of definitive documentation with respect to the A-1 Exit Notes which shall be consistent with this DIP-to-Exit Facility Term Sheet (including, without limitation, as set forth under "Documentation" below) or otherwise reasonably acceptable to the Required Designated DIP Lenders, and upon the effectiveness thereof, the DIP Documentation, and the rights and duties of the agent parties thereto, shall be superseded and of no further force and effect except to the extent any of the provisions in the DIP Documentation expressly survive; |
| | (iii)  All security agreements, mortgages, control agreements and other collateral documents necessary or advisable to create and perfect the liens on the Collateral securing the A-1 Exit Notes (which liens shall be *pari passu* with the liens on the A-2 Exit Facility) shall have been duly executed and delivered and such liens shall have been validly created and perfected subject to appropriate post-closing periods to be agreed and all security agreements, mortgages, control agreements and other collateral documents in respect of the DIP facility in effect prior to the Emergence Date shall have been terminated and of no further force and effect; |
| | (iv)  As of the Emergence Date, pursuant to the terms of the Plan, the Company shall have (x) refinanced the Tranche B Loans (as defined in the DIP Credit Agreement) either through conversion to equity or from the proceeds of a new equity capital raise and (y) repaid, assigned or refinanced any New Tranche A-1 Loans held by the Fronting Lender in full in cash; |
| | (v)  As of the Emergence Date, the Company shall have minimum liquidity of $800,000,000; |

---

[3] In the event that any portion of the New Tranche A-1 DIP Loans are held by the Fronting Lender at the time of the conversion, the Fronting Lender shall, at the direction and expense of the Borrower, assign such New Tranche A-1 DIP Loans to a financial institution(s) at par plus accrued interest. Absent such assignment, no New Tranche A-1 DIP Loan (or any portion thereof) then held by a Fronting Lender shall be converted to A-1 Exit Notes without the prior written consent of the Fronting Lender. The foregoing requirement may not be amended or waived without the prior written consent of the Fronting Lender.

[4] Including assignees, i.e. this premium shall be payable to the lenders of the New Tranche A-1 DIP Loans at the time such payment is due.

#94532811v47

(vi)     The Bankruptcy Court shall have confirmed a Plan (such Plan to be consistent with this DIP-to-Exit Term Sheet and the v2.0 Plan delivered as a condition to the New Tranche A-1 DIP Loans and in form and substance reasonably acceptable to the Required Designated DIP Lenders) that authorizes the transactions herein and all conditions to the effectiveness of such Plan shall have been satisfied;

(vii)    As of the Emergence Date, the Company shall not have outstanding indebtedness for borrowed money which (x) with respect to senior indebtedness consisting of LifeMiles Indebtedness shall exceed $410 million incurred under the LifeMiles program; (y) with respect to any other indebtedness for borrowed money shall exceed $2.25 billion[5]; and (z) with respect to total debt, including aircraft debt and IFRS-16 equivalent aircraft lease obligations, shall exceed $4.355 billion.[6]  In all cases, such debt levels shall exclude obligations under operating lease(s) to a Loan Party relating to up to three 787-9 aircraft (one delivered, two undelivered) which an unaffiliated third party has agreed to pay (directly or indirectly) and where such Loan Party has no further obligation to pay rent under such lease(s) other than to use reasonable best efforts to enforce such third party's obligations in the event such third party does not perform or pay;

(viii)   The Company Approved Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to any confirmation order entered in the Chapter 11 Cases (the "**Confirmation Order**"), which Confirmation Order (a) shall be in form and substance reasonably satisfactory to the Required Designated DIP Lenders and (b) shall provide for releases of the Designated DIP Lenders, the Administrative Agent and the Fronting Lender;

(ix)     The Confirmation Order shall not have been vacated, reversed, modified, amended or stayed in a manner that adversely affects any material right or duty of the Designated DIP Lenders, except as otherwise agreed to in writing by the Designated DIP Lenders;

(x)      All conditions precedent to the effectiveness of the Company Approved Reorganization Plan shall have been satisfied or waived according to its terms (provided that any waiver that adversely affects any material right or duty of the Designated DIP Lenders shall require the prior written consent of the Designated DIP Lenders);

(xi)     The Plan and all transactions contemplated therein or in the Confirmation Order to occur on the Emergence Date shall have been (or substantially concurrently with the effective date of the Conversion Election, shall be) substantially consummated (as defined in section 1101 of the Bankruptcy Code) in accordance with the terms thereof and in compliance with applicable law and Bankruptcy Court and regulatory approvals;

(xii)    The New Tranche A-2 DIP Loans shall contemporaneously convert or be refinanced as exit loans, notes or equity (the "**A-2 Exit Facility**") on terms consistent with the terms disclosed to the Designated DIP Lenders prior to the date of the Commitment Letter or otherwise reasonably acceptable to the Required Designated DIP Lenders and all New Tranche A-1 DIP Loans that have been initially provided by the

---

[5] Excludes any aircraft reconfiguration capex financing.
[6] Aircraft and other corporate debt may be secured to the extent permitted as described in Footnote 12 of this DIP-to-Exit Facility Term Sheet.

Fronting Lender on behalf of any Lender shall have been assigned to such Lender or any of its affiliated or related funds or managed accounts, it being understood that if the commitment of any such Lender (as defined in the Commitment Letter) is initially funded by the Fronting Lender, the commitment of such Lender under the Commitment Letter shall not be discharged until such assignment has been consummated and, after the Closing Date, shall be deemed to be a commitment to cause such assignment to be consummated without undue delay.

(xiii)    Delivery of satisfactory opinions of counsel to the Loan Parties in each relevant jurisdiction (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documents for the A-1 Exit Notes and creation and perfection of security interest), and such corporate resolutions, certificates and other ancillary closing documents customary for financing of this nature as the Required Designated DIP Lenders or the applicable collateral agent shall reasonably require other than opinions and other closing documents that are delivered after the Closing Date as agreed by the Borrower and the applicable collateral agent.

(xiv)    The Company shall have received all other requisite legal and regulatory approvals required to consummate the transactions contemplated herein;

(xv)    The tax, corporate and capital structure of the Issuer and its subsidiaries shall be consistent with the structure disclosed to the Designated DIP Lenders in the Plan confirmed consistent with clause (vi) above;

(xvi)    All fees, expenses, and reimbursement and indemnification obligations (including without limitation the Fee and Expense Reimbursement (as defined in the Commitment Letter) payable under the Commitment Letter or the other DIP-to-Exit Facility Documents and the DIP Loan Documents (including the DIP Amendment and related fee and other letters) through and including the effective date of the Plan shall have been paid;

(xvii)    All filings, recordations and searches necessary or desirable in connection with the liens and security interests in the Collateral securing the A-1 Exit Notes shall have been duly made; and all filing and recording fees and taxes shall have been duly paid;

(xviii)    The A-1 Exit Facility shall have been assigned a public credit rating by at least two of Moody's, S&P and Fitch, and such credit rating shall not be less than the public credit rating assigned to the A-2 Exit Notes (if any); and

(xix)    The Borrower shall have acquired, directly or indirectly, all issued and outstanding equity interests in LifeMiles not owned by the Borrower directly or indirectly as of the date hereof.

#94532811v47

| Summary of Principal Terms of A-1 Exit Notes ($1,050,000,000) |
|---|
| **Issuer:** | The Company or New UK Holdco (as successor to the Borrower), as Issuer (as successor to the Company, as applicable, the "**Issuer**"). |
| **Guarantors:** | Certain of the Guarantors (together with the Issuer, the "**Note Parties**") subject to modifications to be agreed. |
| **Pricing:** | The A-1 Exit Notes shall bear interest at a rate of 9.00% per annum, payable in cash. |
| **A-1 Exit Notes Maturity Date:** | The A-1 Exit Notes shall mature on the date that is seven (7) years after the Emergence Date. |
| **Additional Amounts:** | Payments on the A-1 Exit Notes will be made after withholding and deduction for certain taxes. The Issuer will pay such additional amounts as will result in receipt by the holders of A-1 Exit Notes of such amounts as would have been received by them had no such withholding or deduction for taxes been required, subject to certain customary exceptions for Latin American high-yield debt or for high yield debt issued by issuers of the jurisdiction of the Issuer, as applicable. |
| **Documentation:** | The documentation in respect of the A-1 Exit Notes, including, without limitation, the A-1 Exit Notes indenture, security documents and any additional documents to be entered into pursuant to the A-1 Exit Notes indenture (collectively, the "**Documentation**") shall, to the extent applicable, give due regard to the indenture dated as of December 31, 2019 governing the Company's senior secured notes due 2023 (the "**Secured Notes due 2023**"), as modified by the terms of the DIP-to-Exit Term Sheet or as otherwise agreed by the Required Designated DIP Lenders and as to the covenants and events of default as provided below. |
| **Optional Redemption:** | Prior to the third anniversary of the Emergence Date, any redemption of the A-1 Exit Notes shall be subject to a T+50 make-whole. |
| | On or after the date that is the third anniversary of the Emergence Date, the A-1 Exit Notes may be redeemed at the following redemption prices: |
| | (i) on the date that is the third anniversary of the Emergence Date and during the twelve-month period thereafter, at par plus one half of coupon; |
| | (ii) on the date that is the fourth anniversary of the Emergence Date and during the twelve-month period thereafter, at par plus one quarter of coupon; and |
| | (iii) on the date that is the fifth anniversary of the Emergence Date and thereafter, at par. |
| | In any event, the Issuer may, at any time prior to the third anniversary of the Emergence Date, redeem up to 35% of the aggregate principal amount of the A-1 Exit Notes (x) with the proceeds of new equity or bona fide convertible debt issued in accordance with the limitations on indebtedness, at a redemption price of par plus one half of coupon, or (y) with the proceeds of the incurrence of unsecured debt by the Issuer, at a redemption price of par plus one coupon. |
| | In addition to the applicable redemption prices described above, the Issuer will pay accrued and unpaid interest to, but excluding, the redemption date. |
| **Tax Call:** | 100% of the aggregate principal amount, plus accrued and unpaid interest, if any, to the date of redemption and any additional amounts then due and payable (but without premium), if as |

