**MILBANK LLP**
Dennis F. Dunne
Evan R. Fleck
Benjamin Schak
Kyle R. Satterfield
55 Hudson Yards
New York, NY  10001
(212) 530-5000

**MILBANK LLP**
Gregory A. Bray
2029 Century Park East
33rd Floor
Los Angeles, CA  90067
(424) 386-4000

*Counsel to Debtors and*
*Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| AVIANCA HOLDINGS S.A., *et al.*, | Case No. 20-11133 (MG) |
| Debtors.[1] | (Jointly Administered) |

**JOINT CHAPTER 11 PLAN**
**OF AVIANCA HOLDINGS S.A.**
**AND ITS AFFILIATED DEBTORS**

Dated: September 3, 2021
New York, NY

---

[1]  The Debtors in these cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. International Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaragüense de Aviación, Sociedad Anónima (N/A); Regional Express Américas S.A.S. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aéreo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A); AV Loyalty Bermuda Ltd. (N/A); Aviacorp Enterprises S.A. (N/A).  The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá D.C., Colombia.

**TABLE OF CONTENTS**

ARTICLE I DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW .................................................................................. 1

    A.    Definitions............................................................................................... 1
    B.    Rules of Interpretation .......................................................................... 24
    C.    Computation of Time ............................................................................ 24
    D.    Governing Law ..................................................................................... 24
    E.    Reference to Monetary Figures and Exchange Rates ........................... 25

ARTICLE II ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS .... 25

    A.    General Administrative Expenses.......................................................... 25
    B.    Restructuring Expenses......................................................................... 25
    C.    Professional Fees .................................................................................. 26
        1.    Final Fee Applications ................................................................ 26
        2.    Professional Fees Escrow Account .............................................. 26
        3.    Post-Effective Date Fees and Expenses ...................................... 27
    D.    DIP Facility Claims............................................................................... 27
    E.    DIP Facility Fees and Expenses............................................................ 28
    F.    Priority Tax Claims............................................................................... 29

ARTICLE III CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS ...... 29

    A.    Classification of Claims and Interests................................................... 29
    B.    Treatment of Claims and Interests ........................................................ 30
        1.    Class 1 – Priority Non-Tax Claims............................................. 30
        2.    Class 2 – Other Secured Claims................................................. 31
        3.    Class 3 – Engine Loan Claims.................................................... 31
        4.    Class 4 – Secured RCF Claims................................................... 32
        5.    Class 5 – USAV Receivable Facility Claims.............................. 32
        6.    Class 6 – Grupo Aval Receivable Facility Claims...................... 33
        7.    Class 7 – Grupo Aval Lines of Credit Claims ............................ 33
        8.    Class 8 – Grupo Aval Promissory Note Claims ......................... 34
        9.    Class 9 – Cargo Receivable Facility Claims............................... 34
        10.    Class 10 – Pension Claims.......................................................... 34
        11.    Class 11 – General Unsecured Avianca Claims ......................... 35
        12.    Class 12 – General Unsecured Avifreight Claims ...................... 36
        13.    Class 13 – General Unsecured Aerounión Claims...................... 36
        14.    Class 14 – General Unsecured SAI Claims ............................... 37
        15.    Class 15 – General Unsecured Convenience Claims................... 37
        16.    Class 16 – Subordinated Claims ................................................. 37
        17.    Class 17 – Intercompany Claims ................................................ 38
        18.    Class 18 – Existing AVH Non-Voting Equity Interests ............. 38
        19.    Class 19 – Existing AVH Common Equity Interests.................. 38
        20.    Class 20 –Existing Avifreight Equity Interests........................... 39

21.     Class 21 – Existing SAI Equity Interests ................................................. 39
22.     Class 22 – Other Existing Equity Interests ............................................. 39
23.     Class 23 – Intercompany Interests .......................................................... 40
C.      Special Provision Governing Unimpaired Claims ............................................ 40
D.      Subordination of Claims ................................................................................... 40

ARTICLE IV ACCEPTANCE OR REJECTION OF PLAN ............................................... 41

A.      Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy
        Code ................................................................................................................. 41
B.      Voting Classes ................................................................................................. 41
C.      Presumed Acceptance by Non-Voting Classes ................................................ 41
D.      Presumed Acceptance by Unimpaired Classes ................................................ 41
E.      Elimination of Vacant Classes ......................................................................... 41
F.      Controversy Concerning Impairment ............................................................... 41

ARTICLE V MEANS FOR IMPLEMENTATION OF PLAN ............................................. 42

A.      General Settlement of Claims and Interests ..................................................... 42
B.      Substantive Consolidation ............................................................................... 42
        1.      Avianca Plan Consolidation ...................................................................... 42
        2.      Confirmation in the Event of Partial or No Avianca Plan Consolidation. 42
        3.      Claims Against Avianca Debtors and Unconsolidated Debtors ............... 43
C.      Restructuring Transactions ............................................................................... 43
D.      Sources of Consideration for Plan Distributions ............................................. 44
        1.      Cash ........................................................................................................... 44
        2.      Exit Facility ............................................................................................... 44
        3.      New Common Equity ................................................................................ 45
        4.      Warrants .................................................................................................... 46
E.      Corporate Existence ......................................................................................... 46
F.      Vesting of Assets in the Reorganized Debtors ................................................ 47
G.      Cancellation of Loans, Securities, and Agreements ........................................ 47
H.      Corporate and Other Entity Action .................................................................. 49
I.      New Organizational Documents ....................................................................... 49
J.      Directors and Officers of Reorganized Debtors ............................................... 50
        1.      Reorganized AVH Board ........................................................................... 50
        2.      Officers of Reorganized Debtors .............................................................. 50
        3.      New Subsidiary Boards ............................................................................. 50
K.      Effectuating Documents; Further Transactions ............................................... 50
L.      Section 1146 Exemption ................................................................................... 51
M.      Authorization and Issuance of New Common Equity ...................................... 51
N.      Preservation of Causes of Action ..................................................................... 51
O.      Grupo Aval Settlement ..................................................................................... 52
        1.      Grupo Aval Settlement Agreement ............................................................ 52
        2.      Grupo Aval Exit Facility ........................................................................... 53

ARTICLE VI TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES ...................................................................................................... 54

A.   Assumption and Rejection of Executory Contracts and Unexpired Leases ......... 54
B.   Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ........ 57
C.   Dispute Resolution ................................................................................................. 57
D.   Insurance Policies & Indemnification Obligations ................................................ 58
E.   Modifications, Amendments, Supplements, Restatements, or Other Agreements 59
F.   Reservation of Rights ............................................................................................. 59
G.   Contracts and Leases Entered into after Petition Date ........................................... 59
H.   Compensation and Benefits Plans .......................................................................... 60
I.   USAV Transaction Documents and USAV Settlement Agreement ...................... 60
J.   United Agreements ................................................................................................. 60
K.   Grupo Aval Settlement Agreement ........................................................................ 60

ARTICLE VII PROCEDURES FOR RESOLVING CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS ................................................................................. 61

A.   Allowance of Claims and Interests ........................................................................ 61
B.   Claims Administration Responsibilities ................................................................. 61
C.   General Unsecured Claims Observer ...................................................................... 61
D.   Estimation of Claims .............................................................................................. 62
E.   Adjustment to Claims Register Without Objection ................................................ 62
F.   Time to File Objections to Claims .......................................................................... 62
G.   Disallowance of Claims .......................................................................................... 63
H.   Amendments to Claims ........................................................................................... 63
I.   No Distributions Pending Allowance ..................................................................... 63
J.   Distributions After Allowance ............................................................................... 63
K.   Disputed Claims Reserve ....................................................................................... 63
L.   Claims Resolution Procedures Cumulative ............................................................ 64

ARTICLE VIII PROVISIONS GOVERNING DISTRIBUTIONS ..................................... 65

A.   Timing and Calculation of Amounts to Be Distributed ......................................... 65
B.   Disbursing Agent .................................................................................................... 65
C.   Rights and Powers of Disbursing Agent ................................................................ 65
    1.   Powers of the Disbursing Agent .................................................................. 65
    2.   Incurred Expenses ........................................................................................ 65
D.   Delivery of Distributions and Undeliverable or Unclaimed Distributions ........... 66
    1.   Delivery of Distributions by Disbursing Agent or Servicer ...................... 66
    2.   Delivery of Distributions in General ........................................................... 66
    3.   Minimum Distributions ............................................................................... 66
    4.   Undeliverable Distributions and Unclaimed Property ................................ 66
E.   Exemption from Securities Laws ........................................................................... 67
F.   Compliance with Tax Requirements ....................................................................... 68
G.   No Postpetition Interest on Claims and Interests ................................................... 68
H.   Setoffs and Recoupment ........................................................................................ 68

I.   Claims Paid or Payable by Third Parties ............................................................. 68
     1.   Claims Paid by Third Parties ..................................................................... 68
     2.   Claims Payable by Third Parties ................................................................ 69
     3.   Applicability of Insurance Policies ............................................................ 69
J.   Allocation Between Principal and Accrued Interest ............................................ 69

ARTICLE IX SETTLEMENT, RELEASE, INJUNCTION, AND RELATED PROVISIONS .. 70

A.   Compromise and Settlement .............................................................................. 70
B.   Discharge of Claims and Termination of Interests ............................................ 70
C.   Release of Liens ................................................................................................ 71
D.   Releases by the Debtors .................................................................................... 71
E.   Releases by Holders of Claims or Interests ...................................................... 72
F.   Exculpation ....................................................................................................... 74
G.   Injunction ......................................................................................................... 74
H.   Subordination Rights ........................................................................................ 76

ARTICLE X CONDITIONS TO EFFECTIVE DATE ................................................................. 76

A.   Conditions to Effective Date ............................................................................ 76
B.   Waiver of Conditions ........................................................................................ 78

ARTICLE XI MODIFICATION, REVOCATION OR WITHDRAWAL OF PLAN ................. 78

A.   Modification and Amendments .......................................................................... 78
B.   Effect of Confirmation on Modifications .......................................................... 78
C.   Revocation or Withdrawal of Plan .................................................................... 79

ARTICLE XII RETENTION OF JURISDICTION ..................................................................... 79

ARTICLE XIII MISCELLANEOUS PROVISIONS ................................................................... 82

A.   Immediate Binding Effect ................................................................................. 82
B.   Additional Documents ....................................................................................... 82
C.   Payment of Statutory Fees ................................................................................ 82
D.   Reservation of Rights ........................................................................................ 82
E.   Successors and Assigns ..................................................................................... 83
F.   Notices .............................................................................................................. 83
G.   Term of Injunctions or Stays ............................................................................ 84
H.   Entire Agreement .............................................................................................. 84
I.   Exhibits ............................................................................................................. 84
J.   Nonseverability of Plan Provisions ................................................................... 84
K.   Votes Solicited in Good Faith ........................................................................... 85
L.   Document Retention .......................................................................................... 85
M.   Conflicts ............................................................................................................ 85
N.   Dissolution of Committee .................................................................................. 85

**INTRODUCTION**

Avianca Holdings S.A. ("Avianca") and its affiliated debtors and debtors in possession (each a "Debtor" and, collectively, the "Debtors"), jointly propose this chapter 11 plan of reorganization (the "Plan") pursuant to section 1121(a) of title 11 of the United States Code (the "Bankruptcy Code"). Although proposed jointly for administrative purposes and voting, the Plan constitutes a separate chapter 11 plan of reorganization for the Avianca Debtors and each Unconsolidated Debtor. Capitalized terms used and not otherwise defined shall have the meanings ascribed to such terms in Article I.

Each Debtor is a proponent of the Plan within the meaning of section 1129 of the Bankruptcy Code. Holders of Claims and Interests may refer to the Disclosure Statement for a discussion of the Debtors' history, businesses, assets, results of operations, historical financial information, and projections of future operations, as well as a summary and description of this Plan.

**All holders of Claims and Interests are encouraged to read the Plan and the Disclosure Statement in their entirety before voting to accept or reject the Plan.**

**ARTICLE I**
**DEFINITIONS, RULES OF INTERPRETATION, COMPUTATION OF TIME, AND GOVERNING LAW**

A.    *Definitions*

As used in the Plan, capitalized terms have the meanings set forth below.

1.    "*2020 Notes Claims*" means all Claims on account of, arising under, or relating to, the 2020 Notes and the 2020 Notes Indenture.

2.    "*2020 Notes*" means AVH's 8.375% Senior Notes due 2020 issued pursuant to the 2020 Notes Indenture.

3.    "*2020 Notes Indenture*" means that certain *Indenture*, dated as of May 10, 2013, by and among AVH, Avianca Leasing, LLC, and Grupo Taca Holdings Limited, as issuers, Citibank, N.A., as trustee, transfer agent, and principal paying agent, and Banque Internationale à Luxembourg S.A., as Luxembourg transfer agent and Luxembourg paying agent, and the guarantors party thereto, as amended, restated, modified, and/or supplemented from time to time.

4.    "*2020 Notes Indenture Trustee*" means the Delaware Trust Company, as indenture trustee under the 2020 Notes Indenture, appointed pursuant to the terms thereof, as well as its successors, assigns, or any replacement agent appointed pursuant to the terms of the 2020 Notes Indenture.

5.    "*2020 Notes Indenture Trustee Claims*" means Claims for reasonable compensation, fees, expenses, disbursements, indemnification, subrogation, and contribution of the 2020 Notes Indenture Trustee, including, without limitation, internal default fees and reasonable and documented attorneys', financial advisors', and agents' fees, expenses, and

disbursements, incurred by or owed to the 2020 Notes Indenture Trustee, whether prepetition or postpetition, whether prior to or after consummation of the Plan, to the extent provided for under the 2020 Notes Indenture.

6. "*2023 Notes Claims*" means all Claims on account of, arising under, or relating to, the 2023 Notes and the 2023 Notes Indenture; provided, that 2023 Notes Claims shall not include Claims relating to 2023 Notes that were exchanged for DIP Facility Claims pursuant to the DIP Roll-Up.

7. "*2023 Notes*" means AVH's 9.00% Senior Secured Notes due 2023 issued pursuant to the 2023 Notes Indenture.

8. "*2023 Notes Indenture*" means that certain *Indenture*, dated as of December 31, 2019, by and among AVH, as issuer, Wilmington Savings Fund Society, FSB, as trustee and collateral trustee, Citibank, N.A., as registrar, transfer agent, and principal paying agent, and the guarantors party thereto, as amended, restated, modified, and/or supplemented from time to time.

9. "*2023 Notes Indenture Trustee*" means the indenture trustee under the 2023 Notes Indenture, its successors, assigns, or any replacement agent appointed pursuant to the terms of the 2023 Notes Indenture.

10. "*2023 Notes Indenture Trustee Claims*" means Claims for reasonable compensation, fees, expenses, disbursements, indemnification, subrogation, and contribution of the 2023 Notes Indenture Trustee, including, without limitation, internal default fees and reasonable and documented attorneys', financial advisors', and agents' fees, expenses, and disbursements, incurred by or owed to the 2023 Notes Indenture Trustee, whether prepetition or postpetition, whether prior to or after consummation of the Plan, to the extent provided for under the 2023 Notes Indenture.

11. "*Administrative Expense*" means any cost or expense of administration of the Chapter 11 Cases entitled to priority pursuant to sections 503(b), 507(a)(2), or 507(b) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estates and operating the Debtors' businesses; (b) professional compensation and reimbursement awarded or allowed pursuant to sections 330(a) or 331 of the Bankruptcy Code, including the Professional Fees; (c) an administrative expense of the type described in section 503(b)(9) of the Bankruptcy Code; (d) any and all fees and charges assessed against the Estates pursuant to chapter 123 of title 28 of the United States Code; (e) DIP Facility Claims; and (f) DIP Facility Fees and Expenses.

12. "*Aerounión*" means Aero Transporte de Carga Unión, S.A. de C.V.

13. "*Aircraft Lease*" means an Unexpired Lease relating to the use or operation of an aircraft, aircraft engine, or other aircraft parts.

14. "*Allowed*" means, (a) with respect to any Claim, except as otherwise provided herein: (i) a Claim that is evidenced by a Proof of Claim Filed by the Claims Bar Date in accordance with the Claims Bar Date Order (or for which Claim under the Plan, the Bankruptcy Code or a Final Order of the Bankruptcy Court a Proof of Claim is not or shall not be required to

2

be Filed); (ii) a Claim that is listed in the Schedules, if any, as not contingent, not unliquidated, and not disputed, and for which no Proof of Claim, as applicable, has been timely Filed; or (iii) a Claim Allowed pursuant to the Plan or a Final Order, and (b) with respect to any Interest, an Interest that is (x) reflected in the books and records of the transfer agent for the relevant Debtor on the Confirmation Date or (y) Allowed by Final Order; provided, that with respect to a Claim described in clauses (i) and (ii) above, such Claim shall be considered Allowed only if and to the extent that with respect to such Claim no objection to the allowance thereof has been interposed within the applicable period of time fixed by the Plan, the Bankruptcy Code, the Bankruptcy Rules, or the Bankruptcy Court, or, if such an objection is so interposed and the Claim, as applicable, shall have been Allowed by a Final Order; provided, that the Reorganized Debtors, in their business judgment and in consultation with the General Unsecured Claims Observer (as applicable), may deem a claim "Allowed" following the Effective Date without further order of the Bankruptcy Court; provided, further, that an Allowed Claim (A) includes a previously Disputed Claim to the extent such Disputed Claim becomes Allowed and (B) shall be net of any setoff amount that may be asserted by any Debtor against the holder of such Claim, which shall be deemed to have been set off in accordance with the provisions of the Plan; provided, further, that notwithstanding anything to the contrary herein, the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims or Interests that are Reinstated or otherwise Unimpaired pursuant to the Plan. "*Allow*," "*Allowing*," and "*Allowance*," shall have correlative meanings.

15.    "*Article*" refers to an article of the Plan.

16.    "*AVH*" means Avianca Holdings S.A.

17.    "*Avianca Debtors*" means each Debtor other than the Unconsolidated Debtors, namely Avianca Holdings S.A.; Aeroinversiones de Honduras, S.A.; Aerovías del Continente Americano S.A. Avianca; Airlease Holdings One Ltd.; America Central (Canada) Corp.; America Central Corp.; AV International Holdco S.A.; AV International Holdings S.A.; AV International Investments S.A.; AV International Ventures S.A.; AV Investments One Colombia S.A.S.; AV Investments Two Colombia S.A.S.; AV Taca International Holdco S.A.; Avianca Costa Rica S.A.; Avianca Leasing, LLC; Avianca, Inc.; Avianca-Ecuador S.A.; Aviaservicios, S.A.; Aviateca, S.A.; C.R. International Enterprises, Inc.; Grupo Taca Holdings Limited; International Trade Marks Agency Inc.; Inversiones del Caribe, S.A.; Isleña de Inversiones, S.A. de C.V.; Latin Airways Corp.; Latin Logistics, LLC; Nicaragüense de Aviación, Sociedad Anónima; Regional Express Américas S.A.S.; Ronair N.V.; Servicio Terrestre, Aéreo y Rampa S.A.; Taca de Honduras, S.A. de C.V.; Taca de México, S.A.; Taca International Airlines S.A.; Taca S.A.; Tampa Cargo S.A.S.; Technical and Training Services, S.A. de C.V.; AV Loyalty Bermuda Ltd.; Aviacorp Enterprises S.A.

18.    "*Avianca Plan Consolidation*" means the deemed consolidation of the estates of the Avianca Debtors, solely for purposes of the Plan.

19.    "*Avifreight*" means Avifreight Holding Mexico S.A.P.I. de C.V.

20.    "*Avoidance Actions*" means any and all actual or potential claims and Causes of Action to avoid a transfer of property from, or an obligation incurred by, one or more of the

3

Debtors, that arise under (a) chapter 5 of the Bankruptcy Code, including sections 544, 545, 547, 548, 549, 550, 551, and 553(b) of the Bankruptcy Code or (b) similar non-U.S. or state law.

21.     "*Ballot*" means a ballot providing for the acceptance or rejection of the Plan and to make an election with respect to the releases set forth in <u>Article IX.E</u> of the Plan and, in the case of holders of General Unsecured Avianca Claims, to make an election to receive the Unsecured Creditor Equity Package.

22.     "*Bankruptcy Code*" has the meaning specified in the Introduction hereto.

23.     "*Bankruptcy Court*" means the United States Bankruptcy Court for the Southern District of New York or any other court having jurisdiction over the Chapter 11 Cases.

24.     "*Bankruptcy Rules*" means (a) the Federal Rules of Bankruptcy Procedure, as amended from time to time and as applicable to the Chapter 11 Cases, promulgated pursuant to 28 U.S.C. § 2075, and (b) the general, local, and chambers rules of the Bankruptcy Court.

25.     "*Business Day*" means any day other than a (a) Saturday or Sunday, (b) "legal holiday" (as defined in Bankruptcy Rule 9006(a)), or (c) day on which commercial banks in New York are required or authorized by law to remain closed.

26.     "*Cargo Receivable Facility*" means the credit facility arising under the Cargo Receivable Facility Agreement.

27.     "*Cargo Receivable Facility Agreement*" means that certain *Line of Credit Agreement*, dated as of February 26, 2019, by and among Aerounión, as borrower, and Banco Santander (México), S.A., Institución de Banca Múltiple, and Grupo Financiero Santander México, as lenders.

28.     "*Cargo Receivable Facility Claims*" means all Claims on account of, under, or related to the Cargo Receivable Facility.

29.     "*Cash*" means (a) cash and cash equivalents in U.S. dollars or (b) where non-U.S. currency is specifically referred to, cash and cash equivalents in such non-U.S. currency.

30.     "*Cause of Action*" means any action, claim, cause of action, controversy, demand, right, action, remedy, lien, indemnity, guaranty, suit, obligation, liability, damage, judgment, account, defense, offset, power, privilege, license, and franchise of any kind or character whatsoever, whether known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, disputed or undisputed, secured or unsecured, assertable directly or derivatively, arising before, on, or after the Petition Date, in contract or in tort, in law or in equity, or pursuant to any other theory of law.  For the avoidance of doubt, "Cause of Action" includes: (a) any right of setoff or counterclaim and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code, including, but not limited to, Avoidance Actions; (d) any counterclaim or defense, including fraud, mistake, duress, usury, recoupment, and any other defenses set forth in section 558 of the Bankruptcy Code; and (e) any non-U.S. or state law fraudulent transfer, avoidance or similar claim.

4

31.    "*CAXDAC*" means *Caja de Auxilios y de Prestaciones de la Asociación Colombiana de Aviadores Civiles ACDAC*.

32.    "*CAXDAC Fee Claims*" means Claims for reasonable and documented postpetition fees and expenses of CAXDAC, including reasonable and documented attorneys' fees, expenses, and disbursements, incurred by CAXDAC in connection with the Chapter 11 Cases, whether prior to or after consummation of the Plan, as provided for under the Colombian Pension Regime.

33.    "*Chapter 11 Cases*" means the jointly administered cases of the Debtors under chapter 11 of the Bankruptcy Code.

34.    "*Claim*" means a "claim" as defined in section 101(5) of the Bankruptcy Code against a Debtor.

35.    "*Claims Bar Date*" means January 20, 2021 at 11:59 P.M. (Pacific Time) or, solely with respect to Governmental Units, February 5, 2021 at 11:59 P.M. (Pacific Time) or, solely with respect to the Special Bar Date Entities, June 10, 2021 at 11:59 P.M. (Pacific Time).

36.    "*Claims-Based New Common Equity*" means New Common Equity issued to holders of Allowed Tranche B DIP Facility Claims and Allowed General Unsecured Avianca Claims on account of such Claims, which shall be subject to dilution by the issuance of Contribution-Based New Common Equity, Warrant-Based New Common Equity, and any Post-Emergence New Common Equity.

37.    "*Class*" means a class of Claims or Interests designated in Article III of the Plan, pursuant to section 1122(a) of the Bankruptcy Code.

38.    "*Colombian Pension Regime*" means the laws of the Republic of Colombia relating to pension obligations, including Decree Law 1282 of 1994, Decree Law 1283 of 1994, and Law 100 of 1993; any other applicable decrees, articles, legal authority, or precedent; the Political Constitution of Colombia; and any applicable treaty obligations.

39.    "*Commitment Letters*" means the DIP-to-exit commitment letters annexed as Exhibits B-1 and B-2 to the *Debtors' Motion for Entry of an Order (I) Approving Terms of, and Debtors' Entry Into and Performance Under, the DIP-to-Exit Facility Commitment Letters and (II) Authorizing Incurrence, Payment and Allowance of Obligations Thereunder as Administrative Expenses* [Docket No. 1919].

40.    "*Commitment Letters Order*" means the *Revised Order (I) Approving Terms of, and Debtors' Entry Into and Performance Under, the DIP-to-Exit Facility Commitment Letters and (II) Authorizing Incurrence, Payment and Allowance of Obligations Thereunder as Administrative Expenses* [Docket No. 1938], as modified by the Final DIP Amendment Order, approving, among other things, the Debtors' entry into the Commitment Letters.

41.    "*Committee*" means the official committee of unsecured creditors, appointed on May 22, 2020 by the U.S. Trustee in the Chapter 11 Cases [Docket No. 154] pursuant to section 1102 of the Bankruptcy Code, as it may be constituted from time to time.

5

42.    "*Confirmation*" means the entry of the Confirmation Order on the docket of the Chapter 11 Cases.

43.    "*Confirmation Date*" means the date upon which Confirmation occurs.

44.    "*Confirmation Hearing*" means the hearing held by the Bankruptcy Court to consider confirmation of the Plan or, if the Debtors proceed with one or more Sub-Plans, such Sub-Plan(s) pursuant to section 1129 of the Bankruptcy Code.

45.    "*Confirmation Order*" means the Bankruptcy Court order confirming the Plan or, if the Debtors proceed with one or more Sub-Plans, such Sub-Plan(s) pursuant to section 1129 of the Bankruptcy Code, in form and substance reasonably satisfactory to the Supermajority New Tranche A-1 Lenders the Supermajority New Tranche A-2 Lenders (as defined in the DIP Facility Documents), and the Required Supporting Tranche B Lenders.  The Confirmation Order shall be consistent with the Global Plan Settlement and consistent in all respects with the DIP Facility Documents, and the Committee shall have consultation rights with respect to the provisions of the proposed Confirmation Order to the extent such provisions materially impact the rights of holders of General Unsecured Avianca Claims.

46.    "*Consenting Noteholders*" means those holders of 2023 Notes and/or Tranche A-1 and Tranche A-2 DIP Facility Claims that are or become party to the Noteholder RSA, together with their respective successors and permitted assigns.

47.    "*Consummation*" means the occurrence of the Effective Date.

48.    "*Contribution-Based New Common Equity*" means New Common Equity issued to certain holders of Allowed Tranche B DIP Facility Claims in exchange for each such holder's Tranche B Equity Contribution and/or Tranche B Asset Contribution and on account of the commitment premium set forth in the Tranche B Equity Conversion Agreement, which shall be subject to dilution by the issuance of Warrant-Based New Common Equity and any Post-Emergence New Common Equity.

49.    "*Cure Claim*" means a monetary Claim (unless waived or modified by the applicable counterparty) on account of a Debtor's defaults under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 or 1123 of the Bankruptcy Code, other than (a) a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code and (b) a Claim that, by consent of the applicable counterparty, is to be treated as a General Unsecured Claim.