9

| | |
|---|---|
| | a result of any change in or amendment to the laws (or any rules or regulations thereunder) of a taxing jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, any treaties, regulations, rules, or related agreements to which the taxing jurisdiction is a party (including a holding by a court of competent jurisdiction), any Note Party has or will become obligated to pay additional amounts. |
| Put following a Ratings Downgrade due to a Change of Control: | 101.0% of the aggregate principal amount, plus accrued and unpaid interest, if any. |
| Ratings: | The Issuer shall be required to obtain and maintain public credit ratings from at least two of Moody's, S&P and Fitch. |
| Collateral: | The A-1 Exit Notes shall be secured by the same collateral that secures the New Tranche A DIP Loans and the liens in respect of the collateral may rank *pari passu* with the A-2 Exit Facility (unless such A-2 Exit Facility is in the form of equity).[7] |
| Events of Default: | (i)  default in any payment of interest on any A-1 Exit Note when due and payable, continued for 30 days; <br><br> (ii)  default in the payment of the principal amount of or premium, if any, on any A-1 Exit Note when due at its stated maturity, upon optional redemption, upon required repurchase or mandatory redemption, upon declaration or otherwise; <br><br> (iii)  failure by the Issuer or any Guarantor to comply for 60 days after written notice by the trustee on behalf of the holders or by the holders of at least 25% in aggregate principal amount of the outstanding A-1 Exit Notes with any agreement or obligation contained in the indenture; provided that, in the case of a failure to comply with reporting obligations during the first 18 months after the Emergence Date, such period of continuance of such default or breach shall be 120 days after written notice has been given; <br><br> (iv)  the Issuer, any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary pursuant to or within the meaning of bankruptcy law: <br><br> (a)  commences a voluntary case, or <br><br> (b)  consents to the entry of an order for relief against it in an involuntary case, or <br><br> (c)  consents to the appointment of a custodian of it or for all or substantially all of its property, or <br><br> (d)  makes a general assignment for the benefit of its creditors, or <br><br> (e)  admits in writing its inability generally to pay its debts; <br><br> (v)  a court of competent jurisdiction enters an order or decree under any bankruptcy law that; <br><br> (a)  is for relief against the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary in an involuntary case; |

---

[7] Certain Pledges of Rights to Waterfall Proceeds and Aircraft Residual Value will be terminated in connection with the DIP Amendment.

#94532811v47

(b) appoints a custodian of the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary or for all or substantially all of the property of the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary; or

(c) orders the liquidation of the Issuer, any significant subsidiary or any group of restricted subsidiaries of Issuer that, taken together, would constitute a significant subsidiary;

and in each case the order or decree remains unstayed and in effect for sixty (60) consecutive days;

(vi)    payment default at stated maturity or cross acceleration in respect of indebtedness (other than pre-petition indebtedness that has been discharged under the Plan) in an aggregate amount in excess of $50 million;

(vii)    judgment default in an aggregate amount in excess of $50 million, and provided that such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;

(viii)    any guarantee of the A-1 Exit Notes by a significant subsidiary ceases to be in full force and effect or any guarantor that is a significant subsidiary denies or disaffirms its obligations under its guarantee of the A-1 Exit Notes, other than in accordance with the terms of the indenture;

(ix)    (a) the liens created by the security documents shall at any time not constitute a valid and perfected lien on any material portion of the collateral intended to be covered thereby (unless perfection is not required by the Indenture or the Security Documents) other than (A) in accordance with the terms of the relevant security document and the indenture, (B) the satisfaction in full of all obligations under the indenture or (C) any loss of perfection that results from the failure of the applicable collateral agent to maintain possession of certificates delivered to it representing securities pledged under the security documents or to take any other action required to maintain perfection and (b) such default continues for 30 days after receipt of written notice given by the Trustee or the holders of not less than 25% in aggregate principal amount of the then outstanding A-1 Exit Notes; provided that such default relates to liens in excess of $25 million; and

(x)    the Issuer or any Guarantor that is a significant subsidiary (or any group of subsidiary guarantors that, taken together (as of the latest audited consolidated financial statements for the Issuer and its restricted subsidiaries) would constitute a significant subsidiary) shall assert, in any pleading in any court of competent jurisdiction, that any security interest in any security document is invalid or unenforceable.

11

| | |
|---|---|
| Debt Incurrence Covenants: | The Issuer will be permitted to reborrow[8] and/or refinance existing indebtedness (subject to customary limitations to be agreed), or enter into new aircraft and engine lease obligations, up to the following limits (the "**Debt & Aircraft Lease Baskets**"): |
| | Total debt, including aircraft debt but excluding IFRS-16 aircraft and engine lease obligations: $3.75 billion at any time (the "**Total Debt Basket**"). |
| | Sublimit Life Miles Indebtedness: $410 million at any time |
| | Sublimit for other Corporate Non-Aircraft Indebtedness for Borrowed Money: $2.35 billion[9] at any time (excluding LifeMiles Indebtedness) |
| | Aircraft and engine aggregate annual lease rental payments through calendar year 2025 shall not exceed $480 million[10] in any such calendar year at any time, and for years 2026-2028 shall not exceed 110% of the annual aircraft and lease payments set forth in the Company's business plan (the "**v2.0 Plan**") as provided to the New Tranche A DIP Lenders. |
| | In all cases, such Debt & Aircraft Lease Baskets shall exclude obligations under operating lease(s) to a Loan Party relating to up to three 787-9 aircraft (one delivered, two undelivered) which an unaffiliated third party has agreed to pay (directly or indirectly) and where such Loan Party has no further obligation to pay rent under such lease(s) other than to use reasonable best efforts to enforce such third party's obligations in the event such third party does not perform or pay. |
| | The Issuer's ability to incur additional debt (in addition to amounts set forth in the baskets) will be conditioned upon the Issuer's Fixed Charge Coverage Ratio (defined as Consolidated EBITDAR of the Issuer to Fixed Charges) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional debt is incurred being equal to or greater than (x) from a date to be agreed to December 31, 2022, 1.00:1.00 and (y) thereafter, 1.10:1.00 ("**Ratio Debt**"). |
| | "Debt" or "indebtedness" will be defined in a manner to be agreed, taking into account applicable accounting rules; provided that any portion of lease obligations that are expected to be deemed fully satisfied under the Plan shall not be construed as indebtedness (in a manner consistent with US GAAP fresh start accounting for purposes of such determination, regardless of any IFRS treatment). |
| Liquidity Covenant | The Issuer will be required to maintain Liquidity (to be defined in a manner to be agreed) of no less than $400,000,000. |
| Other Covenants: | (i)      Limitation on Restricted Payments (including Restricted Investments[11]); |

---

[8] The Issuer shall not be permitted to reborrow any amounts previously redeemed through any mandatory redemptions from asset sale/casualty proceeds.

[9] Excludes any aircraft reconfiguration capex financing.

[10] Excludes any "supplemental rents" or other similar terms that may be payable with respect to financing the capital expenditures for densification of aircraft.