50.    "*D&O Policy*" means any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability maintained by the Debtors and in effect or purchased as of the Petition Date.

51.    "*Debtor*" or "*Debtors*" have the meaning specified in the Introduction hereto.

52.    "*Description of Restructuring Transactions*" means a summary description of certain Restructuring Transactions, including any changes to the corporate and/or capital structure of the Debtors (to the extent known), to be made on the Effective Date.

53.     "*DIP Agent*" means JPMorgan Chase Bank, N.A., solely in its capacity as administrative agent, Fronting Lender (as defined in the DIP Credit Agreement), arranger, and collateral agent under the DIP Facility Documents, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

54.     "*DIP Amendment*" means the amendments to the DIP Credit Agreement and other DIP Facility Documents that are contemplated by the DIP Amendment Motion.

55.     "*DIP Amendment Motion*" means the *Debtors' Motion for Entry of a Final Order (I) Authorizing the Debtors to Enter into Amendments to Their Postpetition DIP Credit Documents and Enter into Additional Documents in Furtherance Thereof, (II) Granting and Reaffirming Liens, (III) Granting Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 1972].

56.     "*DIP Credit Agreement*" means that certain *Super-Priority Debtor-in-Possession Term Loan Agreement*, dated as of October 13, 2020, by and among AVH, as borrower, the other Debtors, as guarantors, and the DIP Agent, as administrative agent and collateral agent, and the DIP Lenders, as amended, restated, modified, and/or supplemented from time to time in accordance with the DIP Orders and as amended by the DIP Amendment.

57.     "*DIP Credit Parties*" means the DIP Agent, the DIP Lenders, and the DIP Indenture Trustee.

58.     "*DIP Facility*" means the debtor-in-possession financing facility provided to the Debtors pursuant to the DIP Credit Agreement, the DIP Facility Indentures, and the DIP Orders and consisting (after giving effect to the DIP Amendment) of the Tranche A-1 DIP Obligations, the Tranche A-2 DIP Obligations, and the Tranche B DIP Obligations.

59.     "*DIP Facility Claims*" means all Claims on account of, under, or related to the DIP Facility or DIP Facility Documents held by any DIP Credit Party, including, without limitation, any outstanding principal, accrued and unpaid interest and premiums, fees, reimbursement obligations, and all other amounts that are outstanding obligations under the DIP Facility Documents.

60.     "*DIP Facility Documents*" means the DIP Credit Agreement, the DIP Facility Indentures, the DIP Orders, and any amendments (including the DIP Amendment), modifications, supplements thereto, as well as any related notes, certificates, agreements, security agreements, documents, payoff letters, and instruments (including any amendments, restatements, supplements, or modifications of any of the foregoing) related to or executed in connection with the DIP Credit Agreement, the DIP Facility Indentures, and the DIP Orders.

61.     "*DIP Facility Indentures*" means (i) the *Tranche A-1 Notes Indenture* by and among AVH, as issuer, the other Debtors, as guarantors, and the DIP Indenture Trustee and (ii) the *Tranche A-2 Notes Indenture* by and among AVH, as issuer, the other DIP Obligors, as guarantors, and the DIP Indenture Trustee, each dated as of August 27, 2021.

62.     "*DIP Facility Fees and Expenses*" means (i) the "Fee and Expense Reimbursement" as defined in the Commitment Letters Order, (ii) the fees, expenses, and

7

indemnities due and payable pursuant to section 11.04 of the DIP Credit Agreement; (iii) any fees and expenses due and payable under fee and engagement letters with the DIP Agent; and (iv) all other fees and expenses due and owing to the DIP Agent pursuant to any DIP Facility Documents.

63.    "*DIP Indenture Trustee*" means Wilmington Savings Fund Society, FSB, as notes trustee, solely in its capacity as notes trustee under each of the DIP Facility Indentures, as well as its successors, assigns, and any replacement trustee of each DIP Facility Indenture appointed pursuant to the terms of each DIP Facility Indenture.

64.    "*DIP Lenders*" means the lenders party to the DIP Credit Agreement and DIP Facility Indentures from time to time.

65.    "*DIP Orders*" means the Final DIP Order and the Final DIP Amendment Order, as amended, modified, or supplemented in accordance with the terms thereof.

66.    "*DIP Roll-Up*" means the "roll-up" of $220 million of the 2023 Notes into the DIP Facility, as approved by the Bankruptcy Court pursuant to the Final DIP Order.

67.    "*Direct Loan*" means the loan obligations arising under the Direct Loan Promissory Note.

68.    "*Direct Loan Claims*" means all Claims on account of, under, or related to the Direct Loan.

69.    "*Direct Loan Promissory Note*" means that certain *Promissory Note*, dated as of April 30, 2019, pursuant to which Aerovías del Continente Americano S.A. Avianca promised to pay to Citibank, N.A., acting through its international banking facility, the principal amount of $30,000,000, as may be amended, restated, and supplemented from time to time.

70.    "*Director*" means a member of the board of directors or board of managers, as applicable, of Reorganized AVH.

71.    "*Disallowed*" means any Claim, or any portion thereof, that (i) has been disallowed by Final Order or settlement; (ii) is scheduled at zero or as contingent, disputed, or unliquidated on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely filed under applicable law; or (iii) is not scheduled on the Schedules and as to which a Claims Bar Date has been established but no Proof of Claim has been timely filed or deemed timely filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order of the Bankruptcy Court, including the Claims Bar Date Order, or otherwise deemed timely filed under applicable law.  "*Disallow*" and "*Disallowance*" shall have correlative meanings.

72.    "*Disbursing Agent*" means, as applicable, the Debtors or Reorganized Debtors or any Person or Entity that the Debtors or Reorganized Debtors select to make or facilitate distributions in accordance with the Plan.

8

73.    "*Disclosure Statement*" means the Disclosure Statement for this Plan, as approved by the Bankruptcy Court pursuant to section 1125 of the Bankruptcy Code, together with all exhibits, schedules, supplements, annexes, and attachments to such disclosure statement, as it may be modified or supplemented from time to time.

74.    "*Disputed*" means, with respect to a Claim, any Claim that is not yet Allowed or Disallowed.

75.    "*Distribution Record Date*" means the Confirmation Date or such other date prior to the Effective Date that is selected by the Debtors.

76.    "*Effective Date*" means, with respect to the Plan or, if the Debtors proceed with one or more Sub-Plans, such Sub-Plan(s), the date that is a Business Day selected by the Debtor(s) on which (i) no stay of the Confirmation Order is in effect and (ii) all conditions precedent specified in Article X.A of the Plan have been satisfied or waived in accordance with the Plan or Sub-Plan(s). Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

77.    "*Electing General Unsecured Claimholder*" means a holder of an Allowed General Unsecured Avianca Claim that elects to receive the Unsecured Claimholder Equity Package in accordance with Article IIIB.11.b of the Plan.

78.    "*Engine Loan*" means the loan obligations arising under the Engine Loan Agreement.

79.    "*Engine Loan Agreement*" means that certain *Facility Agreement*, dated as of March 13, 2015, by and among Bank of Utah, as owner trustee and borrower, AVH, as owner participant, AVH, Aerovías del Continente Americano S.A. Avianca, and Taca International Airlines, S.A., as guarantors, and Credit Agricole Corporate and Investment Bank, as lender, administrative agent, and lead arranger, as amended, restated, modified, and/or supplemented from time to time.

80.    "*Engine Loan Claims*" means all Claims on account of, under, or related to the Engine Loan.

81.    "*Entity*" means any "entity," as such term is defined in section 101(15) of the Bankruptcy Code.

82.    "*Estate*" means, with respect to a particular Debtor, the estate created for such Debtor upon commencement of its Chapter 11 Case pursuant to section 541 of the Bankruptcy Code, and the "*Estates*" means every Debtor's Estate, collectively.

83.    "*Exculpated Parties*" means, collectively, and in each case in their capacities as such during the Chapter 11 Cases, (A)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Committee and its members, and (iv) the General Unsecured Claims Observer; (B) with respect to each of the foregoing Entities and Persons in clause (A), all of such Entities' and Persons' Related Parties, solely to the extent such Related Parties are fiduciaries of the Estates or otherwise to the fullest extent provided for pursuant to section 1125(e) of the Bankruptcy Code; (C)(i) the DIP

9

Agent, (ii) the DIP Lenders, (iii) the Consenting Noteholders, (iv) the Supporting Tranche B DIP Lenders, (v) the Exit Facility Indenture Trustee, (vi) the DIP Indenture Trustee, and (vii) the Exit Facility Lenders; and (D) with respect to each of the foregoing Entities and Persons in clause (C), all of such Entities' and Persons' Related Parties; provided, that, with respect to the Entities and Persons in clauses (C) and (D), any exculpations afforded under the Plan or the Confirmation Order shall be granted only to the extent provided for pursuant to section 1125(e) of the Bankruptcy Code.

84.     "*Executory Contract*" means a contract to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

85.     "*Exercise Price*" means an exercise price with respect to the Warrants that implies an equity value of Reorganized AVH of $1,480,000,000.

86.     "*Existing AVH Common Equity Interests*" means Existing AVH Equity Interests other than Existing AVH Non-Voting Equity Interests.

87.     "*Existing AVH Equity Interests*" means existing Interests in AVH.  For the avoidance of doubt, Existing AVH Equity Interests include (a) any unvested granted equity awards or options (which shall be deemed accelerated and treated equivalently to other existing common stock) and any other equity rights or instruments exchangeable, convertible or exercisable into stock of AVH and (b) American depositary receipts that are linked to other Existing AVH Equity Interests.

88.     "*Existing AVH Non-Voting Equity Interests*" means existing preferred Interests in AVH, including, for the avoidance of doubt, American depositary receipts that are linked to Existing AVH Non-Voting Equity Interests.

89.     "*Existing Avifreight Equity Interests*" means existing Interests in Avifreight, other than Interests held by other Debtors.

90.     "*Existing SAI Equity Interests*" means existing Interests in SAI, other than Interests held by other Debtors.

91.     "*Exit A-1 Notes*" means the indebtedness to be issued as part of the Exit Facility on the terms set forth in the Exit A-1 Term Sheet.

92.     "*Exit A-1 Term Sheet*" means the term sheet annexed as Exhibit B-1 to the DIP Amendment Motion.

93.     "*Exit A-2 Notes*" means the indebtedness to be issued as part of the Exit Facility on the terms set forth in the Exit A-2 Term Sheet.

94.     "*Exit A-2 Term Sheet*" means the term sheet annexed as Exhibit B-2 to the DIP Amendment Motion.

95.     "*Exit Facility*" means the new senior secured credit facility or facilities, consisting of the Exit A-1 Notes and the Exit A-2 Notes, to be made available to the Reorganized Debtors

10

pursuant to and subject to the terms and conditions of the Exit Facility Indenture(s) and the other Exit Facility Documents.

96.    "*Exit Facility Documents*" means the documents that will govern the Exit Facility, including (a) each Exit Facility Indenture and (b) all other financing documents related to the Exit Facility, such as intercreditor agreements, pledges, mortgages, and guarantees, each in a form reasonably acceptable to the Required Designated A-1 DIP Lenders and the Supermajority New Tranche A-2 Lenders (each as defined in the DIP Facility Documents).

97.    "*Exit Facility Indenture*" means each indenture with respect to the Exit Facility, as filed with the Plan Supplement.

98.    "*Exit Facility Indenture Trustee*" means each indenture trustee under an Exit Facility Indenture and the other Exit Facility Documents, in its capacity as such.

99.    "*Exit Facility Lenders*" means the holders of indebtedness from time to time under each Exit Facility Indenture, in their capacities as such.

100.    "*Final DIP Amendment Order*" means the *Final Order (I) Authorizing the Debtors to Enter into Amendments to Their Postpetition DIP Credit Documents and Enter Into Additional Documents in Furtherance Thereof, (II) Granting and Reaffirming Liens, (III) Granting Superpriority Administrative Expense Claims, (IV) Modifying the Automatic Stay, and (V) Granting Related Relief* [Docket No. 2032].

101.    "*Final DIP Order*" means the *Final Order (I) Authorizing the Debtors to (A) Obtain Postpetition Financing, and (B) Grant Liens and Superpriority Administrative Expense Claims, (II) Modifying the Automatic Stay, and (III) Granting Related Relief* [Docket No. 1031].

102.    "*Final Order*" means, as applicable, an order entered by the Bankruptcy Court or other court of competent jurisdiction: (a) that has not been reversed, stayed, modified, amended, or revoked, and as to which (i) any right to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has been waived or (ii) the time to appeal or seek leave to appeal, certiorari, review, reargument, stay, or rehearing has expired and no appeal, motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing is pending or (b) as to which an appeal has been taken, a motion for leave to appeal, or petition for certiorari, review, reargument, stay, or rehearing has been filed and (i) such appeal, motion for leave to appeal or petition for certiorari, review, reargument, stay, or rehearing has been resolved by the highest court to which the order or judgment was appealed or from which leave to appeal, certiorari, review, reargument, stay, or rehearing was sought and (ii) the time to appeal (in the event leave is granted) further or seek leave to appeal, certiorari, further review, reargument, stay, or rehearing has expired and no such appeal, motion for leave to appeal, or petition for certiorari, further review, reargument, stay, or rehearing is pending; provided, that the possibility that a request for relief under Rule 60 of the Federal Rules of Civil Procedure or any analogous rule under the Bankruptcy Rules or applicable non-bankruptcy law may be filed relating to such order shall not prevent such order from being a Final Order.

103.    "*Foreign Creditors Order*" means the *Final Order Authorizing (A) Debtors to Pay Prepetition Claims of Foreign Creditors; and (B) Financial Institutions to Honor and Process*

11

*Related Checks and Transfers* (Docket No. 248), as amended by the *Amended Final Order Authorizing (A) Debtors to Pay Prepetition Claims of Foreign Creditors; and (B) Financial Institutions to Honor and Process Related Checks and Transfers* (Docket No. 1357) and as may be further amended by order of the Bankruptcy Court.

104.    "*General Administrative Expense*" means any Administrative Expense other than Professional Fees, DIP Facility Claims, and DIP Facility Fees and Expenses.

105.    "*General Unsecured Aerounión Claim*" means a General Unsecured Claim against Aerounión.

106.    "*General Unsecured Avianca Claim*" means a General Unsecured Claim against any of the Avianca Debtors, other than General Unsecured Convenience Claims but including, for the avoidance of doubt, all 2020 Notes Claims, 2023 Notes Claims, and Direct Loan Claims.

107.    "*General Unsecured Avifreight Claim*" means a General Unsecured Claim against Avifreight.

108.    "*General Unsecured Claim*" means any Claim that is not a Secured Claim, an Intercompany Claim, a Subordinated Claim, or a Claim entitled to priority under the Bankruptcy Code.

109.    "*General Unsecured Claims Observer*" means the Person or Entity that may be appointed by the Committee with the consent of the Debtors (not to be unreasonably withheld) in accordance with Article VII.C of the Plan.

110.    "*General Unsecured Claims Observer Costs*" means the reasonable and documented costs and expenses of the General Unsecured Claims Observer, including reasonable professionals' fees and expenses; provided, that the Reorganized Debtors shall be permitted to challenge the reasonableness of all such costs, fees, and expenses before the Bankruptcy Court.

111.    "*General Unsecured Convenience Claim*" means a General Unsecured Claim (other than a 2020 Notes Claim, 2023 Notes Claim or Direct Loan Claim) against one or more of the Avianca Debtors that is Allowed in an amount of $500,000 or less.

112.    "*General Unsecured SAI Claim*" means a General Unsecured Claim against SAI.

113.    "*Global Plan Settlement*" has the meaning specified in Article V .A of the Plan.

114.    "*Governmental Unit*" means any "governmental unit," as such term is defined in section 101(27) of the Bankruptcy Code.

115.    "*Grupo Aval Definitive Documentation*" means, collectively, the "Definitive Documentation" and the "Working Capital Lines of Credit Definitive Documentation," as defined in the Grupo Aval Settlement Agreement.

116.    "*Grupo Aval Exit Facility*" means that certain exit credit or securitization facility described in the Grupo Aval Settlement Agreement.

117.   "*Grupo Aval Exit Facility Agreement*" means the definitive document or documents that will govern the Grupo Aval Exit Facility.

118.   "*Grupo Aval Lines of Credit*" means (i) that certain $4 million working-capital line of credit dated December 27, 2018, granted by Banco de América Central S.A., (ii) that certain $8.5 million working-capital line of credit dated December 27, 2018, granted by Banco de América Central S.A., and (iii) that certain $1 million working-capital line of credit dated December 21, 2017, granted by Banco de Bogotá S.A.

119.   "*Grupo Aval Lines of Credit Claims*" means all Claims on account of, under, or related to the Grupo Aval Lines of Credit.

120.   "*Grupo Aval Promissory Notes*" means, collectively, that certain *Promissory Note*, dated as of March 19, 2019, executed by Aerovías del Continente Americano, S.A. Avianca, as borrower, and AVH, as guarantor, to the order of Banco de Bogotá, S.A., New York Agency, as lender; that certain *Promissory Note*, dated as of February 26, 2019, executed by Taca International Airlines, S.A., as borrower, and AVH, as guarantor, to the order of Banco de Bogotá, S.A., New York Agency, as lender; and that certain *Promissory Note*, dated as of February 6, 2019, executed by Aerovías del Continente Americano, S.A. Avianca, as borrower, and AVH, as guarantor, to the order of Banco de Bogotá, S.A. New York Agency, as lender.

121.   "*Grupo Aval Promissory Notes Claims*" means all Claims on account of, under, or related to the Grupo Aval Promissory Notes.

122.   "*Grupo Aval Receivable Facility*" means the credit facility arising under the Grupo Aval Receivable Facility Agreement.

123.   "*Grupo Aval Receivable Facility Agreement*" means that certain *Credit and Guaranty Agreement*, dated as of June 16, 2015, by and among Taca International Airlines, S.A., as borrower, AVH, as guarantor, Fiduciaria Bogotá S.A., as administrative agent, and the lenders party thereto, as amended, restated, modified, and/or supplement from time to time.

124.   "*Grupo Aval Receivable Facility Claims*" means all Claims on account of, under, or related to the Grupo Aval Receivable Facility.

125.   "*Grupo Aval Settlement Agreement*" means the settlement of claims between the Debtors and affiliates of Grupo Aval (including Banco de Bogotá S.A.), as set forth in the Grupo Aval Settlement Motion.

126.   "*Grupo Aval Settlement Motion*" means the motion filed by the Debtors seeking approval of the Grupo Aval Settlement Agreement [Docket No. 2048].

127.   "*Grupo Aval Settlement Order*" means the order of the Bankruptcy Court granting the Grupo Aval Settlement Motion.

128.   "*Impaired*" means, with respect to a Claim, Interest, or a Class of Claims or Interests, "impaired" within the meaning of such term in section 1124 of the Bankruptcy Code.

13

129.     "*Implied Equity/Warrant Value*" means (a) with respect to the total value of the Claims-Based New Common Equity, if all the holders of Allowed General Unsecured Avianca Claims elect to receive the Unsecured Claimholder Equity Package, $800 million (such that if all the holders of Allowed General Unsecured Avianca Claims elect to receive the Unsecured Claimholder Equity Package, then the total value of the Claims-Based New Common Equity to be received by such holders would be deemed to be either (i) $14 million or (ii) if Class 11 votes to accept the plan, $20 million) and (b) with respect to the total value of the Warrants, $16 million.

130.     "*Indemnification Obligation*" means any existing or future obligation of any Debtor to indemnify current and former directors, officers, members, managers, sponsors, agents or employees of any of the Debtors who served in such capacity, with respect to or based upon such service or any act or omission taken or not taken in any of such capacities, or for or on behalf of any Debtor, whether pursuant to agreement, letters, the Debtors' respective memoranda, articles or certificates of incorporation, corporate charters, bylaws, operating agreements, limited liability company agreements, or similar corporate or organizational documents or other applicable contract or law in effect as of the Effective Date.

131.     "*Indenture Trustees*" means the 2020 Notes Indenture Trustee and the 2023 Notes Indenture Trustee.

132.     "*Indentures*" means the 2020 Notes Indenture and the 2023 Notes Indenture.

133.     "*Initial General Unsecured Claims Distribution Date*" means a date occurring as soon as reasonably practicable following the Effective Date on which the Disbursing Agent, in consultation with the General Unsecured Claims Observer (as applicable), shall commence distributions to holders of Allowed General Unsecured Avianca Claims.

134.     "*Intercompany Claim*" means any Claim against a Debtor held (a) by another Debtor or (b) by a non-Debtor that is a majority-owned direct or indirect subsidiary of a Debtor, other than Avianca Perú S.A. en Liquidación, Atlantic Aircraft Holding Two Ltd., Airlease Twenty Four Ltd., Airlease Twenty Six Ltd., Airlease Twenty Seven Ltd., Airlease Twenty Eight Ltd., Airlease Thirty Ltd., Airlease Thirty One Ltd., Little Plane Limited, Airlease Thirteen Ltd., Airlease Fourteen Ltd., Atlantic Aircraft Holding Ltd., Airlease Twenty Two Ltd., Airlease Twenty Three Ltd., Airlease Twenty Five Ltd., Airlease Twenty Nine Ltd., Turbo Aviation Three S.A., Airlease Twelve Ltd., Airlease Eleven Ltd, Air Lease One, Air Lease Two, Aviation Leasing Services (ALS) Investments S.A., Tri-Aircraft-Leasing LLC, Tri-Aircraft Leasing II LLC, Octo-Aircraft Leasing LLC, and Uni-Aircraft Leasing LLC.

135.     "*Intercompany Interest*" means any Interest in a Debtor held (a) by another Debtor or (b) by a non-Debtor that is a wholly owned direct or indirect subsidiary of a Debtor.

136.     "*Interest*" means any "equity security" (as such term is defined in section 101(16) of the Bankruptcy Code) or other equity interest in a Debtor, including any share of common or preferred stock, membership interest, partnership unit, or other evidence of ownership of, or a similar interest in, a Debtor, and any option, warrant, or right, contractual or otherwise, to purchase, sell, subscribe, or acquire any such equity security or other equity interest in a Debtor, whether or

14

not transferable, issued or unissued, authorized, or outstanding.  For the avoidance of doubt, "Interest" includes American depositary receipts that are linked to other Interests.

137.  "*JBA*" has the meaning ascribed to such term in the United Omnibus Amendment.

138.  "*JBA Letter Agreement*" means the letter agreement (if any) entered into prior to the Effective Date, by and among AVH, United Airlines, Inc., Compañía Panameña de Aviación, S.A., and certain of their respective affiliates, amending the JBA, the Commitment Letter Guaranties (as defined in the JBA), the Controlling Shareholder Letters of Commitment (as defined in the JBA), the Multilateral Coordination Agreement (as defined in the JBA), and any other Implementing Agreements (as defined in the JBA) or other agreements entered into in connection with the JBA.

139.  "*Lien*" means a "lien" as defined in section 101(37) of the Bankruptcy Code.

140.  "*New Boards*" means the Reorganized AVH Board and New Subsidiary Boards.

141.  "*New Common Equity*" means the common equity of Reorganized AVH to be authorized, issued, and outstanding on and after the Effective Date.

142.  "*New Organizational Documents*" means the new bylaws, certificates of incorporation, certificates of formation, limited liability company agreements, operating agreements, certificates of limited partnership, agreements of limited partnership, shareholder agreements, or such other organizational documents of the Reorganized Debtors, the forms of which shall be reasonably satisfactory in form and substance to the Required Supporting Tranche B Lenders and included in the Plan Supplement.

143.  "*New Subsidiary Boards*" means the initial boards of directors or managers (as applicable) for the Reorganized Debtors other than Reorganized AVH.

144.  "*Noteholder RSA*" means that certain *Restructuring Support Agreement*, dated as of August 28, 2020, by and among the Debtors and the Consenting Noteholders, as may be amended, restated, modified, and/or supplemented from time to time in accordance with its terms.

145.  "*Notice of Entry of Confirmation Order*" means a notice to creditors to be sent by the Reorganized Debtors or a Reorganized Debtor following the entry of the Confirmation Order stating that the Bankruptcy Court has confirmed the Plan or a Sub-Plan and providing such other information as required by the Confirmation Order.

146.  "*Other Existing Equity Interests*" means Interests in Debtors other than Existing AVH Equity Interests, Existing Avifreight Equity Interests, Existing SAI Equity Interests, and Intercompany Interests that are not held, directly or indirectly, by other Debtors.

147.  "*Other Secured Claim*" means any Secured Claim against any Debtor other than a Priority Tax Claim (except as set forth in Article II.F), a DIP Claim, an Engine Loan Claim, a Secured RCF Claim, a USAV Receivable Facility Claim, a Grupo Aval Receivable Facility Claim, a Grupo Aval Lines of Credit Claim, a Grupo Aval Promissory Note Claim, or a Cargo Receivable Facility Claim.

15

148.    "*Pension Claims*" means Claims under the Colombian Pension Regime of (i) CAXDAC for amounts that are required to be paid in the ordinary course under Decree 1269 of 2009, to fund the pensions of civil aviators who are or were employed by Aerovías del Continente Americano S.A. Avianca and/or Tampa Cargo S.A.S. (or their respective predecessors in interest) and (ii) other private pension funds approved in accordance with Colombian law to hold and manage pension funds.

149.    "*Person*" shall have the meaning set forth in section 101(41) of the Bankruptcy Code.

150.    "*Petition Date*" means (a) with respect to a Debtor, the date on which such Debtor commenced its Chapter 11 Cases or (b) with respect to the Debtors generally, the date on which AVH commenced its Chapter 11 Case.

151.    "*Plan*" has the meaning specified in the Introduction hereto.

152.    "*Plan Supplement*" means the compilation of documents (or forms thereof), schedules, and exhibits to the Plan, which shall be filed no later than seven (7) days before the Voting Deadline, as each may be amended, supplemented, or modified from time to time in accordance with this Plan, the Bankruptcy Code, and the Bankruptcy Rules, to be filed with the Bankruptcy Court which may include, as applicable: (a) the New Organizational Documents; (b) a list of the members of the New Boards (to the extent known); (c) the Exit Facility Indenture(s); (d) the Description of Restructuring Transactions; (e) the Schedule of Assumed Contracts (as amended, supplemented, or modified); (f) the Schedule of Retained Causes of Action; (g) the Transaction Steps; (h) the Warrant Agreement; (i) the Shareholders Agreement; and (j) such other documents as are necessary or advisable to implement the Restructuring. For the avoidance of doubt, the Debtors shall have the right to amend, supplement, or modify the Plan Supplement through the Effective Date in accordance with this Plan, the Bankruptcy Code, and the Bankruptcy Rules. The Committee shall have consultation rights with respect to the documents included in the Plan Supplement (including any amendments, supplements, and/or modifications thereto) to the extent such documents materially impact the rights of holders of General Unsecured Avianca Claims; provided, that the Committee's consultation rights with respect to the list of the members of the New Boards shall be limited to consultation regarding the appointment of one independent director to the Reorganized AVH Board, in accordance with Article V.J.1 of the Plan.

153.    "*Preference Actions*" means Avoidance Actions arising under section 547 of the Bankruptcy Code.

154.    "*Post-Emergence New Common Equity*" means New Common Equity issued by Reorganized AVH from time to time following the Effective Date, including pursuant to any employee or management incentive plans.