[11] The negative covenants will permit, at minimum, the following:

(1)   Strategic investments and acquisitions (including, without limitation, transactions with Affiliates) in an unlimited amount to the extent the transaction consideration is paid in the form of, or from the cash proceeds of any issuance of, common equity, preferred equity or any option, warrant or other right to acquire common equity or preferred equity (but not disqualified equity), in each case, of the Issuer and not issued in connection with the Company Approved Reorganization Plan ("**Equity Consideration**");

(2)   Operationally strategic investments and acquisitions (including, without limitation, transactions with Affiliates to the extent permitted under clause (7) below (i.e. the Affiliate Transaction covenant)) in an amount of up to $175 million to the extent the transaction consideration is paid in cash;

#94532811v47

| | (ii) | Limitation on Restrictions on Distributions from Restricted Subsidiaries; |
|---|---|---|
| | (iii) | Limitation on Affiliate Transactions; |
| | (iv) | Limitation on Sales of Assets and Subsidiary Stock; |
| | (v) | Limitation on Liens; [12] |

(3)   The incurrence of acquisition debt in an unlimited amount and liens on the acquired assets financed therewith; provided that neither the Issuer nor any of its restricted subsidiaries at the time of such acquisition shall be required to be an obligor/guarantor for such debt or provide security for any such acquisition debt and that the stock of the ultimate parent of any acquired business shall be pledged as collateral to secure the A-1 Exit Notes;

(4)   "**Affiliate**" means, with respect to any Person, any other Person (as defined in the DIP Credit Agreement) that is in control of, is controlled by or is under common control with such Person.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(5)   Affiliate transactions on arms' length terms, in the ordinary course of business, which shall not, in any event, be deemed or construed as strategic investments or acquisitions chargeable against the strategic investments basket;

(6)   Affiliate transactions that are strategic investments or acquisitions for Equity Consideration in an unlimited amount;

(7)   Affiliate transactions that are strategic investments or acquisitions for cash consideration using investment capacity under clause (2) above in an amount up to $175 million, provided that the cash consideration for any such transaction may not exceed the "Affiliate Cash Consideration Cap" and the transaction has been duly approved in accordance with the organizational documents and shareholders' agreement of reorganized Avianca. For the avoidance of doubt, the Issuer or any restricted subsidiary may proceed with an Affiliate Transaction that exceeds the Affiliate Cash Consideration Cap so long as any consideration above such amount is in the form of Equity Consideration.

a.   "**Affiliate Cash Consideration Cap**" means, at the election of the Issuer:

i.   An amount equal to 110% of Seller's Cost.  "**Seller's Cost**" means, with respect to any assets or equity which are the subject of a transaction with the Issuer or any restricted subsidiary and were acquired by the seller no more than 18 months prior to the transaction with the Issuer or restricted subsidiary, the seller's cost basis, including investment or acquisition consideration paid in the form of cash, stock or other assets, attorneys' fees, investment banker fees, and broker fees, plus a rate of return equal to 14.5% on the seller's costs basis from the date of the seller's original investment or acquisition; or

ii.   An amount within the range of values determined by an Approved Appraisal Firm engaged at the Loan Parties' expense.  "**Approved Appraisal Firm**" means one of five business valuation, investment banking or appraisal firms mutually agreed among each of the holders of 60% of the A-1 Exit Notes, the holders of 60% of the A-2 Exit Notes, and the Tranche B Lenders and set forth in a schedule to the final documentation of the DIP to Exit Financing; or, to the extent the holders of 60% of the A-1 Exit Notes, the holders of 60% of the A-2 Exit Notes, and the Tranche B Lenders do not agree on a specified list of approved appraisal firms, "Approved Appraisal Firm" shall mean any internationally recognized appraisal firm of reputable standing.

[12] The Limitation on Liens covenant to permit liens on:

- up to $410 million LifeMiles Indebtedness secured by the Lifemiles program assets as described in Footnote 13 of this DIP-to-Exit Facility Term Sheet;
- the greater of (x) $1,650,000,000 or (y) the initial balance of the A-1 Exit Notes and the A-2 Exit Notes to secure the A-1 Exit Note and the A-2 Exit Notes on a pari passu basis (and refinancings thereof) secured by substantially the same collateral as is securing the existing DIP Obligations  (the "**Exit Facility Collateral**"), in each case less the amount of any mandatory redemptions from asset sale/casualty proceeds;
- up to $485 million to secure (1) the Citi RCF Facility, (2) the Engine Loan Facility, (3) the USAVflow Facility, (4) the BdB Credit Card Receivables Facility and (5) any successor facilities thereto secured by collateral consisting of spare parts, engines, credit card receivables and any other assets securing the obligations as of the date hereof;
- up to $90 million to secure any other Corporate Non-Aircraft Indebtedness secured by collateral consisting of non-aircraft lease liabilities, real estate, IT and any other assets securing the obligations as of the date hereof;
- up to $125 million to secure junior debt (which amount can be increased to the extent that the basket for the A-1 Exit Notes and A-2 Exit Notes have been repaid or redeemed other than from mandatory redemptions from asset sale/casualty proceeds) to be secured on a junior basis on the Exit Facility Collateral; <u>provided</u> that (1) the maturity shall be more than 90 days after

#94532811v47

|  | (vi) | Designation of Restricted and Unrestricted Subsidiaries; |
|---|---|---|
|  | (vii) | Reporting obligations; |
|  | (viii) | Limitation on Merger and Consolidation (other than in respect of contemplated restructuring); |
|  | (ix) | Limitations on Sale-Leasebacks; and |
|  | (x) | Certain Assurances Related to Loyalty Programs[13]. |
|  | Baskets and exceptions to the covenants will be consistent with comparable Latin American issuers' secured high-yield covenants for companies in the industry of the Issuer and its subsidiaries. | |
| Issuance of Notes: | The A-1 Exit Notes will be issued pursuant to Section 1145 of the Bankruptcy Code, subject to resale pursuant to Rule 144A for life. | |
| **Other** | | |
| Fees and Expenses: | The Company will reimburse all reasonable fees, costs and expenses incurred by the Designated DIP Lenders (including counsel) in connection with the A-1 Exit Notes. | |
| Governing Law: | The laws of the State of New York. | |

---

the maturity of the A-1 Exit Notes and the A-2 Exit Notes and (2) the corresponding intercreditor agreement for each such facility shall be in form and substance acceptable to the A-1 Exit Notes and A-2 Exit Notes in their sole discretion and shall require a "silent" junior lien;

- aircraft securing aircraft debt incurred under the Total Debt Basket; and
- usual and customary for transactions of this type, including but not limited to usual and customary liens (1) for taxes, (2) imposed by or arising by operation of law, (3) with respect to salvage or other rights of insurers or (4) related to engine, aircraft or aircraft parts.

[13] This covenant shall permit LifeMiles debt in the amount of $410 million and the refinancing of such LifeMiles debt, subject to customary limitations, but would disallow such indebtedness to increase. All future loyalty programs would have to be structured in a manner that would provide for a collateral position for the benefit of the A-1 Exit Notes and A-2 Exit Notes that is no less favorable than the collateral positions held by lenders/noteholders under the current DIP Obligations and any loyalty programs that would displace LifeMiles would be on terms substantially similar to the LifeMiles program or otherwise acceptable to the holders of a majority of the A-1 Exit Notes.

#94532811v47

**Annex A**

**Amendments to Sections 4.16, 6.05(a) and 7.06 of the DIP Credit Agreement**

Section 4.16. Sanctions; Anti-corruption; Anti-Money Laundering Laws.

(a) Except as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates or their Affiliates' employees, has engaged in any activity or conduct which would comprise a material violation of any applicable Anti-Corruption Laws ~~or,~~Anti-Money Laundering Laws, **or Sanctions (as defined in 4.16(b))** in any applicable jurisdiction, and the Borrower and its Subsidiaries have instituted and maintain in place policies and procedures designed to promote compliance with such laws.

(b) Except ~~as Except~~ as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates is an individual or entity (for the purposes of this Section 4.16, a "Person"), that is~~: (i)~~ **(i)** the target of any Sanctions (a "Sanctioned Person") ~~or,~~**, including as a result of being (i) listed in any Sanctions-related list of sanctioned Persons maintained by a Sanctions authority, (ii)** located, organized or resident in a country or territory that is the subject of Sanctions broadly prohibiting dealings with such country or territory (currently, Crimea, Cuba, Iran, North Korea, South Sudan, Sudan and Syria) (each, a "Sanctioned Country")**,** or (~~iii~~iii) a Person with whom dealings are prohibited or restricted by reason of a relationship of ownership or control with any Person described in (i**) or (ii**). "Sanctions" shall mean any economic or trade sanctions enacted, imposed, administered or enforced by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, the United Kingdom and/or any other Governmental Authorities with jurisdiction over any country or territory in which any Obligor or any of its Subsidiaries are organized or resident.

(c) Neither the Obligors, nor to their knowledge based on the information available to them after due inquiry, any Person acting on their behalf in connection with the DIP Loan (A) are; or (B) are more than 50% owned by, or are acting on behalf of a Person listed on OFAC's Specially Designated Nationals list.

(d) None of the proceeds in connection with this Agreement will be used, lent, contributed, or otherwise made available, directly or indirectly, (i) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or **in violation of any Anti-Corruption Laws or**Anti-Money Laundering Laws, **or** (ii) in any other manner, in each case as would result in a violation of Sanctions**, Anti-Corruption Laws or Anti-Money Laundering Laws** by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise). The funds used to repay the DIP Obligations or the Tranche A Note Obligations **(including any DIP Collateral and any proceeds thereof)** will not be derived from any Sanctioned Person ~~or,~~any activity that is the target of any Sanctions**, including any activity prohibited for a U.S. citizen under Sanctions, or any activity prohibited by Anti-Corruption Laws or Anti-Money Laundering Laws**.

Section 6.05. Compliance with Laws; Compliance with Environmental Laws.

(a) The Borrower and each of the Guarantors shall comply, and the Borrower shall cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders

#94532811v47

of any Governmental Authority (including Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws) applicable to it or its business or property.