155.    "*Priority Claim*" means any Priority Non-Tax Claim or Priority Tax Claim.

156.    "*Priority Non-Tax Claim*" means any Claim against any Debtor entitled to priority pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Expense, DIP Facility Claim, or Priority Tax Claim.

16

157.    "*Priority Tax Claim*" means any Claim of a Governmental Unit that is entitled to priority pursuant to section 502(i) or 507(a)(8) of the Bankruptcy Code.

158.    "*Pro Rata*" means, for the holder of an Allowed Claim or Interest in a particular Class, proportional to the ratio of the amount of such Allowed Claim or Interest to the amount of all Allowed Claims or Allowed Interests (as applicable) in the same Class or, as applicable and as specifically set forth in the Plan, multiple Classes.

159.    "*Professional*" means any Person retained by order of the Bankruptcy Court in connection with these Chapter 11 Cases pursuant to sections 327, 328, 330, 331, 503(b), or 1103 of the Bankruptcy Code.  "Professional" does not include any professional-service Entity that the Debtors are authorized to employ, compensate, and reimburse in the ordinary course of their businesses.

160.    "*Professional Fees*" means the accrued, contingent, and/or unpaid compensation for services rendered (including hourly, transaction, and success fees), and reimbursement for expenses incurred, by Professionals, that: (a) are awardable and allowable pursuant to sections 327, 328, 329, 330, 331, 503(b)(4), and/or 1103 of the Bankruptcy Code or otherwise rendered allowable prior to the Confirmation Date; (b) have not been denied by the Bankruptcy Court by Final Order; (c) have not been previously paid (regardless of whether a fee application has been filed for any such amount); and (d) remain outstanding after applying any retainer that has been provided to such Professional.  To the extent that any amount of the foregoing compensation or reimbursement is denied or reduced by Final Order of the Bankruptcy Court or any other court of competent jurisdiction, such amount shall no longer constitute Professional Fees.

161.    "*Professional Fees Escrow Account*" means the account established on the Effective Date pursuant to Article II.C.2.

162.    "*Proof of Claim*" means a proof of Claim filed in the Chapter 11 Cases.

163.    "*Related Parties*" means, with respect to (w) any Entity or Person, (x) such Entity's or Person's predecessors, successors and assigns, parents, subsidiaries, affiliates, affiliated investment funds or investment vehicles, managed or advised accounts, funds, or other entities, and investment advisors, sub-advisors, or managers, (y) with respect to each of the foregoing in clauses (w) and (x), such Entity's or Person's respective current and former officers, directors, principals, members, partners, employees, agents, trustees, advisory board members, financial advisors, attorneys, accountants, actuaries, investment bankers, consultants, representatives, management companies, fund advisors and other professionals; and (z) with respect to each of the foregoing in clauses (w)–(y), such Entity's or Person's respective heirs, executors, estates, servants, and nominees.

164.    "*Reinstate*," "*Reinstated*," or "*Reinstatement*" means leaving a Claim Unimpaired under the Plan.

165.    "*Released Parties*" means, collectively, each of the following in their capacity as such:  (A)(i) the Debtors, (ii) the Reorganized Debtors, (iii) the Committee and its members, (iv) the DIP Agent, (v) the DIP Lenders, (vi) the Consenting Noteholders, (vii) the Supporting Tranche B DIP Lenders, (viii) the Exit Facility Indenture Trustee, (ix) the DIP Indenture Trustee;

17

(x) the Exit Facility Lenders, (xi) the Indenture Trustees, and (xii) the Grupo Aval Entities (as defined in the Grupo Aval Settlement Agreement), and (B) with respect to each of the foregoing Entities and Persons set forth in clause (A), all of such Entities' and Persons' respective Related Parties.  Notwithstanding the foregoing, (i) any Entity or Person that opts out of the releases set forth in Article IX.E of the Plan on its Ballot shall not be deemed a Released Party; (ii) any director or officer of the Debtors whose term of service lapsed prior to July 1, 2019 and who did not subsequently hold a director or officer position with any of the Debtors after such date shall not be deemed a Released Party; and (iii) any Entity or Person that would otherwise be a Released Party hereunder but is party to one or more Retained Causes of Action shall not be deemed a Released Party with respect to such Retained Causes of Action.

166.   "*Releasing Parties*" means, collectively, each of the following in their capacity as such:  (i) each of the Released Parties (other than the Debtors and the Reorganized Debtors); (ii) all holders of Claims that vote to accept the Plan; (iii) all holders of Claims or Interests that are Unimpaired under the Plan; and (iv) all holders of Claims in Classes that are entitled to vote under the Plan but that (a) vote to reject the Plan or do not vote either to accept or reject the Plan and (b) do not opt out of granting the releases in Article IX.E of the Plan; and (v) with respect to each of the foregoing Entities and Persons set forth in clauses (ii) through (iv), all of such Entities' and Persons' respective Related Parties.

167.   "*Reorganized*" means, as to any Debtor other than AVH, such Debtor as reorganized in accordance with the Plan, on and after the Effective Date

168.   "*Reorganized AVH*" means a new corporation or other legal entity that may be formed to, among other things, directly or indirectly acquire substantially all of the assets and/or stock of AVH and issue the New Common Equity pursuant to the Plan.

169.   "*Reorganized AVH Board*" means the initial board of Directors of Reorganized AVH.

170.   "*Reorganized Debtors*" means, collectively, (i) Reorganized AVH, (ii) each Debtor other than AVH as Reorganized pursuant to this Plan, and (iii) the direct and indirect subsidiaries of Reorganized AVH, or any successors thereto, by merger, consolidation, or otherwise, in each case on or after the Effective Date.

171.   "*Required Supporting Tranche B Lenders*" has the meaning set forth in the Tranche B Equity Conversion Agreement.

172.   "*Restructuring*" means the comprehensive restructuring of the existing debt and other obligations of the Debtors on the terms and conditions set forth in this Plan.

173.   "*Restructuring Expenses*" means (A) the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases of the Consenting Noteholders, to the extent that the Noteholder RSA remains in effect, including the reasonable and documented fees and expenses of (i) Paul Hastings LLP and (ii) Evercore Partners, and (B) the reasonable and documented fees and expenses incurred in connection with the Chapter 11 Cases of the Supporting Tranche B DIP Lenders, as provided in the Tranche B Equity Conversion Agreement, in each case payable in accordance with the terms of any applicable engagement or fee letters executed with

18

such parties or pursuant to the terms of the DIP Orders or the Tranche B Equity Conversion Agreement, as applicable, and without the requirement for the filing of retention applications, fee applications, or any other application in the Chapter 11 Cases, which shall be Allowed as Administrative Claims upon incurrence.

174.    "*Restructuring Transactions*" has the meaning set forth in <u>Article V.C</u>.

175.    "*Retained Causes of Action*" means the Causes of Action identified on the Schedule of Retained Causes of Action.

176.    "*SAI*" means Servicios Aeroportuarios Integrados SAI S.A.S.

177.    "*Schedules*" means the schedules of assets and liabilities, statements of financial affairs, lists of holders of Claims and Interests and all amendments or supplements thereto filed by the Debtors with the Bankruptcy Court to the extent such filing is not waived pursuant to an order of the Bankruptcy Court.

178.    "*Schedule of Assumed Contracts*" means the schedule of Executory Contracts and Unexpired Leases that shall be assumed by each applicable Debtor as of the Effective Date, as set forth in the Plan Supplement, including the Cure Claim (if any) for each such assumed Executory Contract and Unexpired Lease.

179.    "*Schedule of Retained Causes of Action*" means a schedule of certain Claims and Causes of Action of the Debtors that are not released, waived, or transferred pursuant to the Plan, which schedule shall be included in the Plan Supplement and shall be reasonably acceptable to the Committee; <u>provided</u>, that in no instance shall Claims or Causes of Action against any Released Party or any Exculpated Party that have been released or exculpated pursuant to the Plan be retained.

180.    "*Second Stipulation*" means the applicable *Second Stipulation and Order Between Debtors and Aircraft Counterparties Concerning Certain Aircraft* filed at [Docket Nos. 391–432, 1052–70].

181.    "*Second United Omnibus Amendment*" means the *Second Omnibus Amendment to Certain Commercial Arrangement* (if any), to be entered into prior to the Effective Date, among United, Avianca, and certain of their respective Affiliates.

182.    "*Secured Claim*" means any Claim that is secured by a Lien on property in which an Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Bankruptcy Court order, or subject to setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the creditor's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code.

183.    "*Secured RCF*" means the revolving credit facility arising under Secured RCF Agreement.

184.    "*Secured RCF Agreement*" means that certain *Credit and Guaranty Agreement*, dated as of August 31, 2018, by and among Aerovías del Continente Americano S.A. Avianca, as borrower, AVH and Tampa Cargo S.A.S., as guarantors, Citibank N.A. as collateral agent and administrative agent, and the lenders party thereto, as amended, restated, modified, and/or supplemented from time to time.

185.    "*Secured RCF Claims*" means all Claims on account of, under, or related to the Secured RCF.

186.    "*Securities Act*" means the Securities Act of 1933, 15 U.S.C. §§ 77a–77aa, as amended, together with the rules and regulations promulgated thereunder.

187.    "*Servicer*" means any Person or Entity that has been empowered to act in the capacity of the Disbursing Agent with respect to a particular Class of Claims.

188.    "*Shareholders Agreement*" means a shareholders agreement, equity holders agreement, operating agreement, or other similar agreement for Reorganized AVH governing, among other things, the relative rights of holders of New Common Equity, the form of which shall be included in the Plan Supplement.

189.    "*Special Bar Date Entities*" means the Persons and Entities set forth on Exhibit A of the *Notice of Establishment of Special Bar Date* [Docket No. 1706].

190.    "*Subordinated Claims*" means Claims that are subject to subordination in accordance with sections 510(b)-(c) of the Bankruptcy Code or otherwise.

191.    "*Sub-Plan*" means a separate plan of reorganization for any individual Debtor.

192.    "*Supporting Tranche B DIP Lenders*" means those Tranche B DIP Lenders that are or become party to the Tranche B Equity Conversion Agreement, including, without duplication, any Person that has a valid participation interest in the Tranche B DIP Obligations of such Tranche B DIP Lender that executes a joinder agreement, together with their respective successors and permitted assigns.

193.    "*Tranche A-1 DIP Facility Claims*" means DIP Facility Claims arising from the Tranche A-1 DIP Obligations.

194.    "*Tranche A-1 DIP Obligations*" means, collectively, the "Tranche A Obligations" and "New Tranche A-1 Note Obligations," each as defined in the DIP Credit Agreement, as amended pursuant to the Final DIP Amendment Order.

195.    "*Tranche A-2 DIP Facility Claims*" means DIP Facility Claims arising from the Tranche A-2 DIP Obligations.

196.    "*Tranche A-2 DIP Obligations*" means the "New Tranche A-2 Note Obligations," as defined in the DIP Credit Agreement, as amended pursuant to the Final DIP Amendment Order.

197.   "*Tranche B Asset Contribution*" shall mean the contribution of assets to Reorganized AVH, in accordance with the Tranche B Equity Conversion Agreement and the United Asset Contribution Agreement.

198.   "*Tranche B DIP Facility Claims*" means DIP Facility Claims arising from the Tranche B DIP Obligations.

199.   "*Tranche B DIP Lenders*" means holders of Tranche B DIP Facility Claims.

200.   "*Tranche B DIP Obligations*" means "Tranche B Obligations," as defined in the DIP Credit Agreement.

201.   "*Tranche B Equity Allocation Schedule*" means the equity allocation schedule annexed to the Tranche B Equity Conversion Agreement.

202.   "*Tranche B Equity Contribution*" shall mean the contribution of Cash and/or assets as part of the Equity Raise (as defined in the Tranche B Equity Conversion Agreement) in an aggregate amount up to $200,000,000, pursuant to the terms and subject to the conditions of the Tranche B Equity Conversion Agreement.

203.   "*Tranche B Equity Conversion Agreement*" means that certain *Equity Conversion and Commitment Agreement*, dated as of September 1, 2021, by and among AVH, the other Debtors, and the Supporting Tranche B DIP Lenders, as may be amended, restated, modified, and/or supplemented from time to time in accordance with its terms.

204.   "*Transaction Steps*" means the steps selected by the Debtors to implement the Restructuring Transactions, which shall be filed as part of the Plan Supplement.

205.   "*Unconsolidated Debtors*" means, collectively, Aerounión, Avifreight, and SAI.

206.   "*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under sections 365 or 1123 of the Bankruptcy Code.

207.   "*Unimpaired*" means, with respect to a Class, Claim, Interest, or a holder of a Claim or Interest, that such Class, Claim, Interest, or holder is not Impaired.

208.   "*United Agreements*" means (i) the Assumed United Agreements, as defined in the United Omnibus Amendment, (ii) the JBA, (iii) the Interline Relationship Agreements (as defined in the motion filed at Docket No. 9); (iv) the Commitment Letter Guaranties (as defined in the JBA), (v) the Multilateral Coordination Agreement (as defined in the JBA), and (vi) any other Implementing Agreements (as defined in the JBA).

209.   "*United Asset Contribution Agreement*" means the "United Asset Contribution Agreement" as defined in section 4.19 of the Tranche B Equity Conversion Agreement.

210.   "*United Omnibus Amendment*" means the *Omnibus Amendment to Certain Commercial Arrangement* among United, Avianca, and certain of its Affiliates, dated September 21, 2020.

211.   "*Unsecured Claimholder Cash Pool*" means Cash in the amount of $30,000,000 for purposes of distributions to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan, which shall be reduced in an amount equal to the Implied Equity/Warrant Value of the Claims-Based New Common Equity (on account of Electing General Unsecured Claimholders' Pro Rata shares of the Unsecured Claimholder Equity Pool) and Warrants to be distributed to Electing General Unsecured Claimholders.

212.   "*Unsecured Claimholder Enhanced Cash Pool*" means incremental Cash in the amount of $6,000,000 for purposes of distributions to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan, which shall be reduced in an amount equal to the Implied Equity/Warrant Value of the Claims-Based New Common Equity (on account of Electing General Unsecured Claimholders' Pro Rata shares of the Unsecured Claimholder Enhanced Equity Pool) to be distributed to Electing General Unsecured Claimholders.

213.   "*Unsecured Claimholder Enhanced Equity Pool*" means an incremental 0.75% of the total Claims-Based New Common Equity, which shall be distributed to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan and shall be reduced in an amount of Claims-Based New Common Equity that has a value equal to the value of the Unsecured Claimholder Enhanced Cash Pool to be distributed to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan based on the Implied Equity/Warrant Value applicable to such Cash distributions that are attributable to Claims-Based New Common Equity that such holders would have received on account of their Pro Rata shares of the Unsecured Claimholder Enhanced Equity Pool if they had elected to receive the Unsecured Claimholder Equity Package.

214.   "*Unsecured Claimholder Equity Package*" means, with respect to a holder of an Allowed General Unsecured Avianca Claim, such holder's Pro Rata share of (i)(x) the Unsecured Claimholder Equity Pool and (y) the Unsecured Claimholder Enhanced Equity Pool (if applicable, in accordance with in Article III.B.11.b of the Plan) and (ii) the Warrants, in lieu of any Cash distribution.

215.   "*Unsecured Claimholder Equity Pool*" means 1.75% of the total Claims-Based New Common Equity, which shall be distributed to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan and shall be reduced in an amount of Claims-Based New Common Equity that has a value equal to the value of the Unsecured Claimholder Cash Pool to be distributed to holders of Allowed General Unsecured Avianca Claims in accordance with Article III.B.11.b of the Plan based on the Implied Equity/Warrant Value applicable to such Cash distributions that are attributable to Claims-Based New Common Equity that such holders would have received on account of their Pro Rata shares of the Unsecured Claimholder Equity Pool if they had elected to receive the Unsecured Claimholder Equity Package.

216.   "*U.S. Trustee*" means the Office of the United States Trustee for Region 2.

217.   "*USAV Receivable Facility*" means the credit facility arising under the USAV Receivable Facility Agreement.

22

218.    "*USAV Receivable Facility Agreement*" means that certain *Loan Agreement*, dated as of December 2017, by and among USAVflow Limited, as borrower, AVH, Taca International Airlines, S.A., and Avianca Costa Rica S.A., as guarantors, Citibank, N.A. as administrative agent and collateral agent, and the lenders party thereto, as amended, restated, modified, and/or supplemented from time to time.

219.    "*USAV Receivable Facility Claims*" means all Claims on account of, under, or related to the USAV Receivable Facility, as amended.

220.    "*USAV Settlement Agreement*" means that certain settlement agreement, dated as of February 18, 2021, by and among the Debtors, Avianca Perú S.A. en Liquidación, USAVflow Limited, the lenders party to the USAV Receivable Facility Agreement, Citibank, N.A., as administrative agent and collateral agent under the USAV Receivable Facility Agreement, and Citibank N.A., London Branch, as collateral trustee under the USAV Receivable Facility Agreement, which was approved by the Bankruptcy Court on March 17, 2021 [Docket Nos. 1468, 1480].

221.    "*USAV Transaction Documents*" means those certain documents required or necessary to implement the transactions contemplated by the USAV Settlement Agreement, including, but not limited to, the amended and restated Contract Rights and Receivables Sale, Purchase, and Servicing Agreement; the amended and restated Receivables Maintenance Agreement; the amended and restated Cash Management Agreement; and the amended and restated Loan Agreement (each as defined in the USAV Settlement Agreement), in each case as amended, restated, supplemented, or otherwise modified from time to time.

222.    "*Voting Deadline*" means [_____], 2021, at 4:00 p.m. (prevailing Eastern Time), or such other date and time as may be set by the Bankruptcy Court.

223.    "*Voting Record Date*" means September 9, 2021.

224.    "*Warrant Agreement*" means the agreement setting forth the terms and conditions of the Warrants, which shall be reasonably acceptable to the Committee and the Required Supporting Tranche B Lenders, and the form of which shall be reasonably satisfactory to the Required Supporting Tranche B Lenders and the Committee and filed with the Plan Supplement.

225.    "*Warrant-Based New Common Equity*" means New Common Equity issued with respect to the exercise of the Warrants, amounting to 5.0% of the New Common Equity (on a post-dilution basis with respect to the issuance of Claims-Based New Common Equity and Contribution-Based New Common Equity and subject to anti-dilution protection with respect to the issuance of Post-Emergence New Common Equity as set forth in the Warrant Agreement).

226.    "*Warrants*" means warrants to purchase Warrant-Based New Common Equity, exercisable on a cashless basis at the Exercise Price for a five (5) year term, on the terms set forth in the Warrant Agreement.

23

B.     *Rules of Interpretation*

For purposes of the Plan and unless otherwise specified herein: (1) each term, whether stated in the singular or the plural, shall include, in the appropriate context, both the singular and the plural; (2) each pronoun stated in the masculine, feminine, or neuter gender shall include, in the appropriate context, the masculine, feminine, and the neuter gender; (3) the words "herein," "hereof," and "hereto" refer to the Plan in its entirety rather than to a particular portion of the Plan; (4) the words "include," "includes," and "including" are by way of example and not limitation; (5) all references to articles or Articles are references to the Articles hereof; (6) all captions and headings are inserted for convenience of reference only and are not intended to be a part of, or to affect the interpretation of, the Plan; (7) any reference to an Entity as a holder of a Claim or Interest includes that Entity's successors and assigns; (8) any reference to an existing document, schedule, or exhibit, whether or not filed, having been filed, or to be filed, shall mean that document, schedule or exhibit, as it may thereafter be amended, modified, or supplemented; (9) any reference to an event occurring on a specified date, including on the Effective Date, shall mean that the event will occur on that date or as soon thereafter as reasonably practicable; (10) any reference to a contract, lease, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions except as specifically provided herein; (11) all references to statutes, regulations, orders, rules of courts and the like shall mean as amended from time to time and as applicable to the Chapter 11 Cases; (12) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with, the applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (13) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (14) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

C.     *Computation of Time*

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein. If the date on which a transaction may or shall occur pursuant to the Plan is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

D.     *Governing Law*

Unless federal law (including the Bankruptcy Code and Bankruptcy Rules) is applicable, and unless specifically stated otherwise, the laws of the State of New York, without giving effect to the principles of conflict of laws that would require application of the law of another jurisdiction, shall govern the rights, obligations, construction, and implementation of the Plan and any agreements, documents, instruments, or contracts executed or entered into in connection with the Plan (except as otherwise set forth in those agreements, in which case the governing law of such agreement shall control); provided, however, that corporate or entity governance matters relating

24

to the Debtors or the Reorganized Debtors shall be governed by the laws of the state or country of incorporation or organization of the relevant Debtor or Reorganized Debtor, as applicable.

E.    *Reference to Monetary Figures and Exchange Rates*

All references in the Plan to monetary figures, "dollars," or "$" refer to the currency of the United States of America, unless otherwise expressly provided.  With respect to any Claim filed in these Chapter 11 Cases in a currency other that the currency of the United States of America, the amount of such Claim shall be converted to the currency of the United States of America in accordance with the exchange rates specified by Bloomberg News as of closing on May 8, 2020.

# ARTICLE II
# ADMINISTRATIVE EXPENSES AND OTHER UNCLASSIFIED CLAIMS

In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Expenses, DIP Facility Claims, and Priority Tax Claims have not been classified and, thus, are excluded from the Classes of Claims and Interests set forth in Article III.

A.    *General Administrative Expenses*

Each holder of an Allowed General Administrative Expense, to the extent such Allowed General Administrative Expense has not already been paid during the Chapter 11 Cases and without any further action by such holder, shall receive, in full and final satisfaction of its General Administrative Expense, Cash equal to the Allowed amount of such General Administrative Expense on the Effective Date (or, if payment is not then due, when such payment otherwise becomes due in the applicable Reorganized Debtor's ordinary course of business without further notice to or order of the Bankruptcy Court), unless otherwise agreed by the holder of such General Administrative Expense and the applicable Debtor or Reorganized Debtor.  For the avoidance of doubt, holders of General Administrative Expenses shall not be required to file a request for payment with the Bankruptcy Court.

B.    *Restructuring Expenses*

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date shall be paid in full in Cash on the Effective Date (to the extent not previously paid during the course of the Chapter 11 Cases) without the requirement to file a fee application with the Bankruptcy Court or comply with the guidelines of the U.S. Trustee, and without any requirement for review or approval by the Bankruptcy Court or any other party.  All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to the Effective Date and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided, that such estimate shall not be considered an admission or limitation with respect to such Restructuring Expenses.  In addition, the Reorganized Debtors (as applicable) shall continue to pay the Restructuring Expenses related to implementation, consummation, and defense of the Plan after the Effective Date when due and payable in the ordinary course, whether incurred before, on or after the Effective Date.

25

C.      *Professional Fees*

    1.      Final Fee Applications

All final requests for payment of Professional Fees incurred prior to the Effective Date must be filed with the Bankruptcy Court and served on the Reorganized Debtors, the U.S. Trustee, counsel to the Committee, and all other parties that have requested notice in these Chapter 11 Cases by no later than forty-five (45) days after the Effective Date, unless the Reorganized Debtors agree otherwise in writing. Objections to Professional Fees must be filed with the Bankruptcy Court and served on the Reorganized Debtors and the applicable Professional within thirty (30) days after the filing of the applicable final fee application. After notice and a hearing in accordance with the procedures established by the Bankruptcy Code and any prior orders of the Bankruptcy Court in the Chapter 11 Cases, the Allowed amounts of all Professional Fees shall be determined by the Bankruptcy Court and, once approved by the Bankruptcy Court, shall be paid in full in Cash from the Professional Fees Escrow Account as promptly as practicable; provided, however, that if the funds in the Professional Fees Escrow Account are insufficient to pay the full Allowed amounts of the Professional Fees, the Reorganized Debtors shall promptly pay any remaining Allowed amounts from their Cash on hand.

For the avoidance of doubt, the immediately preceding paragraph shall not affect any professional-service Entity that the Debtors are permitted to pay without seeking authority from the Bankruptcy Court in the ordinary course of the Debtors' businesses (and in accordance with any relevant prior order of the Bankruptcy Court), which payments may continue notwithstanding the occurrence of Confirmation and the Effective Date.

    2.      Professional Fees Escrow Account

Professionals shall estimate their unpaid Claims for Professional Fees incurred in rendering services to the Debtors, their Estates or the Committee (if any), as applicable, as of the Effective Date and shall deliver such estimate to counsel for the Debtors no later than five (5) Business Days before the anticipated Effective Date; provided, that such estimate shall not be deemed to limit the Allowed Professional Fees of any Professional. If a Professional does not provide an estimate, the Debtors shall estimate the unpaid and unbilled fees and expenses of such Professional for the purposes of funding the Professional Fees Escrow Account.

On the Effective Date, the Reorganized Debtors shall fund the Professional Fees Escrow Account in an amount equal to all asserted Claims for Professional Fees incurred but unpaid as of the Effective Date (including, for the avoidance of doubt, any reasonable estimates for unbilled amounts provided prior to the Effective Date). The Professional Fees Escrow Account may be an interest-bearing account. Amounts held in the Professional Fees Escrow Account shall not constitute property of the Reorganized Debtors. In the event there is a remaining balance in the Professional Fees Escrow Account following payment to all holders of Allowed Claims for Professional Fees, any such amounts shall be promptly returned to, and constitute property of, the Reorganized Debtors.

3.      Post-Effective Date Fees and Expenses

From and after the Effective Date, the Reorganized Debtors may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, promptly pay in Cash the reasonable legal, professional, or other fees and expenses related to implementation of the Plan and Consummation incurred by the Reorganized Debtors on and after the Effective Date.  On the Effective Date, any requirement that professionals comply with sections 327 through 331 and 1103 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and the Reorganized Debtors may employ and pay any professional in the ordinary course of business without any further notice to or action, order or approval of the Bankruptcy Court.

D.      *DIP Facility Claims*

On the Effective Date, the DIP Facility Claims shall be Allowed in the full amount due and owing under the DIP Facility Documents, including, for the avoidance of doubt, (a) the principal amounts outstanding under the DIP Facility on such date; (b) all interest accrued and unpaid thereon through and including the date of payment; and (c) all premiums, fees (including, without limitation, back-end fees and exit fees), expenses, and indemnification obligations payable under the DIP Facility Documents.  For the avoidance of doubt, the DIP Facility Claims shall not be subject to any avoidance, reduction, setoff, recoupment, recharacterization, subordination (equitable or contractual or otherwise), counter-claim, defense, disallowance, impairment, objection or any challenges under applicable law or regulation.

On the Effective Date, in full and final satisfaction of the Tranche A-1 DIP Facility Claims, each holder of an Allowed Tranche A-1 DIP Facility Claim shall, in accordance with and subject to the terms of the DIP Facility Documents, receive either (i) at the election of the Debtors, its Pro Rata share of the Exit A-1 Notes, in accordance with and subject to the Exit Facility Documents and the DIP Facility Documents, or (ii) payment in full in Cash.  In addition, the Debtors shall pay, on the Effective Date, in full in Cash, all accrued and unpaid DIP Facility Claims arising under section 11.04 of the DIP Credit Agreement and all accrued and unpaid DIP Facility Fees and Expenses in accordance with Article II.E of the Plan; provided, that if any Tranche A-1 DIP Facility Claims are held by the Fronting Lender (as defined in the DIP Credit Agreement) on the Effective Date, such Tranche A-1 DIP Facility Claims shall be paid in full in Cash in accordance with the terms of the DIP Facility Documents.