Section 7.06. <u>Use of Proceeds</u>. The Obligors will not use, and will not permit any of their respective Subsidiaries to use, (i) the proceeds of any DIP Loan (A) in violation, in any material respect, of any ~~anti-corruption laws or~~ **Sanctions, Anti-Corruption Laws or** Anti-Money Laundering Laws or (B) (1) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (2) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise) or (ii) funds **(including any DIP Collateral and any proceeds thereof)** derived from any Sanctioned Person ~~or~~**,** any activity that is the target of any Sanctions**, including any activity prohibited for a U.S. citizen under Sanctions, or any activity prohibited by Anti-Corruption Laws or Anti-Money Laundering Laws,** to repay the DIP Obligations or the Tranche A Note Obligations.

**<u>Exhibit B-2</u>**

**Tranche A-2 Commitment Letter and Term Sheet**

**[Commitment Letter Redacted from Public Filing]**

**EXHIBIT A to Commitment Letter**

**Avianca Holdings S.A.**

**DIP-to-Exit Facility Term Sheet**

This term sheet (the "**DIP-to-Exit Facility Term Sheet**") sets forth the principal terms of a potential refinancing of a portion of the Company's outstanding super-priority debtor-in-possession term loans in the form of loans and/or notes (collectively, the "**New Tranche A-2 DIP Loans**") and conversion of the New Tranche A-2 DIP Loans in the form of notes (the "**A-2 Exit Notes**").

The New Tranche A DIP Loans (as defined below) will be subject to (a) the approval of the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**"), (b) a final order entered by the Bankruptcy Court authorizing the Loan Parties (as defined below) to enter the New Tranche A DIP Loans and to amend the DIP Credit Agreement (as defined below), which order shall be in form and substance reasonably acceptable to Required A-2 DIP Lenders (as defined below) and the Majority Tranche B Lenders (as defined in the DIP Credit Agreement) and (c) the "Conditions Precedent to New Tranche A-2 DIP Loans" as set forth below and the conditions described in the Commitment Letter to which this DIP-to-Exit Facility Term Sheet is attached (the "**Commitment Letter**"). The issuance of A-2 Exit Notes and conversion of the New Tranche A-2 DIP Loans into such notes will be subject to (i) emergence by the Loan Parties from their respective cases under chapter 11 of title 11 of the United States Code (the "**Chapter 11 Cases**," and the date of such emergence, the "**Emergence Date**"), in accordance with the chapter 11 plan of reorganization (the "**Plan**"), (ii) an order entered by the Bankruptcy Court authorizing the Loan Parties to issue the A-2 Exit Notes, which order may be part of the order confirming the Plan, which shall be in form and substance reasonably acceptable to A-2 DIP Lenders (as defined below) holding no less than 60% of the commitments under the Commitment Letter on the date hereof (the "**Required A-2 DIP Lenders**"), and the Majority Tranche B Lenders, which order shall be final, non-appealable and in full force and effect and (iii) the "Conditions Precedent to Conversion Election" as set forth below.

| Summary of Principal Terms of New Tranche A DIP Loans | |
|---|---|
| Borrower: | Avianca Holdings S.A., as Borrower (the "**Company**"). |
| Guarantors: | Each of the Borrower's Subsidiaries that are debtors and parties to the DIP Credit Agreement, each as a debtor and debtor-in-possession in the Chapter 11 Cases (collectively, the "**Guarantors**" and, together with the Borrower, the "**Loan Parties**"). |
| Amount: | The principal amount of the New Tranche A-2 DIP Loans shall not exceed $550,000,000, which, together with the proceeds of new Tranche A-1 loans or notes (the "**New Tranche A-1 DIP Loans**" and together with New Tranche A-2 DIP Loans, the "**New Tranche A DIP Loans**") shall be used as provided in the Use of Proceeds below. The A-2 DIP Lenders shall be allocated the New Tranche A-2 DIP Loans. The New Tranche A-2 DIP Loans may be provided in the form of loans under the DIP Credit Agreement or notes to be issued under a new indenture. |
| Ranking; Other Material Terms: | The New Tranche A-1 DIP Loans and the New Tranche A-2 DIP Loans shall be made in connection with an Amendment (the "**DIP Amendment**") to that Super-Priority Debtor-In-Possession Term Loan Agreement, dated as of October 13, 2020 (the "**DIP Credit Agreement**"),[1] among the Borrower, the Guarantors, the several banks and other financial institutions or entities from time to time party thereto and JPMorgan Chase Bank, N.A., as administrative agent and collateral agent (in such capacities, the "**Administrative Agent**"). |
| | The New Tranche A-1 DIP Loans and the New Tranche A-2 DIP Loans shall be *pari passu* and the other material terms of the DIP Credit Agreement and the New Tranche A-2 DIP Loans shall be consistent with the terms of the DIP Credit Agreement as in effect except as |

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

|  | set forth in the section "DIP Amendment Provisions" as described below. |
|  | The definitive documentation evidencing the New Tranche A-1 DIP Loans shall not include any term or condition that would be more beneficial to the lenders thereof than any analogous provision contained in the definitive documentation evidencing the New Tranche A-2 DIP Loans. |
| A-2 DIP Lenders: | Lenders (including any subsidiaries, affiliates, or any funds and/or accounts managed, advised or controlled by any such lenders, and any applicable fronting institution) that executed the Commitment Letter (the "**A-2 DIP Lenders**" and together with all lenders under the New Tranche A DIP Loans, the "**New Tranche A DIP Lenders**"). |
| Required A-2 DIP Lenders | A-2 DIP Lenders holding no less than 60% of the commitments under the Commitment Letter on the date hereof. |
| **New Tranche A-2 DIP Loans** | |
| Pricing: | Fixed interest rate of 9.0% per annum.  At the option of the Borrower, interest, fees and premiums shall be payable in cash or in kind.  Interest, fees and premiums that the Borrower elects to pay in kind will be added to the outstanding principal amount of the New Tranche A-2 DIP Loans and shall be treated as principal and bear interest from the date of such in-kind payment. |
| Maturity Date: | The New Tranche A-2 DIP Loans shall mature on March 31, 2022. |
| Closing Date: | The date on which the satisfaction of all Conditions Precedent to New Tranche A-2 DIP Loans described herein have occurred (the "**Closing Date**"). |
| Commitment Premium: | The Commitment Premium (as defined in the Commitment Letter) shall be paid to the A-2 DIP Lenders as set forth in the Commitment Letter. |
| Use of Proceeds: | The proceeds of the New Tranche A DIP Loans shall be used to (i) repay in full all Tranche A Loans and all Tranche A Notes outstanding under the DIP Loan Documents (as defined in the DIP Credit Agreement), (ii) all fees, expenses and other amounts (including legal and financial advisor fees) incurred in connection with the New Tranche A DIP Loans, the DIP Amendment, the other agreements related thereto and the transactions contemplated thereby other than fees paid-in-kind or paid as original issue discount and (iii) for working capital and general corporate purposes of the Loan Parties. |
| Prepayment before the Maturity Date/Exit Fee: | Prior to the Maturity Date, any optional or mandatory prepayment of New Tranche A-2 DIP Loans (other than in connection with a Conversion Election) shall be accompanied by (x) a premium equal to 9.0% of the principal amount of the New Tranche A-2 DIP Loans so prepaid plus (y) all accrued interest, payable in cash on the New Tranche A-2 DIP Loans so prepaid.<br><br>If on the earlier of the Maturity Date and the date on which the Borrower or any of its successors exits from its Chapter 11 Case (whether by way of consummation of a plan of reorganization or otherwise), the Borrower has not made a Conversion Election or the Conditions Precedent to Conversion Election are not satisfied, or if the New Tranche A-2 DIP Loans are accelerated in accordance with their terms, the Borrower shall pay the New Tranche A DIP Lenders holding New Tranche A-2 DIP Loans, for their ratable benefit, a premium in an amount equal to 9.0% of the New Tranche A-2 DIP Loans then outstanding.[2] |

---

[2] Including assignees, i.e. this premium shall be payable to the lenders of the New Tranche A-2 DIP Loans at the time such payment is due.