On the Effective Date, in full and final satisfaction of the Tranche A-2 DIP Facility Claims, each holder of an Allowed Tranche A-2 DIP Facility Claim shall, in accordance with and subject to the terms of the DIP Facility Documents, receive either (i) at the election of the Debtors, its Pro Rata share of the Exit A-2 Notes, in accordance with and subject to the Exit Facility Documents and the DIP Credit Agreement, or (ii) payment in full in Cash.  In addition, the Debtors shall pay, on the Effective Date, in full in Cash, all accrued and unpaid DIP Facility Claims arising under section 11.04 of the DIP Credit Agreement, including DIP Facility Fees and Expenses as set forth in Article II.E of the Plan.

On the Effective Date, in accordance with and subject to the Tranche B Equity Conversion Agreement (unless otherwise provided therein or in the DIP Orders), each holder of an Allowed

Tranche B DIP Facility Claim shall receive, in full and final satisfaction of its Tranche B DIP Facility Claim, its respective allocation of New Common Equity (consisting of Claims-Based New Common Equity and, as applicable, Contribution-Based New Common Equity) set forth on the Tranche B Equity Allocation Schedule, in exchange for such holder's Allowed Tranche B DIP Facility Claim and, as applicable, its Tranche B Equity Contribution and/or Tranche B Asset Contribution.  In addition, the Debtors shall pay, on the Effective Date, in full in Cash, all accrued and unpaid DIP Facility Claims arising under section 11.04 of the DIP Credit Agreement, including DIP Facility Fees and Expenses as set forth in Article II.E of the Plan.  For the avoidance of doubt, to the extent any holder of an Allowed Tranche B DIP Facility Claim has (a) a Claim for deficiency arising out of, or related to, the Tranche B DIP Obligations or (b) a Claim for adequate protection arising out of, or related to, the Tranche B DIP Obligations against any Debtor, such Claims shall be deemed waived as of the Effective Date, and such holder shall not be entitled to any distributions under the Plan on account of such Claims.

Notwithstanding anything to the contrary herein, upon the occurrence of the Effective Date, the DIP Agent and its sub-agents shall be relieved of all further duties and responsibilities under the DIP Facility Documents and shall be deemed to have resigned, pursuant to section 9.05 of the DIP Credit Agreement, on the Effective Date; provided, that any provisions of the DIP Facility Documents that by their terms survive the termination of the DIP Facility Documents shall survive in accordance with the terms of the DIP Facility Documents.

E.      *DIP Facility Fees and Expenses*

To the extent not previously paid during the course of the Chapter 11 Cases, the DIP Facility Fees and Expenses incurred, or estimated to be incurred, up to and including the Effective Date, shall be paid in full in Cash on the Effective Date in accordance with, and subject to, the terms of the DIP Facility Documents, without any requirement to file a fee application with the Bankruptcy Court, without the need for itemized time detail, or without any requirement for Bankruptcy Court review or approval.  All DIP Facility Fees and Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date, and such estimates shall be delivered to the Debtors at least five (5) Business Days before the anticipated Effective Date; provided, that such estimates shall not be considered an admission or limitation with respect to such DIP Facility Fees and Expenses.  On or as soon as practicable after the Effective Date, final invoices for all DIP Facility Fees and Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors.  In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay when due pre- and post-Effective Date any DIP Facility Fees and Expenses related to the DIP Facility in accordance with, and subject to, the terms of the DIP Orders and the DIP Facility Documents, whether incurred before, on, or after the Effective Date.

Prior to the Effective Date, the Debtors shall pay DIP Facility Fees and Expenses in accordance with, and subject to, the terms of the DIP Orders and the DIP Facility Documents, within ten (10) calendar days (which time period may be extended by the applicable professional in its discretion) after delivery of an invoice therefor to the Debtors, the Committee, and the U.S. Trustee, subject to the objection procedures set forth below.  None of such invoices shall be required to comply with the U.S. Trustee fee guidelines and (i) may be redacted to protect privileged, confidential, or proprietary information and (ii) shall not be required to contain individual time detail.  The Debtors, the Committee, and the U.S. Trustee (the "Fee Notice

Parties") shall have ten (10) calendar days following their receipt of such invoices to file objections with the Bankruptcy Court with respect to the reasonableness of the fees and expenses included therein. Within ten (10) calendar days after delivery of such invoices (the "Fee Objection Period"), without further order of, or application to, the Court or notice to any other party, such fees and expenses shall be promptly paid by the Debtors unless a written objection is made by any of the Fee Notice Parties. If a written objection is made by any of the Fee Notice Parties within the Fee Objection Period to the reasonableness of the requested fees and expenses, then only the disputed portion of such fees and expenses shall be withheld until the objection is resolved by the applicable parties in good faith or by order of the Bankruptcy Court, and the undisputed portion shall be promptly paid by the Debtors.

In addition, the Debtors and the Reorganized Debtors (as applicable) shall continue to pay post-Effective Date, when due and payable in the ordinary course, the DIP Facility Fees and Expenses in accordance with, and subject to, the terms of the DIP Facility Documents. For the avoidance of doubt, such post-Effective Date payments shall not be subject to the review and objection procedures described in this Article II.E of the Plan.

F.      *Priority Tax Claims*

Except to the extent that an Allowed Priority Tax Claim has not been previously paid in full or its holder agrees to a less favorable treatment, in full and final satisfaction of each Priority Tax Claim, each holder of an Allowed Priority Tax Claim shall be treated in accordance with the terms set forth in section 1129(a)(9)(C) of the Bankruptcy Code. In the event an Allowed Priority Tax Claim is Allowed as a Secured Claim, it shall be classified and treated as an Allowed Other Secured Claim.

## ARTICLE III
## CLASSIFICATION AND TREATMENT OF CLAIMS AND INTERESTS

A.      *Classification of Claims and Interests*

Claims and Interests, except for Administrative Expenses, DIP Facility Claims, and Priority Tax Claims, are classified in the Classes set forth in this Article III. A Claim or Interest is classified in a particular Class only to the extent that the Claim or Interest qualifies within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest qualifies within the description of such other Classes. A Claim or Interest also is classified in a particular Class for the purpose of receiving distributions pursuant to the Plan only to the extent that such Claim is an Allowed Claim or Allowed Interest, as applicable, in that Class. To the extent a specified Class does not include any Allowed Claims or Allowed Interests, as applicable, then such Class shall be deemed not to exist.

The Plan constitutes a separate chapter 11 plan of reorganization for the Avianca Debtors and each Unconsolidated Debtor. Pursuant to section 1122 of the Bankruptcy Code, the classification of Claims and Interests is as follows:

| Class | Claims or Interests | Status | Voting Rights |
|---|---|---|---|
| 1 | Priority Non-Tax Claims | Unimpaired | Presumed to accept |
| 2 | Other Secured Claims | Unimpaired | Presumed to accept |
| 3 | Engine Loan Claims | Impaired | **Entitled to vote** |
| 4 | Secured RCF Claims | Impaired | **Entitled to vote** |
| 5 | USAV Receivable Facility Claims | Unimpaired | Presumed to accept |
| 6 | Grupo Aval Receivable Facility Claims | Unimpaired | Presumed to accept |
| 7 | Grupo Aval Lines of Credit Claims | Impaired | **Entitled to vote** |
| 8 | Grupo Aval Promissory Note Claims | Unimpaired | Presumed to accept |
| 9 | Cargo Receivable Facility Claims | Unimpaired | Presumed to accept |
| 10 | Pension Claims | Unimpaired | Presumed to accept |
| 11 | General Unsecured Avianca Claims | Impaired | **Entitled to vote** |
| 12 | General Unsecured Avifreight Claims | Unimpaired | Presumed to accept |
| 13 | General Unsecured Aerounión Claims | Unimpaired | Presumed to accept |
| 14 | General Unsecured SAI Claims | Unimpaired | Presumed to accept |
| 15 | General Unsecured Convenience Claims | Impaired | **Entitled to vote** |
| 16 | Subordinated Claims | Impaired | Deemed to reject |
| 17 | Intercompany Claims | Impaired/ Unimpaired | Deemed to reject/ presumed to accept |
| 18 | Existing AVH Non-Voting Equity Interests | Impaired | Deemed to reject |
| 19 | Existing AVH Common Equity Interests | Impaired | Deemed to reject |
| 20 | Existing Avifreight Equity Interests | Unimpaired | Presumed to accept |
| 21 | Existing SAI Equity Interests | Unimpaired | Presumed to accept |
| 22 | Other Existing Equity Interests | Impaired | Deemed to reject |
| 23 | Intercompany Interests | Impaired/ Unimpaired | Deemed to reject/ presumed to accept |

B.    *Treatment of Claims and Interests*

   1.    Class 1 – Priority Non-Tax Claims

      a.    *Classification*:  Class 1 consists of all Priority Non-Tax Claims.

      b.    *Treatment*:  Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of an

30

Allowed Priority Non-Tax Claim shall (i) receive from the applicable Reorganized Debtor, in full and final satisfaction of its Priority Non-Tax Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its Priority Non-Tax Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired.

c. *Voting*: Class 1 is Unimpaired under the Plan. Holders of Priority Non-Tax Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

2. Class 2 – Other Secured Claims

a. *Classification*: Class 2 consists of all Other Secured Claims.

b. *Treatment*: Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of an Allowed Other Secured Claim, at the option of the Debtors, (a) shall receive Cash in an amount equal to the Allowed amount of such Claim on the later of the Effective Date and the date that is ten (10) Business Days after the date such Other Secured Claim becomes an Allowed Claim; (b) on the Effective Date, such holder's Allowed Other Secured Claim shall be Reinstated; (c) on the Effective Date, such holder shall receive such other treatment sufficient to render such holder's Allowed Other Secured Claim Unimpaired; or (d) on the Effective Date or as soon as reasonably practicable thereafter, such holder shall receive delivery of, or shall retain, the applicable collateral securing any such Claim up to the secured amount of such Claim pursuant to section 506(a) of the Bankruptcy Code and payment of any interest required under section 506(b) of the Bankruptcy Code in satisfaction of the Allowed amount of such Other Secured Claim.

c. *Voting*: Class 2 is Unimpaired under the Plan. Holders of Other Secured Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

3. Class 3 – Engine Loan Claims

a. *Classification*: Class 3 consists of all Engine Loan Claims.

b. *Allowance*: The Engine Loan Claims shall be Allowed in the aggregate amount of $[52,967,149.35], plus accrued and unpaid interest (at the revised non-default rate) and all applicable fees, costs, expenses, and other amounts due under the terms of the Engine Loan Agreement, subject to reduction for payments made by the Debtors.

31

    c.    *Treatment*:  The Engine Loan Agreement will be amended as of the Effective Date in accordance with an amendment to be included in the Plan Supplement.  The amendment will provide for, among other things, no reduction in the outstanding amount of principal, payment of accrued interest (at the revised non-default rate) on regular interest payment dates, and an amended amortization schedule.

    d.    *Voting*:  Class 3 Claims are Impaired under the Plan.  Holders of Engine Loan Claims are entitled to vote to accept or reject the Plan.

4.    Class 4 – Secured RCF Claims

    a.    *Classification:*  Class 4 consists of all Secured RCF Claims.

    b.    *Allowance:*  The Secured RCF Claims shall be Allowed in the aggregate amount of $100,000,000.00, plus accrued and unpaid interest (at the revised non-default rate) due under the terms of the existing Secured RCF Agreement.

    c.    *Treatment:*  The Secured RCF Agreement will be amended as of the Effective Date to provide for, among other things, no reduction in the outstanding amount of principal, continuation of the loan commitments, payment of accrued interest (at the revised non-default rate) and fees on regular interest payment dates, an amended amortization schedule, and retention of the existing collateral package, in accordance with an amendment to be included in the Plan Supplement.

    d.    *Voting:*  Class 4 is Impaired under the Plan.  Holders of Secured RCF Claims are entitled to vote to accept or reject the Plan.

5.    Class 5 – USAV Receivable Facility Claims

    a.    *Classification:*  Class 5 consists of all USAV Receivable Facility Claims.

    b.    *Allowance:*  The USAV Receivable Facility Claims shall be Allowed in the aggregate amount of $66,962,332.85, pursuant to the USAV Settlement Agreement.

    c.    *Treatment:*  The USAV Receivable Facility Claims shall be Reinstated, as amended pursuant to the USAV Settlement Agreement.

    d.    *Voting:*  Class 5 is Unimpaired under the Plan.  Holders of USAV Receivable Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

32

6. Class 6 – Grupo Aval Receivable Facility Claims

a. *Classification:* Class 6 consists of all Grupo Aval Receivable Facility Claims.

b. *Allowance:* The Grupo Aval Receivable Facility Claims shall be Allowed in the amount of $128,552,032.00, pursuant to the Grupo Aval Settlement Agreement.

c. *Treatment:* Pursuant to the Grupo Aval Settlement Agreement and on the schedule set forth therein, each holder of an Allowed Grupo Aval Receivable Facility Claim shall receive, in full and final satisfaction of its Grupo Aval Receivable Facility Claim, the consideration set forth in the Grupo Aval Settlement Agreement, namely: (i) its Pro Rata share of the Grupo Aval Exit Facility; (ii) its Pro Rata share of the Grupo Aval LifeMiles Consideration; and (iii) equal Cash payments on the first Business Day of each month on or after the Effective Date through January 2024, in an amount equal to non-default interest accrued and unpaid under the Grupo Aval Receivable Facility through the Grupo Aval Settlement Date.

d. *Voting:* Class 6 is Unimpaired under the Plan. Holders of Grupo Aval Receivable Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

7. Class 7 – Grupo Aval Lines of Credit Claims

a. *Classification:* Class 7 consists of all Grupo Aval Lines of Credit Claims.

b. *Allowance:* The Grupo Aval Lines of Credit Claims shall be Allowed in the aggregate amount of $11,651,000, allocated as $1,000,000.00 to Banco de Bogotá S.A. and $10,651,000.00 to Banco de América Central S.A. El Salvador.

c. *Treatment:* On the Effective Date, pursuant to the Grupo Aval Settlement Agreement, each holder of an Allowed Grupo Aval Lines of Credit Claim shall receive, in full and final satisfaction of its Grupo Aval Lines of Credit Claim, (i) its Pro Rata share of the Grupo Aval Exit Facility; (ii) its Pro Rata share of the Grupo Aval LifeMiles Consideration; and (iii) equal Cash payments on the first Business Day of each month on or after the Effective Date through January 2024, in an amount equal to non-default interest accrued and unpaid under the Grupo Aval Lines of Credit through the Effective Date.

d. *Voting:* Class 7 is Impaired under the Plan. Holders of Grupo Aval Lines of Credit Claims are entitled to vote to accept or reject the Plan.

33

8.      Class 8 – Grupo Aval Promissory Note Claims

   a.     *Classification:* Class 8 consists of all Grupo Aval Promissory Note Claims.

   b.     *Allowance:* The Grupo Aval Promissory Note Claims shall be Allowed in the aggregate amount of $9,999,997.28.

   c.     *Treatment:* Pursuant to the Grupo Aval Settlement Agreement and on the schedule set forth therein, each holder of an Allowed Grupo Aval Promissory Note Claim shall receive, in full and final satisfaction of its Grupo Aval Promissory Note Claim, the consideration set forth in the Grupo Aval Settlement Agreement, namely: (i) its Pro Rata share of the New Grupo Aval Promissory Notes, which shall have the same terms and conditions as the Existing Grupo Aval Promissory Notes and (ii) equal Cash payments on the first Business Day of each month on or after the Effective Date through January 2024, in an amount equal to non-default interest accrued and unpaid under the Grupo Aval Promissory Notes through the Grupo Aval Settlement Date.

   d.     *Voting:* Class 8 is Unimpaired under the Plan. Holders of Grupo Aval Promissory Note Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

9.      Class 9 – Cargo Receivable Facility Claims

   a.     *Classification:* Class 9 consists of all Cargo Receivable Facility Claims.

   b.     *Allowance:* The Cargo Receivable Facility Claims shall be Allowed in the aggregate amount of $3,176,468.00, plus accrued and unpaid interest (at the applicable non-default rate) due under the terms of the existing Cargo Receivable Facility Agreement.

   c.     *Treatment:* On the Effective Date, all Cargo Receivable Facility Claims shall be Reinstated.

   d.     *Voting:* Class 9 is Unimpaired under the Plan. Holders of Cargo Receivable Facility Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

10.     Class 10 – Pension Claims

   a.     *Classification:* Class 10 consists of all Pension Claims.

   b.     *Treatment:* Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of an Allowed Pension Claim shall be fully Reinstated and continue as an

34

ongoing obligation of the applicable Reorganized Debtor(s) to the extent provided for under the Colombian Pension Regime, the holder of such Claim being unaffected by the Chapter 11 Cases or the Plan.  In addition, on the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtors shall pay in full in Cash, without application to or approval of the Bankruptcy Court and without a deduction from distributions made to holders of Pension Claims, any and all unpaid CAXDAC Fee Claims.

c.  *Voting:*  Class 10 is Unimpaired under the Plan.  Holders of Pension Claims are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

11.  Class 11 – General Unsecured Avianca Claims[2]

a.  *Classification:*  Class 11 consists of all General Unsecured Avianca Claims.

b.  *Treatment:*  On the Initial General Unsecured Claims Distribution Date (or on the next distribution date following Allowance, if later), each holder of an Allowed General Unsecured Avianca Claim shall receive its Pro Rata share of either (A) the Unsecured Claimholder Cash Pool or (B) if such holder makes a written election on a timely and properly delivered and completed Ballot or other writing reasonably acceptable to the Debtors or Reorganized Debtors to receive the Unsecured Claimholder Equity Package, (1) the Unsecured Claimholder Equity Pool and (2) the Warrants;

provided, that, **if Class 11 votes to <u>accept</u> the Plan**, in addition to the treatment set forth above, each holder of an Allowed General Unsecured Avianca Claim shall also receive its Pro Rata Share of either (x) the Unsecured Claimholder Enhanced Cash Pool or (y) if such holder duly elects to receive the Unsecured Claimholder Equity Package, the Unsecured Claimholder Enhanced Equity Pool.

---

[2]  The DIP Facility is secured, in part, by the same collateral securing the 2023 Notes (the "<u>Shared Collateral</u>"); however, pursuant to the Final DIP Order, DIP Facility Claims shall be satisfied first from proceeds of the Shared Collateral (the "<u>DIP Marshaling Provision</u>").  As a result of the DIP Roll-Up and the DIP Marshaling Provision, no value with respect to the Shared Collateral will be available to satisfy 2023 Notes Claims after DIP Facility Claims are satisfied, thereby rendering the 2023 Notes, as well as any other indebtedness secured by the Shared Collateral on equal footing with the 2023 Notes, effectively unsecured pursuant to section 506(a) of the Bankruptcy Code.  Further, pursuant to the Final DIP Order, holders of 2023 Notes Claims (and holders of other indebtedness secured by the Shared Collateral) have no claims against any Debtor for, arising out of, or related to adequate protection (including on account of the priming liens in respect of the Shared Collateral).  For the avoidance of doubt, 2023 Notes Claims shall not include any unsecured deficiency claim held by a Consenting Noteholder on account of, arising out of, or relating to the 2023 Notes.

35

For the avoidance of doubt, if a holder of an Allowed General Unsecured Avianca Claim does not duly elect to receive the Unsecured Claimholder Equity Package, such holder shall automatically receive its distribution in Cash (i.e., its Pro Rata share of the Unsecured Claimholder Cash Pool and, as applicable, the Unsecured Claimholder Enhanced Cash Pool).

c. *Voting:* Class 11 is Impaired under the Plan. Holders of General Unsecured Avianca Claims are entitled to vote to accept or reject the Plan.

12. Class 12 – General Unsecured Avifreight Claims

a. *Classification:* Class 12 consists of all General Unsecured Avifreight Claims.

b. *Treatment:* Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of a General Unsecured Avifreight Claim shall (i) receive from Reorganized Avifreight, in full and final satisfaction of its General Unsecured Avifreight Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its General Unsecured Avifreight Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired.

c. *Voting:* Class 12 is Unimpaired under the Plan. Holders of General Unsecured Avifreight Claims are not entitled to vote to accept or reject the Plan.

13. Class 13 – General Unsecured Aerounión Claims

a. *Classification:* Class 13 consists of all General Unsecured Aerounión Claims.

b. *Treatment:* Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of a General Unsecured Aerounión Claim shall (i) receive from Reorganized Aerounión, in full and final satisfaction of its General Unsecured Aerounión Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its General Unsecured Aerounión Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired.

c. *Voting:* Class 13 is Unimpaired under the Plan. Holders of General Unsecured Aerounión Claims are not entitled to vote to accept or reject the Plan.

14.    Class 14 – General Unsecured SAI Claims

    a.    *Classification:*  Class 14 consists of all General Unsecured SAI Claims.

    b.    *Treatment:*  Except to the extent previously paid during the Chapter 11 Cases or the holder agrees to less favorable treatment, each holder of a General Unsecured SAI Claim shall (i) receive from Reorganized SAI, in full and final satisfaction of its General Unsecured SAI Claim, payment, in Cash, equal to the Allowed amount of such Claim, on the later of the Effective Date and the date when its General Unsecured SAI Claim becomes due and payable in the ordinary course or (ii) be otherwise rendered Unimpaired.

    c.    *Voting:*  Class 14 is Unimpaired under the Plan.  Holders of General Unsecured SAI Claims are not entitled to vote to accept or reject the Plan.

15.    Class 15 – General Unsecured Convenience Claims

    a.    *Classification:*  Class 15 consists of all General Unsecured Convenience Claims.

    b.    *Treatment:*  Except to the extent previously paid during the Chapter 11 Cases or such holder agrees to less favorable treatment, each holder of an Allowed General Unsecured Convenience Claim shall receive, in full and final satisfaction of its General Unsecured Convenience Claim, Cash in an amount equal to 1.0% of the amount of such Allowed General Unsecured Convenience Claim.

    c.    *Voting:*  Class 15 is Impaired under the Plan.  Holders of General Unsecured Convenience Claims are entitled to vote to accept or reject the Plan.

16.    Class 16 – Subordinated Claims

    a.    *Classification:*  Class 16 consists of all Subordinated Claims, if any.

    b.    *Treatment:*  All Subordinated Claims, if any, shall be discharged, cancelled, released, and extinguished as of the Effective Date, and will be of no further force or effect, and holders of Subordinated Claims will not receive any distribution on account of such Subordinated Claims.

    c.    *Voting:*  Class 16 is Impaired under the Plan.  Holders of Subordinated Claims are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

17. Class 17 – Intercompany Claims

    a. *Classification:* Class 17 consists of all Intercompany Claims.

    b. *Treatment:* No property will be distributed to holders of Intercompany Claims. Each Intercompany Claim will be either Reinstated or released and cancelled, as determined appropriate by the Debtors.

    c. *Voting:* Depending on the treatment accorded, Intercompany Claims are either Unimpaired or Impaired under the Plan. Holders of Intercompany Claims are conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code and, in either case, are not entitled to vote to accept or reject the Plan.

18. Class 18 – Existing AVH Non-Voting Equity Interests

    a. *Classification:* Class 18 consists of all Existing AVH Non-Voting Equity Interests.

    b. *Treatment:* Holders of Existing AVH Non-Voting Equity Interests shall retain such Interests, which will be cancelled, released, or extinguished, or will receive economically similar treatment, as of the Effective Date or as soon as reasonably practicable thereafter, to the extent permitted by applicable law as determined by the Debtors in their business judgment, and holders of Existing AVH Non-Voting Equity Interests shall not receive any distributions on account of such Interests.

    c. *Voting:* Class 18 is Impaired under the Plan. Holders of Existing AVH Non-Voting Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

19. Class 19 – Existing AVH Common Equity Interests

    a. *Classification:* Class 19 consists of all Existing AVH Common Equity Interests.

    b. *Treatment:* Holders of Existing AVH Common Equity Interests shall retain such Interests, which will be cancelled, released, or extinguished, or will receive economically similar treatment, as of the Effective Date or as soon as reasonably practicable thereafter, to the extent permitted by applicable law as determined by the Debtors in their business judgment, and holders of Existing AVH Common Equity Interests shall not receive any distributions on account of such Interests.

    c. *Voting:* Class 19 is Impaired under the Plan. Holders of Existing AVH Common Equity Interests are deemed to have rejected the Plan pursuant to

section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

20.   Class 20 –Existing Avifreight Equity Interests

   a.   *Classification:*  Class 20 consists of all Existing Avifreight Equity Interests.

   b.   *Treatment:*  Each holder of an Allowed Existing Avifreight Equity Interest shall have its Interest Reinstated.

   c.   *Voting:*  Class 20 is Unimpaired under the Plan.  Holders of Existing Avifreight Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

21.   Class 21 – Existing SAI Equity Interests

   a.   *Classification:*  Class 21 consists of all Existing SAI Equity Interests.

   b.   *Treatment:*  Each holder of an Allowed Existing SAI Equity Interest shall have its Interest Reinstated.

   c.   *Voting:*  Class 21 is Unimpaired under the Plan.  Holders of Existing SAI Equity Interests are conclusively presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

22.   Class 22 – Other Existing Equity Interests

   a.   *Classification:*  Class 22 consists of all Other Existing Equity Interests.

   b.   *Treatment:*  Holders of Other Existing Equity Interests will not receive any distribution on account of such Interests, which will be cancelled, released, extinguished, or receive economically similar treatment as of the Effective Date or as soon as reasonably practicable thereafter, to the extent permitted by applicable law as determined by the Debtors in their business judgment, and holders of Other Existing Equity Interests shall not receive or retain any property under the Plan on account of such Other Existing Equity Interests.

   c.   *Voting:*  Class 22 is Impaired under the Plan.  Holders of Other Existing Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and, therefore, are not entitled to vote to accept or reject the Plan.

39

23. Class 23 – Intercompany Interests

    a. *Classification:*  Class 23 consists of all Intercompany Interests.

    b. *Treatment:*  No property will be distributed to holders of Intercompany Interests.  Each Intercompany Interest will either be (i) Reinstated solely to the extent necessary to maintain the Reorganized Debtors' corporate structure or (ii) transferred to a newly formed holding entity in conformance with the Transaction Steps.

    c. *Voting:*  Depending on the treatment accorded, Intercompany Claims are either Unimpaired or Impaired under the Plan.  Holders of Intercompany Interests are conclusively presumed to have accepted or deemed to have rejected the Plan pursuant to section 1126(f) or 1126(g) of the Bankruptcy Code and, in either case, are not entitled to vote to accept or reject the Plan.

C. *Special Provision Governing Unimpaired Claims*

Except as otherwise specifically provided in the Plan, nothing herein shall be deemed to affect, diminish, or impair the Debtors' or the Reorganized Debtors' rights and defenses, both legal and equitable, with respect to any Reinstated Claim or Unimpaired Claim, including legal and equitable defenses to setoffs or recoupment against Reinstated Claims or Unimpaired Claims, and, except as otherwise specifically provided in the Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date against or with respect to any Claim that is Unimpaired by the Plan.  Except as otherwise specifically provided in the Plan, the Debtors and the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' and Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

D. *Subordination of Claims*

Except as expressly provided herein, the Allowance, classification, and treatment of all Allowed Claims and Interests and the respective distributions and treatments under the Plan take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, section 510(b) of the Bankruptcy Code, or otherwise.  Pursuant to section 510 of the Bankruptcy Code, the Debtors and the Reorganized Debtors reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.