| DIP Amendment Provisions: | Amendments to the DIP Credit Agreement under the DIP Amendment shall include: |
|---|---|
| | (i) Amendments necessary to provide for the New Tranche A DIP Loans under the DIP Credit Agreement and effectuate the provisions set forth in this DIP-to-Exit Facility Term Sheet. |
| | (ii) Amend the Maturity Date to March 31, 2022 for the New Tranche A DIP Loans. |
| | (iii) Addition of a new Section 2.16 setting forth the mechanics of the Conversion Election. |
| | (iv) Deletion of Section 7.16(b) (Cumulative Cash Burn). |
| | (v) Provide for the majority of the Lenders of New Tranche A DIP Loans to have the amendment protections set forth in Section 11.08(a)(vi-vii). |
| | (vi) Addition of newly created UK SPVs as guarantors and the termination and release of certain Pledges of Rights to Waterfall Proceeds and Aircraft Residual Value. |
| | (vii) Amend the Bankruptcy Milestones to include, without limitation, the following: |
| |     a. The Bankruptcy Court entering an order confirming a Company Approved Reorganization Plan (as defined in the DIP Credit Agreement and as further described below), which order shall be reasonably acceptable to the Required A-2 DIP Lenders, by no later than 60 days after entry of the disclosure statement order; and |
| |     b. Such Company Approved Reorganization Plan becoming effective by no than later 30 days after the entry of the Confirmation Order. |
| | (viii) Amend Sections 4.16, 6.05(a) and 7.06 to delete the bold, stricken text (indicated textually in the same manner as the following example: ~~stricken text~~) and to add the bold, double-underlined text (indicated textually in the same manner as the following example: **<u>double-underlined text</u>**) as set forth on Annex A hereto. |
| Conditions Precedent to New Tranche A-2 DIP Loans | (i) (A) The Administrative Agent, the Tranche B Lenders, and the New Tranche A DIP Lenders shall have received copies of the DIP Amendment duly executed by the Majority Tranche B Lenders, the New Tranche A DIP Lenders, the Administrative Agent and each Loan Party, (B) the New Tranche A DIP Loans shall be secured by the Liens under the order described under clause (viii) below and the Collateral Documents (as defined in the DIP Credit Agreement), and (C) the terms and conditions of the definitive documentation of the DIP-to-Exit Facility shall be consistent with this DIP-to-Exit Facility Term Sheet and otherwise satisfactory to the Required A-2 DIP Lenders and, as matters affecting the rights and obligations of the Administrative Agent and the financial institution acting as a fronting lender with respect to the New Tranche A-1 DIP Loans (the "**Fronting Lender**"), reasonably satisfactory to the Administrative Agent and the Fronting Lender, as applicable. |
| | (ii) The Administrative Agent shall have received duly executed copies of an indenture made in connection with the New Tranche A DIP Loans that will take the form of notes, and the terms of such notes and the agreements related thereto shall be |

consistent with this DIP-to-Exit Facility Term Sheet and otherwise satisfactory to the Required A-2 DIP Lenders.

(iii)    With respect to the New Tranche A DIP Loans that will take the form of notes, the issuance of such notes shall be contemporaneous with the funding of the New Tranche A DIP Loans, and the New Tranche A DIP Lenders and Administrative Agent shall have received satisfactory evidence of the consummation of such issuance and the receipt of proceeds thereunder.

(iv)    The Administrative Agent shall have received a Loan Request as described in Section 2.02 of the DIP Credit Agreement with respect to the New Tranche A DIP Loans to be made as loans (and the Trustee shall have received a comparable request for any New Tranche A DIP Loans to be made in the form of notes) no later than three (3) Business Days prior to the proposed funding date.

(v)    The Borrower shall have paid all reasonable and documented out-of-pocket fees, charges and disbursements due and payable under the DIP Loan Documents and incurred in connection with the New Tranche A DIP Loans, including all reasonable and documented out-of-pocket fees, charges and disbursements of the Administrative Agent and the Fronting Lender and counsel to the Administrative Agent, counsel to the Fronting Lender and counsel to the A-2 DIP Lenders.

(vi)    No Default or Event of Default shall have occurred and be continuing or would immediately result from the DIP Amendment or the transactions contemplated thereby;

(vii)    With respect to the funding of the New Tranche A-2 DIP Loans, the funding of the New Tranche A-1 DIP Loans shall occur concurrently therewith on terms consistent with the terms disclosed to the A-2 DIP Lenders prior to the date of the Commitment Letter or otherwise reasonably acceptable to the Required A-2 DIP Lenders.

(viii)    The Bankruptcy Court shall have entered an order approving the DIP Amendment, the other agreements related thereto and the transactions contemplated thereby (including without limitation, the fees payable in respect of such transactions), and such order (i) shall be final and non-appealable and shall not be subject to any pending appeal, petition for certiorari, motion for reargument, reconsideration, or rehearing, (ii) shall be in form and substance acceptable to the Required A-2 DIP Lenders and the Majority Tranche B Lenders and (iii) shall be in form and substance reasonably acceptable to each of the Administrative Agent and the Fronting Lender as it relates to matters affecting the rights and obligations of the Administrative Agent and the Fronting Lender, as applicable.

(ix)    No trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, or examiner or receiver with expanded powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code shall have been appointed or designated with respect to the Loan Parties or their respective business, properties or assets under any of the Chapter 11 Cases.

(x)    The Administrative Agent and the New Tranche A DIP Lenders shall have received

4

the definitive v2.0 Plan, with such v2.0 Plan (including the debt/equity capital structure of the Company and its affiliates and the aircraft fleet ownership/lease structure specified therein) being acceptable to the New Tranche A DIP Lenders (it being understood and agreed that the draft v2.0 Plan delivered to the New Tranche A DIP Lenders prior to executing the Commitment Letter shall be deemed to be acceptable to the New Tranche A DIP Lenders).

(xi)    All representations and warranties contained in the DIP Loan Documents and the indenture made in connection with the New Tranche A DIP Lender shall be true and correct in all material respects on and as of the date of each New Tranche A DIP Loan (both before and after giving effect thereto and, in the case of each New Tranche A DIP Loans the application of proceeds therefrom) with the same effect as if made on and as of such date except to the extent such representations and warranties expressly relate to an earlier date and in such case as of such date; *provided* that any representation or warranty that is qualified by materiality, "Material Adverse Change" or "Material Adverse Effect" shall be true and correct in all respects as though made on and as of the applicable date, before and after giving effect to such New Tranche A DIP Loan.

(xii)    The New Tranche A DIP Lenders and the Administrative Agent shall have received a certificate of a responsible officer of the Borrower demonstrating in reasonable detail that, as of the Closing Date, reflect that the Borrower is in compliance with all applicable financial covenants under the DIP Loan Documents, including those under the DIP Amendment.[3]

(xiii)    Upon the reasonable request of any New Tranche A DIP Lender made at least ten (10) days prior to the Closing Date, the Loan Parties shall have provided to such New Tranche A DIP Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money-laundering rules and regulations, including the PATRIOT Act, in each case at least five (5) days prior to the Closing Date.

(xiv)    At least five (5) days prior to the Closing Date, to the extent any Loan Party qualifies as a "legal entity customer" under the Beneficial Ownership Regulation, such Loan Party shall deliver a Beneficial Ownership Certification. As used herein, "**Beneficial Ownership Certification**" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association; and "**Beneficial Ownership Regulation**" means 31 C.F.R. § 1010.230.

(xv)    Any and all necessary governmental and material third party consents and approvals necessary in connection with the funding of the New Tranche A DIP Loans and the execution and delivery by the Loan Parties of the DIP Amendment shall have been obtained and shall remain in effect.

---

[3] DIP Indenture will contain customary opinions on its issuance.

| | | |
|---|---|---|
| | (xvi) | All applicable taxes and stamp duties, if any, arising in connection with the execution, delivery and performance of the DIP Amendment, shall have been paid in full. |
| | (xvii) | The Administrative Agent shall have received a confirmation and reaffirmation agreement in respect of the Collateral Agency Agreement and the collateral documents under the existing DIP facility, in form and substance satisfactory to the Required A-2 DIP Lenders, as well as any other collateral documentation reasonably required (if any) to affirm the collateral granted under the existing DIP facility. |
| **Summary of Conversion Election** | | |
| Conversion Election: | The Borrower may elect to convert all or part of the New Tranche A-2 DIP Loans to A-2 Exit Notes on the Emergence Date; *provided*, that the Conditions Precedent to Conversion Election have been satisfied or waived by the Required A-2 DIP Lenders, including payment of the Conversion Premium. | |
| Conversion Premium: | If the Borrower exercises the Conversion Election, a conversion premium in the amount equal to ███% of the (x) principal amount of the New Tranche A-2 DIP Loans then outstanding and (y) all accrued interest and shall be paid in the form of additional A-2 Exit Notes to the New Tranche A DIP Lenders holding New Tranche A-2 DIP Loans, for their ratable benefit.[4] | |
| Conditions Precedent to Conversion Election: | (i) | The DIP Credit Agreement, DIP Amendment and the indenture made in connection with the New Tranche A DIP Loans (the "**DIP Documentation**") shall be in full force and effect. |
| | (ii) | The negotiation, execution and delivery of definitive documentation with respect to the A-2 Exit Notes which shall be consistent with this DIP-to-Exit Facility Term Sheet (including, without limitation, as set forth under "Documentation" below) or otherwise reasonably acceptable to the Required A-2 DIP Lenders, and upon the effectiveness thereof, the DIP Documentation, and the rights and duties of the agent parties thereto, shall be superseded and of no further force and effect except to the extent any of the provisions in the DIP Documentation expressly survive. |
| | (iii) | All security agreements, mortgages, control agreements and other collateral documents necessary or advisable to create and perfect the liens on the Collateral securing the A-2 Exit Notes (which liens shall be pari passu with the liens on the A-1 Exit Facility) shall have been duly executed and delivered and such liens shall have been validly created and perfected subject to appropriate post-closing periods to be agreed and all security agreements, mortgages, control agreements and other collateral documents in respect of the DIP facility in effect prior to the Emergence Date shall have been terminated and of no further force and effect. |
| | (iv) | As of the Emergence Date, pursuant to the terms of the Plan, the Company shall have refinanced the Tranche B Loans (as defined in the DIP Credit Agreement) either through conversion to equity or from the proceeds of a new equity capital raise. |
| | (v) | As of the Emergence Date, the Company shall have minimum liquidity of $800,000,000. |

---

[4] Including assignees, i.e. this premium shall be payable to the lenders of the New Tranche A-2 DIP Loans at the time such payment is due.