## ARTICLE IV
## ACCEPTANCE OR REJECTION OF PLAN

A.    *Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code*

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by any Impaired Class of Claims. The Debtors shall seek Confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code with respect to any rejecting Class of Claims or Interests.

B.    *Voting Classes*

Holders of Claims in the following Classes as of the Voting Record Date are entitled to vote to accept or reject the Plan:  Classes 3, 4, 7, 11, and 15.

The Bankruptcy Code defines "acceptance" of a plan by a class of (i) Impaired Claims as acceptance by creditors in that class that hold at least two-thirds (⅔) in dollar amount and more than one-half (½) in number of the Claims that cast ballots for acceptance or rejection of the Plan and (ii) Impaired Interests as acceptance by Interest holders in that Class that hold at least two-thirds (⅔) in amount of the Interests that cast ballots for acceptance or rejection of the Plan.

C.    *Presumed Acceptance by Non-Voting Classes*

If a Class contains Claims or Interests eligible to vote and no holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by the holders of such Claims or Interests in such Class.

D.    *Presumed Acceptance by Unimpaired Classes*

Classes 1, 2, 5, 6, 8, 9, 10, 12, 13, 14, 20, 21, and, depending on their respective treatment, Classes 17 and 23, are Unimpaired under the Plan.  Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.

E.    *Elimination of Vacant Classes*

Any Class of Claims or Interests that does not have a holder of an Allowed Claim or Allowed Interest or a Claim or Interest temporarily Allowed by the Bankruptcy Court as of the date of the Confirmation Hearing shall be deemed eliminated from the Plan for purposes of voting to accept or reject the Plan and for purposes of determining acceptance or rejection of the Plan by such Class pursuant to section 1129(a)(8) of the Bankruptcy Code.

F.    *Controversy Concerning Impairment*

If a controversy arises as to whether any Claims or Interests, or any Class of Claims or Interests, are Impaired, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date.

# ARTICLE V
# MEANS FOR IMPLEMENTATION OF PLAN

A.     *General Settlement of Claims and Interests*

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distributions, releases, and other benefits provided under the Plan, on the Effective Date, the provisions of the Plan shall constitute an arms' length and good faith compromise and settlement of all Claims and Interests and controversies resolved pursuant to the Plan, and all distributions made to holders of Allowed Claims and Interests in any Class in accordance with the Plan are intended to be, and shall be, final.  Among other things, the Plan provides for a global settlement among the Debtors and various creditors of the Debtors (the "Global Plan Settlement"), which provides substantial value to the Debtors' Estates.

B.     *Substantive Consolidation*

1.     Avianca Plan Consolidation

The Plan serves as a motion seeking, and entry of the Confirmation Order shall constitute, the approval, pursuant to section 105(a) of the Bankruptcy Code, effective as of the Effective Date, of the Avianca Plan Consolidation.

Except as otherwise provided herein, solely for voting, Confirmation, and distribution purposes hereunder, and subject to the following sentence, (i) all assets and all liabilities of the Avianca Debtors shall be treated as though they were merged; (ii) all guarantees of any Avianca Debtor of the payment, performance, or collection of obligations of another Avianca Debtor shall be eliminated and cancelled; (iii) all joint obligations of two or more Avianca Debtors and multiple Claims against such Entities on account of such joint obligations shall be treated and allowed as a single Claim against the consolidated Avianca Debtors; (iv) all Claims between any Avianca Debtors shall be deemed cancelled; and (v) each Claim filed in the Chapter 11 Case of any Avianca Debtor shall be deemed filed against the consolidated Avianca Debtors and a single obligation of the consolidated Avianca Debtors' Estate. The substantive consolidation and deemed merger effected pursuant to this Article V.B shall not affect (other than for purposes of the Plan as set forth in this Article V.B) (i) the legal and organizational structure of the Reorganized Avianca Debtors, except as provided in the Restructuring Transactions; (ii) defenses to any Causes of Action or requirements for any third party to establish mutuality to assert a right of setoff; (iii) the claims, rights, or remedies of the DIP Agent and each of the DIP Lenders under the DIP Facility Documents until the satisfaction and discharge of all obligations under the DIP Facility Documents in accordance with the Plan on the Effective Date; and (iv) distributions out of any insurance policies or proceeds of such policies.

2.     Confirmation in the Event of Partial or No Avianca Plan Consolidation

In the event that the Bankruptcy Court orders partial, or does not order, the Avianca Plan Consolidation, the Debtors reserve the right to (i) proceed with no or partial Avianca Plan Consolidation, (ii) propose one or more Sub-Plans, (iii) proceed with confirmation of one or more Sub-Plans to the exclusion of other Sub-Plans, (iv) withdraw some or all of the Sub-Plans, or (v) withdraw the Plan.   The Debtors' inability to obtain approval of the Avianca Plan

42

Consolidation or confirm any Sub-Plan, or the Debtors' election to withdraw the Avianca Plan Consolidation or any Sub-Plan, shall not impair confirmation or consummation of any other Sub-Plan. In the event that the Bankruptcy Court does not order the Avianca Plan Consolidation, (i) Claims against a particular Debtor shall be treated as Claims against solely such Debtor's Estate for all purposes and administered as provided in the applicable Sub-Plan and (ii) the Debtors shall not be required to resolicit votes with respect to the Plan or the applicable Sub-Plan.

3. Claims Against Avianca Debtors and Unconsolidated Debtors

If one or more Avianca Debtors and one or more Unconsolidated Debtors are obligated on a particular Claim, the holder of such Claim shall be deemed to have no Claim against the Avianca Debtors and one Claim against each applicable Unconsolidated Debtor for purposes of Confirmation and distribution. For the avoidance of doubt, no such holder shall receive distributions totaling an amount in excess of 100% of its Allowed Claim.

C.  *Restructuring Transactions*

Prior to, on, or after the Effective Date, subject to and consistent with the terms of their obligations under the Plan, the Debtors and the Reorganized Debtors shall be authorized to enter into such transactions and take such other actions as may be necessary or appropriate to effect a corporate and other Entity restructuring of their businesses, to otherwise simplify the overall corporate and other Entity structure of the Debtors, and/or to reincorporate or reorganize certain of the Debtors under the laws of jurisdictions other than the laws under which such Debtors currently are incorporated or formed, which restructuring may include one or more mergers, consolidations, dispositions, transfers, assignments, contributions, liquidations or dissolutions, as may be determined by the Debtors to be necessary or appropriate to result in substantially all of the respective assets, properties, rights, liabilities, duties and obligations of certain of the Debtors vesting in one or more surviving, resulting or acquiring entities (collectively, the "Restructuring Transactions"). Subject to the terms of the Plan, in each case in which the surviving, resulting or acquiring Entity in any such transaction is a successor to a Debtor, such surviving, resulting or acquiring Entity shall perform the obligations of such Debtor pursuant to the Plan to pay or otherwise satisfy the Allowed Claims against and Interests in such Debtor, except as provided in any contract, instrument or other agreement or document effecting a disposition to such surviving, resulting or acquiring Entity, which may provide that another Debtor will perform such obligations.

In effecting the Restructuring Transactions, the Debtors and the Reorganized Debtors shall implement the Transaction Steps and be permitted to: (1) execute and deliver appropriate agreements or other documents of merger, consolidation, restructuring, disposition, liquidation, or dissolution containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable non-bankruptcy law and such other terms to which the applicable Entities may agree; (2) form new Entities, execute and deliver appropriate documents in connection therewith containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable non-bankruptcy law, and issue equity in such newly formed Entities; (3) execute and deliver appropriate instruments of transfer, assignment, assumption or delegation of any asset, property, right, liability, duty or obligation on terms consistent with the terms of the Plan and having such other terms to which the applicable Entities may agree and

43

effectuate such transfers, assignments, assumptions, or delegations in accordance with such instruments, including to any Entities formed in accordance with the Restructuring Transactions and the Plan; (4) file appropriate certificates or articles of merger, consolidation or dissolution pursuant to applicable non-bankruptcy law; and (5) take all other actions that the applicable Entities determine to be necessary or appropriate, including making filings or recordings, or vacating previously filed filings or recordings, that may be required by applicable non-bankruptcy law in connection with such transactions. Each agent of the Debtors and other Persons authorized to make filings with respect to the Debtors (including, without limitation, each resident agent) is directed to cooperate with and to take direction from the Debtors and the Reorganized Debtors as to the foregoing. To the extent known, any such Restructuring Transactions will be summarized in the Description of Restructuring Transactions, and in all cases, such transactions shall be subject to the terms and conditions of the Plan and any consents or approvals required under the Plan or the Tranche B Equity Conversion Agreement.

On the Effective Date or as soon as reasonably practicable thereafter, all Interests in AVH will be cancelled, released, extinguished, or receive economically similar treatment, to the extent permitted by applicable law as determined by the Debtors in their business judgment.

D.    *Sources of Consideration for Plan Distributions*

1.    Cash

The Reorganized Debtors shall fund distributions under the Plan required to be paid in Cash, if any, with Cash on hand (including Cash from operations and Cash received under the DIP Facility in accordance with the DIP Facility Documents) and Cash received on the Effective Date (including borrowings under the Exit Facility and the Tranche B Equity Contributions).

2.    Exit Facility

On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Facility Documents, subject to the requisite approvals, without further (i) notice to or order of the Bankruptcy Court, (ii) vote, consent, authorization, or approval of any Person, or (iii) action by the holders of Claims or Interests.

The Reorganized Debtors shall be authorized to convert/repay the Tranche A-1 DIP Obligations and Tranche A-2 DIP Obligations with the Exit Facility and use the proceeds of such borrowings for any purpose permitted thereunder. Without limiting the foregoing, the Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities, and other amounts, including any applicable refinancing premiums and applicable exit fees, provided under the DIP Facility Documents related to the DIP Facility and/or the Exit Facility Documents relating to such Exit Facility.

The Exit Facility Documents shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever under applicable law, the Plan or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the

44

Bankruptcy Code or any other applicable non-bankruptcy law.  The financial accommodations to be extended pursuant to the Exit Facility Documents are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

On the Effective Date, all of the Liens to be granted in accordance with the Exit Facility Documents (a) shall be deemed to be approved; (b) shall be legal, binding, and enforceable Liens on the collateral granted under the respective Exit Facility Documents in accordance with the terms thereof; (c)(i) shall be deemed perfected on the Effective Date and (ii) the priorities of such Liens shall be as set forth in the respective Exit Facility Documents, and, in the case of this clause (ii), subject only to such Liens as may be permitted under the Exit Facility Documents; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the secured parties (and their designees and agents) under such Exit Facility Documents are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents, to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the Liens granted under the Exit Facility Documents shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals, and consents shall not be necessary or required), and the Reorganized Debtors and the secured parties (and their designees and agents) under such Exit Facility Documents will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

To the extent that any holder of a Secured Claim that has been satisfied or discharged pursuant to the Plan, or any agent for such holder, has filed or recorded any Liens to secure such holder's Secured Claim, then on or as soon as practicable after the Effective Date, such holder (or the agent for such holder) shall, at the Debtors' or Reorganized Debtors' sole cost and expense, take any and all steps reasonably requested by the Debtors, Reorganized Debtors, or the Exit Facility Indenture Trustee that are necessary to cancel and/or extinguish such Liens (it being understood that such Liens held by holders of Secured Claims that are satisfied on the Effective Date pursuant to the Plan shall be automatically canceled/or extinguished on the Effective Date by virtue of the entry of the Confirmation Order).

3.      New Common Equity

Reorganized AVH is authorized to issue or cause to be issued, and shall issue, the New Common Equity without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

All of the New Common Equity issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid and non-assessable.  Each distribution and issuance of the New Common Equity under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of

45

the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All of the New Common Equity issued and/or distributed pursuant to the Plan, whether solely in exchange for Claims or, in the case of certain Tranche B DIP Lenders, in exchange for Tranche B DIP Facility Claims and the Tranche B Equity Contribution, shall be exempt from the registration requirements of Section 5 of the Securities Act and any "Blue Sky" Laws of any U.S. jurisdiction pursuant to section 1145(a) of the Bankruptcy Code, except to the extent that they are subject to the provisions of section 1145(b)(1).

4.      Warrants

Reorganized AVH is authorized to issue or cause to be issued, and shall issue, the Warrants without further notice to or order of the Bankruptcy Court, act or action under applicable law, regulation, order, or rule, or the vote, consent, authorization, or approval of any Person.

The Warrants shall be automatically exercisable upon any scheme of merger, acquisition, reorganization liquidation, dissolution, winding-up, or sale of Reorganized AVH or the sale of all or substantially all of the assets of Reorganized AVH where the Exercise Price is achieved.  The Warrants shall have standard anti-dilution protection, and the Warrants shall be fully transferable, subject to applicable securities laws and regulations.  Holders of Warrants shall have standard information rights during the period prior to the registration of the New Common Equity or listing of the New Common Equity on a global securities exchange.

All of the Warrants issued and/or distributed pursuant to the Plan shall be duly authorized, validly issued, and, as applicable, fully paid and non-assessable.  Each distribution and issuance of the Warrants under the Plan shall be governed by the terms and conditions set forth in the Plan applicable to such distribution or issuance and by the terms and conditions of the instruments evidencing or relating to such distribution or issuance, which terms and conditions shall bind each Entity receiving such distribution or issuance.

All of the Warrants issued and/or distributed pursuant to the Plan shall be exempt from the registration requirements of Section 5 of the Securities Act and any "Blue Sky" Laws of any U.S. jurisdiction pursuant to section 1145(a) of the Bankruptcy Code, except to the extent that they are subject to the provisions of section 1145(b)(1).

E.      *Corporate Existence*

Except as otherwise provided in the Plan, and despite the Avianca Plan Consolidation, each Debtor and each of its direct and indirect subsidiaries shall continue to exist after the Effective Date as a separate corporation, limited liability company, limited partnership, or other form, as the case may be, with all the powers of a corporation, limited liability company, limited partnership, or other form, as the case may be, pursuant to the applicable law in the jurisdiction in which each applicable Debtor is incorporated or formed and pursuant to the respective bylaws, limited liability company agreement, operating agreement, limited partnership agreement (or other formation documents) in effect prior to the Effective Date, except to the extent such formation documents are amended under the Plan or otherwise, and to the extent such documents are amended, such documents are deemed to be amended pursuant to the Plan and require no further action or approval

(other than any requisite filings required under applicable law); <u>provided</u>, that after the Effective Date, AVH and its direct and indirect subsidiaries may be liquidated, wound up, and/or dissolved in accordance with applicable law and applicable rules of corporate governance.

F.      *Vesting of Assets in the Reorganized Debtors*

Except as otherwise provided in the Plan, on the Effective Date, pursuant to sections 1141(b) and (c) of the Bankruptcy Code, all property in each applicable Estate, and any property acquired by the Debtors pursuant to the Plan shall vest in the Reorganized Debtors and, if applicable, any Entity or Entities formed pursuant to the Restructuring Transactions to hold the assets and/or equity of the Reorganized Debtors, free and clear of all Liens, Claims, charges, or other encumbrances.  On and after the Effective Date, except as otherwise provided in the Plan, the applicable Reorganized Debtors may operate their businesses and may use, acquire, or dispose of property and compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court, and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

The Plan shall be conclusively deemed to be adequate notice that Liens, Claims, charges or other encumbrances are being extinguished.  Any Person having a Lien, Claim, charge or other encumbrance against any of the property vested in accordance with the foregoing paragraph shall be conclusively deemed to have consented to the transfer, assignment and vesting of such property to or in the Reorganized Debtors free and clear of all Liens, Claims, charges or other encumbrances by failing to object to confirmation of the Plan, except as otherwise provided in the Plan.

G.      *Cancellation of Loans, Securities, and Agreements*

Except as otherwise provided in the Plan or the Tranche B Equity Conversion Agreement, on the Effective Date or as soon as reasonably practicable thereafter with respect to each Debtor: (1) the DIP Facility Claims, Grupo Aval Receivable Facility Claims, Grupo Aval Lines of Credit Claims, 2020 Notes Claims, 2023 Notes Claims, Direct Loan Claims, Other Existing Equity Interests, and any other certificate, equity security, share, note, purchase right, option, warrant, or other instrument or document directly or indirectly evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors giving rise to any Claim or Interest (except such certificates, notes, or other instruments or documents evidencing indebtedness or obligation of, or ownership interest in, the Debtors that are Reinstated or otherwise retained by holders thereof pursuant to the Plan), shall, to the fullest extent permitted by applicable law, be deemed cancelled, released, surrendered, extinguished, and discharged as to the Debtors without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other Person or Entity, and the Reorganized Debtors shall not have any continuing obligations thereunder or in any way related thereto; and (2) the obligations of the Debtors pursuant, relating, or pertaining to any agreements, indentures, certificates of designation, bylaws or certificate or articles of incorporation, or similar documents governing the shares, certificates, notes, purchase rights, options, warrants, or other instruments or documents evidencing or creating any indebtedness or obligation of, or ownership interest in, the Debtors (except such agreements, certificates, notes or other instruments evidencing indebtedness or obligation of or ownership interest in the Debtors that are specifically Reinstated pursuant to the Plan) shall be deemed satisfied in full, released, and

discharged without any need for further action or approval of the Bankruptcy Court or any holder thereof or any other Person or Entity.

Notwithstanding such cancellation and discharge, the DIP Credit Agreement, the DIP Facility Indentures, the other DIP Facility Documents, the Direct Loan Promissory Note, the 2020 Notes Indenture, and the 2023 Notes Indenture shall continue in effect to the extent necessary (i) to allow the holders of Claims to receive distributions under the Plan; (ii) to allow the Debtors, the Reorganized Debtors, and the agents and Indenture Trustees under such documents to take other actions pursuant to the Plan on account of Claims; (iii) to allow holders of Claims to retain their respective rights and obligations vis-à-vis other holders of Claims pursuant to such documents; (iv) to allow the agents, including the DIP Agent, and Indenture Trustees under such documents to enforce their rights, claims, causes of action and interests under such documents against any party other than the Debtors, including, but not limited to, any rights with respect to priority of payment and/or to exercise charging liens; (v) to preserve any rights of the agents, including the DIP Agent, and Indenture Trustees under such documents to payment of fees, expenses, and indemnification obligations under such documents, including any rights to priority of payment and/or to exercise charging liens; (vi) to allow the agents, including the DIP Agent, and Indenture Trustees under such documents to enforce any obligations owed to them under the Plan; (vii) to allow the agents, including the DIP Agent, and Indenture Trustees under such documents to exercise rights and obligations relating to the interests of creditors under such documents; (viii) to allow the agents, including the DIP Agent, and Indenture Trustees under such documents to appear in the Chapter 11 Cases or in any proceeding in the Bankruptcy Court or any other court relating to the such documents; provided, that nothing in this Article V.G shall affect the discharge of Claims pursuant to the Plan.

Notwithstanding any provision in the Plan to the contrary, the Debtors or the Reorganized Debtors shall promptly pay in Cash in full the reasonable and documented 2020 Notes Indenture Trustee Claims, subject to an aggregate cap of $875,000, without the filing of fee applications with or approval by the Bankruptcy Court; provided, that the 2020 Notes Indenture Trustee and its counsel shall provide the Debtors or Reorganized Debtors (as applicable) and the Committee with invoices (or other documentation as the Debtors or Reorganized Debtors (as applicable) may reasonably request) for which it seeks payment within five (5) Business Days after the entry of the Confirmation Order, provided, further, that, to the extent that the Debtors and the Committee have no objection to such fees and expenses, such fees and expenses shall be paid within five (5) Business Days of the Effective Date.  To the extent that the Debtors or the Reorganized Debtors (as applicable) or the Committee objects to any of the fees and expenses of the 2020 Notes Indenture Trustee or its advisors, the Debtors or the Reorganized Debtors (as applicable) shall not be required to pay any disputed portion of such fees and expenses until a resolution of such objection is agreed to by the Debtors or Reorganized Debtors (as applicable), the Committee, and the 2020 Notes Indenture Trustee or upon further order of the Bankruptcy Court upon a motion filed by the 2020 Notes Indenture Trustee.

Except for the foregoing, upon the occurrence of the Effective Date, the agents and indenture trustees under the DIP Facility Documents, the DIP Facility Indentures, the Direct Loan Promissory Note, the 2020 Notes Indenture, and the 2023 Notes Indenture shall be relieved of all further duties and responsibilities related to such documents; provided, that any provisions of such

48

documents that by their terms survive their termination shall survive in accordance with their terms.

Upon the full payment or other satisfaction of an Allowed Other Secured Claim, or promptly thereafter, the holder of such Allowed Other Secured Claim shall deliver to the Debtors or Reorganized Debtors, as applicable, any collateral or other property of a Debtor held by such holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents and take all other steps reasonably requested by the Debtors, the Reorganized Debtors, or the Exit Facility Indenture Trustee that are necessary to cancel and/or extinguish Liens securing such holder's Claim.

H.    *Corporate and Other Entity Action*

On the Effective Date, all actions contemplated under the Plan (including, for the avoidance of doubt, the Plan Supplement) shall be deemed authorized and approved in all respects, including, with respect to the applicable Reorganized Debtors: (1) appointment of the New Boards pursuant to Article V.J and any other managers, directors, or officers for the Reorganized Debtors identified in the Plan Supplement; (2) the issuance and distribution of the New Common Equity by Reorganized AVH; (3) entry into the New Organizational Documents; (4) entry into the Exit Facility Documents; (5) implementation of the Restructuring Transactions (which, pursuant to Article V.C of the Plan, may be implemented prior to, on, or after the Effective Date); (6) transfer of intellectual property to a stand-alone subsidiary of Reorganized Avianca; and (7) all other actions contemplated under the Plan (whether to occur before, on, or after the Effective Date). All matters provided for in the Plan involving the corporate or other Entity structure of the Debtors or the Reorganized Debtors, and any corporate or other Entity action required by the Debtors or Reorganized Debtors in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders, managers, or officers of the Debtors or the Reorganized Debtors. On or before the Effective Date, the appropriate officers of the Debtors or Reorganized Debtors, as applicable, shall be authorized and (as applicable) directed to issue, execute, and deliver the agreements, documents, securities, and instruments contemplated under the Plan (or necessary or desirable to effectuate the transactions contemplated under the Plan) in the name, and on behalf, of the Reorganized Debtors, including any and all agreements, documents, securities, and instruments relating to the foregoing. The authorizations and approvals contemplated by this Article V.H shall be effective notwithstanding any requirements under applicable non-bankruptcy law.

I.    *New Organizational Documents*

On or prior to the Effective Date or as soon thereafter as is practicable, the applicable Reorganized Debtors shall, if so required under applicable local law, file their New Organizational Documents with the applicable Secretaries of State and/or other applicable authorities in their respective states or countries of incorporation in accordance with the corporate laws of the respective states or countries of incorporation or formation. Pursuant to section 1123(a)(6) of the Bankruptcy Code, the New Organizational Documents will prohibit the issuance of non-voting equity securities, but only to the extent required by section 1123(a)(6) of the Bankruptcy Code.

After the Effective Date, the Reorganized Debtors may amend and restate their respective New Organizational Documents and other constituent documents as permitted by the laws of their respective states or countries of incorporation or formation, and their respective New Organizational Documents, without further order of the Bankruptcy Court.

J.      *Directors and Officers of Reorganized Debtors*

   1.      Reorganized AVH Board

On the Effective Date, the Reorganized AVH Board shall consist of at least nine (9) directors, one of which shall be an independent director selected in consultation with the Committee.  The identities of the other directors will, to the extent known, be disclosed in the Plan Supplement.  The composition of the boards of directors or managers, as applicable, of each other Reorganized Debtor will be identified no later than the hearing on Confirmation.  Except to the extent that a member of a Debtor's board of directors or managers, as applicable, continues to serve as a director or manager of the corresponding Reorganized Debtor after the Effective Date, the members of the Debtors' boards of directors or managers, as applicable, shall have no continuing obligations to the Reorganized Debtors on or after the Effective Date in their capacities as such, and each such director or manager shall be deemed to have resigned or shall otherwise cease to be a director or manager of the applicable Debtor on the Effective Date.  Commencing on the Effective Date, each of the directors or managers, as applicable, of the Reorganized Debtors shall serve pursuant to the terms of the applicable New Organizational Documents and may be replaced or removed in accordance with such documents.

   2.      Officers of Reorganized Debtors

Except as otherwise provided in the Plan Supplement, the officers of the Debtors immediately before the Effective Date shall serve as the initial officers of each of the respective Reorganized Debtors on and after the Effective Date.  After the Effective Date, the selection of officers of the Reorganized Debtors shall be as provided by their respective organizational documents.

   3.      New Subsidiary Boards

On the Effective Date, the applicable New Subsidiary Boards shall be appointed in accordance with the applicable New Organizational Documents.

K.      *Effectuating Documents; Further Transactions*

On and after the Effective Date, the applicable Reorganized Debtors and the officers and members of the boards of directors thereof are authorized to, and may issue, execute, deliver, file, or record, such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan, and the securities issued pursuant to the Plan in the name, and on behalf, of the Reorganized Debtors, without the need for any approvals, authorization, or consents, except for those expressly required pursuant to the Plan or the New Organizational Documents.

50

L.      *Section 1146 Exemption*

Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with any of the transactions contemplated under the Plan or the reinvesting, transfer or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in the Plan (whether to one or more of the Reorganized Debtors or otherwise), (d) the grant of collateral under the Exit Facility Documents, and (e) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including, without limitation, the Confirmation Order, shall not be subject to any document recording tax, stamp tax, conveyance fee or other similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax or other similar tax or governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees and expenses, documentary stamp tax, deed stamps, stamp tax, transfer tax, intangible tax or similar tax.

M.      *Authorization and Issuance of New Common Equity*

On the Effective Date, Reorganized AVH shall issue the New Common Equity in accordance with the terms of the Transaction Steps, the Plan, and the Tranche B Equity Conversion Agreement.  All of the New Common Equity, when so issued, shall be duly authorized, validly issued, and, in the case of the New Common Equity, fully paid, and non-assessable.

N.      *Preservation of Causes of Action*

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to Article IX.D of the Plan, the Reorganized Debtors shall retain and may enforce all rights to commence and pursue, as appropriate, any and all Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and the Reorganized Debtors' rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date; provided, that the Reorganized Debtors waive their rights to assert Preference Actions against holders of General Unsecured Claims (but reserve the right to assert any such Preference Actions solely as counterclaims or defenses to Claims asserted against the Debtors; provided, that any such assertion may solely be defensive, without any right to seek or obtain an affirmative recovery on account of any such counterclaim).  The Reorganized Debtors may pursue such Causes of Action, as appropriate, in accordance with the best interests of the Reorganized Debtors in their discretion.

**No Person or Entity may rely on the absence of a specific reference in the Plan, the Plan Supplement, or the Disclosure Statement to any Cause of Action against them as any**

51

**indication that the Debtors or the Reorganized Debtors will not pursue any and all available Causes of Action against them.** Unless any Cause of Action against a Person is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or a Final Order of the Bankruptcy Court, the Reorganized Debtors expressly reserve all Causes of Action, for later adjudication, and, therefore no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of the confirmation of the Plan or the occurrence of the Effective Date.