(vi)     The Bankruptcy Court shall have confirmed a Plan (such Plan to be consistent with this DIP-to-Exit Term Sheet and the v2.0 Plan delivered as a condition to the New Tranche A-2 DIP Loans and in form and substance reasonably acceptable to the Required A-2 DIP Lenders) that authorizes the transactions herein and all conditions to the effectiveness of such Plan shall have been satisfied.

(vii)    As of the Emergence Date, the Company shall not have outstanding indebtedness for borrowed money which (x) with respect to senior indebtedness consisting of LifeMiles Indebtedness shall exceed $410 million incurred under the LifeMiles program; (y) with respect to any other indebtedness for borrowed money shall exceed $2.25 billion[5]; and (z) with respect to total debt, including aircraft debt and IFRS-16 equivalent aircraft lease obligations, shall exceed $4.355 billion.[6]  In all cases, such debt levels shall exclude obligations under operating lease(s) of a Loan Party relating to up to three 787-9 aircraft (one delivered, two undelivered) which an unaffiliated third party has agreed to pay (directly or indirectly) and where such Loan Party has no further obligation to pay rent under such lease(s) other than to use reasonable best efforts to enforce such third party's obligations in the event such third party does not perform or pay.

(viii)   The Company Approved Reorganization Plan shall have been confirmed by the Bankruptcy Court pursuant to any confirmation order entered in the Chapter 11 Cases (the "**Confirmation Order**"), which Confirmation Order (a) shall be in form and substance reasonably satisfactory to the Required A-2 DIP Lenders and (b) shall provide for releases of the A-2 DIP Lenders the Administrative Agent and the Fronting Lender.

(ix)     The Confirmation Order shall not have been vacated, reversed, modified, amended or stayed in a manner that adversely affects any material right or duty of the A-2 DIP Lenders, except as otherwise agreed to in writing by the A-2 DIP Lenders.

(x)      All conditions precedent to the effectiveness of the Company Approved Reorganization Plan shall have been satisfied or waived according to its terms (provided that any waiver that adversely affects any material right or duty of the A-2 DIP Lenders shall require the prior written consent of the A-2 DIP Lenders).

(xi)     The Plan and all transactions contemplated therein or in the Confirmation Order to occur on the Emergence Date shall have been (or substantially concurrently with the effective date of the Conversion Election, shall be) substantially consummated (as defined in section 1101 of the Bankruptcy Code) in accordance with the terms thereof and in compliance with applicable law and Bankruptcy Court and regulatory approvals.

(xii)    The New Tranche A-1 DIP Loans shall contemporaneously convert or be refinanced as exit loans, notes or equity (the "**A-1 Exit Facility**") on terms consistent with the terms disclosed to the A-2 DIP Lenders prior to the date of the Commitment Letter or otherwise reasonably acceptable to the Required A-2 DIP Lenders.

(xiii)   Delivery of satisfactory opinions of counsel to the Loan Parties in each relevant jurisdiction (which shall cover, among other things, authority, legality, validity, binding effect and enforceability of the documents for the A-2 Exit Notes and creation and perfection of security interest), and such corporate resolutions, certificates and other ancillary closing documents customary for financing of this

---

[5] Excludes any aircraft reconfiguration capex financing.
[6] Aircraft and other corporate debt may be secured to the extent permitted as described in Footnote 12 of this DIP-to-Exit Facility Term Sheet.

|  |  | nature as the Required A-2 DIP Lenders or the applicable collateral agent shall reasonably require other than opinions and other closing documents that are delivered after the Closing Date as agreed by the Borrower, the Required A-2 DIP Lenders and the applicable collateral agent. |
|--|--|--|
|  | (xiv) | The Company shall have received all other requisite legal and regulatory approvals required to consummate the transactions contemplated herein. |
|  | (xv) | The tax, corporate and capital structure of the Issuer and its subsidiaries shall be consistent with the structure disclosed to the Required A-2 DIP Lenders in the Plan and/or Disclosure Statement. |
|  | (xvi) | All fees, expenses, and reimbursement and indemnification obligations (including without limitation the Fee and Expense Reimbursement (as defined in the Commitment Letter) payable under the Commitment Letter or the other DIP-to-Exit Facility Documents and the DIP Loan Documents (including the DIP Amendment and related fee and other letters) through and including the effective date of the Plan shall have been paid. |
|  | (xvii) | All filings, recordations and searches necessary or desirable in connection with the liens and security interests in the Collateral securing the A-2 Exit Notes shall have been duly made; and all filing and recording fees and taxes shall have been duly paid. |
|  | (xviii) | The A-2 Exit Facility shall have been assigned a public credit rating by at least two of Moody's, S&P and Fitch, and such credit rating shall not be less than the public credit rating assigned to the A-1 Exit Notes (if any). |
|  | (xix) | The Borrower shall have acquired, directly or indirectly, all issued and outstanding equity interests in LifeMiles not owned by the Borrower directly or indirectly as of the date hereof. |

| **Summary of Principal Terms of A-2 Exit Notes ($550,000,000)** | |
|---|---|
| Issuer: | The Company or New UK Holdco (as successor to the Borrower), as Issuer (as successor to the Company, as applicable, the "**Issuer**"). |
| Guarantors: | Certain of the Guarantors (together with the Issuer, the "**Note Parties**") subject to modifications to be agreed. |
| Pricing: | The A-2 Exit Notes shall bear interest at a rate of 9.0% per annum, payable in cash. |
| A-2 Exit Notes Maturity Date: | The A-2 Exit Notes shall mature on the date that is seven (7) years after the Emergence Date. |
| Additional Amounts: | Payments on the A-2 Exit Notes will be made after withholding and deduction for certain taxes. The Issuer will pay such additional amounts as will result in receipt by the holders of A-2 Exit Notes of such amounts as would have been received by them had no such withholding or deduction for taxes been required, subject to certain customary exceptions for Latin American high-yield debt or for high yield debt issued by issuers of the jurisdiction of the Issuer, as applicable. |
| Documentation: | The documentation in respect of the A-2 Exit Notes, including, without limitation, the A-2 Exit Notes indenture, security documents and any additional documents to be entered into pursuant to the A-2 Exit Notes indenture (collectively, the "**Documentation**") shall, to the extent applicable, give due regard to the indenture dated as of December 31, 2019 governing the Company's senior secured notes due 2023 (the "**Secured Notes due 2023**"), as modified by the terms of the DIP-to-Exit Term Sheet or as otherwise agreed by the Required A-2 DIP Lenders and as to the covenants and events of default as provided below. |
| Optional Redemption: | Prior to the second anniversary of the Emergence Date, any redemption of the A-2 Exit Notes shall be subject to a T+50 make-whole. |
| | On or after the date that is the second anniversary of the Emergence Date, the A-2 Exit Notes may be redeemed at the following redemption prices: |
| | (i) on the date that is the second anniversary of the Emergence Date and during the twelve-month period thereafter, at 102; |
| | (ii) on the date that is the third anniversary of the Emergence Date and during the twelve-month period thereafter, at 101; and |
| | (iii) on the date that is the fourth anniversary of the Emergence Date and thereafter, at par. |
| | In any event, the Issuer may, at any time prior to the second anniversary of the Emergence Date, redeem up to 35% of the aggregate principal amount of the A-2 Exit Notes (x) with the proceeds of new equity or bona fide convertible debt issued in accordance with the limitations on indebtedness, at a redemption price of par plus one half of coupon, or (y) with the proceeds of the incurrence of unsecured debt by the Issuer, at a redemption price of par plus one coupon. |
| | In addition to the applicable redemption prices described above, the Issuer will pay accrued and unpaid interest to, but excluding, the redemption date. |
| Tax Call: | 100% of the aggregate principal amount, plus accrued and unpaid interest, if any, to the date of redemption and any additional amounts then due and payable (but without premium), if as a result of any change in or amendment to the laws (or any rules or regulations thereunder) of |

| | |
|---|---|
| | a taxing jurisdiction, or any amendment to or change in an official interpretation, administration or application of such laws, any treaties, regulations, rules, or related agreements to which the taxing jurisdiction is a party (including a holding by a court of competent jurisdiction), any Note Party has or will become obligated to pay additional amounts. |
| Put following a Ratings Downgrade due to a Change of Control: | 101.0% of the aggregate principal amount, plus accrued and unpaid interest, if any. |
| Ratings: | The Issuer shall be required to obtain and maintain public credit ratings from at least two of Moody's, S&P and Fitch. |
| Collateral: | The A-2 Exit Notes shall be secured by the same collateral that secures the New Tranche A DIP Loans and the liens in respect of the collateral shall rank *pari passu* with the A-1 Exit Facility.[7] |
| Events of Default: | (i)    default in any payment of interest on any A-2 Exit Note when due and payable, continued for 30 days; |
| | (ii)    default in the payment of the principal amount of or premium, if any, on any A-2 Exit Note when due at its stated maturity, upon optional redemption, upon required repurchase or mandatory redemption, upon declaration or otherwise; |
| | (iii)    failure by the Issuer or any Guarantor to comply for 60 days after written notice by the trustee on behalf of the holders or by the holders of at least 25% in aggregate principal amount of the outstanding A-2 Exit Notes with any agreement or obligation contained in the indenture; provided that, in the case of a failure to comply with reporting obligations during the first 18 months after the Emergence Date, such period of continuance of such default or breach shall be 120 days after written notice has been given; |
| | (iv)    the Issuer, any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary pursuant to or within the meaning of bankruptcy law: |
| |     (a)  commences a voluntary case, or |
| |     (b)  consents to the entry of an order for relief against it in an involuntary case, or |
| |     (c)  consents to the appointment of a custodian of it or for all or substantially all of its property, or |
| |     (d)  makes a general assignment for the benefit of its creditors, or |
| |     (e)  admits in writing its inability generally to pay its debts; |
| | (v)    a court of competent jurisdiction enters an order or decree under any bankruptcy law that: |
| |     (a)  is for relief against the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary in an involuntary case; |
| |     (b)  appoints a custodian of the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a |