O.    *Grupo Aval Settlement*

Capitalized terms used and not otherwise defined in this Article V.O shall have the meanings ascribed to such terms in the Grupo Aval Settlement Agreement.

1.    Grupo Aval Settlement Agreement

The terms, conditions, obligations, covenants, and agreements set forth in the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation, all of which will be ratified and affirmed and shall continue in full force and effect (in each case as amended, restated, supplemented, or otherwise modified from time to time), are valid, effective, and non-avoidable post-petition obligations of the Debtors' Estates.  The Debtors are authorized to enter into and perform the Grupo Aval Definitive Documentation, including any amendments and modifications that may be agreed in writing among the Debtors and the Grupo Aval Entities.

The Grupo Aval Settlement Agreement and Grupo Aval Definitive Documentation constitute legal, valid, binding, and non-avoidable post-petition obligations of the Debtors and their estates, enforceable against them in accordance with their terms.

Effective as of the Effective Date, the admissions, agreements, and releases contained in the Grupo Aval Definitive Documentation relating to the restructuring of the Working Capital Lines of Credit, including the Working Capital Lines of Credit Definitive Documentation (each as defined in the Term Sheet), shall be binding upon the Settling Parties, the Debtors' Estates, and any and all other parties in interest, including, without limitation, the Committee and any other person or entity acting or seeking to act on behalf of the Debtors' Estates, including any chapter 7 or chapter 11 trustee or examiner appointed or elected for any of the Debtors, in all circumstances and for all purposes.

Effective as of the Settlement Effective Date, any liens and security interests granted pursuant to the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation are (a) deemed approved, (b) legal, valid, binding, and enforceable liens on, and security interests in, the collateral granted thereunder in accordance with the terms of the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation and with the priorities established in respect thereof under applicable non-bankruptcy law and (c) deemed perfected as of the earlier of the Settlement Effective Date and the date of perfection of liens in connection with any transaction among the Settling Parties prior to the Settlement Effective Date, subject only to such liens and security interests as may be permitted under the Settlement and the Grupo Aval Definitive Documentation.  Any guarantees, mortgages, deeds of trust, pledges, liens, and other security

interests granted pursuant to or in connection with the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation, the payment of fees contemplated thereunder, and the execution and consummation of the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation have been and are being undertaken in good faith, for good and valuable consideration, for reasonably equivalent value and for legitimate business purposes as an inducement to lenders to extend credit thereunder and are reasonable and shall be, and hereby are, deemed not to constitute a preferential transfer, fraudulent conveyance, fraudulent transfer, or other voidable transfer and shall not otherwise be subject to avoidance, recharacterization, or subordination for any purpose whatsoever under the Bankruptcy Code or any other applicable non-bankruptcy law, and the priorities of such liens and security interests will be as set forth in the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation.

2.      Grupo Aval Exit Facility

On or prior to the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Grupo Aval Exit Facility Agreement, subject to the requisite approvals, without further (i) notice to or order of the Bankruptcy Court; (ii) vote, consent, authorization, or approval of any Person; or (iii) action by the holders of Claims or Interests.

The Reorganized Debtors shall pay, as and when due, all fees, expenses, losses, damages, indemnities, and other amounts, including any applicable refinancing premiums and applicable exit fees, provided under the Grupo Aval Exit Facility Agreement related to the Grupo Aval Exit Facility.

The Grupo Aval Exit Facility Agreement shall constitute legal, valid, binding, and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms, and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever under applicable law, the Plan, or the Confirmation Order and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any other applicable non-bankruptcy law. The financial accommodations to be extended pursuant to the Grupo Aval Exit Facility Agreement are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

The sale and transfer of any Grupo Aval Credit Card Receivables (as defined in the Grupo Aval Settlement Agreement) as contemplated in the Grupo Aval Exit Facility (the "**Restructured Credit Card Securitization Facility**") will constitute a valid, final, definitive, enforceable, irrevocable, indefeasible, and non-avoidable "true sale" and transfer, enforceable against the Debtors, their Estates, and all third parties, and not a lending transaction or any other economic arrangement other than a true sale, will confer upon the applicable Grupo Aval Entity good and valid title to all of the rights and receivables (and all collections derived therefrom) arising under all Credit Card Processing Agreements, and vests the applicable Grupo Aval Entity with the definitive and indefeasible ownership thereof (whether or not such rights and receivables are in existence as of the Settlement Effective Date).

As of the Settlement Effective Date, all of the Liens to be granted in accordance with the Grupo Aval Exit Facility Agreement (a) shall be deemed to be approved; (b) shall be legal, binding, and enforceable Liens on the collateral granted under the respective Grupo Aval Exit Facility Agreement documents in accordance with the terms thereof; (c)(i) shall be deemed perfected as of the earlier of the Settlement Effective Date and the date of perfection of liens in connection with the Credit Card Securitization (as defined in the Grupo Aval Settlement Agreement) prior to the Settlement Effective Date and (ii) the priorities of such Liens shall be as set forth in the respective Grupo Aval Exit Facility Agreement documents, and, in the case of this clause (ii), subject only to such Liens as may be permitted under the Grupo Aval Exit Facility Agreement; and (d) shall not be subject to avoidance, recharacterization, or subordination (including equitable subordination) for any purposes whatsoever and shall not constitute preferential transfers, fraudulent conveyances, or other voidable transfers under the Bankruptcy Code or any applicable non-bankruptcy law.  The Reorganized Debtors and the secured parties (and their designees and agents) under such Grupo Aval Exit Facility Agreement are hereby authorized to make all filings and recordings, and to obtain all governmental approvals and consents, to establish and perfect such Liens under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of the Plan and the Confirmation Order (it being understood that perfection of the Liens granted under the Grupo Aval Exit Facility Agreement shall occur automatically by virtue of the entry of the Confirmation Order and funding on or after the Effective Date, and any such filings, recordings, approvals, and consents shall not be necessary or required), and the Reorganized Debtors and the secured parties (and their designees and agents) under such Grupo Aval Exit Facility Agreement will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens to third parties.

## ARTICLE VI
## TREATMENT OF EXECUTORY CONTRACTS
## AND UNEXPIRED LEASES

A.    *Assumption and Rejection of Executory Contracts and Unexpired Leases*

Except as otherwise provided herein, each Executory Contract and Unexpired Lease shall be deemed rejected, without the need for any further notice to or action, order, or approval of the Bankruptcy Court, as of the Effective Date, pursuant to section 365 of the Bankruptcy Code, unless such Executory Contract or Unexpired Lease (a) was previously assumed or rejected; (b) previously expired or terminated pursuant to its own terms; (c) is the subject of a motion or notice to reject, assume, or assume and assign filed on or before the Confirmation Date; or (d) is designated specifically as an Executory Contract or Unexpired Lease on the Schedule of Assumed Contracts; provided, that the Debtors reserve the right to seek enforcement of an assumed or assumed and assigned Executory Contract or Unexpired Lease following the Confirmation Date, including, but not limited to, seeking an order of the Bankruptcy Court for the rejection of such Executory Contract or Unexpired Lease for cause; provided, further, that the Debtors reserve the right to seek, following the Confirmation Date, assumption of an Executory Contract or Unexpired Lease that was deemed rejected.  The amendment of an Executory Contract or Unexpired Lease after the Petition Date shall not, by itself, constitute the assumption of such Executory Contract or Unexpired Lease.  The assumption of Executory Contracts and Unexpired Leases hereunder may include the assignment of certain of such contracts to Affiliates.  Unless previously approved by

54

the Bankruptcy Court, the Confirmation Order will constitute an order of the Bankruptcy Court approving the above-described rejections, assumptions and assignments, all pursuant to sections 365(a) and 1123 of the Bankruptcy Code and effective on the occurrence of the Effective Date.

Unless otherwise provided by an order of the Bankruptcy Court, at least twenty-one (21) days prior to the Confirmation Hearing or such other date set by the Bankruptcy Court, the Debtors shall file, or cause to be filed, the Schedule of Assumed Contracts. Any objection to the assumption of an Executory Contract or Unexpired Lease under the Plan (other than those Executory Contracts and Unexpired Leases that were previously assumed by the Debtors or are the subject of a motion or notice to assume or assume and assign filed on or before the Confirmation Date) must be Filed, served and actually received by the Debtors no later than seven (7) days prior to the Confirmation Hearing; provided, that, if the Debtors file an amended Schedule of Assumed Contracts (the "**Amended Schedule of Assumed Contracts**") prior to the Confirmation Hearing, then, with respect to any lessor or counterparty affected by such Amended Schedule of Assumed Contracts, objections to the assumption of the relevant Executory Contract or Unexpired Lease must be filed by the earlier of (i) seven (7) days from the date the Amended Schedule of Assumed Contracts is filed and (ii) the Confirmation Hearing; provided, further, that if the Debtors file an Amended Schedule of Assumed Contracts after the Confirmation Hearing, but prior to the Effective Date, then, with respect to any lessor or counterparty affected by such Amended Schedule of Assumed Contracts, objections to the assumption of the relevant Executory Contract or Unexpired Lease must be filed by seven (7) days from the date the Amended Schedule of Assumed Contracts is filed; provided, further, that the Debtors may file an Amended Schedule of Assumed Contracts after the Effective Date with the consent of the lessors or counterparties affected by such Amended Schedule of Assumed Contracts. Any counterparty to an Executory Contract or Unexpired Lease that fails to timely object to the proposed assumption of any Executory Contract or Unexpired Lease will be deemed to have consented to such assumption.

With respect to Aircraft Leases that were not previously assumed, had not previously expired or terminated pursuant to their terms, or are not subject to a motion to assume or assume and assign filed on or before the Confirmation Date, the Debtors shall assume only those Aircraft Leases and related Executory Contracts that are designated specifically as an Unexpired Lease or Executory Contract on the Schedule of Assumed Contracts. For the avoidance of doubt, any Executory Contracts or Unexpired Leases that are ancillary to Aircraft Leases shall not be assumed and shall be deemed rejected, even if the Debtors assume the relevant Aircraft Lease, unless such Executory Contracts or Unexpired Leases were previously assumed, are subject to a motion to assume or assume and assign filed on or before the Confirmation Date, or are designated specifically as an Executory Contract or Unexpired Lease on the Schedule of Assumed Executory Contracts. No provision in an assumed or assumed and assigned Aircraft Lease shall restrict, limit, or prohibit the assumption, assignment, or sale of such assumed Aircraft Lease (including any "change of control" provision), and any such anti-assignment provision shall be unenforceable in connection with the assumption or assumption and assignment of such Aircraft Lease pursuant to section 365(f) of the Bankruptcy Code. For any rejected Aircraft Lease, the relevant property shall be disposed of in accordance with agreement of the parties or, in the absence of such agreement, in accordance with the terms of the applicable Second Stipulation; otherwise, in the absence of such agreement or an applicable Second Stipulation, such property shall be deemed abandoned.

55

With respect to Aircraft Leases that are subject to a motion to assume or assume and assign filed on or before the Confirmation Date or are designated specifically as an Unexpired Lease or Executory Contract on the Schedule of Assumed Contracts but that are subject to ongoing negotiations with respect to definitive documentation relating to the amendment of such Aircraft Leases, the terms of the relevant Second Stipulation shall remain in effect until (x) the effectiveness of the assumption or assumption and assignment of such Aircraft Lease (which effectiveness shall occur pursuant to the relevant order of the Bankruptcy Court approving the assumption or assumption and assignment of such Aircraft Lease or upon the Debtors' or the Reorganized Debtors' entry into definitive documentation with respect to the amendment of such Aircraft Lease), (y) in the event that the Debtors or Reorganized Debtors are unable to reach an agreement with respect to definitive documentation relating to the amendment of such Aircraft Lease, the rejection of such Aircraft Lease, or (z) as otherwise agreed by the parties.

With respect to aircraft that were subject to an Aircraft Lease that (x) previously was rejected by the Debtors but that (y) are subject to a new lease executed by the Debtors pursuant to an order of the Bankruptcy Court (each, a "**New Aircraft Lease**"), the end of the Stipulation Period (as such period is defined in the relevant Second Stipulation) shall be deemed the date of entry into the New Aircraft Lease, solely to the extent provided by the order of the Bankruptcy Court approving such New Aircraft Lease.

Except as otherwise provided herein or agreed to by the Debtors and the applicable counterparty, each Executory Contract and Unexpired Lease assumed pursuant to this Article VI.A or by any order of the Bankruptcy Court, which has not been assigned to a third party prior to the Effective Date, shall revest in, be fully enforceable by, and constitute binding obligations of the applicable Reorganized Debtor in accordance with its terms (including any amendments to any Executory Contracts and Unexpired Leases that were entered into after the Petition Date), except as such terms are modified by the provisions of the Plan or any order of the Bankruptcy Court authorizing and providing for its assumption under applicable federal law. To the extent that the terms of an Aircraft Lease assumed pursuant to this Article VI.A or by any order of the Bankruptcy Court require the obligations of a Reorganized Debtor thereunder to be guaranteed by the relevant Reorganized Debtor's ultimate parent, Reorganized AVH shall contractually assume such guarantee obligations. To the maximum extent permitted by law, to the extent that any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned pursuant to the Plan restricts or prevents, or purports to restrict or prevent, or is breached or deemed breached by, the assumption or assumption and assignment of such Executory Contract or Unexpired Lease (including any "change of control" provision), then such provision shall be deemed modified or stricken such that the transactions contemplated by the Plan shall not entitle the non-Debtor that is party thereto to terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights with respect thereto.

**All Executory Contracts and Unexpired Leases that are not expressly assumed shall be deemed rejected as of the Effective Date.** Unless otherwise provided by an order of the Bankruptcy Court that is entered after Confirmation, Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, if any, must be filed with the Bankruptcy Court no later than thirty (30) days from the latest of (i) the date of entry of an order of the Bankruptcy Court approving such rejection, (ii) entry of the Confirmation Order, and (iii) the effective date of the rejection of such Executory Contract or Unexpired Lease. **Any Claims**

56

**arising from the rejection of an Executory Contract or Unexpired Lease not filed within such time shall be Disallowed, forever barred from assertion, and shall not be enforceable against the Debtors or the Reorganized Debtors, or property thereof, without the need for any objection by the Debtors or the Reorganized Debtors or further notice to, or action, order, or approval of the Bankruptcy Court or any other Entity, and any Claim arising out of the rejection of the Executory Contract or Unexpired Lease shall be deemed fully satisfied, released, and discharged, notwithstanding anything in the Schedules, if any, or a Proof of Claim to the contrary.** Claims arising from the rejection of the Debtors' Executory Contracts or Unexpired Leases shall be classified as General Unsecured Claims, as applicable, and may be objected to in accordance with the provisions of Article VI.C of the Plan and applicable provisions of the Bankruptcy Code and Bankruptcy Rules.

B.     *Cure of Defaults for Executory Contracts and Unexpired Leases Assumed*

Except as set forth below, any Cure Claims shall be satisfied for the purposes of section 365(b)(1) of the Bankruptcy Code, by payment in Cash, on the Effective Date or as soon as reasonably practicable thereafter, of the cure amount set forth on the Schedule of Assumed Contracts for the applicable Executory Contract or Unexpired Lease, or on such other terms as the parties to such Executory Contracts or Unexpired Leases and the Debtors or Reorganized Debtors, as applicable, may otherwise agree. Any Cure Claim shall be deemed fully satisfied, released, and discharged upon the payment of the Cure Claim. The Debtors may settle any Cure Claim without any further notice to or action, order, or approval of the Bankruptcy Court.

Assumption of any Executory Contract or Unexpired Lease pursuant to the Plan shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any such Executory Contract or Unexpired Lease at any time before the date that the Debtors assume or assume and assign such Executory Contract or Unexpired Lease. Subject to the resolution of any timely objections in accordance with Article VI.C below, any Proofs of Claim filed with respect to an Executory Contract or Unexpired Lease that has been assumed or assumed and assigned shall be deemed Disallowed and expunged, without further notice to or action, order, or approval of the Bankruptcy Court.

C.     *Dispute Resolution*

In the event of a timely filed objection regarding (i) the amount of any Cure Claim; (ii) the ability of the Debtors or the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code) under an Executory Contract or Unexpired Lease to be assumed; or (iii) any other matter pertaining to assumption or the cure of defaults required by section 365(b)(1) of the Bankruptcy Code (each, an "**Assumption Dispute**"), such dispute shall be resolved by a Final Order of the Bankruptcy Court (which may be the Confirmation Order) or as may be agreed upon by the Debtors and the counterparty to the Executory Contract or Unexpired Lease. During the pendency of an Assumption Dispute, the applicable counterparty shall continue to perform under the applicable Executory Contract or Unexpired Lease.

To the extent an Assumption Dispute relates solely to the amount of a Cure Claim, the Debtors may assume and/or assume and assign the applicable Executory Contract or Unexpired Lease prior to the resolution of such Assumption Dispute; provided, that the Debtors reserve Cash in an amount sufficient to pay the Cure Claim asserted by the counterparty pending resolution of the Assumption Dispute. To the extent that the Assumption Dispute is resolved or determined unfavorably to the Debtors, the Debtors may reject the applicable Executory Contract or Unexpired Lease after such determination.

For the avoidance of doubt, if the Debtors are unable to resolve an Assumption Dispute relating solely to the amount of a Cure Claim prior to the Confirmation Hearing, such Assumption Dispute may be scheduled to be heard by the Bankruptcy Court after the Confirmation Hearing (an "**Adjourned Cure Dispute**"); provided, that the Reorganized Debtors may settle any Adjourned Cure Dispute after the Effective Date without any further notice to any party or any action, order, or approval of the Bankruptcy Court.

D.     *Insurance Policies & Indemnification Obligations*

Each of the insurance policies of the Debtors, including all director and officer insurance policies in place as of the Petition Date, are deemed to be and treated as Executory Contracts under the Plan. On the Effective Date, the Debtors shall be deemed to have assumed all insurance policies, including all director and officer insurance policies in place as of the Petition Date, provided, that the Reorganized Debtors shall not indemnify officers, directors, equity holders, agents, or employees, as applicable, of the Debtors for any claims or Causes of Action arising out of or relating to any act or omission that is a criminal act or constitutes intentional fraud, gross negligence, or willful misconduct.

In addition, after the Effective Date, all current and former officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies. In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date; provided, that, for the avoidance of doubt, any insurance policy, including tail insurance policies, for directors', members', trustees', and officers' liability to be purchased or maintained by the Reorganized Debtors after the Effective Date shall be subject to the ordinary-course corporate governance of the Reorganized Debtors.

Notwithstanding anything in the Plan, any Indemnification Obligation to indemnify current and former officers, directors, members, managers, agents, sponsors, or employees with respect to all present and future actions, suits, and proceedings against the Debtors or such officers, directors, members, managers, agents, or employees based upon any act or omission for or on behalf of the Debtors shall (i) remain in full force and effect, (ii) not be discharged, impaired, or otherwise affected in any way, including by the Plan, the Plan Supplement, or the Confirmation Order, (iii) not be limited, reduced or terminated after the Effective Date, and (iv) survive unimpaired and unaffected irrespective of whether such Indemnification Obligation is owed for an act or event occurring before, on or after the Petition Date; provided, that the Reorganized Debtors shall not

58

indemnify officers, directors, members, or managers, as applicable, of the Debtors for any claims or Causes of Action that are not indemnified by such Indemnification Obligation.  All such obligations shall be deemed and treated as executory contracts to be assumed by the Debtors under the Plan and shall continue as obligations of the Reorganized Debtors, and, if necessary to effectuate such assumption under local law, Reorganized AVH shall contractually assume such obligations.  Any claim based on the Debtors' obligations under the Plan shall not be a Disputed Claim or subject to any objection, in either case, by reason of section 502(e)(1)(B) of the Bankruptcy Code.

For the avoidance of doubt, and notwithstanding anything in the Plan, the Reorganized Debtors shall retain all Interests in Avianca Enterprises, LLC after the Effective Date.  The Reorganized Debtors shall be prohibited from liquidating, winding up, dissolving, or taking any other similar action with respect to Avianca Enterprises, LLC for a period of seven (7) years after the Effective Date.

E.    *Modifications, Amendments, Supplements, Restatements, or Other Agreements*

Unless otherwise provided in the Plan, each Executory Contract and Unexpired Lease that is assumed and, if applicable, assigned to the Reorganized Debtors, shall include all modifications, amendments, supplements, restatements, or other agreements that in any manner affect such Executory Contract or Unexpired Lease, including all easements, licenses, permits, rights, privileges, immunities, options, rights of first refusal, and any other interests, unless any of the foregoing agreements has been previously terminated or is otherwise not in effect.

Modifications, amendments, supplements, and restatements to prepetition Executory Contracts or Unexpired Leases that have been executed by the Debtors during the Chapter 11 Cases shall not be deemed to alter the prepetition nature of the Executory Contract or Unexpired Lease, or the validity, priority, or amount of any Claims that may arise in connection therewith.

F.    *Reservation of Rights*

Nothing contained in the Plan shall constitute an admission by the Debtors that any Executory Contract or Unexpired Lease is, in fact, an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors has any liability thereunder.

G.    *Contracts and Leases Entered into after Petition Date*

Contracts and leases entered into after the Petition Date by any Debtor, will be performed by the applicable Debtor or Reorganized Debtor, as the case may be, liable thereunder in the ordinary course of its business or as authorized by the Bankruptcy Court.  Accordingly, such contracts and leases (including any assumed Executory Contracts and Unexpired Leases) will survive and remain unaffected by entry of the Confirmation Order, and, on the Effective Date, shall revest in and be fully enforceable by the applicable Reorganized Debtor in accordance with its terms, except as such terms may have been modified by order of the Bankruptcy Court.

H.   *Compensation and Benefits Plans*

All employment, confidentiality, and non-competition agreements, collective bargaining agreements, offer letters (including any severance set forth therein), bonus, gainshare and incentive programs, vacation, holiday pay, severance, retirement, supplemental retirement, indemnity, executive retirement, pension, deferred compensation, medical, dental, vision, life and disability insurance, flexible spending account, and other health and welfare benefit plans, programs, agreements and arrangements, and all other wage, compensation, employee expense reimbursement, and other benefit obligations (including, for the avoidance of doubt, letter agreements with respect to certain employees' rights and obligations in the event of certain terminations of their employment in connection with and following the implementation of the Restructuring Transactions) (collectively, the "Compensation and Benefits Plans") are deemed to be, and shall be treated as, Executory Contracts under the Plan and, on the Effective Date, shall be deemed assumed (or, in the event that AVH is party to such agreements or arrangements, assumed and assigned to Reorganized AVH)  pursuant to sections 365 and 1123 of the Bankruptcy Code (in each case, as amended prior to or on the Effective Date); provided, that no employee equity or equity-based incentive plans, or any provisions set forth in any Compensation and Benefits Plans that provide for rights to acquire equity interests in any of the Debtors, including, without limitation, Existing AVH Equity Interests, shall be assumed, or deemed assumed, by the Reorganized Debtors, or assumed and assigned, or deemed to be assumed and assigned, to Reorganized AVH.

I.   *USAV Transaction Documents and USAV Settlement Agreement*

Without limiting the procedures relating to the assumption and assumption and assignment of Executory Contracts set forth in this Article VI of the Plan, in order to comply with the Debtors' obligations under the USAV Settlement Agreement, Reorganized AVH will assume all obligations of AVH under the USAV Transaction Documents on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, the USAV Settlement Agreement and any amended and restated transaction documents related thereto shall survive consummation of the Plan.

J.   *United Agreements*

In order to comply with the Debtors' obligations under the United Omnibus Amendment, the Second United Omnibus Amendment, and the JBA Letter Agreement, notwithstanding anything to the contrary in this Article VI of the Plan, on the Effective Date, the United Agreements, as amended or modified pursuant to the United Omnibus Amendment, the Second Omnibus Amendment, and the JBA Letter Agreement, as applicable, shall be assumed pursuant to sections 365 and 1123 of the Bankruptcy Code, and the United Agreements as so amended shall vest in the Reorganized Debtors pursuant to Article V.F of the Plan and be binding obligations on the Reorganized Debtors.

K.   *Grupo Aval Settlement Agreement*

Without limiting the procedures relating to the assumption and assumption and assignment of Executory Contracts set forth in this Article VI of the Plan, in order to comply with the Debtors'

60

obligations under the Grupo Aval Settlement Agreement, Reorganized AVH will assume all obligations of AVH under the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation on the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code. For the avoidance of doubt, the Grupo Aval Settlement Agreement and the Grupo Aval Definitive Documentation shall survive consummation of the Plan. For the avoidance of doubt, the Visa Colombia Processing Agreement and the Master Agreement (each as defined and as amended pursuant to the Grupo Aval Settlement Agreement) shall be deemed assumed pursuant to the Grupo Aval Settlement Order.

**ARTICLE VII**
**PROCEDURES FOR RESOLVING**
**CONTINGENT, UNLIQUIDATED, AND DISPUTED CLAIMS**

A.      *Allowance of Claims and Interests*

Except as expressly provided in the Plan or in any order entered in the Chapter 11 Cases before the Effective Date (including the Confirmation Order), no Claim shall become an Allowed Claim unless and until such Claim is deemed Allowed pursuant to the Plan or a Final Order (including the Confirmation Order) Allowing such Claim. On and after the Effective Date, each of the Reorganized Debtors shall have and retain any and all rights and defenses the corresponding Debtor had with respect to any Claim immediately before the Effective Date.

B.      *Claims Administration Responsibilities*

Except as otherwise expressly provided in the Plan and notwithstanding any requirements that may be imposed pursuant to Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtors shall have the authority (i) to file, withdraw, or litigate to judgment objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court. For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, the Reorganized Debtors shall have and retain any and all rights and defenses the Debtors had immediately prior to the Effective Date with respect to any Disputed Claim, including the Retained Causes of Action.

C.      *General Unsecured Claims Observer*

The Committee may appoint, as of the Effective Date, a General Unsecured Claims Observer with duties limited to consulting with the Reorganized Debtors with respect to the Allowance of General Unsecured Avianca Claims in excess of $10,000,000; provided, that the General Unsecured Claims Observer shall have standing to appear before the Bankruptcy Court with respect to matters arising out of or related to reconciliation, Allowance, and settlement of any General Unsecured Avianca Claims, as well as any objections thereto.

The General Unsecured Claims Observer may employ, without further order of the Bankruptcy Court, professionals to assist in carrying out the duties as limited above, and the General Unsecured Claims Observer Costs, including reasonable professional fees and expenses,

shall be reimbursed by the Reorganized Debtors in the ordinary course of business in an aggregate amount not to exceed $250,000 as soon as reasonably practicable after invoiced.

Upon the death, resignation or removal of the General Unsecured Claims Observer, the Reorganized Debtors shall appoint a successor General Unsecured Claims Observer with approval of the Bankruptcy Court. Upon the resolution of all Disputed General Unsecured Avianca Claims, the General Unsecured Claims Observer shall be released and discharged of and from further authority, duties, responsibilities, and obligations relating to and arising from and in connection with the Chapter 11 Cases.