---

[7] Certain Pledges of Rights to Waterfall Proceeds and Aircraft Residual Value will be terminated in connection with the DIP Amendment.

|  | significant subsidiary or for all or substantially all of the property of the Issuer or any significant subsidiary or any group of restricted subsidiaries of the Issuer that, taken together, would constitute a significant subsidiary; or |
|  | (c) orders the liquidation of the Issuer, any significant subsidiary or any group of restricted subsidiaries of Issuer that, taken together, would constitute a significant subsidiary;<br><br>and in each case the order or decree remains unstayed and in effect for sixty (60) consecutive days;<br><br>(vi) payment default at stated maturity or cross acceleration in respect of indebtedness (other than pre-petition indebtedness that has been discharged under the Plan) in an aggregate amount in excess of $50 million;<br><br>(vii) judgment default in an aggregate amount in excess of $50 million, and provided that such judgment or order shall not have been satisfied, vacated, discharged or stayed or bonded pending an appeal for a period of sixty (60) days after such judgment becomes final, and in the event such judgment is covered by insurance, an enforcement proceeding has been commenced by any creditor upon such judgment or decree which is not promptly stayed;<br><br>(viii) any guarantee of the A-2 Exit Notes by a significant subsidiary ceases to be in full force and effect or any guarantor that is a significant subsidiary denies or disaffirms its obligations under its guarantee of the A-2 Exit Notes, other than in accordance with the terms of the indenture;<br><br>(ix) (a) the liens created by the security documents shall at any time not constitute a valid and perfected lien on any material portion of the collateral intended to be covered thereby (unless perfection is not required by the Indenture or the Security Documents) other than (A) in accordance with the terms of the relevant security document and the indenture, (B) the satisfaction in full of all obligations under the indenture or (C) any loss of perfection that results from the failure of the applicable collateral agent to maintain possession of certificates delivered to it representing securities pledged under the security documents or to take any other action required to maintain perfection and (b) such default continues for 30 days after receipt of written notice given by the Trustee or the holders of not less than 25% in aggregate principal amount of the then outstanding A-2 Exit Notes; provided that such default relates to liens in excess of $25 million; and<br><br>(x) the Issuer or any Guarantor that is a significant subsidiary (or any group of subsidiary guarantors that, taken together (as of the latest audited consolidated financial statements for the Issuer and its restricted subsidiaries) would constitute a significant subsidiary) shall assert, in any pleading in any court of competent jurisdiction, that any security interest in any security document is invalid or unenforceable. |
| Debt Incurrence Covenants: | The Issuer will be permitted to reborrow and/or refinance existing indebtedness (subject to customary limitations to be agreed), or enter into new aircraft and engine lease obligations, up to the following limits (the "**Debt & Aircraft Lease Baskets**")[8]:<br><br>Total debt, including aircraft debt but excluding IFRS-16 aircraft and engine lease obligations: $3.75 billion at any time (the "**Total Debt Basket**")<br><br>Sublimit Life Miles Indebtedness: $410 million at any time |

---

[8] The Issuer shall not be permitted to reborrow any amounts previously redeemed through any mandatory redemptions from asset sale/casualty proceeds.

| | |
|---|---|
| | Sublimit for other Corporate Non-Aircraft Indebtedness for Borrowed Money: $2.35 billion[9] at any time (excluding LifeMiles Indebtedness)<br><br>Aircraft and engine aggregate annual lease rental payments through calendar year 2025 shall not exceed $480 million[10] in any such calendar year at any time, and for years 2026-2028 shall not exceed 110% of the annual aircraft and lease payments set forth in the Company's business plan (the "**v2.0 Plan**") as provided to the New Tranche A DIP Lenders.<br><br>In all cases, such Debt & Aircraft Lease Baskets shall exclude obligations under operating lease(s) to a Loan Party relating to up to three 787-9 aircraft (one delivered, two undelivered) which an unaffiliated third party has agreed to pay (directly or indirectly) and where such Loan Party has no further obligation to pay rent under such lease(s) other than to use reasonable best efforts to enforce such third party's obligations in the event such third party does not perform or pay.<br><br>The Issuer's ability to incur additional debt (in addition to amounts set forth in the baskets) will be conditioned upon the Issuer's Fixed Charge Coverage Ratio (defined as Consolidated EBITDAR of the Issuer to Fixed Charges) for the most recently ended four full fiscal quarters for which internal financial statements are available immediately preceding the date on which such additional debt is incurred being equal to or greater than (x) from a date to be agreed to December 31, 2022, 1.00:1.00 and (y) thereafter, 1.10:1.00 ("**Ratio Debt**").<br><br>"Debt" or "indebtedness" will be defined in a manner to be agreed, taking into account applicable accounting rules; provided that any portion of lease obligations that are expected to be deemed fully satisfied under the Plan shall not be construed as indebtedness (in a manner consistent with US GAAP fresh start accounting for purposes of such determination, regardless of any IFRS treatment). |
| Liquidity Covenant | The Issuer will be required to maintain Liquidity (to be defined in a manner to be agreed) of no less than $400,000,000. |
| Other Covenants: | (i)        Limitation on Restricted Payments (including Restricted Investments[11]); |

---

[9] Excludes any aircraft reconfiguration capex financing.

[10] Excludes any "supplemental rents" or other similar terms that may be payable with respect to financing the capital expenditures for densification of aircraft.

[11] The negative covenants will permit, at minimum, the following:

(1)   Strategic investments and acquisitions (including, without limitation, transactions with Affiliates) in an unlimited amount to the extent the transaction consideration is paid in the form of, or from the cash proceeds of any issuance of, common equity, preferred equity or any option, warrant or other right to acquire common equity or preferred equity (but not disqualified equity), in each case, of the Issuer and not issued in connection with the Company Approved Reorganization Plan ("**Equity Consideration**");

(2)   Operationally strategic investments and acquisitions (including, without limitation, transactions with Affiliates to the extent permitted under clause (7) below (i.e. the Affiliate Transaction covenant)) in an amount of up to $175 million to the extent the transaction consideration is paid in cash;

(3)   The incurrence of acquisition debt in an unlimited amount and liens on the acquired assets financed therewith; provided that neither the Issuer nor any of its restricted subsidiaries at the time of such acquisition shall be required to be an obligor/guarantor for such debt or provide security for any such acquisition debt and that the stock of the ultimate parent of any acquired business shall be pledged as collateral to secure the A-2 Exit Notes;

(4)   "**Affiliate**" means, with respect to any Person, any other Person (as defined in the DIP Credit Agreement) that is in control of, is controlled by or is under common control with such Person.  For purposes of this definition, control of a Person means the power, direct or indirect, to direct or cause the direction of the management and policies of such Person whether by contract or otherwise.