D.    *Estimation of Claims*

Before or after the Effective Date, the Debtors or the Reorganized Debtors, as applicable, may at any time request the Bankruptcy Court to estimate any Claim that is contingent or unliquidated pursuant to section 502(c) of the Bankruptcy Code for any reason, regardless of whether any party previously has objected to such Claim or whether the Bankruptcy Court has ruled on any such objection, and the Bankruptcy Court shall retain jurisdiction to estimate any such Claim, including during the litigation of any objection to any Claim or during the appeal relating to such objection. In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim for all purposes under the Plan. If the estimated amount constitutes a maximum limitation of the amount of such Claim, the Debtors or the Reorganized Debtors, as applicable, may elect to pursue any supplemental proceedings to object to any ultimate Allowance of such Claim. Notwithstanding section 502(j) of the Bankruptcy Code, in no event shall any holder of a Claim that has been estimated pursuant to section 502(c) of the Bankruptcy Code or otherwise be entitled to seek reconsideration of such estimation unless such holder has filed a motion requesting the right to seek such reconsideration on or before 21 days after the date on which such Claim is estimated. All of the aforementioned objection, estimation, and resolution procedures are cumulative and not exclusive of one another. Claims and Interests may be estimated and subsequently compromised, settled, withdrawn, or resolved by any mechanism approved by the Bankruptcy Court.

E.    *Adjustment to Claims Register Without Objection*

Any duplicate Claim or any Claim that has been paid or otherwise satisfied, or any Claim that has been amended or superseded, may be adjusted or expunged on the claims register by the Debtors or Reorganized Debtors upon stipulation between the parties without an objection to such Claim having to be filed and without any further notice or action, order, or approval of the Bankruptcy Court.

F.    *Time to File Objections to Claims*

The Debtors and Reorganized Debtors, as applicable, shall be entitled to object to Claims. After the Effective Date, except as expressly provided herein to the contrary, the Reorganized Debtors shall have and retain any and all rights and defenses that the Debtors had with regard to any Claim to which they may object, except with respect to any Claim that is Allowed. Any objections to Proofs of Claim shall be served and filed on or before the later of (a) 180 days after

62

the Effective Date, and (b) on such later date as may be fixed by the Bankruptcy Court, after notice and a hearing, upon a motion by the Reorganized Debtors that is filed before the date that is 180 days after the Effective Date. The expiration of such period shall not limit or affect the Debtors' rights to dispute Claims asserted in the ordinary course of business other than through a Proof of Claim.

G.      *Disallowance of Claims*

Any Claims held by Persons from whom property is recoverable under sections 542, 543, 550, or 553 of the Bankruptcy Code or that is a transferee of a transfer avoidable under sections 522(f), 522(h), 544, 545, 547, 548, or 549 of the Bankruptcy Code, shall be deemed Disallowed pursuant to section 502(d) of the Bankruptcy Code, and holders of such Claims shall not receive any distributions on account of such Claims until such time as the applicable Cause of Action against that Person has been settled or a Bankruptcy Court order with respect thereto has been entered and, if such Cause of Action has been resolved in favor of the applicable Debtor or Estate, all sums due from that Person have been turned over or paid to the Debtors or the Reorganized Debtors, as applicable. All Claims filed on account of an indemnification obligation to a director, officer, or employee shall be deemed satisfied and may be expunged from the Claims Register as of the Effective Date to the extent such indemnification obligation is assumed (or honored or reaffirmed, as the case may be) pursuant to the Plan, without any further notice to or action, order, or approval of the Bankruptcy Court.

H.      *Amendments to Claims*

On and after the Effective Date, a Claim may not be amended without the prior authorization of the Reorganized Debtors or order of the Bankruptcy Court.

I.      *No Distributions Pending Allowance*

If an objection, motion to estimate, or other challenge to a Claim is filed, no payment or distribution shall be made on account of such Claim unless and until (and only to the extent that) such Claim becomes an Allowed Claim.

J.      *Distributions After Allowance*

As soon as reasonably practicable after the date that the order or judgment of a court of competent jurisdiction allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the holder of such Claim the distribution (if any) to which such holder is entitled under the Plan as of the Effective Date, without any interest, dividends, or accruals to be paid on account of such Claim unless required under applicable non-bankruptcy law.

K.      *Disputed Claims Reserve*

Any amounts or property that would be distributable in respect of any Disputed General Unsecured Avianca Claim had such Disputed General Unsecured Avianca Claim been Allowed on the Effective Date, together with all earnings thereon (net of any taxes imposed thereon or otherwise payable by the Disputed Claims Reserve), as applicable, shall be deposited in the Disputed Claims Reserve. The amount of, or the amount of property constituting, the Disputed

63

Claims Reserve shall be determined prior to the Confirmation Hearing, based on the Debtors' good faith estimates or an order of the Bankruptcy Court estimating such Disputed Claims, and shall be established on or about the Effective Date.

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, or the receipt of a determination by the IRS, the Disbursing Agent shall treat the Disputed Claims Reserve as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 and to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. All parties (including the Debtors, the Reorganized Debtors, the Disbursing Agent, and the holders of Disputed General Unsecured Avianca Claims) shall be required to report for tax purposes consistently with the foregoing.

The Disputed Claim Reserve shall be responsible for payment, out of the assets of the Disputed Claim Reserve, of any taxes imposed on the Disputed Claim Reserve or its assets. In the event, and to the extent, any Cash in the Disputed Claim Reserve is insufficient to pay the portion of any such taxes attributable to the taxable income arising from the assets of such reserve (including any income that may arise upon the distribution of the assets in such reserve), assets of the Disputed Claim Reserve may be sold to pay such taxes.

To the extent that a Disputed General Unsecured Avianca Claim becomes an Allowed Claim after the Effective Date, the Disbursing Agent shall distribute to the holder thereof out of the Disputed Claims Reserve any amount or property to which such holder is entitled hereunder (net of any allocable taxes imposed thereon or otherwise incurred or payable by the Disputed Claims Reserve, including in connection with such distribution). No interest shall be paid with respect to any Disputed Claim that becomes an Allowed Claim after the Effective Date.

In the event the remaining assets of the Disputed Claims Reserve are insufficient to satisfy all the Disputed General Unsecured Avianca Claims that have become Allowed, such Allowed General Unsecured Avianca Claims shall be satisfied pro rata from such remaining assets. After all assets have been distributed from the Disputed Claims Reserve, no further distributions shall be made in respect of Disputed General Unsecured Avianca Claims. At such time as all Disputed General Unsecured Avianca Claims have been resolved, any remaining assets in the Disputed Claims Reserve shall be distributed Pro Rata to all holders of Allowed General Unsecured Avianca Claims.

The Disbursing Agent may request an expedited determination of taxes under section 505(b) of the Bankruptcy Code for all returns filed for or on behalf of the Disputed Claims Reserve for all taxable periods through the date on which final distributions are made.

L.      *Claims Resolution Procedures Cumulative*

All of the objection, estimation, and resolution procedures with respect to Disputed Claims are cumulative and not exclusive of one another. Claims may be estimated and subsequently compromised, settled, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

**ARTICLE VIII**
**PROVISIONS GOVERNING DISTRIBUTIONS**

A.    *Timing and Calculation of Amounts to Be Distributed*

Unless otherwise provided in the Plan or paid pursuant to a prior Bankruptcy Court order, including, but not limited to, the Foreign Creditors Order, on the Effective Date or, with respect to General Unsecured Avianca Claims, the Initial General Unsecured Claims Distribution Date, or as soon as reasonably practicable thereafter (or, if a Claim is not an Allowed Claim on the Effective Date or, with respect to General Unsecured Avianca Claims, the Initial General Unsecured Claims Distribution Date, on the date that such Claim becomes Allowed or as soon as reasonably practicable thereafter), each holder of an Allowed Claim or Allowed Interest shall receive the full amount of the distributions that the Plan provides for Allowed Claims or Allowed Interests in the applicable Class.  In the event that any payment or act under the Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day.

For the avoidance of doubt, the Reorganized Debtors shall retain the ability to pay Claims pursuant to a prior Bankruptcy Court order, including, but not limited to, the Foreign Creditors Order, after the Effective Date.

B.    *Disbursing Agent*

All distributions under the Plan shall be made by the Disbursing Agent on the Effective Date or the Initial General Unsecured Claims Distribution Date, as applicable, or (in each case) as soon as reasonably practicable thereafter.  If the Disbursing Agent is one or more of the Reorganized Debtors, the Disbursing Agent shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. Additionally, in the event that the Disbursing Agent is so otherwise ordered, all costs and expenses of procuring any such bond or surety shall be borne by the Reorganized Debtors.

C.    *Rights and Powers of Disbursing Agent*

1.    Powers of the Disbursing Agent

Without further order of the Bankruptcy Court, the Disbursing Agent shall be empowered to: (a) effect all actions and execute all agreements, instruments, and other documents necessary to perform its duties under the Plan; (b) make all distributions contemplated hereby; (c) employ professionals and incur reasonable fees and expenses to represent it with respect to its responsibilities; and (d) exercise such other powers as may be vested in the Disbursing Agent by order of the Bankruptcy Court, pursuant to the Plan, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions hereof.

2.    Incurred Expenses

Except as otherwise ordered by the Bankruptcy Court, the amount of any reasonable fees and documented expenses incurred by the Disbursing Agent on or after the Effective Date

65

(including taxes and reasonable attorney fees and expenses) in connection with making distributions shall be paid in Cash by the Reorganized Debtors.

D. *Delivery of Distributions and Undeliverable or Unclaimed Distributions*

    1.    Delivery of Distributions by Disbursing Agent or Servicer

The Disbursing Agent shall make all distributions required under the Plan, except that with respect to distributions to holders of Allowed Claims governed by a separate agreement (which shall include the DIP Facility and the Indentures), and administered by a Servicer (which shall include the DIP Agent and the Indenture Trustees), the Disbursing Agent, the Debtor, and the applicable Servicer shall exercise commercially reasonable efforts to implement appropriate mechanics governing such distributions in accordance with the Plan. All reasonable and documented fees and expenses of the Servicers (including the reasonable and documented fees and expenses of its counsel and agents) incurred after the Effective Date in connection with making distributions shall be paid by the Reorganized Debtors. Notwithstanding anything to the contrary in the Plan or the Confirmation Order, the DIP Agent shall not make any distributions or act as the Disbursing Agent in respect of the Exit Facility or any securities of the Reorganized Debtors.

    2.    Delivery of Distributions in General

Except as otherwise provided in the Plan or prior Bankruptcy Court order, the Disbursing Agent shall make distributions to holders of Allowed Claims as of the Distribution Record Date at the address for each such holder as indicated on the proofs of Claims (or, if no Proof of Claim has been filed, the Debtors' records as of the date of any such distribution); provided, however, that the manner of such distributions shall be determined at the discretion of Reorganized Debtors.

    3.    Minimum Distributions

No (A) fractional New Common Equity or Warrants (as applicable) or (B) Cash payment of less than $25.00 shall be distributed to a holder of an Allowed Claim on account of such Allowed Claim. When any distribution pursuant to the Plan would otherwise result in the issuance of a number of shares of New Common Equity or Warrants (as applicable) that is not a whole number, the actual distribution of such New Common Equity or Warrants (as applicable) shall be rounded as follows: (a) fractions of greater than one-half (½) shares of New Common Equity or Warrants (as applicable) shall be rounded to the next higher whole number and (b) fractions of one-half (½) or less of New Common Equity or Warrants (as applicable) shall be rounded to the next lower whole number with no further payment therefor. The total number of authorized shares of New Common Equity or Warrants (as applicable), as applicable, to be distributed to holders of Allowed Claims may be adjusted as necessary to account for the foregoing rounding.

    4.    Undeliverable Distributions and Unclaimed Property

In the event that any distribution to any holder is returned as undeliverable, no distribution to such holder shall be made unless and until the Disbursing Agent has determined the then-current address of such holder, at which time such distribution shall be made to such holder without interest; provided, however, that such distributions shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code at the expiration of one year from the date on which such

distribution was attempted to be made; <u>provided</u>, <u>further</u>, that the Debtors or Reorganized Debtors, as applicable, shall use reasonable efforts to locate a holder if any distribution is returned as undeliverable. After such date, all unclaimed property or interests in property shall revert to Reorganized Debtors automatically and without need for a further order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandonment, or unclaimed property laws to the contrary), and the claim of any holder to such property or interest in property shall be discharged and forever barred; <u>provided</u>, that all distributions of Cash from the Unsecured Claimholder Cash Pool and, as applicable, the Unsecured Claimholder Enhanced Cash Pool that are unclaimed by holders of Allowed General Unsecured Avianca Claims shall be distributed on a Pro Rata basis to the holders of Allowed General Unsecured Avianca Claims whose distributions were not returned as undeliverable.

E.      *Exemption from Securities Laws*

(a)      The offer, issuance, and distribution under the Plan of the New Common Equity and the Warrants shall be exempt, without further act or actions by any Entity, from registration under the Securities Act and any other applicable securities laws to the fullest extent permitted by section 1145 of the Bankruptcy Code, except with respect to an Entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. Subject to the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents, these securities may be resold without registration under the Securities Act or other federal securities laws pursuant to the exemption provided by section 4(a)(1) of the Securities Act, unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, subject to the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents, such section 1145 exempt securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states.

(b)      The offer, sale, issuance, and distribution under the Plan of any New Common Equity and Warrants issued to an Entity that is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code, shall be exempt from registration under the Securities Act and any other applicable securities laws in reliance on the exemption from registration set forth in Section 4(a)(2) under the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act. Such securities will be considered "restricted securities" and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the New Organizational Documents.

(c)      Each holder of New Common Equity shall be deemed to be a party to, and shall be bound to the terms of, the Shareholders Agreement from and after the Effective Date, even if not a signatory thereto.

67

F.    *Compliance with Tax Requirements*

In connection with the Plan, to the extent applicable, the Reorganized Debtors and the Disbursing Agent shall comply with all tax withholding and reporting requirements imposed on them by any Governmental Unit, and all distributions pursuant to the Plan shall be subject to such withholding and reporting requirements.   Notwithstanding any provision in the Plan to the contrary, the Reorganized Debtors and the Disbursing Agent shall be authorized to take all actions necessary or appropriate to comply with such withholding and reporting requirements, including withholding distributions pending receipt of information necessary to facilitate such distributions or establishing any other mechanisms they believe are reasonable and appropriate.   The Reorganized Debtors reserve the right to allocate all distributions made under the Plan in compliance with all applicable wage garnishments, alimony, child support and other spousal awards, liens, and encumbrances.   Notwithstanding the above, each holder of an Allowed Claim or Allowed Interest that is to receive a distribution under the Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution.   The Debtors have the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to any issuing or disbursing party for payment of any such tax obligations.   The Debtors may require, as a condition to receipt of a distribution, that the holder of an Allowed Claim complete and return a Form W-8 or W-9 or similar form, as applicable to each such holder.

G.    *No Postpetition Interest on Claims and Interests*

Unless otherwise specifically provided for in the Plan, the Confirmation Order, or other Bankruptcy Court order, postpetition interest shall not accrue or be paid on any Claims or Interests, and no holder of a Claim or Interest shall be entitled to interest accruing on or after the Petition Date on any such Claim or Interest.

H.    *Setoffs and Recoupment*

Except for Claims that are expressly Allowed hereunder, the Debtors and the Reorganized Debtors may, but shall not be required to, set off against any Claim or Interest (for purposes of determining the Allowed amount of such Claim or Interest on which distribution shall be made), any claims of any nature whatsoever that the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest; <u>provided</u>, that neither the failure to do so nor the allowance of any Claim or Interest hereunder shall constitute a waiver or release by the Debtors or the Reorganized Debtors of any such claim the Debtors or the Reorganized Debtors may have against the holder of such Claim or Interest.

I.    *Claims Paid or Payable by Third Parties*

1.    Claims Paid by Third Parties

The Debtors or Reorganized Debtors, as applicable, shall reduce in full a Claim, and such Claim shall be disallowed without an objection having to be filed and without any further notice to or action, order, or approval of the Bankruptcy Court, to the extent that the holder of such Claim receives payment (before or after the Effective Date) on account of such Claim from a party that

68

is not a Debtor or Reorganized Debtors; provided, however, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to the party that is not a Debtor or Reorganized Debtor, and such holder in fact repays all or a portion of the Claim to such third party, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.  To the extent a holder of a Claim receives a distribution on account of such Claim under the Plan and receives payment from a party that is not a Debtor or the Reorganized Debtor on account of such Claim, such holder shall, within ten (10) days of receipt thereof, repay or return the distribution to the applicable Debtor or Reorganized Debtor, to the extent the holder's total recovery on account of such Claim from the third party and under the Plan exceeds the amount of such Claim as of the date of any such distribution under the Plan.  The failure of such holder to timely repay or return such distribution shall result in the holder owing the applicable Reorganized Debtor annualized interest at the federal judgment rate, as in effect as of the Petition Date, on such amount owed for each Business Day after the 10-day grace period specified above until the amount is repaid.

2.      Claims Payable by Third Parties

To the extent that one or more of the Debtors' insurers agree to satisfy in full or in part a Claim (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' payment thereof, the applicable portion of such Claim may be expunged without an objection having to be filed and without any further notice to or action, order or approval of the Bankruptcy Court; provided, however, if such holder is required to repay all or any portion of a Claim (either by contract or by order of a court of competent jurisdiction) to a Debtor insurer, and such holder in fact repays all or a portion of the Claim to such insurer, the repaid amount of such Claim shall remain subject to the applicable treatment set forth in the Plan and the respective rights and defenses of the Debtors or Reorganized Debtors, as applicable, and the holder of such Claim.

3.      Applicability of Insurance Policies

Except as otherwise provided in the Plan, distributions to holders of Allowed Claims shall be in accordance with the provisions of any applicable insurance policy.  Except as otherwise expressly set forth in the Plan, nothing herein shall constitute or be deemed a waiver of any Cause of Action that the Debtors or any Entity, including any holders of Claims, may hold against any other Entity under any insurance policies, including against insurers or any insured, nor shall anything contained herein constitute or be deemed a waiver by such insurers of any defenses, including coverage defenses, held by such insurers.

J.      *Allocation Between Principal and Accrued Interest*

Except as otherwise provided in the Plan, the aggregate consideration paid to holders with respect to their Allowed Claims shall be treated pursuant to the Plan as allocated first to the principal amount of such Allowed Claims (to the extent thereof) and, thereafter, to the interest, if any, accrued through the Effective Date.

## ARTICLE IX
## SETTLEMENT, RELEASE, INJUNCTION,
## AND RELATED PROVISIONS

A.     *Compromise and Settlement*

The Confirmation Order will constitute the Bankruptcy Court's finding and determination that the settlements reflected in the Plan are (1) in the best interests of the Debtors, their Estates, and all holders of Claims, (2) fair, equitable, and reasonable, (3) made in good faith, and (4) approved by the Bankruptcy Court pursuant to applicable bankruptcy law.  In addition, the allowance, classification, and treatment of any Allowed Claims of a Released Party take into account any Causes of Action, whether under the Bankruptcy Code or otherwise under applicable non-bankruptcy law, that may exist between the Debtors and any Released Party and, as of the Effective Date, any and all such Causes of Action are settled, compromised, and released as set forth in the Plan except as specified on the Schedule of Retained Causes of Action.  The Confirmation Order shall authorize and approve the releases by all Entities of all such contractual, legal, and equitable subordination rights and Causes of Action that are satisfied, compromised, and settled pursuant hereto except as specified on the Schedule of Retained Causes of Action. Notwithstanding anything herein to the contrary, nothing in the Plan shall compromise or settle, in any way whatsoever, (i) any Causes of Action that the Debtors or Reorganized Debtors, as applicable, may have against any Entity that is not a Released Party, (ii) any Causes of Action that are preserved pursuant to Article V.N, (iii) any Causes of Action included on the Schedule of Retained Causes of Action, or (iv) any Claims or Interests in Unimpaired Classes.

In accordance with the provisions of the Plan, and pursuant to Bankruptcy Rule 9019, without any further notice to, or action, order, or approval of, the Bankruptcy Court, after the Effective Date, the applicable Reorganized Debtors may, in their sole and absolute discretion, compromise and settle (1) Claims (including Causes of Action) against and Interests in the Debtors not previously Allowed (if any) and (2) claims (including Causes of Action) against other Entities.

B.     *Discharge of Claims and Termination of Interests*

Except as otherwise provided in the Plan, effective as of the Effective Date of each applicable Debtor: (a) the rights afforded in the Plan and the treatment of all Claims and Interests shall be in exchange for and in complete satisfaction, discharge, and release of all claims and interests of any nature whatsoever, including any interest accrued on such claims from and after the Petition Date, against the applicable Debtors or any of their assets, property or estates; (b) the Plan shall bind all holders of Claims against and Interests in such Debtors, notwithstanding whether any such holders failed to vote to accept or reject the Plan or voted to reject the Plan; (c) all Claims and Interests shall be satisfied, discharged and released in full, and such Debtors' liability with respect thereto shall be extinguished completely, including any liability of the kind specified under section 502(g) of the Bankruptcy Code; and (d) all entities shall be precluded from asserting against such Debtors, such Debtors' estates, the applicable Reorganized Debtors, their successors and assigns and their assets and properties any other Claims or Interests based upon any documents, instruments or any act or omission, transaction or other activity of any kind or nature that occurred before the Effective Date.

70

C.      *Release of Liens*

**Except as otherwise expressly provided in the Plan or the Tranche B Equity Conversion Agreement, or in any contract, instrument, release, or other agreement or document that is created, amended or Reinstated pursuant to the Plan (including the Exit Facility Documents, the Grupo Aval Exit Facility Agreement, the USAV Receivable Facility Agreement, the Engine Loan Agreement, and the Secured RCF Agreement), on the Effective Date, and concurrently with the applicable distributions made pursuant to the Plan and the effectiveness of the Exit Facility Documents, the amended Engine Loan Agreement, and the amended Secured RCF Agreement, all mortgages, deeds of trust, Liens, pledges, or other security interests against any property of the Estates shall be fully released and discharged, and all of the right, title, and interest of any holder of such mortgages, deeds of trust, Liens, pledges, or other security interests shall revert to the Reorganized Debtors and each of their successors and assigns, and the Exit Facility Indenture Trustee, the DIP Agent, Indenture Trustees, and Citibank, N.A. (as "Bank" under the Direct Loan) shall be directed to release any such mortgages, deeds of trust, Liens, pledges or other security interests held by such holder and to take such actions as may be requested by the Reorganized Debtors to evidence the release of such mortgages, deeds of trust, Liens, pledges or other security interests, including the execution, delivery and filing or recording of any related releases or discharges as may be requested by the Reorganized Debtors or may be required in order to effectuate the foregoing, in each case, at the Reorganized Debtors' sole cost and expense.  On and after the Effective Date, the Reorganized Debtors (and any of their respective agents, attorneys or designees) shall be authorized to execute and file on behalf of creditors Form UCC-3 termination statements, intellectual property assignments, mortgage or deed of trust releases, or such other forms or release documents in any jurisdiction as may be necessary or appropriate to evidence such releases and implement the provisions of this <u>Article IX.C</u>, including, for the avoidance of doubt, with respect to the DIP Facility.**

D.      *Releases by the Debtors*

**Notwithstanding anything contained in the Plan to the contrary, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, the applicable Debtors and the Estates are deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged each Released Party from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action (including Avoidance Actions), remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity, or otherwise, that the Debtors or the Estates would have been legally entitled to assert in their own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors; the Chapter 11 Cases; the DIP Facility; the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors; the assumption, rejection, or amendment of any Executory Contract or Unexpired Lease; the subject matter of, or the transactions or**

71

**events giving rise to, any Claim or Interest that receives treatment pursuant to the Plan; the business or contractual arrangements between any Debtor and any Released Party; the restructuring of Claims and Interests before or during the Chapter 11 Cases; and the negotiation, formulation, preparation, consummation, or dissemination of (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the Exit Facility Documents, (iii) the Disclosure Statement, (iv) the Noteholder RSA, (v) the DIP Facility Documents, or (vi) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence. Notwithstanding anything to the contrary in the foregoing, (1) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, the Exit Facility, or any assumed Executory Contract or Unexpired Lease; and (2) the releases set forth above do not release any claims or Causes of Action of the Debtors against parties to the Tranche B Equity Conversion Agreement and the United Asset Contribution Agreement for any breach of the provisions thereof; and (3) the releases set forth above shall be effective with respect to a Released Party if and only if the releases granted by such Released Party pursuant to <u>Article IX.E</u> of the Plan are enforceable in the jurisdiction(s) in which the Released Claims may be asserted under applicable law.**

**Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in this <u>Article IX.D</u> and shall constitute the Bankruptcy Court's finding that such releases (1) are an essential means of implementing the Plan; (2) are an integral and non-severable element of the Plan and the transactions incorporated herein; (3) confer substantial benefits on the Debtors' Estates; (4) are in exchange for the good and valuable consideration provided by the Released Parties; (5) are a good-faith settlement and compromise of the Claims and Causes of Action released by this <u>Article IX.D</u> of the Plan; (6) are in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (7) are fair, equitable, and reasonable; and (8) are given and made after due notice and opportunity for hearing. The releases described in this <u>Article IX.D</u> shall, on the Effective Date, have the effect of *res judicata* (a matter adjudged), to the fullest extent permissible under applicable laws of the Republic of Colombia and any other jurisdiction in which the Debtors operate.**

E.      *Releases by Holders of Claims or Interests*

**Except as otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Bankruptcy Code, for good and valuable consideration, on and after the Effective Date, to the maximum extent permitted by applicable law, each Releasing Party shall be deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever released, waived, and discharged the Released Parties from, and covenanted not to sue on account of, any and all claims, interests, obligations (contractual or otherwise), rights, suits, damages, Causes of Action, remedies, and liabilities whatsoever, including any derivative claims assertable by or on behalf of a Debtor, whether known or unknown, foreseen or unforeseen, fixed or contingent, matured or unmatured, disputed or undisputed, liquidated or unliquidated, existing or hereafter arising, in law, equity or otherwise, that such Releasing Party would**

have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the holder of any Claim or Interest or other Entity (including any Debtor), based on or relating to, or in any manner arising from, in whole or in part, the Debtors; the Chapter 11 Cases; the DIP Facility; the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or Reorganized Debtors; the assumption, rejection or amendment of any Executory Contract or Unexpired Lease; the subject matter of, or the transactions or events giving rise to, any Claim or Interest that received treatment pursuant to the Plan; the business or contractual arrangements between any Debtor and any Released Party; the restructuring of Claims and Interests before or during the Chapter 11 Cases; and the negotiation, formulation, preparation, consummation, or dissemination of (i) the Plan (including, for the avoidance of doubt, the Plan Supplement), (ii) the Exit Facility Documents, (iii) the Disclosure Statement, (iv) the Noteholder RSA, (v) the Tranche B Equity Conversion Agreement, (vi) the United Asset Contribution Agreement, (vii) the DIP Facility Documents, or (viii) related agreements, instruments, or other documents, upon any other act or omission, transaction, agreement, event, or other occurrence taking place on or before the Effective Date, other than claims or liabilities arising out of or relating to any act or omission of a Released Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence (collectively, the "Released Claims").   Notwithstanding anything to the contrary in the foregoing, (i) the releases set forth above do not release any post-Effective Date obligations of any party or Entity under the Plan, any assumed Executory Contract or Unexpired Lease, or agreement or document that is created, amended or Reinstated pursuant to the Plan (including the Exit Facility Documents, the Grupo Aval Exit Facility Agreement, the USAV Receivable Facility Agreement, the Engine Loan Agreement, and the Secured RCF Agreement) and (ii) the releases set forth above do not release any post-Effective Date obligations of the Debtors under the Tranche B Equity Conversion Agreement, the United Asset Contribution Agreement, the United Agreements or the JBA Letter Agreement, or any Claims or Causes of Action for breach that any party to the Tranche B Equity Conversion Agreement, the United Asset Contribution Agreement, the United Agreements or the JBA Letter Agreement may have against any other party to those agreements.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to applicable bankruptcy law, of the releases described in this Article IX.E and shall constitute the Bankruptcy Court's finding that such releases (a) are an essential means of implementing the Plan; (b) are an integral and non-severable element of the Plan and the transactions incorporated therein; (c) confer substantial benefits on the Debtors' Estates; (d) are in exchange for the good and valuable consideration provided by the Released Parties; (e) are a good-faith settlement and compromise of the Claims and Causes of Action released by this Article IX.E of the Plan; (f) are in the best interests of the Debtors, their Estates, and all holders of Claims and Interests; (g) are fair, equitable, and reasonable; (h) are given and made after due notice and opportunity for hearing; and (i) are a bar to any of the parties deemed to grant the releases contained in this Article IX.E of the Plan asserting any Claim or Cause of Action released by the releases contained in this Article IX.E of the Plan against any of the Released Parties.