(5)   Affiliate transactions on arms' length terms, in the ordinary course of business, which shall not, in any event, be deemed or construed as strategic investments or acquisitions chargeable against the strategic investments basket;

|  | (ii) | Limitation on Restrictions on Distributions from Restricted Subsidiaries; |
|--|------|------|
|  | (iii) | Limitation on Affiliate Transactions; |
|  | (iv) | Limitation on Sales of Assets and Subsidiary Stock; |
|  | (v) | Limitation on Liens[12]; |
|  | (vi) | Designation of Restricted and Unrestricted Subsidiaries; |
|  | (vii) | Reporting obligations; |
|  | (viii) | Limitation on Merger and Consolidation (other than in respect of contemplated restructuring); |

(6)   Affiliate transactions that are strategic investments or acquisitions for Equity Consideration in an unlimited amount;

(7)   Affiliate transactions that are strategic investments or acquisitions for cash consideration using investment capacity under clause (2) above in an amount up to $175 million, provided that the cash consideration for any such transaction may not exceed the "Affiliate Cash Consideration Cap" and the transaction has been duly approved in accordance with the organizational documents and shareholders' agreement of reorganized Avianca. For the avoidance of doubt, the Issuer or any restricted subsidiary may proceed with an Affiliate Transaction that exceeds the Affiliate Cash Consideration Cap so long as any consideration above such amount is in the form of Equity Consideration.

    a.   "**Affiliate Cash Consideration Cap**" means, at the election of the Issuer:

        i.   An amount equal to 110% of Seller's Cost.  "**Seller's Cost**" means, with respect to any assets or equity which are the subject of a transaction with the Issuer or any restricted subsidiary and were acquired by the seller no more than 18 months prior to the transaction with the Issuer or restricted subsidiary, the seller's cost basis, including investment and acquisition consideration paid in the form of cash, stock or other assets, attorneys' fees, investment banker fees, and broker fees, plus a rate of return equal to 14.5% on the seller's costs basis from the date of the seller's original investment or acquisition; or

        ii.   An amount within the range of values determined by an Approved Appraisal Firm engaged at the Loan Parties' expense.  "**Approved Appraisal Firm**" means one of five business valuation, investment banking or appraisal firms mutually agreed among each of the holders of 60% of the A-1 Exit Notes, the holders of 60% of the A-2 Exit Notes, and the Tranche B Lenders and set forth in a schedule to the final documentation of the DIP to Exit Financing; or, to the extent the holders of 60% of the A-1 Exit Notes, the holders of 60% of the A-2 Exit Notes, and the Tranche B Lenders do not agree on a specified list of approved appraisal firms, "Approved Appraisal Firm" shall mean any internationally recognized appraisal firm of reputable standing.

[12] The Limitation on Liens covenant to permit liens on:

- up to $410 million LifeMiles Indebtedness secured by the Lifemiles program assets as described in Footnote 13 of this DIP-to-Exit Facility Term Sheet;

- the greater of (x) $1,650,000,000 or (y) the initial balance of the A-1 Exit Notes and the A-2 Exit Notes to secure the A-1 Exit Note and the A-2 Exit Notes on a pari passu basis (and refinancings thereof) secured by substantially the same collateral as is securing the existing DIP Obligations  (the "**Exit Facility Collateral**"), in each case less the amount of any mandatory redemptions from asset sale/casualty proceeds;

- up to $485 million to secure (1) the Citi RCF Facility, (2) the Engine Loan Facility, (3) the USAVflow Facility, (4) the BdB Credit Card Receivables Facility and (5) any successor facilities thereto secured by collateral consisting of spare parts, engines, credit card receivables and any other assets securing the obligations as of the date hereof;

- up to $90 million to secure any other Corporate Non-Aircraft Indebtedness secured by collateral consisting of non-aircraft lease liabilities, real estate, IT and any other assets securing the obligations as of the date hereof;

- up to $125 million to secure junior debt (which amount can be increased to the extent that the basket for the A-1 Exit Notes and A-2 Exit Notes have been repaid or redeemed other than from mandatory redemptions from asset sale/casualty proceeds) to be secured on a junior basis on the Exit Facility Collateral; provided that (1) the maturity shall be more than 90 days after the maturity of the A-1 Exit Notes and the A-2 Exit Notes and (2) the corresponding intercreditor agreement for each such facility shall be in form and substance acceptable to the A-1 Exit Notes and A-2 Exit Notes in their sole discretion and shall require a "silent" junior lien;

- aircraft securing aircraft debt incurred under the Total Debt Basket; and

- usual and customary for transactions of this type, including but not limited to usual and customary liens (1) for taxes, (2) imposed by or arising by operation of law, (3) with respect to salvage or other rights of insurers or (4) related to engine, aircraft or aircraft parts.

|  | (ix)    Limitations on Sale-Leasebacks; and |
|---|---|
|  | (x)    Certain Assurances Related to Loyalty Programs[13]. |
|  | Baskets and exceptions to the covenants will be consistent with comparable Latin American issuers' secured high-yield covenants for companies in the industry of the Issuer and its subsidiaries. |
| Issuance of Notes: | The A-2 Exit Notes will be issued pursuant to Section 1145 of the Bankruptcy Code, subject to resale pursuant to Rule 144A for life. |
| **Other** | |
| Fees and Expenses: | The Company will reimburse all reasonable fees, costs and expenses incurred by the A-2 DIP Lenders (including counsel) in connection with the A-2 Exit Notes. |
| Governing Law: | The laws of the State of New York. |

---

[13] This covenant shall permit LifeMiles debt in the amount of $410 million and the refinancing of such LifeMiles debt, subject to customary limitations, but would disallow such indebtedness to increase. All future loyalty programs would have to be structured in a manner that would provide for a collateral position for the benefit of the A-1 Exit Notes and A-2 Exit Notes that is no less favorable than the collateral positions held by lenders/noteholders under the current DIP Obligations and any loyalty programs that would displace LifeMiles would be on terms substantially similar to the LifeMiles program or otherwise acceptable to the holders of a majority of the A-2 Exit Notes.

### Annex A

### Amendments to Sections 4.16, 6.05(a) and 7.06 of the DIP Credit Agreement

Section 4.16. <u>Sanctions; Anti-corruption; Anti-Money Laundering Laws.</u>

(a) Except as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates or their Affiliates' employees, has engaged in any activity or conduct which would comprise a material violation of any applicable Anti-Corruption Laws ~~or,~~ Anti-Money Laundering Laws, **or Sanctions (as defined in 4.16(b))** in any applicable jurisdiction, and the Borrower and its Subsidiaries have instituted and maintain in place policies and procedures designed to promote compliance with such laws.

(b) Except ~~as Except~~ as set forth on Schedule 4.16, neither the Borrower nor any of its Subsidiaries, or their respective directors or officers, nor to their knowledge, their Affiliates is an individual or entity (for the purposes of this Section 4.16, a "<u>Person</u>"), that is ~~(i)~~ the target of any Sanctions (a "<u>Sanctioned Person</u>") ~~or,~~ **including as a result of being (i) listed in any Sanctions-related list of sanctioned Persons maintained by a Sanctions authority, (ii)** located, organized or resident in a country or territory that is the subject of Sanctions broadly prohibiting dealings with such country or territory (currently, Crimea, Cuba, Iran, North Korea, South Sudan, Sudan and Syria) (each, a "<u>Sanctioned Country</u>")**,** or (~~ii~~**iii**) a Person with whom dealings are prohibited or restricted by reason of a relationship of ownership or control with any Person described in (i**) or (ii**). "<u>Sanctions</u>" shall mean any economic or trade sanctions enacted, imposed, administered or enforced by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union, the United Kingdom and/or any other Governmental Authorities with jurisdiction over any country or territory in which any Obligor or any of its Subsidiaries are organized or resident.

(c) Neither the Obligors, nor to their knowledge based on the information available to them after due inquiry, any Person acting on their behalf in connection with the DIP Loan (A) are; or (B) are more than 50% owned by, or are acting on behalf of a Person listed on OFAC's Specially Designated Nationals list.

(d) None of the proceeds in connection with this Agreement will be used, lent, contributed, or otherwise made available, directly or indirectly, (i) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or **in violation of any Anti-Corruption Laws or** Anti-Money Laundering Laws, **or** (ii) in any other manner, in each case as would result in a violation of Sanctions**, Anti-Corruption Laws or Anti-Money Laundering Laws** by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise). The funds used to repay the DIP Obligations or the Tranche A Note Obligations **(including any DIP Collateral and any proceeds thereof)** will not be derived from any Sanctioned Person ~~or,~~ any activity that is the target of any Sanctions**, including any activity prohibited for a U.S. citizen under Sanctions, or any activity prohibited by Anti-Corruption Laws or Anti-Money Laundering Laws**.

Section 6.05. <u>Compliance with Laws; Compliance with Environmental Laws.</u>

(a) The Borrower and each of the Guarantors shall comply, and the Borrower shall cause each of its Subsidiaries to comply, in all material respects, with all applicable laws, rules, regulations and orders of any Governmental Authority (including Sanctions, Anti-Money Laundering Laws and Anti-Corruption Laws) applicable to it or its business or property.

Section 7.06. <u>Use of Proceeds</u>. The Obligors will not use, and will not permit any of their respective Subsidiaries to use, (i) the proceeds of any DIP Loan (A) in violation, in any material respect, of any ~~anti-corruption laws or~~**Sanctions, Anti-Corruption Laws or** Anti-Money Laundering Laws or (B) (1) to fund or finance any activities or business of or with any Person that is a Sanctioned Person or in any Sanctioned Country, or (2) in any other manner, in each case as would result in a violation of Sanctions by any Person in connection with this Agreement (including any Person participating or acting in connection with the loan hereunder, whether as underwriter, advisor, investor, lender, hedge provider, facility or security agent or otherwise) or (ii) funds **(including any DIP Collateral and any proceeds thereof)** derived from any Sanctioned Person ~~or,~~any activity that is the target of any Sanctions**, including any activity prohibited for a U.S. citizen under Sanctions, or any activity prohibited by Anti-Corruption Laws or Anti-Money Laundering Laws,** to repay the DIP Obligations or the Tranche A Note Obligations.