The releases described in this **Article IX.E** shall, on the Effective Date, have the effect of *res judicata* (a matter adjudged), to the fullest extent permissible under applicable laws of the Republic of Colombia and any other jurisdiction in which the Debtors operate.

F.      *Exculpation*

Without affecting or limiting the releases set forth in **Article IX.D** and **Article IX.E** of the Plan, and notwithstanding anything herein to the contrary, to the fullest extent permitted by applicable law, no Exculpated Party shall have or incur, and each Exculpated Party shall be released and exculpated from, any claim or Cause of Action in connection with or arising out of the administration of the Chapter 11 Cases; the negotiation and pursuit of the DIP Facility, the Exit Facility, the Disclosure Statement, any settlement or other acts approved by the Bankruptcy Court, the Tranche B Equity Conversion Agreement, the United Asset Contribution Agreement, the Restructuring Transactions, and the Plan, or the solicitation of votes for, or confirmation of, the Plan; the funding of the Plan; the occurrence of the Effective Date; the administration and implementation of the Plan or the property to be distributed under the Plan; the issuance or distribution of securities under or in connection with the Plan; the issuance, distribution, purchase, sale, or rescission of the purchase or sale of any security of the Debtors or the Reorganized Debtors under or in connection with the Plan; or the transactions in furtherance of any of the foregoing; other than claims or liabilities arising out of or relating to any act or omission of an Exculpated Party that is determined by a Final Order of a court of competent jurisdiction to have constituted willful misconduct, intentional fraud, or gross negligence, but in all respects such Exculpated Parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities.  The Exculpated Parties have, and upon implementation of the Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of, and distribution of, consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.  This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.  Notwithstanding anything to the contrary in the foregoing, the exculpation set forth above does not exculpate any post-Effective Date obligations of any party or Entity under the Plan, the Exit Facility, or any assumed Executory Contract or Unexpired Lease.

G.      *Injunction*

UPON ENTRY OF THE CONFIRMATION ORDER, ALL HOLDERS OF CLAIMS AND INTERESTS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES SHALL BE ENJOINED FROM TAKING ANY ACTIONS TO INTERFERE WITH THE IMPLEMENTATION OR CONSUMMATION OF THE PLAN IN RELATION TO ANY CLAIM EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN.

74

EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THE PLAN OR THE CONFIRMATION ORDER, ALL ENTITIES THAT HAVE HELD, HOLD, OR MAY HOLD CLAIMS AGAINST OR INTERESTS IN THE DEBTORS AND OTHER PARTIES IN INTEREST, ALONG WITH THEIR RESPECTIVE PRESENT OR FORMER EMPLOYEES, AGENTS, OFFICERS, DIRECTORS, PRINCIPALS, AFFILIATES, AND RELATED PARTIES ARE PERMANENTLY ENJOINED, FROM AND AFTER THE EFFECTIVE DATE, FROM TAKING ANY OF THE FOLLOWING ACTIONS AGAINST THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, OR THE EXCULPATED PARTIES (TO THE EXTENT OF THE EXCULPATION PROVIDED PURSUANT TO **ARTICLE IX.F** OF THE PLAN WITH RESPECT TO THE EXCULPATED PARTIES):  (I) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (II) ENFORCING, ATTACHING, COLLECTING, OR RECOVERING BY ANY MANNER OR MEANS ANY JUDGMENT, AWARD, DECREE, OR ORDER AGAINST SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (III) CREATING, PERFECTING, OR ENFORCING ANY LIEN OR ENCUMBRANCE OF ANY KIND AGAINST SUCH ENTITIES OR THE PROPERTY OR THE ESTATES OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS; (IV) ASSERTING ANY RIGHT OF SETOFF, SUBROGATION, OR RECOUPMENT OF ANY KIND AGAINST ANY OBLIGATION DUE FROM SUCH ENTITIES OR AGAINST THE PROPERTY OF SUCH ENTITIES ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS UNLESS SUCH ENTITY HAS TIMELY ASSERTED SUCH SETOFF RIGHT IN A DOCUMENT FILED WITH THE BANKRUPTCY COURT EXPLICITLY PRESERVING SUCH SETOFF, AND NOTWITHSTANDING AN INDICATION OF A CLAIM OR INTEREST OR OTHERWISE THAT SUCH ENTITY ASSERTS, HAS, OR INTENDS TO PRESERVE ANY RIGHT OF SETOFF PURSUANT TO APPLICABLE LAW OR OTHERWISE; AND (V) COMMENCING OR CONTINUING IN ANY MANNER ANY ACTION OR OTHER PROCEEDING OF ANY KIND ON ACCOUNT OF OR IN CONNECTION WITH OR WITH RESPECT TO ANY SUCH CLAIMS OR INTERESTS RELEASED OR SETTLED PURSUANT TO THE PLAN.

BY ACCEPTING DISTRIBUTIONS PURSUANT TO THE PLAN, EACH HOLDER OF AN ALLOWED CLAIM OR INTEREST EXTINGUISHED, DISCHARGED, OR RELEASED PURSUANT TO THE PLAN WILL BE DEEMED TO HAVE AFFIRMATIVELY AND SPECIFICALLY CONSENTED TO BE BOUND BY THE PLAN, INCLUDING, WITHOUT LIMITATION, THE INJUNCTIONS SET FORTH IN THIS **ARTICLE IX.G**.

THE INJUNCTIONS IN THIS **ARTICLE IX.G** SHALL EXTEND TO ANY SUCCESSORS OF THE DEBTORS, THE REORGANIZED DEBTORS, THE RELEASED PARTIES, AND THE EXCULPATED PARTIES AND THEIR RESPECTIVE PROPERTY AND INTERESTS IN PROPERTY.

75

H.      *Subordination Rights*

The classification and manner of satisfying all Claims and Interests under the Plan take into consideration all subordination rights, whether arising under general principles of equitable subordination, contract, section 510(c) of the Bankruptcy Code, or otherwise, that a holder of a Claim or Interest may have against other Claim or Interest holders with respect to any distribution made pursuant to the Plan.  Except as provided in the Plan, all subordination rights that a holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

## ARTICLE X
## CONDITIONS TO EFFECTIVE DATE

A.      *Conditions to Effective Date*

The following are conditions to each Debtor's Effective Date that shall have been satisfied or waived in accordance with Article X.B:

1.      all transactions and other documents to effectuate the Restructuring shall contain terms and conditions consistent in all material respects with the Tranche B Equity Conversion Agreement;

2.      the DIP Facility shall remain in full force and effect and shall not have been terminated;

3.      the Bankruptcy Court shall have entered the Confirmation Order and such order shall not have been reversed, stayed, or vacated;

4.      all authorizations, consents, regulatory approvals, rulings, or documents required by applicable law to implement and effectuate the Plan, including any approvals required in connection with the transfer, change of control, or assignment of permits and licenses held by the applicable Debtor, unless such permits or licenses are abandoned, shall have been obtained from any appropriate regulatory agencies and not subject to any appeal;

5.      the Debtors shall have obtained all governmental and regulatory approvals, consents, authorizations, rulings, or other documents that are legally required for the consummation of the Restructuring shall have been obtained, not be subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods under the Hart-Scott-Rodino Antitrust Improvements Act of 1976 (as amended) or applicable review periods under non-U.S. antitrust law shall have expired;

6.      except as otherwise expressly provided herein, all documents to be executed, delivered, assumed, or performed upon or in connection with Consummation, including, without limitation, the Grupo Aval Definitive Documentation, as to the applicable Debtor, shall have been (i) executed, delivered, assumed, or performed, as the case may be, (ii) to the extent required, filed with the applicable Governmental Units in accordance with applicable law, (iii) any conditions contained in such documents (other than Consummation or notice of Consummation) shall have

76

been satisfied or waived in accordance therewith, including all documents included in the Plan Supplement, and (iv) shall be consistent with the Tranche B Equity Conversion Agreement and the Grupo Aval Settlement Agreement, including, without limitation, any consent rights included therein;

7.      there shall not be in effect any (a) order, opinion, ruling, or other decision entered by any court or other Governmental Unit or (b) U.S. or other applicable law staying, restraining, enjoining, prohibiting, or otherwise making illegal the implementation of any of the transactions contemplated by the Plan;

8.      subject to the terms of the DIP Facility Documents and the DIP Orders, either (x) the conditions precedent to the effectiveness of the Exit Facility (as set forth in the DIP Facility Documents and the Exit Facility Documents, as applicable) shall have been satisfied or duly waived in writing in accordance with the terms of the DIP Facility Documents and the Exit Facility Documents, as applicable, and the Exit Facility Documents shall be in full force and effect as of the Effective Date, or (y) all Tranche A-1 DIP Facility Claims and Tranche A-2 DIP Facility Claims have been paid in full in Cash;

9.      the Tranche B Equity Conversion Agreement shall be in full force and effect and shall not have been terminated, and all conditions to closing thereunder shall have been satisfied (or will be satisfied contemporaneously with the Effective Date) or waived in accordance with its terms;

10.     all conditions to the transfer and/or issuance of the New Common Equity shall have occurred, including the creation of Reorganized AVH;

11.     the Debtors shall have paid in full in Cash all DIP Facility Fees and Expenses incurred, or reasonably estimated to be incurred, through the Effective Date in accordance with Article II.E of the Plan;

12.     the Debtors shall have paid in full in Cash all Restructuring Expenses incurred, or reasonably estimated to be incurred, through the Effective Date, in each case that have been invoiced at least three (3) Business Days prior to the Effective Date;

13.     the Professional Fees Escrow Account shall have been established and funded in full, in Cash, in accordance with, and in the amounts required by, the Plan;

14.     the Grupo Aval Settlement Agreement shall be in full force and effect and shall not have been terminated, all conditions to closing thereunder shall have been satisfied or waived in accordance with its terms, and the Debtors shall have paid all amounts due thereunder as of the Effective Date; and

15.     the Restructuring to be implemented on the Effective Date shall be consistent with the Plan and the Tranche B Equity Conversion Agreement.

B.      *Waiver of Conditions*

The conditions to the Effective Date set forth in this Article X may be waived, without notice, leave, or order of the Bankruptcy Court, only by the Debtors together with (i) the reasonable consent of the Committee (to the extent such waiver materially and adversely impacts the rights of holders of General Unsecured Avianca Claims), (ii) the reasonable consent of the Required Supporting Tranche B Lenders, and (iii) the reasonable consent of the Grupo Aval Entities (to the extent such waiver materially and adversely impacts the rights of the Grupo Aval Entities pursuant to the Grupo Aval Settlement); provided, that the conditions set forth in Article X.A.2 and Article X.A.8 may only be waived with the written consent of the Required Designated A-1 DIP Lenders and the Supermajority New Tranche A-2 Lenders (each as defined in the DIP Facility Documents). If any such condition precedent is waived pursuant to this section and the Effective Date occurs, each party agreeing to waive such condition precedent shall be estopped from withdrawing such waiver after the Effective Date or otherwise challenging the occurrence of the Effective Date on the basis that such condition was not satisfied, the waiver of such condition precedent shall benefit from the "equitable mootness" doctrine, and the occurrence of the Effective Date shall foreclose any ability to challenge the Plan in any court. If the Plan is confirmed for fewer than all of the Debtors, only the conditions applicable to the Debtor or Debtors for which the Plan is confirmed must be satisfied or waived for the Effective Date to occur.

## ARTICLE XI
## MODIFICATION, REVOCATION OR
## WITHDRAWAL OF PLAN

A.      *Modification and Amendments*

Effective as the date hereof, the Debtors reserve the right to modify the Plan in consultation with the Committee, to the extent such modification impacts the rights of holders of General Unsecured Avianca Claims, whether such modification is material or immaterial and seek Confirmation consistent with the Bankruptcy Code. After entry of the Confirmation Order, the Debtors or Reorganized Debtors, as applicable, may, upon order of the Bankruptcy Court, amend or modify the Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, reconcile any inconsistency in the Plan in such manner as may be necessary to carry out the purpose and intent of the Plan consistent with the terms of the Restructuring, or withdraw or revoke the Plan. Notwithstanding anything to the contrary herein, the Debtors or the Reorganized Debtors, as applicable, shall not amend or modify the Plan or waive conditions to the Effective Date in a manner inconsistent with the Global Plan Settlement or the consenting rights (if any) set forth in the Tranche B Equity Conversion Agreement or the DIP Facility Documents.

B.      *Effect of Confirmation on Modifications*

Entry of a Confirmation Order shall mean that all modifications or amendments to the Plan since the solicitation thereof are approved pursuant to section 1127(a) of the Bankruptcy Code and do not require additional disclosure or resolicitation under Bankruptcy Rule 3019.

C.      *Revocation or Withdrawal of Plan*

The Debtors reserve the right to revoke or withdraw the Plan, in consultation with the Committee, with respect to any or all of the Debtors prior to the Confirmation Date and to file subsequent plans of reorganization. If the Debtors revoke or withdraw the Plan or Confirmation does not occur, then: (1) the Plan shall be null and void in all respects; (2) any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount certain of any Claim or Class of Claims), assumption of Executory Contracts or Unexpired Leases effected under the Plan, and any document or agreement executed pursuant to the Plan, shall be deemed null and void; and (3) nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims or Interests; (b) prejudice in any manner the rights of such Debtor or any other Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking of any sort by such Debtor or any other Entity. For the avoidance of doubt, except as provided in the Tranche B Equity Conversion Agreement, nothing in the Plan shall be construed as requiring termination or avoidance of the Tranche B Equity Conversion Agreement due to non-occurrence of the Effective Date (subject to any consent, termination, or other rights of the Supporting Tranche B DIP Lenders under the Tranche B Equity Conversion Agreement).

## ARTICLE XII
## RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, on and after the Effective Date, the Bankruptcy Court shall retain jurisdiction over all matters arising out of, or related to, the Chapter 11 Cases and the Plan pursuant to sections 105(a) and 1142 of the Bankruptcy Code, including jurisdiction to:

1.      allow, disallow, determine, liquidate, classify, estimate, or establish the priority, Secured or Unsecured status, or amount of any Claim or Interest, including (a) the resolution of any request for payment of any Administrative Expense and (b) the resolution of any objections to the Secured or Unsecured status, priority, amount, or allowance of Claims or Interests;

2.      decide and resolve all matters related to the granting and denying, in whole or in part, of any applications for allowance of compensation or reimbursement of expenses to Professionals pursuant to the Bankruptcy Code or the Plan;

3.      resolve any matters related to: (a) the assumption, assumption and assignment, or rejection of any Executory Contract or Unexpired Lease to which the Debtors are party or with respect to which the Debtors may be liable, and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including Claims for rejection damages or Cure Claims pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed, or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

4.      ensure that distributions to holders of Allowed Claims and Allowed Interests are accomplished pursuant to the provisions of the Plan;

5. adjudicate, decide, or resolve any motions, adversary proceedings, contested, or litigated matters, and any other matters, and grant or deny any applications involving the Debtors that may be pending on the Effective Date;

6. adjudicate, decide, or resolve any and all matters related to sections 1141 and 1146 of the Bankruptcy Code;

7. enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of the Plan and all contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan or the Disclosure Statement;

8. enter and enforce any order for the sale or transfer of property pursuant to sections 363, 1123, or 1146(a) of the Bankruptcy Code;

9. resolve any cases, controversies, suits, disputes, or Causes of Action that may arise in connection with the Consummation, interpretation, or enforcement of the Plan or any Entity's obligations incurred in connection with the Plan;

10. issue injunctions, enter, and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with Consummation or enforcement of the Plan and ensure compliance with the Plan;

11. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the releases, injunctions, and other provisions contained in Article IX, and enter such orders as may be necessary or appropriate to implement or enforce such releases, injunctions, and other provisions;

12. resolve any cases, controversies, suits, disputes, or Causes of Action with respect to the repayment or return of distributions and the recovery of additional amounts owed by the holder of a Claim or Interest for amounts not timely repaid pursuant to Article VIII.I.1;

13. enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

14. determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, indenture, or other agreement or document created in connection with the Plan or the Disclosure Statement;

15. enter an order or final decree concluding or closing the Chapter 11 Cases;

16. adjudicate any and all disputes arising from or relating to distributions under the Plan;

17. consider any modifications of the Plan, to cure any defect or omission, or to reconcile any inconsistency in any Bankruptcy Court order, including the Confirmation Order;

18. determine requests for the payment of Claims and Interests entitled to priority pursuant to section 507 of the Bankruptcy Code;

19. hear and determine disputes arising in connection with the interpretation, implementation, or enforcement of the Plan or the Confirmation Order, including disputes arising under agreements, documents, or instruments executed in connection with the Plan;

20. hear and determine matters concerning state, local, federal taxes and fees in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

21. hear and determine all disputes involving the existence, nature, scope, or enforcement of any exculpations, discharges, injunctions, and releases granted in the Plan, including under Article IX, regardless of whether such termination occurred before or after the Effective Date;

22. determine whether and in what amount a Claim or Interest is Allowed;

23. to hear and determine matters related to the DIP Facility and the DIP Orders;

24. recover all assets of the Debtors and property of the Estates, wherever located;

25. resolve any disputes concerning whether an Entity had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to the amount of a cure, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purpose;

26. hear and determine any rights, claims, or Causes of Action held by, or accruing to, the Debtor pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory, including, but not limited to, those set forth on the Schedule of Retained Causes of Action;

27. enforce all orders previously entered by the Bankruptcy Court; and

28. hear any other matter as to which the Bankruptcy Court has jurisdiction.

provided, however, that documents contained in the Plan Supplement shall be governed in accordance with applicable jurisdictional, forum selection or dispute resolution clauses in such documents; provided, further, that, as of the Effective Date, the Exit Facility Documents, the Grupo Aval Definitive Documentation, and any other documents related to either the Exit Facility Documents or the Grupo Aval Definitive Documentation shall be governed by the jurisdictional provisions contained therein, and the Bankruptcy Court shall not retain jurisdiction with respect thereto.

81

# ARTICLE XIII
# MISCELLANEOUS PROVISIONS

A.      *Immediate Binding Effect*

Subject to Article X.A and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon Consummation, the terms of the Plan shall be immediately effective and enforceable and deemed binding upon the Debtors, the Reorganized Debtors, and any and all holders of Claims or Interests (irrespective of whether such Claims or Interests are deemed to have accepted the Plan), all Entities that are party, or subject, to the settlements, compromises, releases, discharges, and injunctions described in the Plan, each Entity acquiring property under the Plan, and any and all of the Debtors' counterparties to Executory Contracts, Unexpired Leases, and any other prepetition agreements.

B.      *Additional Documents*

On or before the Effective Date, the Debtors may enter into any such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.  The Debtors or the Reorganized Debtors, as applicable, and all holders of Claims or Interests receiving distributions pursuant to the Plan and all other parties in interest may, from time to time, prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan.

C.      *Payment of Statutory Fees*

All fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code ("Quarterly Fees") prior to the Effective Date shall be paid by the applicable Debtors in these cases on such Effective Date.  After the Effective Date, the applicable Reorganized Debtors shall be jointly and severally liable to pay any and all Quarterly Fees when due and payable.  The Debtors shall file all quarterly reports due prior to the Effective Date when they become due, in a form reasonably acceptable to the U.S. Trustee.  After the Effective Date, the applicable Reorganized Debtors shall file with the Bankruptcy Court quarterly reports when they become due, in a form reasonably acceptable to the U.S. Trustee.  Each and every one of the Debtors and the Reorganized Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed or converted to a case under Chapter 7 of the Bankruptcy Code.  Notwithstanding the foregoing, nothing herein shall prohibit the Reorganized Debtors (or the Disbursing Agent on behalf of the Reorganized Debtors) from paying any Quarterly Fees that become due and payable.

D.      *Reservation of Rights*

Except as expressly set forth in the Plan, the Plan shall have no force or effect unless the Bankruptcy Court enters the Confirmation Order, and the Confirmation Order shall have no force or effect as to a Debtor if the Effective Date does not occur as to such Debtor.  None of the filing of the Plan, any statement or provision contained in the Plan, or the taking of any action by any Debtor with respect to the Plan, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of any Debtor with respect to the holders of Claims or Interests before Consummation.

82

E.     *Successors and Assigns*

The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

F.     *Notices*

Any pleading, notice, or other document required by the Plan to be served on or delivered to the Debtors or the Committee shall be served on:

If to the Debtors, to:

Avianca Holdings S.A.
Avenida Calle 26 # 59 – 15
Bogotá D.C., Colombia
Attn:   Richard Galindo Sanchez
Email:  Richard.Galindo@Avianca.com

with copies to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention:     Dennis F. Dunne, Esq.
               Gregory A. Bray, Esq.
               Evan Fleck, Esq.
               Benjamin M. Schak, Esq.
               Kyle R. Satterfield, Esq.
Email:         DDunne@Milbank.com
               GBray@Milbank.com
               EFleck@Milbank.com
               BSchak@Milbank.com
               KSatterfield@Milbank.com

If to the Committee:

Willkie Farr & Gallagher LLP
787 Seventh Avenue
New York, NY 10019
Attention:     Brett Miller, Esq.
               Todd Goren, Esq.
Email:         bmiller@willkie.com
               tgoren@willkie.com

83

If to the Supporting Tranche B DIP Lenders, to the addresses set forth following each such Lender's signature page to the Tranche B Equity Conversion Agreement with copies to their respective counsel.

In the Notice of Entry of Confirmation Order, the Debtors shall notify all Entities that, in order to continue to receive documents after the Effective Date pursuant to Bankruptcy Rule 2002, such Entity (excluding the United States Trustee) must file a renewed request to receive documents pursuant to Bankruptcy Rule 2002. After service of the Notice of Entry of Confirmation and the occurrence of the Effective Date, the Reorganized Debtors shall be authorized to limit the list of Entities receiving documents pursuant to Bankruptcy Rule 2002 to the Reorganized Debtors, the United States Trustee and those Entities who have filed renewed requests.

G.    *Term of Injunctions or Stays*

Unless otherwise provided in the Plan or in the Confirmation Order, all injunctions or stays in effect in the Chapter 11 Cases pursuant to sections 105 or 362 of the Bankruptcy Code or any order of the Bankruptcy Court, and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan or the Confirmation Order) shall remain in full force and effect until the Effective Date. For the avoidance of doubt, (i) upon the Effective Date, the automatic stay pursuant to Bankruptcy Code section 362 of any litigation proceedings against or involving the applicable Debtors shall terminate and (ii) all injunctions or stays contained in the Plan or the Confirmation Order shall remain in full force and effect in accordance with their terms.

H.    *Entire Agreement*

Except as otherwise indicated, the Plan (including the Plan Supplement) supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan.

I.    *Exhibits*

All exhibits, schedules, supplements, and appendices to the Plan (including any other documents to be executed, delivered, assumed, or performed in connection with the occurrence of the Effective Date) are incorporated into and are a part of the Plan as if set forth in full in the Plan. To the extent any exhibit or document is inconsistent with the terms of the Plan, unless otherwise ordered by the Bankruptcy Court, the Plan shall control; provided, however, that, in the event of any inconsistency between the Plan and the DIP Orders, the DIP Credit Agreement, or the DIP Facility Indenture, the DIP Orders, the DIP Credit Agreement, or the DIP Facility Indenture, as applicable, shall control.

J.    *Nonseverability of Plan Provisions*

Before Confirmation, if any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted.

84

Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of the Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. Confirmation shall constitute a judicial determination and shall provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is: (1) valid and enforceable pursuant to its terms; (2) integral to the Plan and may not be deleted or modified without consent of the Debtors; and (3) nonseverable and mutually dependent.

K.      *Votes Solicited in Good Faith*

Upon Confirmation, the Debtors shall be deemed to have solicited votes on the Plan in good faith and in compliance with the Bankruptcy Code and, pursuant to section 1125(e) of the Bankruptcy Code, the Debtors and their respective affiliates, agents, representatives, members, principals, shareholders, officers, directors, employees, advisors, and attorneys shall be deemed to have participated in good faith and in compliance with the Bankruptcy Code in the offer, issuance, sale, and purchase of securities offered and sold under the Plan and any previous plan, and, therefore, none of any such parties or individuals or the Reorganized Debtors will have any liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan or the offer, issuance, sale, or purchase of the securities offered and sold under the Plan and any previous plan.

L.      *Document Retention*

On and after the Effective Date, the applicable Reorganized Debtors may maintain documents in accordance with its current document retention policy, as may be altered, amended, modified, or supplemented by such Reorganized Debtors.

M.      *Conflicts*

In the event of a conflict between the Plan and the Disclosure Statement, the terms of the Plan shall control in all respects. In the event of a conflict between the Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or in the Confirmation Order); provided, that, in the event any such conflict is a material conflict of the type that would require the Debtors to re-solicit the votes of holders of Claims against the Debtors under section 1127 of the Bankruptcy Code, the Plan shall control solely with respect to such provision giving rise to such material conflict. In the event of a conflict between the Confirmation Order and the Plan, the Confirmation Order shall control.

N.      *Dissolution of Committee*

On the Effective Date with respect to the Plan or all Sub-Plans, the Committee (and any other statutory committee) shall be deemed to have been dissolved, and the members thereof, and their respective officers, employees, counsel, advisors and agents, shall be released and discharged of and from all further authority, duties, responsibilities, and obligations related to and arising from and in connection with the Chapter 11 Cases, except with respect to any continuing confidentiality obligations and for the limited purpose of, if applicable, appointing the initial General Unsecured Claims Observer; prosecuting requests for allowances of compensation and reimbursement of

expenses incurred prior to the Effective Date; and, in the event that the Bankruptcy Court's entry of the Confirmation Order is appealed, participating in such appeal.  From and after the Effective Date, the Reorganized Debtors shall continue to pay, when due and payable in the ordinary course of business, the reasonable and documented fees and expenses of the Committee's professionals solely to the extent arising out of or related to the foregoing without further order of the Bankruptcy Court.

[*Remainder of page intentionally left blank.*]

Dated: September 3, 2021
      Bogotá, Colombia

Avianca Holdings S.A. on behalf of itself
and each of its Debtor affiliates


By:  */s/  Adrian Neuhauser*
Name:  Adrian Neuhauser
Title:   President and Chief Executive Officer

87